**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FLOTA PETROLERA ECUATORIANA EP,<br><br>    Plaintiff,<br><br>  v.<br><br>WILLIAM S. SUDHAUS, DAVID W. SUDHAUS, ENRIQUE CADENA-MARIN, JAIME CONDOY-BLACIO, DRAGUN USA LLP, MJØLNER AFRAMAX POOL CO LLC, MJØLNER SOLUTIONS CHARTERING LLC, MJØLNER SHIP MANAGEMENT LLC, AMAZONAS CA LLC, AMAZONAS TANKERS LLC, CORE TRANSPORT LLC, AND JOHN AND JANE DOES 1-10,<br><br>    Defendants. | Case No. 2:26-cv-00124-GAW |

**PLAINTIFF'S MEMORANDUM IN**
**OPPOSITION TO DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION AND STAY PROCEEDINGS**

Greenberg Traurig, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
Tel: 1.215.988.7800

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND................................................................................................3

    FLOPEC and Its Statutory Mandate ..........................................................................3
    The Sudhaus Group's Corrupt Scheme.......................................................................3
    The Initial Pool Arrangement and the Expanded Agreement That Are Omitted in
        the Moving Defendants' Motion to Compel and in the SMA Arbitration...............6
    The Four Contracts Identified in the SMA Arbitration Demand.......................................6
    The SMA Arbitration and Risk of "No Forum" ..................................................................8

STANDARD OF REVIEW ...................................................................................................8

ARGUMENT .........................................................................................................................9

I.     NO VALID AGREEMENT TO ARBITRATE EXISTS .........................................9

    A.  The Arbitration Clauses Are Unenforceable Because Ecuadorian Law
        Required Attorney General Approval and Because the Signatory Officials
        Lacked Authority to Bind FLOPEC ...........................................................9

        1.      Ecuadorian Law Required Prior Written Approval from the
                Attorney General for International Arbitration.......................................10
        2.      FLOPEC's Officials Could Not Bind FLOPEC to Arbitration ...............12

    B.  FLOPEC Did Not Ratify the Arbitration Clauses.........................................................16

II.    THE ARBITRATION CLAUSES ARE "NULL AND VOID" UNDER THE
       NEW YORK CONVENTION..................................................................................17

III.   FLOPEC'S CLAIMS FALL OUTSIDE THE SCOPE OF THE ARBITRATION
       CLAUSES..................................................................................................................18

    A.  The Arbitration Clauses Are Limited to "Interpretation and Fulfillment" of the
        Contracts ...............................................................................................18
    B.  FLOPEC's Claims Arise from a Non-Contractual Fraudulent Scheme, Not
        from Contractual Performance...................................................................18
    C.  The SMA Arbitration Confirms That FLOPEC's Claims Are Not At Issue
        There ....................................................................................................20

IV.   NON-SIGNATORY DEFENDANTS CANNOT COMPEL ARBITRATION ...............20

    A.  Core Transport Is Not a Party and Lacks FLOPEC's Written Approval.....................21
    B.  The Contracts Expressly Exclude Third Party Enforcement ......................................21
    C.  The "Intertwined Claims" (Estoppel) Doctrine Is Inapplicable.................................22

V.    THE COURT SHOULD NOT STAY THIS ACTION ......................................................24

VI.    BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION, THE
        CASE MUST BE REMANDED ........................................................................................24

CONCLUSION ........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Recovery Tr.*,
634 F.3d 678 (2d Cir. 2011)..............................................................................................16

*American Personality Photos, LLC v. Mason*,
589 F. Supp. 2d 1325 (S.D. Fla. 2008) ............................................................................22

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006)..........................................................................................................25

*AT & T Tech., Inc. v. Communications Workers of Am.*,
475 U.S. 643 (1986)............................................................................................................9

*Britton v. Co-op Banking Group*,
4 F.3d 742 (9th Cir. 1993) ................................................................................................21

*Bromwell v. Mich. Mut. Ins. Co.*,
115 F.3d 208 (3d Cir. 1997)..............................................................................................25

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)............................................................................................................2

*CardioNet v. Cigna Health Corp.*,
751 F.3d 165 (3d Cir. 2014)..............................................................................................19

*Choctaw Generation Ltd. Partnership v. American Home Assurance Co.*,
271 F.3d 403 (2d Cir. 2001)..............................................................................................22

*Chung Chang v. Warner Bros. Entertainment*,
2019 WL 5304144 (S.D.N.Y. Oct. 21, 2019)....................................................................23

*Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*,
49 F.4th 802 (2d Cir. 2022) ..............................................................................................13

*D.C. v. Greene*,
806 A.2d 216 (D.C. 2002) .................................................................................................16

*Edminster, Hinshaw, Russ and Assoc., Inc. v. Downe Twp.*,
953 F.3d 348 (5th Cir. 2020) ............................................................................................15

*In re Estate of Edgar Wolf Levy*,
893 N.Y.S.2d 142 (App. Div. 2010)...................................................................................16

*Flintkote Co. v. Aviva PLC*,
769 F.3d 215 (3d Cir. 2014)................................................................................................9

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010)..........................................................................................................19

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
716 F.3d 764 (3d Cir. 2013)................................................................................................9

4

*JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*,
  2005 WL 1863676 (S.D.N.Y. Aug. 3, 2005), *aff'd*, 167 F. App'x 266 (2d Cir.
  2006) ...............................................................................................................................13

*Ledee v. Ceramiche Ragno*,
  684 F.2d 184 (1st Cir. 1982)..........................................................................................17

*Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*,
  817 F. Supp. 2d 515 (E.D. Pa. 2011) .............................................................................22

*Miron v. BDO Seidman, LLP*,
  342 F. Supp. 2d 324 (E.D. Pa. 2004) .......................................................................20, 21

*Morgan v. S. Bend Cmty. Sch. Corp.*,
  797 F.2d 471 (7th Cir. 1986) ..........................................................................................16

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
  460 U.S. 1 (1983)............................................................................................................25

*Noye v. Johnson & Johnson Services, Inc.*,
  765 F. App'x 742 (3d Cir. 2019) .....................................................................................23

*OJSC Ukrnafta v. Carpatsky Petroleum Corp.*,
  957 F.3d 487 (5th Cir. 2020) .....................................................................................12, 15

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967)...........................................................................................................2

*Rodeo Time Promotions LLC v. Lawrenceburg Mun. Utilities*,
  2020 WL 7322216 (S.D. Tex. Dec. 11, 2020)................................................................15

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
  2016 WL 4613390 (S.D.N.Y. Aug. 31, 2016)...........................................................16, 17

*Sharon Steel Corp. v. Jewell Coal and Coke Co.*,
  735 F.2d 775 (3d Cir. 1984)............................................................................................13

*Sorathia v. Fidato Partners, LLC*,
  483 F. Supp. 3d 262 (E.D. Pa. 2020) .............................................................................18

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
  559 U.S. 662 (2010).........................................................................................................21

*United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*,
  522 F.3d 324 (3d Cir. 2008)............................................................................................19

*In re Vitamin C Antitrust Litig.*,
  8 F.4th 136 (2d Cir. 2021) ..............................................................................................18

*W.M. Schlosser Co. v. Sch. Bd. of Fairfax Cnty., Va.*,
  980 F.2d 253 (4th Cir. 1992) ..........................................................................................16

*In re Wholesale Grocery Products Antitrust Litigation*,
  707 F.3d 917 (8th Cir. 2013) ..........................................................................................24

*Young v. Experian Info. Sols., Inc.*,
  119 F.4th 314 (3d Cir. 2024) ........................................................................................8, 9

5

*Zirpoli v. Midland Funding, LLC*,
    48 F.4th 136 (3d Cir. 2022) ...............................................................................9, 10

**Statutes**

9 U.S.C. § 203.................................................................................................................25

9 U.S.C. § 205.................................................................................................................25

28 U.S.C. § 1447(c) ...................................................................................................25, 26

Ecuador Arbitration and Mediation Statute, Article 42 ................................................11

Ecuador Civil Code, Article 10......................................................................................13

Ecuador Civil Code, Article 13......................................................................................13

Ecuador Civil Code, Article 1478.............................................................................13, 14

Ecuador Civil Code, Article 9........................................................................................13

Ecuador Statute Governing the Office of the Attorney General, Article 11..................11

N.Y. Convention Article II(3)......................................................................................2, 17

Organic Law of the National Public Procurement System, Article 78 .....................13, 14

**Other Authorities**

1 Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION, §
    4.07[A] (3d ed. 2021)................................................................................................12

Article 190 of the Ecuadorian Constitution ..................................................................10

57 N.Y. Jur.2d *Estoppel, Ratification, and Waiver* § 87 .............................................16

Plaintiff Flota Petrolera Ecuatoriana EP ("FLOPEC") hereby submits this memorandum in support of its opposition to Defendants William S. Sudhaus, David W. Sudhaus, Dragun USA LLP, Mjølner Aframax Pool Co LLC, Mjølner Solutions Chartering LLC, Mjølner Ship Management LLC, Amazonas CA LLC, Amazonas Tankers LLC, and Core Transport, LLC's (collectively, the "Moving Defendants") Motion to Compel Arbitration and Stay Proceedings (the "Motion"). ECF No. 31.

## PRELIMINARY STATEMENT

This case is not a contract dispute. It is a case about a sweeping scheme of corruption and fraud that siphoned hundreds of millions of dollars from FLOPEC, Ecuador's state-owned oil shipping company. The Moving Defendants, together with their co-conspirators, orchestrated a years-long scheme to seize control of FLOPEC's statutory shipping mandate, divert at least $650 million in revenues to entities they controlled, and shield their misconduct through opaque corporate structures and the corruption of Ecuadorian officials. Am. Compl. ¶¶ 2–6.

The Moving Defendants now ask this Court to compel arbitration of FLOPEC's claims based on arbitration clauses contained in four cherry-picked contracts that are themselves products and instruments of the very fraud and corruption at issue. The Court should deny the Motion for several independent reasons.

*First*, no valid arbitration agreement exists. Ecuadorian law governs FLOPEC's capacity to consent to international arbitration and requires prior written approval from Ecuador's Attorney General—an undisputed prerequisite that was never met. Further, Defendant Jaime Condoy-Blacio, the FLOPEC official who signed the main contracts on which the Moving Defendants rely, lacked authority to bind FLOPEC to international arbitration. He is now a fugitive facing corruption allegations, and signed English-language contracts he could not read, without Board approval, legal counsel, or the required governmental authorization. The Moving Defendants—

who have decades of experience doing business in Ecuador and have previously entered into arbitration clauses with Ecuador with the approval of the Attorney General—cannot credibly claim ignorance of these requirements.

This challenge is directed specifically at the arbitration clauses, not at the contracts as a whole.[1] Under Ecuadorian law, a state-owned entity's agreement to submit disputes to international arbitration is a distinct legal act requiring separate, specific governmental authorization that was never obtained. Accordingly, the separability doctrine of *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), does not relegate this challenge to the arbitrator— it is precisely the type of challenge to the arbitration provision itself that courts must resolve. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967).

*Second*, the arbitration clauses are "null and void" under the New York Convention and unenforceable as a matter of U.S. public policy. Article II(3) of the New York Convention requires courts to refer parties to arbitration unless the arbitration agreement is "null and void, inoperative, or incapable of being performed." Arbitration clauses procured through corruption of government officials or in violation of a sovereign nation's Constitution fall squarely within this exception. Enforcing such clauses would violate the most basic notions of morality and justice and deny comity to Ecuador's constitutional order.

*Third*, even if a valid arbitration agreement existed (it does not), FLOPEC's claims fall outside the scope of the four cherry-picked arbitration clauses on which the Moving Defendants have chosen to rely, which apply only to disputes over the "interpretation and fulfillment" of the contracts. FLOPEC brings no contract claims; it alleges torts and statutory violations of Ecuadorian law arising from a fraudulent scheme that began years before the contracts were

---

[1] Although FLOPEC's opposition to arbitration focuses on the arbitration clauses at issue, the contracts as a whole are a sham and should be disregarded as an unlawful vehicle of corruption.

executed. The factual underpinnings—bribery, corruption, fraud, and the misappropriation of sovereign revenues—do not require "interpretation and fulfillment" of any contract provision.

*Fourth*, seven of the eight Moving Defendants are not parties to any contract with FLOPEC, let alone any contract containing an arbitration clause, and cannot compel arbitration. Only Amazonas CA LLC signed the four contracts that the Moving Defendants have put at issue. None of the other seven Moving Defendants—including Core Transport—have produced evidence they were ever a "Participant", a status requiring FLOPEC's express written consent. The other Moving Defendants are strangers to the contracts, which expressly bar third party enforcement.

*Lastly*, none of the Moving Defendants have stipulated to the arbitration tribunal's jurisdiction to hear FLOPEC's claims in the event this Court compels arbitration. As such, the Moving Defendants intend to deprive FLOPEC of any forum, thereby completely escaping accountability for their fraudulent and corrupt misconduct. This is an inequitable, unacceptable outcome, and it would be unprecedented.

The Motion should therefore be denied.  This action should proceed—no stay is warranted.

## FACTUAL BACKGROUND

### FLOPEC and Its Statutory Mandate

FLOPEC is an Ecuadorian state-owned enterprise established by law to serve as Ecuador's exclusive maritime oil shipping company. Ex. A ("Am. Compl.") ¶ 13. Under Ecuadorian law, all hydrocarbons leaving Ecuadorian ports must be transported by a state-owned company. *Id*. FLOPEC thus holds a statutorily mandated monopoly on the maritime transport of Ecuadorian crude oil and other hydrocarbons—a function critical to Ecuador's economy and sovereignty. *Id*.

### The Sudhaus Group's Corrupt Scheme

As alleged in the Amended Complaint, Defendants William S. Sudhaus, David W. Sudhaus, and their affiliated entities (the "Sudhaus Group"), together with their co-conspirators—

3

including corrupt Ecuadorian officials—orchestrated a scheme beginning in 2018 to seize control of FLOPEC's oil shipping business, seize control over the shipping of the majority of the country's crude oil, and divert the resulting revenues to Sudhaus-controlled entities. Am. Compl. ¶¶ 1-9.

The Sudhaus Group, working through a web of companies and local operatives, created a "pool" that stripped FLOPEC of its statutory mandate—as a result, FLOPEC was barred from shipping outside the "pool", the majority of Ecuador's crude oil was shifted to being shipped through the "pool", and FLOPEC was deprived of the majority of shipping revenues—which were funneled to Sudhaus-controlled entities. *Id.* ¶¶ 5, 52, 54, 57.

Pool arrangements are typical in the maritime industry, but they are essentially joint ventures requiring all participants to contribute meaningful assets or capabilities (e.g., cargo, vessels, or customers). *Id.* ¶ 4. Crucially, the "pool" that the Sudhaus Group created served no legitimate commercial purpose for FLOPEC. The Sudhaus Group contributed no meaningful assets or capabilities. *Id.* ¶¶ 42, 44, 50. The cargo (i.e., the oil) was Ecuador's oil, the customers were Ecuador's customers, and the vessels were either FLOPEC's vessels or vessels ultimately belonging to third parties unrelated to the Sudhaus Group. *Id.* ¶¶ 5, 42.

Further, the Sudhaus Group and its co-conspirators caused FLOPEC to shift most of its oil shipments to Aframax vessels.[2] Indeed, during the 2018-2024 period, the Sudhaus Group caused Aframax vessels to become the predominant type of vessel used by FLOPEC to ship Ecuadorian oil. *Id.* ¶ 41. The Sudhaus pool captured Aframax vessels, claiming exclusivity over all Aframax shipments. *Id.* In seizing the use of Aframax vessels and also causing the majority of oil shipments to rely on those types of vessels, the Sudhaus Group and its co-conspirators essentially took over the majority of Ecuadorian oil shipments. *Id.*

---

[2] Aframax vessels are one of several types of vessels that can be used for oil shipping. They are mid-sized vessels typically used for medium distance voyages. Am. Compl. ¶ 37.

4

When all is said and done, the Sudhaus "pool" was designed to misappropriate funds from the Ecuadorian government while cloaking the scheme in a veneer of legitimacy. *Id*. The scheme was facilitated through corruption at the highest levels. Defendant Condoy-Blacio, FLOPEC's former General Manager, was appointed by a former Minister of Energy who accepted bribes from an oil company associated with the Sudhaus Group. *Id*. ¶ 8. That Minister committed suicide while in custody pending trial. *Id*. Condoy-Blacio is a fugitive and his whereabouts are unknown. The Sudhaus Group lavished FLOPEC officials with travel, meals, rent-free condominiums, and cash to secure their cooperation. *Id*. ¶ 9. Defendant Enrique Cadena-Marin (whose whereabouts are unknown) served as a corrupt local operator who lobbied the Ecuadorian government on the Sudhaus Group's behalf. *Id*. ¶ 17.

The Sudhaus Group's connections to corruption in Ecuador are well-documented. The Sudhaus Defendants conducted business in Ecuador for years alongside Gunvor S.A. ("Gunvor"), which in 2024 pleaded guilty in the United States to paying tens of millions of dollars in bribes to Ecuadorian officials. *Id*. ¶¶ 15, 69. The Sudhaus Group's underhanded tactics reveal their penchant for corruption. In 2024, after FLOPEC began to extricate itself from the "pool", the Moving Defendants aggressively attempted to extract a broad release from Ecuador, including intensively lobbying Ecuadorian officials and threatening litigation. When that effort failed, Defendant William S. Sudhaus wrote to FLOPEC in October 2024 that "we do not expect to take action against FLOPEC for its breaches unless FLOPEC fails to make payments due in accordance with charter party terms or the Ecuadorean government directly or indirectly acts against our interests first." Ex. B. Indeed, the Sudhaus Group chose to commence arbitration and assert claims against FLOPEC only <u>after</u> FLOPEC sued the Sudhaus Group and its co-conspirators in Pennsylvania. This reveals the Moving Defendants' true posture: they know their claims against FLOPEC are

5

baseless, and their litigation threats are a last resort designed to dissuade FLOPEC from recovering revenues lawfully owed to a sovereign nation.

### The Initial Pool Arrangement and the Expanded Agreement That Are Omitted in the Moving Defendants' Motion to Compel and in the SMA Arbitration

Importantly, the "pool" did not begin with the four contracts the Moving Defendants now invoke. The initial pool arrangement originated in December 2018, via email communications with Dragun USA, a Sudhaus-Group vehicle; it was never formalized in a formal written contract and contained no arbitration clause. Am. Compl. ¶ 43; Ex. D. In March 2020, the arrangement expanded—again without an arbitration clause. Am. Compl. ¶¶ 47–48; Ex. E. The March 2020 agreement was signed by Condoy-Blacio during a secret trip to New York, without Board approval and in English—a language he does not read or speak. Am. Compl. ¶¶ 49, 59, 66.

The Moving Defendants' motion ignores these earlier arrangements. That omission is telling: FLOPEC's claims arise from the entire corrupt scheme—dating back to 2018—not merely from the four later contracts executed in 2020–2023 that the Moving Defendants now seek to arbitrate. The Moving Defendants cannot retroactively impose arbitration on a fraudulent and corrupt scheme that pre-dates any arbitration clause.

### The Four Contracts Identified in the SMA Arbitration Demand

*December 2020 Addendum*. On December 1, 2020, the Sudhaus Group and their co-conspirators expanded the pool arrangement set forth in the March 2020 arrangement described above. *Id.* at ¶ 5. Indeed, the December 2020 document (Exhibit F) is identified as an "addendum" to the March 2020 arrangement. The December 2020 addendum prohibited FLOPEC from using Aframax vessels outside the pool, effectively forcing FLOPEC to charter exclusively from the pool for all crude shipments in those vessels. Am. Compl. ¶ 52. The pool arrangement lacked any legitimate commercial purpose, as FLOPEC was required to route its cargo through the pool

6

without any benefit, while the Sudhaus Group retained most of the profits. *Id.* at ¶ 54. This circular structure allowed the Sudhaus Group to extract revenues from the pool arrangement, which deprived FLOPEC, and ultimately the Ecuadorian government, of significant revenue. *Id.* at ¶ 57.

This addendum, which is in English, was also signed by Condoy-Blacio. Am. Compl. ¶ 66. There are no records, reports, studies or analyses, let alone Board approvals at FLOPEC, discussing or authorizing the execution of this document. *Id.* ¶¶ 8, 59, 133.

There are several important aspects to highlight about the December 2020 "addendum". FLOPEC and Amazonas CA are the only parties to the December 2020 addendum. *See* Ex. F. Further, while it refers to the possibility of other pool "participants," the addendum states that express, written approval is required from FLOPEC to allow any new "participants." Ex. F § 11.1. Additionally, the addendum states that no third parties can enforce any of its terms. Ex. F § 17.2. Lastly, the addendum is subject to New York law and disputes relating to its "interpretation and fulfillment" are subject to SMA Arbitration seated in New York. Ex. F § 15.1.

***January 2023 Agreement***. According to the allegations in the SMA Arbitration, as of January 10, 2023, FLOPEC and Amazonas CA amended the December 2020 addendum, primarily revising the section regarding termination. The January 2023 agreement, as provided by Defendants in the SMA Arbitration, is attached herein as Exhibit G. The clauses regarding possible "participants," the prohibition for third parties to enforce, and the choice of law and forum remained the same. Ex. G § 11.1, 15.1, 17.2.

***Pool Participation Agreements***. The pool arrangement contemplated that FLOPEC would contribute vessels into the pool. FLOPEC indeed contributed two of its vessels to the pool (the Pichincha and the Zaruma), through two "pool participation agreements" dated October 6, 2020

7

and December 1, 2021. The Pool Participation Agreements (as provided in the SMA Arbitration) are attached herein as Exhibit H and Exhibit I, respectively.

Of note, again, FLOPEC and Amazonas CA are the only parties to each of those two pool participation agreements. Ex. H at Signature Page; Ex. I at Signature Page. Further, the agreements state that no third party can enforce any of their terms. Ex. H § 20; Ex. I § 20. The agreements contain choice of law provisions providing for application of New York law and disputes relating to their "interpretation and fulfillment" are subject to SMA Arbitration seated in New York. Ex. H § 14; Ex. I § 14.

### The SMA Arbitration and Risk of "No Forum"

Only two of the eight Moving Defendants—Amazonas CA and Core Transport—are Claimants in the SMA Arbitration. Only Amazonas CA is a signatory to the four contracts containing arbitration clauses. Yet all Moving Defendants now seek to compel and stay this entire action—including claims against Defendants Cadena-Marin and Condoy-Blacio, who have not appeared and are not parties to any arbitration agreement.

Critically, none of the Moving Defendants has stipulated that it will submit to the jurisdiction of the SMA Arbitration for purposes of FLOPEC's claims. They seek the benefit of compelling arbitration while reserving the right to contest the tribunal's jurisdiction over FLOPEC's affirmative claims— creating a risk that FLOPEC will be left with no forum in which to pursue its claims.

### **STANDARD OF REVIEW**

Under Third Circuit precedent, a motion to compel arbitration is evaluated under the Rule 56 summary judgment standard where "the complaint does not set forth clearly that the claims are subject to an arbitration agreement," or where the plaintiff rebuts the motion with "reliable evidence" that is more than a mere denial of intent to be bound. *Young v. Experian Info. Sols., Inc.*,

119 F.4th 314, 319 (3d Cir. 2024) (citing *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013)).

Because FLOPEC challenges the very existence and enforceability of any agreement to arbitrate—raising issues of statutory capacity, actual authority, and mandatory governmental approval—the Rule 56 framework applies. The Court cannot grant the motion on a bare or incomplete record. *See Young*, 119 F.4th at 321. If material factual disputes remain—such as those concerning authority, required approvals, or party status—the Court must deny the motion (or, at minimum, permit targeted discovery before deciding arbitrability).

<u>**ARGUMENT**</u>

**I.      NO VALID AGREEMENT TO ARBITRATE EXISTS**

> **A.      The Arbitration Clauses Are Unenforceable Because Ecuadorian Law Required Attorney General Approval and Because the Signatory Officials Lacked Authority to Bind FLOPEC**

Parties "cannot be required to submit to arbitration any dispute which [they have] not agreed so to submit." *AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650 (1986). A court may compel arbitration "only if the party agreed to arbitration. A party agrees to arbitrate if (1) 'there is a valid agreement to arbitrate between the parties and, if so, (2) . . . the merits-based dispute in question falls within the scope of that valid agreement.'" *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 142 (3d Cir. 2022) (citing *Flintkote Co. v. Aviva PLC,* 769 F.3d 215, 220 (3d Cir. 2014)). Further, the party seeking arbitration bears the burden of establishing the existence of such an agreement. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013). The Moving Defendants cannot meet that burden here.

Importantly, the policy favoring arbitration under the FAA "is not intended to force arbitration where the parties to a contract did not agree to it." *Zirpoli*, 48 F.4th at 142. Courts have the "authority to adjudicate formation challenges" unless parties "clearly and unmistakably

9

referred formation issues to arbitration in a written contract whose formation is not in issue." *Id*. at 144. Here, no such clause exists, and thus the Court must determine whether a valid agreement to arbitrate exists between the parties. FLOPEC never entered into a valid agreement to arbitrate with the Moving Defendants and thus the Motion should be denied.

These arguments involve the Ecuadorian Constitution and other Ecuadorian laws. It comes as no surprise—and the SMA Arbitration Demand so concedes—that Ecuadorian law applies to this dispute. Indeed, in the SMA Arbitration Demand, Amazonas CA and Core Transport expressly and specifically seek a declaratory judgment that the four agreements they put at issue are compliant with Ecuadorian law. *See* Ex. C ¶ 73 (Claimants request arbitrators "DECLARE that the Amazonas Contracts and PPAs/ACAs are valid and effective and compliant with any applicable provisions of Ecuadorian law") (emphasis added). The Moving Defendants cannot now feign surprise about the applicability of Ecuadorian law or attempt to argue that it is irrelevant.

### 1.    Ecuadorian Law Required Prior Written Approval from the Attorney General for International Arbitration

*First*, under Ecuadorian law, the decision by a public entity (like FLOPEC) to submit disputes to international arbitration is treated as a distinct legal act requiring prior written approval from Ecuador's Attorney General. Article 190 of the Ecuadorian Constitution plainly provides:

> Article 190. Arbitration, mediation and other alternative procedures for dispute settlement are recognized. These procedures shall be applied subject to the law in those areas where, because of their nature, compromises can be reached. In public contracts, legal arbitration shall be accepted after a favorable ruling by the Attorney-General's Office, in conformity with conditions provided for by law. (emphasis added)

Appendix ¶ 1 (Spanish version.) Further, Ecuador's Arbitration and Mediation Statute (*Ley de Arbitraje y Mediacion*), Article 42—specific to international arbitration—provides, in relevant part:

10

> In order for the various entities that make up the public sector to submit to international arbitration, <u>the express authorization of the highest authority of the respective institution will be required, subject to a favorable report from the Attorney General,</u> unless arbitration is provided for in existing international instruments.

(emphasis added). Appendix ¶ 2 (Spanish version.)  Finally, Article 11 of Ecuador's Statute Governing the Office of the Attorney General (*Ley Orgánica de la Procuraduría General del Estado*), states that "[t]o submit to international arbitration, [state entities] will also <u>require authorization from the Attorney General's Office</u>" (emphasis added). Appendix ¶ 3 (Spanish version.)

Together, these provisions establish a clear rule: Ecuadorian state entities such as FLOPEC cannot agree to international arbitration without the prior written approval of the Attorney General. It is undisputed that no such approval was ever obtained here. The arbitration clauses contained in the four agreements were never submitted to Ecuador's Attorney General and never received the required authorization.

Further, the Moving Defendants cannot plausibly claim ignorance of this requirement. In their own arbitration filings, the Moving Defendants proudly emphasize that they and their affiliates have more than twenty years of experience transporting crude oil from Ecuador. Ex. C ¶ 22. Indeed, the Moving Defendants and related entities have entered into numerous other agreements with FLOPEC for which they obtained Attorney General approval for arbitration provisions. *See, e.g.,* Exs. J-O (six agreements, from 2019 and 2021, involving FLOPEC and one of Mjølner Aframax Pool Co., Mjølner Solutions Chartering, Core Transport LLC, Dragun USA LLP, and Amazonas Tanker Pool Company LLC, in which the Ecuador Attorney General's approval was sought and obtained).[3] Thus, the absence of required approval here is dispositive.

---

[3] Exhibits J through O contain the original documents (in Spanish) followed by an English translation created by DeepL.com

## 2.    FLOPEC's Officials Could Not Bind FLOPEC to Arbitration

*Second*, the FLOPEC officials who signed the four agreements at issue did not have the capacity to enter into the arbitration provisions contained therein, rendering them unenforceable. Two of the four agreements invoked by the Moving Defendants were signed by Defendant Jaime Condoy-Blacio while he served as FLOPEC's General Manager.[4] The other two agreements were signed by two other officials.[5] Defendant Condoy-Blacio and the other officials lacked authority, and thus capacity, to bind FLOPEC to international arbitration.

Under the New York Convention, capacity is determined "by the 'law applicable to' the party, rather than the law 'to which the parties have subjected it' or the 'law of the country where the award was made.'" *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487, 498 (5th Cir. 2020); *see also* 1 Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION, § 4.07[A] at 626-627 (3d ed. 2021) (the "law applicable to the party" on a capacity question is the law of its domicile"). Here, FLOPEC is an Ecuadorian entity, and thus, Ecuador law applies.[6]

---

[4] Condoy-Blacio signed the Addendum dated December 1, 2020 and the Pool Participation Agreement dated October 6, 2020. *See* Exs. F, H .

[5] Other officials from FLOPEC signed the Addendum amendment dated January 10, 2023 and the Pool Participation Agreement dated December 1, 2021. *See* Exs. G, I.

[6] The Moving Defendants argue that the arbitration contracts' New York choice-of-law clauses require application of New York law to determine the validity of the arbitration provisions. ECF No. 31 at 21-24. Not so. The Third Circuit has firmly established that the "the ultimate arbitrability of a contract is a matter of federal substantive law" under the Federal Arbitration Act ("FAA"). *Sharon Steel Corp. v. Jewell Coal and Coke Co.*, 735 F.2d 775 (3d Cir. 1984). This "question is governed by federal, not state, law." *JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 2005 WL 1863676, at *2 (S.D.N.Y. Aug. 3, 2005), *aff'd,* 167 F. App'x 266 (2d Cir. 2006). And federal courts apply the law of the domiciliary in assessing capacity. The Moving Defendants' reliance on *Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802 (2d Cir. 2022) is misplaced. That case addressed the substantive validity of an arbitration agreement under a chosen law; it did not involve a challenge based on the constitutional incapacity of a sovereign entity to consent to arbitration absent governmental authorization. Indeed, *Commodities & Minerals Enterprise Ltd.* addressed whether an underlying contract was valid— here, FLOPEC challenges only the contract's arbitration provision, not the agreements as a whole.

Under Ecuadorian law, an official lacks authority to enter into a contract in violation of the Ecuadorian Constitution and other mandatory, public policy statutes. As described above, the Ecuadorian legal framework undeniably requires express, written approval from the Attorney General for international arbitration clauses binding state-owned entities. Indeed, it is an uncontroversial proposition under blackletter Ecuadorian law that entering into a contract in violation of the Constitution and other statutes causes the contract to be null, void and unenforceable. See Ecuador Civil Code, Article 9 ("Acts prohibited by law are null and void, unless the law expressly designates an effect other than nullity in the event of a violation") (Appendix ¶ 4 (Spanish version); Article 10 ("Under no circumstances may a judge declare valid an act that the law orders to be null and void") (Appendix ¶ 5 (Spanish version); Article 13 ("The law is binding on all inhabitants of the Republic, including foreigners, and ignorance of the law is no excuse") (Appendix ¶ 6 (Spanish version); Article 1478 ("Anything that contravenes Ecuadorian public law is unlawful") (Appendix ¶ 7 (Spanish version); Organic Law of the National Public Procurement System, Article 78 ("Contracts governed by this Law shall be null and void in the following cases: 1. For the general reasons established in the Law; 2. For having omitted the procedures and formalities legally established; and, 3. For having been awarded or entered into by a manifestly incompetent body" (Appendix ¶ 8 (Spanish version)).  A government official simply has no power to bind an entity if that official's contractual consent violates Ecuadorian law and, as such, a government entity is not subject to a contract that was entered into in plain violation of Ecuador's Constitution and public policy.

Equally important, under FLOPEC's bylaws, the Board of Directors must approve any joint venture (such as a pool) and any such arrangement must be preceded by the preparation of detailed

13

analyses and reports. In particular, Article 4(25) of FLOPEC's bylaws (*Reglamento de Directorio de la Empresa Pública Flota Petrolera Ecuatoriana EP FLOPEC*) states that the Board must:

> "[a]pprove strategic alliances upon presentation of the corresponding supporting reports by the General Manager. When dealing with other types of partnership arrangements, the Board of Directors will authorize the start of the pre-contractual process, upon presentation by the General Manager of the technical, financial, legal, risk analysis and environmental reports, if applicable."

Appendix ¶ 9 (Spanish version). As such, FLOPEC's Board of Directors was required to approve the four agreements at issue.

Against this backdrop, Defendant Condoy-Blacio and the other two officials clearly lacked authority to enter into the arbitration agreements. For example, Condoy-Blacio executed English-language contracts that he could not read. Am. Compl. ¶¶ 8, 66, 89. He did not consult with FLOPEC's legal department, did not obtain approval from FLOPEC's Board of Directors, and did not seek advice from counsel in Ecuador or the United States before executing the agreements. Id. ¶¶ 8, 18, 59. Equally telling, no supporting records, studies, analyses, or board approvals exist authorizing FLOPEC to enter into the pool arrangements or the arbitration clauses contained in the contracts. *Id*. ¶¶ 8, 18, 59, 89, 133. The circumstances surrounding Condoy-Blacio's appointment further underscore the absence of legitimate authority. He was appointed by a former Ecuadorian Minister of Energy who allegedly accepted bribes from an oil company associated with the Sudhaus Group. *Id*. ¶ 8. That minister later committed suicide while in custody awaiting trial. *Id*. Condoy-Blacio himself has since fled Ecuador and is currently a fugitive suspected of corruption. *Id*. ¶¶ 18, 68.

Similarly, there are no records showing (and the Moving Defendants have provided no evidence) that the two officials who signed the other two agreements consulted with anyone,

reported to the Board or sought Board approval, or conducted any analyses or studies in connection with those agreements. It is the same fact pattern as the two agreements signed by Condoy-Blacio.

Thus, under Ecuadorian law, Defendant Condoy-Blacio and the other two officials plainly lacked capacity to bind FLOPEC and thus the arbitration clauses in those agreements are unenforceable. *See OJSC Ukrnafta*, 957 F.3d at 498 ("[d]ispute resolution clauses in a contract do not have force unless the parties had the capacity to contract in the first place"); *see also Rodeo Time Promotions LLC v. Lawrenceburg Mun. Utilities*, 2020 WL 7322216, at *3 (S.D. Tex. Dec. 11, 2020) ("While the Master Agreement specifies that Texas law governs disputes between the parties, a choice-of-law provision does not control the "preliminary question of contract formation."); *Edminster, Hinshaw, Russ and Assoc., Inc. v. Downe Twp.*, 953 F.3d 348, 351 (5th Cir. 2020) ("[T]he choice-of-law provision has force only if the parties validly formed a contract."). And while Ecuador law is applicable here, courts in the United States also routinely hold that arbitration clauses are unenforceable where the individual purporting to execute the agreement lacked authority to bind the principal. *See, e.g.*, *W.M. Schlosser Co. v. Sch. Bd. of Fairfax Cnty., Va.*, 980 F.2d 253, 258 (4th Cir. 1992) (holding that agent could not bind school board to arbitrate because state law provided the agent only express power and not the power to arbitrate on its behalf); *Morgan v. S. Bend Cmty. Sch. Corp.*, 797 F.2d 471, 479 (7th Cir. 1986) (holding that state law affirmatively required full board to approve employment contracts, so superintendent's contract modification was invalid); *D.C. v. Greene*, 806 A.2d 216, 222 (D.C. 2002) (enjoining parties from arbitrating dispute where the legislature precluded governing contracting officers from entering into arbitration agreements).

Because Defendant Condoy-Blacio and the other two officials lacked authority to bind FLOPEC to international arbitration, the clauses on which the Motion relies are unenforceable.

15

### B.      FLOPEC Did Not Ratify the Arbitration Clauses

The Moving Defendants also contend that FLOPEC ratified the arbitration clauses by performing under the contracts for several years. This argument fails as a matter of law.

Ratification is "the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011) (citing 57 N.Y. Jur.2d *Estoppel, Ratification, and Waiver* § 87). In all cases, ratification requires both "knowledge of a defect in the act to be confirmed" and "the right to reject or ratify it." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2016 WL 4613390, at *16 (S.D.N.Y. Aug. 31, 2016) (citing *In re Estate of Edgar Wolf Levy*, 893 N.Y.S.2d 142, 144 (App. Div. 2010)). Ratification "must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." *Id*.

Here, FLOPEC's Board of Directors and Ecuador's Attorney General were never informed of the arbitration clauses and never approved them. Performance under the commercial aspects of the agreements—such as shipping oil and receiving revenues—does not constitute knowing ratification of arbitration provisions that were never disclosed to or approved by the governmental authorities whose approval was required. Moreover, to the extent FLOPEC performed under the contracts, it did so under the direction of officials acting in concert with the Sudhaus Group as part of the alleged corruption scheme.

For all of these reasons, the Moving Defendants have failed to establish the existence of a valid agreement to arbitrate FLOPEC's claims.

16

## II.    THE ARBITRATION CLAUSES ARE "NULL AND VOID" UNDER THE NEW YORK CONVENTION

Even if the Court were to conclude that the arbitration clauses were formally executed by those with capacity and authority to do so—which FLOPEC disputes—they remain unenforceable under the New York Convention.

Article II(3) of the Convention requires courts to refer parties to arbitration unless the arbitration agreement is "null and void, inoperative or incapable of being performed." The "null and void" exception encompasses circumstances in which an arbitration agreement was procured through fraud, corruption, or other violations of fundamental public policy. *See, e.g., Ledee v. Ceramiche Ragno*, 684 F.2d 184, 187 (1st Cir. 1982).

FLOPEC alleges that the contracts containing the arbitration clauses were themselves the product and instrument of a corrupt scheme to divert Ecuador's oil shipping revenues. The Moving Defendants secured these agreements through corrupt relationships with Ecuadorian officials—including the former Minister of Energy and Defendant Condoy-Blacio—and by circumventing the legal requirements that protect Ecuador's sovereign interests. Am. Compl. ¶¶ 8–9, 62–70.

Critically, the arbitration violated Ecuador's Constitution and statutes requiring prior Attorney General approval, which was never obtained. Enforcing arbitration clauses procured through corruption and in violation of a sovereign's laws contravenes basic principles of justice and public policy. The United States' public policy strongly opposes international corruption, embodied in the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 et seq. It also recognizes the importance of international comity—respect for the constitutional and legal frameworks of foreign sovereigns. *See In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 146 (2d Cir. 2021).

17

Because the arbitration clauses here were obtained in violation of fundamental legal requirements and public policy, they are "null and void" under the Convention and unenforceable.

## III.    FLOPEC'S CLAIMS FALL OUTSIDE THE SCOPE OF THE ARBITRATION CLAUSES

Even if a valid arbitration agreement existed (it does not), the Motion should be denied because FLOPEC's claims are not arbitrable under the narrow language of the clauses at issue.

### A.    The Arbitration Clauses Are Limited to "Interpretation and Fulfillment" of the Contracts

The scope of the arbitration clauses in the four contracts invoked by the Moving Defendants is limited as by their terms. Arbitration would be required only to resolve disputes relating to the "interpretation and fulfillment" of the agreements. FLOPEC does not allege any breach of contract, nor do its claims require interpretation or enforcement of the contracts' terms. Indeed, the very claims brought in the SMA Arbitration are for breach of contract—highlighting the distinction between those contract-based claims and FLOPEC's claims here.

It is black-letter law that arbitration is a matter of contract: a court cannot compel arbitration of matters outside the scope of the arbitration clause. *See Sorathia v. Fidato Partners, LLC*, 483 F. Supp. 3d 262, 275 (E.D. Pa. 2020) (quoting *United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 332 (3d Cir. 2008)). "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original). The federal policy favoring arbitration does not extend to disputes where no agreement to arbitrate exists or where the clause does not cover the claims. *Id*. at 299–300.

### B.    FLOPEC's Claims Arise from a Non-Contractual Fraudulent Scheme, Not from Contractual Performance

The Moving Defendants argue that FLOPEC's claims fall within the scope of the arbitration clauses because they are factually intertwined with the contracts. ECF No. 31 at 13-18.

18

But the proper inquiry is not whether the claims have some connection to the contracts. Rather, the Court must "focus on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *CardioNet v. Cigna Health Corp.*, 751 F.3d 165, 173 (3d Cir. 2014).

In *CardioNet*, the Third Circuit held claims fell outside an arbitration clause "regarding the performance or interpretation of the Agreement" where their resolution "did not require construction of, or even reference to, any provision in the Agreement" and "performance of obligations under the Agreement had no bearing on whether plaintiffs were harmed as they alleged." *Id*. at 175-76. The court emphasized the focus must be on the factual underpinnings of the claims, not on whether the claims have some abstract relationship to the contract. *Id*.

Here, the factual underpinnings of FLOPEC's claims do not concern the "interpretation and fulfillment" of the four contracts that the Moving Defendants have put at issue. Rather, they concern:

- A corrupt scheme to seize control of FLOPEC's business, beginning in 2018—two years before the first contract containing an arbitration clause. Ex. A ¶ 43.

- The bribery and corruption of Ecuadorian government officials, including the former Minister of Energy and Defendant Condoy-Blacio. *Id*. ¶¶ 8-9, 62-70.

- The use of corrupt local operators, including Defendant Cadena-Marin, to lobby the Ecuadorian government on behalf of the Sudhaus Group. *Id*. ¶ 17.

- The creation of a commercially senseless pool arrangement designed to strip FLOPEC of its statutory mandate and divert revenues to Sudhaus-controlled entities. *Id*. ¶¶ 3-5.

- The concealment of the scheme through opaque corporate structures. *Id*. ¶ 2.

- The expansion of use of Aframax vessels within FLOPEC for those vessels to become the predominant type of vessel to ship Ecuador's crude oil, thereby allowing the "pool" to capture the majority of the country's oil shipments and its revenue. *Id*. ¶¶ 41-42, 52.

- Violations of Ecuadorian law, including the unauthorized transfer of control of FLOPEC's business to privately owned foreign entities. *Id*. ¶¶ 9, 60, 131-133.

None of these allegations require interpretation or fulfillment of any contract provision. Whether the Moving Defendants or their coconspirators bribed officials, orchestrated a fraudulent

19

scheme, or violated Ecuadorian law does not depend on the meaning or performance of any contractual term. The contracts are, at most, evidence of the broader scheme—not the basis for FLOPEC's claims. The claims are "completely independent" of the contracts on which the Moving Defendants rely, they "do not depend on" those contracts, and they are not intertwined with those agreements. *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 334 (E.D. Pa. 2004). Even apart from these contracts, FLOPEC would have causes of action against the Moving Defendants.

Defendants' argument that FLOPEC is merely a "recast" of contract claims as torts is incorrect and misses the point. ECF No. 31 at 18. FLOPEC does not allege breach of contract, failure to perform, or raise any issues of contract interpretation. Instead, it alleges a conspiracy and acts of corruption that predate—and are independent of—the contracts. The claims are not subject to arbitration simply because the fraudulent scheme involved the later execution of contracts.

### C.    The SMA Arbitration Confirms That FLOPEC's Claims Are Not At Issue There

The Arbitration Demand filed by Amazonas CA and Core Transport in the SMA Arbitration seeks to adjudicate their purported breach of contract claims against FLOPEC. It does not purport to provide a forum for, or to resolve, the tort, statutory, and public law claims asserted by FLOPEC here. Critically, the Moving Defendants have not stipulated that, if the Court compels arbitration, they will submit to the jurisdiction of the SMA Arbitration on FLOPEC's claims.

Granting the Motion would deprive FLOPEC of a forum for its claims: compelling arbitration risks leaving FLOPEC without a forum to pursue its claims due to jurisdictional objections—a result that is contrary to basic fairness and the policies underlying the FAA.

### IV.    NON-SIGNATORY DEFENDANTS CANNOT COMPEL ARBITRATION

The Motion fails for an additional reason: all but one of the Moving Defendants are <u>not</u> parties to any contract containing an arbitration clause. Arbitration is a matter of consent. A party

cannot be compelled to arbitrate a dispute with an entity that did not sign the arbitration agreement. *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 684 (2010). As noted by one of the cases cited by the Moving Defendants, "exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party." *Miron*, 342 F. Supp. 2d 324, 332 (E.D. Pa. 2004). Courts routinely refuse to compel arbitration at the request of non-signatories absent a recognized legal theory permitting enforcement. *Id.*; *Britton v. Co-op Banking Group*, 4 F.3d 742, 744 (9th Cir. 1993) (holding a non-signatory cannot compel arbitration because the right arises from contract and "may not be invoked by one who is not a party to the agreement").

Who signed the contracts? Only Amazonas CA LLC is a signatory to the four agreements containing arbitration clauses. The remaining Moving Defendants—including William Sudhaus, David Sudhaus, Dragun USA LLP, Amazonas Tankers LLC, and the renamed Mjølner entities—are complete strangers to the contracts. There is no basis for them to compel arbitration.

### A.     Core Transport Is Not a Party and Lacks FLOPEC's Written Approval

Core Transport argues it may enforce the arbitration clauses as a pool "participant," but the agreements expressly require FLOPEC's written approval for additional participants. ECF No. 31 at 18-19. This argument fails for two reasons. *First*, the Moving Defendants have failed to produce or attach to their Motion (or the SMA Arbitration Demand) any evidence showing that Core Transport entered into any pool participation agreement or any other agreement otherwise purporting to make it a pool "participant." *Second*, the Moving Defendants have failed to produce or attach to their Motion (or the SMA Arbitration Demand) any evidence that FLOPEC ever gave written approval for Core Transport to become a party or "participant" to any relevant agreement.

### B.     The Contracts Expressly Exclude Third Party Enforcement

Additionally, the contracts here contain explicit provisions barring third party rights. Courts consistently enforce such clauses and reject non-signatory attempts to invoke arbitration.

*See, e.g.*, *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515, 528 (E.D. Pa. 2011); *American Personality Photos, LLC v. Mason*, 589 F. Supp. 2d 1325, 1331 (S.D. Fla. 2008) (one non-signatory could not be bound by arbitration clause where claim related to tort committed by non-signatory in his personal capacity); *Choctaw Generation Ltd. Partnership v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001) (noting that none of the five theories applied because the non-signatory sought to invoke the arbitration clause).

**C.     The "Intertwined Claims" (Estoppel) Doctrine Is Inapplicable**

Also baseless is the Moving Defendants' argument that the non-signatory Moving Defendants should be able to compel arbitration because the issues are "intertwined with the agreement that the estopped party has signed." ECF No. 31 at 19. The narrow "intertwined claims" exception applies only when the non-signatory has a close and direct relationship with the contract, and when the claims themselves depend upon the contract's terms.

For example, in *Chung Chang v. Warner Bros. Entertainment*, 2019 WL 5304144, at *2 (S.D.N.Y. Oct. 21, 2019), the court applied estoppel in employment dispute involving two closely affiliated entities. Crucially, there was "no question" that the plaintiff understood the relationship between the entities, both referenced as the "Company" in the agreement and even the plaintiff's complaint used their names interchangeably. *Id*. at *4–5 (holding plaintiff estopped from denying an agreement to arbitrate claims against Warner Bros.). Similarly, in *Noye v. Johnson & Johnson Services, Inc.*, 765 F. App'x 742, 743 (3d Cir. 2019), the court enforced an agreement between the plaintiff and a temporary staffing company, where the plaintiff was hired to work for non-signatory Johnson & Johnson ("J&J"). Although J&J was a non-signatory, the agreement referred to J&J as the "customer," and the job offer was described as an "Offer from J&J through Kelly Services." *Id*.

By contrast, the contracts invoked by the Moving Defendants here reference only FLOPEC and Amazonas CA LLC. None of the remaining individuals or entities is mentioned anywhere in the agreements. Nor do the close relationships between non-signatories and signatories that justified estoppel in *Chung Chang* and *Noye* exist here. Indeed, the Moving Defendants inadvertently reveal the flaw in their position by arguing that FLOPEC cannot avoid its obligation to arbitrate by joining non-signatory Defendants who are merely "interconnected with the signatory" Moving Defendants. ECF No. 31 at 21. But mere interconnectedness is not the standard. Rather, the signatories and non-signatories must be closely intertwined with respect to the contract and the dispute—a circumstance not present here. For example, while William and David Sudhaus may be associated with entities that formed the "pool", neither had any individual involvement in the contracts themselves. Neither Sudhaus signed any of the agreements, nor are they referenced anywhere in them. That the Sudhaus Defendants may have indirectly benefitted from the underlying structure and scheme is not enough to create the type of "intertwined" relationship necessary to compel non-signatories to arbitrate. See, e.g., *In re Wholesale Grocery Products Antitrust Litigation*, 707 F.3d 917, 923 (8th Cir. 2013) (rejecting equitable estoppel where claims did not require violation or interpretation of the contract, the contract did not provide the basis for the injuries, and there was no evidence the contract anticipated the disputed relationship).

Here, FLOPEC's claims do not depend on the contracts at issue. They arise from an alleged corruption scheme and can be adjudicated without interpreting or enforcing the agreements. But even if that were not so, the non-signatory parties are not closely linked to the contracts on which the Moving Defendants rely—so estoppel cannot apply.

The Moving Defendants are, in effect, seeking to have it both ways: they ask the Court to compel arbitration as to all Defendants while only Amazonas CA LLC and Core Transport are

23

claimants in the SMA Arbitration. This tactic is plainly designed to prevent FLOPEC from litigating its claims in <u>any</u> forum. If the Moving Defendants truly wished to arbitrate all the claims in the Amended Complaint, they could have sought to do so collectively. Instead, their chosen approach is inconsistent with applicable law and highly prejudicial to FLOPEC. Thus, the non-signatory Defendants lack any contractual or equitable basis to compel arbitration.

## V.    THE COURT SHOULD NOT STAY THIS ACTION

Because the Moving Defendants have not established a valid and enforceable arbitration agreement covering FLOPEC's claims, the Court should deny both the request to compel arbitration and the request for a stay. Even if the Court were to compel arbitration with respect to Amazonas CA, a stay of the entire action would be inappropriate. All the other Defendants—including Cadena-Marin and Condoy-Blacio—are not parties to any arbitration agreement and have not appeared in the arbitration proceeding. District courts retain discretion to allow litigation to proceed against non-arbitrating parties. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 20 n.23 (1983). Staying the entire action would therefore serve only to delay resolution of claims that are not subject to arbitration.

## VI.   BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION, THE CASE MUST BE REMANDED

The Moving Defendants repeatedly (and incorrectly) suggest that FLOPEC conceded to arbitration because it did not file a motion to remand, and, thus conceded federal subject-matter jurisdiction. *See, e.g.*, ECF No. 31 at 8-9. This is absurd. FLOPEC has conceded nothing—and subject-matter jurisdiction cannot be conceded, forfeited, or waived. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Asserting a specific count regarding the arbitration agreements in the Amended Complaint cannot be construed as a concession of subject matter jurisdiction or to

arbitrate. Once this Motion is denied and the case remanded, FLOPEC will seek summary judgment or an early judgment on the pleadings regarding the agreements' unenforceability.

Removal under 9 U.S.C. § 205 requires an agreement "falling under the [New York] Convention." 9 U.S.C. § 203. Because no valid and enforceable arbitration covers FLOPEC's claims (which do not fall within the scope of the clauses Defendants invoke), this action does not "fall under the Convention," and the Court lacks subject-matter jurisdiction. Accordingly, remand is mandatory. 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Bromwell v. Mich. Mut. Ins. Co.*, 115 F.3d 208, 213 (3d Cir. 1997).

Accordingly, if the Moving Defendants' asserted basis for removal is the Convention/FAA—and there is no other independent basis for federal jurisdiction—this action must be remanded to the Court of Common Pleas of Chester County pursuant to 28 U.S.C. § 1447(c) upon denial of the Moving Defendants' Motion.

**<u>CONCLUSION</u>**

For the foregoing reasons, FLOPEC respectfully requests that this Court deny the Motion and, because there is no basis for subject-matter jurisdiction, remand this action.

25

Dated: March 11, 2026

                                    **GREENBERG TRAURIG, LLP**

                                    Respectfully submitted,

                                    */s/ A. Michael Pratt*
                                    A. Michael Pratt (Pa. ID 44973)
                                    Sophia Lee (Pa. ID 86239)
                                    Lucy Sumner (Pa. ID 337829)
                                    1717 Arch Street, Suite 400
                                    Philadelphia, PA 19103
                                    Tel: 215.972.5916
                                    Fax: 215.754.4858
                                    prattam@gtlaw.com
                                    sophia.lee@gtlaw.com
                                    lucy.sumner@gtlaw.com

                                    Daniel Pulecio-Boek
                                    2101 L Street, N.W., Suite 1000
                                    Washington, D.C. 20037
                                    Tel: 202.331.3100
                                    pulecioboekd@gtlaw.com

                                    John C. Molluzzo, Jr.
                                    One Vanderbilt Plaza
                                    New York, NY 10017
                                    Tel: 212.801.9200
                                    molluzzoj@gtlaw.com

                                    *Attorneys for Plaintiff Flota Petrolera*
                                    *Ecuatoriana EP*

**CERTIFICATE OF SERVICE**

I, A. Michael Pratt, hereby certify that on the 11th day of March 2026, I caused a true and correct copy of the foregoing Response in Opposition to Defendants' Motion to Compel Arbitration and Stay Proceedings to be served on all counsel of record via the Court's electronic filing system.

**SAUL EWING LLP**
John F. Stoviak (Pa. ID 23471)
Margaret G. Clark (Pa. ID 33376)
Ashley Campbell (Pa. ID 334029)
1200 Liberty Ridge Dr., Suite 200
Wayne, PA 19087
(610) 251-5056
john.stoviak@saul.com
margaret.clark@saul.com
ashley.campbell@saul.com

**ALSTON & BIRD LLP**
Joanna C. Hendon (pro hac vice forthcoming)
Alex Yanos (pro hac vice forthcoming)
90 Park Avenue, 15th Floor
New York, NY 10016
(212) 210-1244
joanna.hendon@alston.com
alex.yanos@alston.com

*Attorneys for the Defendants*

/s/ A. Michael Pratt
A. Michael Pratt

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FLOTA PETROLERA ECUATORIANA EP, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM S. SUDHAUS, DAVID W. SUDHAUS, ENRIQUE CADENA-MARIN, JAIME CONDOY-BLACIO, DRAGUN USA LLP, MJØLNER AFRAMAX POOL CO LLC, MJØLNER SOLUTIONS CHARTERING LLC, MJØLNER SHIP MANAGEMENT LLC, AMAZONAS CA LLC, AMAZONAS TANKERS LLC, CORE TRANSPORT LLC, AND JOHN AND JANE DOES 1-10, <br><br> Defendants. | Case No. 2:26-cv-00124-GAW |

## ORDER

**AND NOW**, this _____ day of _____, 2026, upon consideration of Plaintiff Flota Petrolera Ecuatoriana EP's Response in Opposition to Defendants William S. Sudhaus, David W. Sudhaus, Dragun USA LLP, Mjølner Solutions Chartering LLC, Mjølner Aframax Pool Co LLC, Mjølner Ship Management LLC, Amazonas CA LLC, Amazonas Tankers LLC, and Core Transport LLC's Motion to Compel Arbitration and Stay Proceedings, it is hereby **ORDERED** that the Motion is **DENIED.**

**BY THE COURT**:

_____
J.