# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FLOTA PETROLERA ECUATORIANA EP,

      Plaintiff,

      v.

WILLIAM S. SUDHAUS, DAVID W. SUDHAUS, ENRIQUE CADENA-MARIN, JAIME CONDOY-BLACIO, DRAGUN USA LLP, MJØLNER AFRAMAX POOL CO LLC, MJØLNER SOLUTIONS CHARTERING LLC, MJØLNER SHIP MANAGEMENT LLC, AMAZONAS CA LLC, AMAZONAS TANKERS LLC, CORE TRANSPORT LLC, AND JOHN AND JANE DOES 1-10,

      Defendants.

Case No. 2:26-cv-00124-GAW

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Plaintiff Flota Petrolera Ecuatoriana EP ("FLOPEC") brings this amended action for damages and declaratory relief against Defendants William S. Sudhaus, David W. Sudhaus, Enrique Cadena-Marín, Jaime Condoy-Blacio, Dragun USA LLP, Mjølner Aframax Pool Co LLC, Mjølner Solutions Chartering LLC, Mjølner Ship Management LLC, Amazonas CA LLC (previously known as Amazonas Tanker Pool Company, LLC), Amazonas Tankers LLC, and Core Transport, LLC.

## INTRODUCTION

1. This action arises from a calculated, audacious scheme by Pennsylvania residents William S. Sudhaus and David W. Sudhaus, their web of affiliated entities (together, with William

and David Sudhaus, the "Sudhaus Group"), and other defendants, to hijack Ecuador's state-owned oil-shipping business and thereby deprive Ecuador of at least $650 million in revenues.

2. Defendants systematically defrauded FLOPEC, Ecuador's state-owned enterprise established by Ecuadorian law to act as the country's exclusive oil shipping company. Defendants did so, including by divesting FLOPEC of its exclusive rights over Ecuadorian oil shipments, diverting the majority of revenues to Sudhaus-controlled entities, and concealing their theft behind deliberately opaque structures.

3. Through the Sudhaus Group's interconnected entities including Dragun USA, Mjølner-branded companies, Core-branded companies, and Amazonas-branded companies, Defendants engineered a commercially senseless maritime "pool" arrangement (the "Amazonas Tanker Pool" or "Pool"), stripped FLOPEC of control over its statutory oil shipping mandate, deprived FLOPEC of financial transparency, and diverted the majority of revenues to Sudhaus-controlled entities rather than to FLOPEC.

4. In the maritime industry, pool arrangements of this type are relatively common. Companies will pool together assets or capabilities (generally, cargo such as oil, customers, vessels), creating a joint venture to buy, ship and sell a product. In the oil industry, one example of a reasonable pool arrangement is a joint venture between an oil producer, a shipping company and an oil broker to produce, ship and sell oil to customers. However, the Amazonas Tanker Pool—the pool arrangement at issue here—was a sham designed exclusively by Defendants to misappropriate hundreds of millions of dollars from the Ecuadorian government.

5. Under the Amazonas Tanker Pool arrangement, Defendants precluded FLOPEC from chartering (*i.e.*, renting) vessels other than those vessels offered by the pool and Defendants kept the majority of revenues generated by each shipment of Ecuadorian oil. Defendants did not

2

own the vessels chartered to FLOPEC at high cost, did not generate any customers for FLOPEC, and certainly did not produce any oil.   PetroEcuador (Ecuador's national oil company) produced the oil, PetroEcuador produced the customers, and the vessels were available in the open market. In short, Defendants did virtually nothing other than sit back, and profit handsomely at Ecuador's expense.

6.       As a result of this arrangement, most of the oil Ecuador exported from 2020 to 2024 (when FLOPEC terminated the "Pool") was shipped through Defendants, yielding Defendants over $650 million in revenues.

7.       The Sudhaus Group deceptively engineered a series of documents to create the Amazonas Tanker Pool.   Starting with a December 7, 2018 email memorializing an initial arrangement between FLOPEC and the Sudhaus Group vehicle, Dragun USA, the Sudhaus Group appeared to create a relatively standard pool structure.   In March 2020, however, the Sudhaus Group designed a document that formally created the Amazonas Tanker Pool arrangement.   The Sudhaus Group perfected its fraudulent scheme with a December 2020 document that entirely deprived FLOPEC of its statutory mandate to act as Ecuador's oil shipping company.

8.       The Amazonas Tanker Pool arrangement resulted from complicity with corrupt government officials.   Without the statutorily required approval (or knowledge) of FLOPEC's Board of Directors, former FLOPEC General Manager Jaime Condoy-Blacio signed the 2020 documents creating the arrangement.   The documents are in English, but Mr. Condoy-Blacio does not speak, read or write English.   No record exists that he ever retained counsel, let alone U.S. counsel, in connection with these documents, and no FLOPEC records exist that Mr. Condoy-Blacio discussed these documents with anyone or sought the statutorily required approval of FLOPEC's Board of Directors.   Moreover, Mr. Condoy-Blacio apparently signed at least one of

3

these documents during a one-week trip to New York for which there are no detailed records or information. Finally, Mr. Condoy-Blacio was appointed to that role by a former Minister of Energy who took bribes from an oil company associated with the Sudhaus Group and committed suicide while in custody pending trial.

9. This fact pattern is consistent with a repeated pattern of corruption by the Sudhaus Group with former FLOPEC officials which has been reported to include lavish travel and meals, arranging for rent-free condominiums, and cash payments. More importantly, the pool arrangement is a brazen violation of Ecuadorian law. The Sudhaus Group is well-versed in Ecuadorian law—they have been conducting business in or relating to the Ecuadorian oil industry for over a decade—and know (or should know) that Ecuadorian law does not allow the creation of a pool that entirely supplants FLOPEC's governmental business role and deprives it of hundreds of millions of dollars in revenues and profits. The Sudhaus Group has also historically relied on local power brokers and intermediaries that have been suspected of corruption or are under investigation for corruption.

10. In October 2023 when Daniel Noboa was elected President, Ecuador underwent a seismic political shift. President Noboa's election ended over a decade of corrupt governments. The Noboa administration began to clean house and, in 2024, FLOPEC terminated the Amazonas Tanker Pool.

11. FLOPEC brings claims for tortious interference with business relations, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, civil conspiracy, and violations of Ecuadorian civil law, and seeks, among other relief, disgorgement and restitution of ill-gotten revenues, constructive trusts, actual losses, lost profits and other consequential damages. Notably, the Ecuadorian government's Office of the Inspector General (which has

oversight over the country's national spending) has already concluded that the Sudhaus Group misappropriated at least approximately $90 million from FLOPEC by charging, withholding or collecting supposed and undocumented costs relating to the Amazonas Tanker Pool arrangement.

12. As alleged herein, the evidence will show that Defendants used a deliberately opaque structure to expropriate FLOPEC's business and revenue stream, asserted control over Ecuador's oil shipments, and concealed the costs by which they retained hundreds of millions of dollars that should have flowed to FLOPEC.

## PARTIES

13. Plaintiff FLOPEC is a state-owned company created by and incorporated under the laws of Ecuador and domiciled in Esmeraldas, Ecuador. FLOPEC's headquarters are located at Avenida del Pacifico No. 001 y Puerto Rico Esmeraldas, Ecuador, Código Postal 080108.

14. FLOPEC was established on March 26, 2012, under Executive Decree No. 1117, published in the official registry on April 12, 2012, No. 681. Under Ecuadorian law, FLOPEC is responsible for Ecuadorian oil shipments and therefore holds a near-monopoly in Ecuador for (i) shipping crude oil produced in Ecuador mainly by PetroEcuador, the national oil company; and (ii) shipping into Ecuador refined petroleum products such as gasoline and diesel. *See* Ley de Facilitación de las Exportaciones y del Transporte Acuático, 147/1992; and Decreto Ejecutivo 1117/2012.

15. Defendant William S. Sudhaus is an individual and citizen of the United States who resides in Wayne, Delaware County, Pennsylvania at 967 Delchester Road, Newtown Square, PA 19073. He has been and remains the current owner of numerous companies involved in the oil industry, as well as shipping or maritime services. William S. Sudhaus operates these companies from offices located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525. William S.

Sudhaus has long been associated with Gunvor, an international oil trading company, who pleaded guilty in March 2024 to violating the U.S. Foreign Corrupt Practices Act by engaging in a scheme to provide over $70 million in bribes to Ecuadorian government officials.

16. Defendant David W. Sudhaus (with William S. Sudhaus, the "Sudhaus Family") is an individual and citizen of the United States who is domiciled in Wayne, Chester County, Pennsylvania at 578 Pugh Road, Wayne, PA 19087. Along with his father, William S. Sudhaus, Defendant David W. Sudhaus has been and remains the current owner of numerous companies involved in the oil industry, as well as shipping or maritime services. David W. Sudhaus operates these companies from offices located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525.

17. Defendant Enrique Cadena-Marín is an individual and Ecuadorian national. He has been publicly identified in media reports as working with the Sudhaus Family in Ecuador. Media reports also indicate that he is under investigation for corruption involving Ecuador's oil sector. Upon information and belief, Cadena-Marín has received millions of dollars in payments from entities associated with the Sudhaus Group. His whereabouts are presently unknown, and he is believed to have fled Ecuador.

18. Defendant Jaime Condoy-Blacio is an individual and Ecuadorian national who was a former General Manager of FLOPEC. Defendant Condoy-Blacio has worked closely with the Sudhaus Family and has taken trips to the United States to meet with the Sudhaus Group. As General Manager of FLOPEC, he signed several documents purportedly on FLOPEC's behalf. He lacked authority from FLOPEC's Board of Directors to enter into any such agreements and failed to obtain requisite approvals under Ecuadorian law and FLOPEC's bylaws. His whereabouts are presently unknown, and he is believed to have fled Ecuador.

19. Defendant Dragun USA LLP ("Dragun USA") is a limited liability limited partnership organized and existing under the laws of Delaware, with its registered headquarters in New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Dragun is owned by the Sudhaus Family and operates as part of the Sudhaus Group.

20. Defendant Mjølner Aframax Pool Co LLC is a Marshall Islands company with offices in New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Upon information and belief, Mjølner Aframax Pool Co LLC is another vehicle of the Sudhaus Group.

21. Defendant Mjølner Solutions Chartering LLC is a Marshall Islands company with offices in or around New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Mjølner Solutions Chartering LLC is one of the Sudhaus Group entities that participated in the Amazonas Tanker Pool arrangement.

22. Defendant Mjølner Ship Management LLC is a Marshall Islands company with offices in or around New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Mjølner Ship Management LLC is one of the Sudhaus Group entities that participated in the Amazonas Tanker Pool arrangement.

23. Defendant Core Transport, LLC is a Marshall Islands company with its office in Chester County located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525. Core Transport, LLC is one of the Sudhaus Group entities that participated in the Amazonas Tanker Pool arrangement.

24. Defendant Amazonas CA LLC (previously known as Amazonas Tanker Pool Company, LLC) is a Marshall Islands company with its office in Chester County, Pennsylvania located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525. Amazonas Tanker Pool Company, LLC is one of the Sudhaus Group companies involved in the Amazonas Tanker Pool.

25.     Defendant Amazonas Tankers LLC is a Delaware company with its office in Chester County, Pennsylvania at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525. Amazonas Tankers LLC is one of the Sudhaus Family companies involved in the Amazonas Tanker Pool.

26.     The Dragun, Core, Mjølner and Amazonas branded companies are all mere sham vehicles or shells of the Sudhaus Family.  These use the same U.S. bank accounts or have accounts at the same U.S. banks, use the same addresses and/or offices and have the same directors, officers and agents.

27.     The true extent and scope of this fraud against the Ecuadorian government is not yet known.  There are likely several additional entities and individuals that are members of or assisted the Sudhaus Group, including via bribe payments or kickback schemes.  FLOPEC therefore includes John and Jane Does 1-10 as named defendants and will amend the complaint as discovery reveals the identities of all wrongdoers.

28.     The Sudhaus Family, Cadena-Marín, Dragun USA, Mjølner Aframax Pool Co LLC, Mjølner Solutions Chartering LLC, Mjølner Ship Management LLC, Core Transport, LLC, Amazonas CA LLC, and Amazonas Tankers LLC shall be known as the "Sudhaus Group Defendants."

## JURISDICTION AND VENUE

29.     Defendants (with the exception of Cadena-Marin and Condoy-Blacio, who have not yet been located or served) removed this action from the Chester County Court of Common Pleas to this federal court on the basis of 9 U.S.C. §§ 203, 205, and 303.  Defendants contend that this Court has original jurisdiction over this matter "because it falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York

8

Convention"), 21 U.S.T. 2517, as well as the Inter-American Convention on International Arbitration of January 30, 1975 (the "Panama Convention")." ECF No. 1 ¶ 14. Defendants simultaneously moved to compel arbitration and purported to commence arbitration against FLOPEC.

30.     Jurisdiction is proper in state court in Pennsylvania pursuant to 42 Pa.C.S. § 5301, et seq. because Defendants carry on continuous and systematic business within Pennsylvania, have caused harm or injury by act or omission in Pennsylvania, or otherwise have purposefully directed activities at Pennsylvania residents and purposely availed themselves of the privilege of conducting activities within Pennsylvania.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(b)-(c) because Defendants regularly conduct business in Chester County in this district or the causes of action arose out of transactions or occurrences which took place in whole or part in Chester County in this district. Therefore, they are subject to this Court's personal jurisdiction.

## FACTS

### A.  FLOPEC's Role, Business Model, and Vessels

32.     FLOPEC is an Ecuadorian state-owned company responsible for maritime transportation of hydrocarbons.  Established under Ecuadorian law, FLOPEC is responsible for (i) exporting crude oil produced in Ecuador—principally crude oil produced by PetroEcuador, the state-owned oil enterprise and the country's primary oil company; and (ii) importing into Ecuador refined products such as gasoline and diesel.

33.     FLOPEC does not own a large fleet of vessels, and therefore charters (*i.e.*, rents) most vessels from third parties to transport its oil.

34.     FLOPEC's business model is designed to be transparent and efficient.  FLOPEC assumes minimal commercial or financial risks because it neither purchases the oil from PetroEcuador nor bears responsibility for identifying customers.  Rather, FLOPEC's role is to transport crude oil to PetroEcuador's customers, who pay FLOPEC for delivering the crude oil.  These payments are known as the "shipping rate."

35.     As such, FLOPEC's profits derive from the spread between the shipping rate customers pay and what FLOPEC pays to vessel owners for charters as well as other operational costs.  Typically, shipping rates exceed the charter prices, yielding profits—sometimes significant profits.

36.     Additionally, FLOPEC generates revenues by transporting cargo after completing each oil shipment.  When the oil is delivered, the vessel becomes available for use.  Because FLOPEC usually maintains control of the vessel after each delivery of oil (either because it owns the vessel or because it chartered the vessel and there are still days left in the charter period), FLOPEC "finds work" for the vessel.  For example, FLOPEC can find refined oil products to transport back to Ecuador (Ecuador has almost no independent refining capabilities), or other cargo to be transported between other ports before the vessel makes its way back to Ecuador or to the vessel's owner.

37.     FLOPEC uses three different types of vessels to transport its crude oil, depending on the destination:

 a. <u>Panamax vessels</u>: These vessels are specifically designed to pass through the Panama Canal.

 b. <u>Aframax vessels</u>: These are larger vessels used for short- to medium-length trips. The Sudhaus Group and their co-conspirators caused the majority of oil shipments

out of Ecuador from 2018 to 2024 to rely on Aframax vessels, which are the types of vessels at issue in the Amazonas Tanker Pool arrangement.

    c. <u>Suezmax vessels</u>: The largest types of vessels for transporting crude oil and the largest size that can pass through the Suez Canal. These are used for long voyages.

**B. Pool Arrangements and Structure**

38. The maritime industry often employs "pools," which are joint ventures in which participants contribute assets or capabilities—such as vessels, cargo, or customer relationships—and share profits pursuant to agreed allocation formulas (*e.g.*, by contribution or vessel type/efficiency).

39. Pool arrangements are necessary because single parties often lack the assets or capabilities to operate an entire maritime business on their own. For example, a party may have cargo (*e.g.*, oil or another commodity) but no customers or vessels to ship the cargo, while another party may have relationships with customers, and another party may own vessels.

40. Given its need to ship crude oil to various customers around the globe, FLOPEC has entered into several pool arrangements over the years.

41. The pool at the center of this dispute, the Amazonas Tanker Pool, was formed to increase and monopolize Ecuador's oil shipments through Aframax vessels. Indeed, from 2018 to 2024, the Sudhaus Group and their co-conspirators caused the majority of crude oil produced in Ecuador to be exported through Aframax vessels. Therefore, through the Amazonas Tanker Pool arrangement, the Sudhaus Group essentially attempted to take over the entirety of Ecuador's oil-shipping business.

42. The pool lacked any legitimate commercial purpose. FLOPEC brought the cargo (*i.e.*, Ecuadorian oil) and customers (*i.e.*, PetroEcuador's buying customers) to the pool. During

11

the relevant time period (approximately 2018 to 2024), FLOPEC's primary customers were the Chinese government (through PetroChina and other state-owned companies), the Thai government (through PTT), and major oil buyers and traders (such as Trafigura, Shell or Repsol). The vessels needed to ship Ecuadorian oil to PetroEcuador's customers are and have always been widely available in the maritime market. However, the Sudhaus Group controlled the Amazonas Tanker Pool. It contributed no meaningful assets or capabilities to the pool but kept a majority of the revenues and profits. Notably, the Sudhaus Group did not own any of the Aframax vessels that participated in the Amazonas Tanker Pool arrangement.

### C. Amazonas Tanker Pool

#### 1. The Initial Pool Arrangement

43. On December 7, 2018, FLOPEC and the Sudhaus Group (through its vehicle, Dragun USA) entered into a pool arrangement. This arrangement was never memorialized in a contract but rather was reflected in email communications.

44. Upon information and belief, PetroChina, a Chinese state-owned oil company and, at the time, one of the principal purchasers of PetroEcuador's crude, demanded that FLOPEC work through the Sudhaus Group to ship crude from Ecuador to PetroChina. But for PetroChina's demand, the arrangement made no commercial sense: FLOPEC could have used its own vessels or, as needed, chartered (*i.e.*, rented) vessels in the open market to ship PetroEcuador's oil to PetroChina.

45. Under the initial arrangement, FLOPEC would charter to the Sudhaus Group (through the Sudhaus vehicle, Dragun USA) two Aframax vessels that FLOPEC owned and the Sudhaus Group would "contribute" those two vessels to a joint venture styled as the "Mjølner Aframax Pool." The Sudhaus Group (through Mjølner-branded companies), in turn, would

12

"contribute" two additional Aframax vessels into the pool. The pool would seek to employ the four Aframax vessels, including chartering them to FLOPEC, though FLOPEC did not obtain any preference.

46. This initial pool arrangement was merely a vehicle for the Sudhaus Group to charter vessels to FLOPEC for FLOPEC to ship oil to PetroChina.

### 2. March 2020 Arrangement

47. On March 10, 2020, the Sudhaus Group created a new pool arrangement styled as the "Amazonas Tanker Pool."

48. This new arrangement permitted FLOPEC to charter up to four Aframax vessels to the Sudhaus Group (via Sudhaus vehicles, Dragun USA or Mjølner-branded companies) which would then "contribute" FLOPEC's own vessels to the Amazonas Tanker Pool. The Sudhaus Group (through Mjølner-branded companies) would also contribute vessels into the Pool. The pool would seek employment for participating vessels, including charters to FLOPEC, and provided FLOPEC with a preference to charter the vessels that FLOPEC had contributed.

49. The document describing this new pool arrangement was signed by Jaime Condoy-Blacio, then-General Manager of FLOPEC, and the Sudhaus Group (through the Sudhaus vehicle, Dragun USA). Mr. Condoy-Blacio signed this document during a suspicious one-week trip to New York for which there are no detailed records. The document is in English, yet Mr. Condoy-Blacio does not speak or write English.

50. Like the original arrangement, the March 2020 pool arrangement lacked any legitimate commercial rationale for FLOPEC. It made no sense for FLOPEC to contribute additional Aframax vessels of its own to the pool when FLOPEC had enough cargo (*i.e.*, Ecuadorian oil) to keep its vessels permanently in use. As such, this amendment simply sought to

13

lock up more of FLOPEC's Aframax vessels in a sham pool arrangement intended solely for the Sudhaus Family to take control of Ecuador's oil shipping business and profit handsomely at FLOPEC's expense. This absurd arrangement essentially forced FLOPEC to render its own Aframax vessels to the Sudhaus Group, only to later pay charter hire (*i.e.*, rent) to the Sudhaus Group to be able to use them and ship its own oil.

### 3. The December 2020 Arrangement

51. On December 1, 2020, the Sudhaus Group devised a new pool arrangement. Under the terms of the December 2020 pool arrangement, two new Sudhaus Group vehicles, Amazonas Tanker Pool Company, LLC (now known as Amazonas CA LLC) and Amazonas Tankers LLC would manage the pool of vessels in their sole discretion. As such, the Sudhaus Group had full discretion to accept or terminate vessels and to determine the size of the pool fleet.

52. More importantly, the December 2020 agreement prohibited FLOPEC from using Aframax vessels outside the Amazonas Tanker Pool, compelling FLOPEC to charter (*i.e.*, rent) exclusively from the Pool for all crude shipments. The agreement prohibited FLOPEC from using its own Aframax vessels or anyone else's to ship its own oil. At the same time, the Sudhaus Group and their co-conspirators caused the majority of Ecuadorian oil to be exported using Aframax vessels thereby ensuring that the overwhelming majority of the country's revenues for oil shipments were diverted to the Sudhaus Group. As such, this arrangement subordinated FLOPEC to the Sudhaus Group and effectively forced most of Ecuador's crude exports to go through the pool.

53. Further, the December 2020 document purports to contain a clause requiring that claims relating to the "interpretation and fulfillment" of the agreement be subject to arbitration in New York under the rules of the Society of Maritime Arbitrators. However, according to the

14

Ecuadorian Constitution and several other blackletter Ecuadorian statutes, Ecuadorian government entities (such as FLOPEC) may only enter into international arbitration agreements subject to the prior, written approval of the Ecuadorian Attorney General. Neither Mr. Condoy-Blacio nor the Sudhaus Group ever sought, let alone obtained, any such written approval. Therefore Mr. Condoy-Blacio lacked authority to enter into any such arbitration clause and the arbitration clause contained therein is illegal, invalid and unenforceable.

54. The December 2020 structure had no legitimate business purpose. FLOPEC was required to route the majority of its cargo through the pool without any corresponding benefit, while the Sudhaus Group pocketed the majority of the pool's profits. Further, this was an absurd arrangement that yielded circular benefits to the Sudhaus Group. The Sudhaus Group chartered (*i.e.*, rented) Aframax vessels to FLOPEC that the Sudhaus Group did not even own (forcing FLOPEC to pay substantially higher rates than the Sudhaus Group was paying third parties for those vessels); FLOPEC then had to "contribute" those vessels into the Amazonas Tanker Pool because it was prohibited from using Aframax vessels outside the Pool; and FLOPEC then had to charter those very same Aframax vessels from the Sudhaus Group to ship its own oil.

55. The document describing this new pool arrangement was signed by Jaime Condoy-Blacio, then-General Manager of FLOPEC, and Casey Dalcher from the Sudhaus Group.

### D. Revenue and Concealment

56.     From 2020 to 2024, the Sudhaus Group received at least $650 million in revenues flowing from the Amazonas Tanker Pool arrangement.  This is revenue that the Sudhaus Group took from the Ecuadorian government and that should have been received by FLOPEC.

57.     The Sudhaus Group extracted revenues all around from the Pool arrangement, engaging in a circular structure that allowed it to deprive FLOPEC and, ultimately, the Ecuadorian government, of a significant source of revenue.

- The Sudhaus Group received most of the shipping rates paid by FLOPEC's customers for each oil delivery.  Every oil delivery requires FLOPEC's customers (which are mainly purchasers of PetroEcuador's oil) to pay a shipping rate.  FLOPEC had to direct most of each shipping rate to the Sudhaus Group as "charter hire" *i.e.*, rent payments, for using the Pool's Aframax vessels.  Since FLOPEC could not use Aframax vessels outside the Pool and since the Sudhaus Group caused the majority of Ecuador's oil to be shipped via Aframax vessels, this resulted in hundreds of millions of dollars in revenues for the Sudhaus Group.

- The Sudhaus Group received payments from FLOPEC for chartering (*i.e.*, renting) Aframax vessels to FLOPEC that FLOPEC then had to "contribute" back to the Pool. As described immediately above, FLOPEC would then have to charter again those very same vessels from the Sudhaus Group for each shipment.  Importantly, the vessels that the Sudhaus Group chartered to FLOPEC were not owned by the Sudhaus Group— they were vessels that the Sudhaus Group had chartered in the open market from third party vessel owners at significantly lower rates.

- As described above (*supra* 35), after each oil delivery, the vessel remains available to find other work and thus generate additional revenues. The vessel, for example, can transport refined oil products back to Ecuador or can transport cargo between other ports prior to returning to Ecuador. The Sudhaus Group deprived FLOPEC of revenues resulting from using the vessels after completion of each oil delivery. Further, the Sudhaus Group concealed from FLOPEC the supporting documentation showing revenues generated by the vessels for this secondary workflow. As such, FLOPEC lacks documentation showing exactly how much the Sudhaus Group profited from using the vessels after each delivery to FLOPEC's customers.

- The Sudhaus Group also profited by selling the fuel to the vessels in the "Pool." Defendant Core Transport LLC, which is a Sudhaus Group vehicle, sold most of the fuel needed to power the vessels for each voyage.

- FLOPEC does not know for certain whether the Sudhaus Group profited in additional ways, for example, by fabricating costs associated with each voyage. The Sudhaus Group concealed from FLOPEC detailed supporting documentation for every source of income and cost associated with each voyage of the vessels in the Pool. As such, it is possible that the Sudhaus Group's revenues and profits exceed the categories described in this complaint. FLOPEC will amend the complaint as it receives information from Defendants during discovery.

**E.  Ecuadorian Law Violations**

58.     The pool arrangement created by the Sudhaus Group violated Ecuadorian law in two significant ways.

59.     First, then-General Manager of FLOPEC, Mr. Condoy-Blacio, entered into the pool arrangement without consulting, much less obtaining approval from, FLOPEC's Board of Directors, in direct violation of FLOPEC's bylaws.  Further, there are no records within FLOPEC of Mr. Condoy-Blacio conducting any market or business analysis or seeking advice or opinions from shipping advisors or legal counsel in connection with entering into the pool arrangement.  As is obvious, Ecuadorian laws require state-owned companies to carefully deliberate about any business or joint venture arrangements, including leaving a detailed record of their decision-making process.

60.     Second, Ecuadorian law prohibits state-owned business enterprises from forfeiting their businesses or transferring them to privately-owned third parties.  In hijacking the Ecuadorian oil shipping industry, which is under the exclusive mandate of FLOPEC, the Amazonas Tanker Pool arrangement violated Ecuadorian law and public policy.

61.     The Sudhaus Group knew fully well that the pool arrangement that it designed and implemented brazenly violated Ecuadorian law.  The Sudhaus Family and their web of companies have been conducting business in and related to Ecuador, including in the Ecuadorian oil industry, for over a decade.  For example, in 2009, Core Petroleum, one of the Sudhaus Group companies, bid to broker a large PetroEcuador oil sale, demonstrating the Sudhaus Group's familiarity with Ecuador's oil sector, its laws, and contracting procedures in the oil industry.  Further, the Sudhaus Group has extensively relied on and availed itself of Ecuadorian intermediaries and powerbrokers,

18

including corrupt agents. The local intermediaries of the Sudhaus Group include Defendant Cadena-Marín, Roberto Dongo (a local operator) and local attorney Daniel Pino-Arroba.

### F. The Amazonas Tanker Pool Resulted from Corruption

62. Substantial evidence shows the Amazonas Tanker Pool arrangement was the product of corruption.

63. First, the pool arrangement lacked any legitimate commercial rationale and provided no benefit to FLOPEC while delivering hundreds of millions of dollars in upside to the Sudhaus Group.

64. Second, FLOPEC had no management or control over the pool and only limited, curated visibility into its finances. The Sudhaus Group controlled which vessels participated, fleet size, and pool management, and provided to FLOPEC only limited information and documentation.

65. Third, Mr. Condoy-Blacio signed the document reflecting the March 2020 arrangement during a one-week trip to New York. Unsurprisingly, he left no detailed records of that trip or his discussions with the Sudhaus Group.

66. Fourth, Mr. Condoy-Blacio prepared no internal analyses or reports justifying the entrance into the Amazonas Tanker Pool, and he did not retain business advisors or legal counsel in connection with same. The documents reflecting the pool arrangement were in English. Mr. Condoy-Blacio signed them, even though he did not speak, read, or write English.

67. Fifth, as detailed above, the pool arrangement violated Ecuadorian law in key respects, to the full knowledge of the Sudhaus Group.

68. Sixth, Hernán Luque—a senior government official responsible for government contracting when the Amazonas Tanker Pool arrangement was implemented—was recorded

19

stating that FLOPEC officials were receiving "bags of cash." Mr. Luque has been charged with crimes in Ecuador and is a fugitive.

69. Seventh, media reports indicated that the Sudhaus Group engaged in a repeated pattern of corruption with former FLOPEC officials including paying for lavish travel and meals, arranging for rent-free condominiums, and cash deliveries. Further, William S. Sudhaus, the patriarch of the Sudhaus Group, has long been associated with Gunvor, an international oil trading company, which pleaded guilty in March 2024 to violating the U.S. Foreign Corrupt Practices Act by paying in excess of $70 million in bribes to Ecuadorian government officials. Importantly, part of these admitted bribes were to pay José Agusto Briones, the Minister of Energy who appointed Mr. Condoy-Blacio as FLOPEC's General Manager. Mr. Briones committed suicide while in custody in Ecuador pending trial for corruption.

70. Lastly, one of the Sudhaus Group's operators in Ecuador appears to be Enrique Cadena-Marín, a target of an ongoing U.S. investigation into corruption in Ecuador's oil sector. Public reporting shows Mr. Cadena-Marín received over $10 million from the Sudhaus Group via Core Petroleum (one of the Sudhaus Family's vehicles) and has been publicly identified as a corrupt intermediary in Ecuador's oil industry since at least 2016.

**G. The Ecuadorian Government Terminates Corrupt Amazonas Tanker Pool**

71. The Amazonas Tanker Pool arrangement has been at the center of Ecuadorian legal and political scrutiny since 2021. Indeed, in 2021, the Ecuadorian Inspector General's Office opened an investigation into the pool and in November 2021 issued a report concluding that the pool arrangement violated Ecuadorian law, including for the reasons described above. The report also found that FLOPEC was losing money through the pool. For example, the report concluded that FLOPEC was paying substantially more for chartering the pool's vessels than what the

20

Sudhaus Group was paying third party vessel owners to charter those vessels from them and "contribute" them to the pool.

72. Further, in May 2024, the Inspector General's Office issued a second report expressly finding, *inter alia*, that the Sudhaus Group had misappropriated approximately $90 million from FLOPEC by charging, withholding, or collecting supposed and undocumented costs relating to the Amazonas Tanker Pool arrangement.

73. Moreover, the Pool has become a matter of national scrutiny in Ecuador. In 2023, the Ecuadorian Congress initiated impeachment proceedings against then-President Guillermo Lasso, in part, based on allegations concerning the pool and the government's handling of it. Amid the resulting turmoil, President Lasso dissolved Congress and called for a snap presidential election.

74. Daniel Noboa won that presidential election and assumed office in November 2023. His administration prioritized anti-corruption measures. Early in 2024, FLOPEC, under the Noboa administration, terminated the Pool. FLOPEC gave notice terminating its participation in February 2024 and the termination became effective in August 2024.

75. FLOPEC's termination encountered substantial resistance from legacy—and likely corrupt—FLOPEC officials. In August 2024, then-General Manager Frederic Petrilli (since replaced) nevertheless chartered three vessels from the Sudhaus Group that had previously been in the Pool. Continuing to do business with entities FLOPEC was preparing to sue—after deciding to end the relationship—lacked any legitimate justification. Mr. Petrilli was dismissed in October 2024.

76. The only logical explanation for Mr. Petrilli's decision is corruption. Indeed, Mr. Petrilli had a close relationship with the Sudhaus Group. On information and belief, in May 2024,

the Sudhaus Group invited Mr. Petrilli and one of FLOPEC's legacy Ecuadorian advisors to a Formula 1 race held in Miami. Shortly thereafter, Mr. Petrilli chartered vessels from the Sudhaus Group.

77. Further, in the summer of 2024, Mr. Petrilli (or someone acting at his direction) appears to have leaked FLOPEC's contemplated litigation to the Sudhaus Group. This triggered a period of intense lobbying. In particular, the Sudhaus Group—through their Ecuadorian intermediaries and powerbrokers—attempted to lobby senior officials in the Noboa administration to get a broad release of any legal claims. The Sudhaus Group's team of local intermediaries included Defendant Cadena-Marín and local operator Roberto Dongo, as well as local attorney Daniel Pino-Arroba. The administration refused.

78. On October 1, 2024, Defendant David W. Sudhaus, signing as "owner" of the Sudhaus family vehicle, Amazonas Tankers LLC, wrote to FLOPEC and Ecuador's Ministry of Energy stating he regretted Ecuador's refusal to sign a release and threatening counterclaims if FLOPEC sued. Mr. Sudhaus' threat was an attempt to bully FLOPEC into foregoing litigation, as he has never identified the basis for any such counterclaims nor did he ever file any claims against FLOPEC.

79. The Pool's end immediately revealed transparent market rates, enabling FLOPEC—through direct chartering—to capture the revenues that the Sudhaus Group had been misappropriating for years.

80. FLOPEC continues to incur damages, including lost profits, investigation costs, and reputational harm, and seeks damages, restitution, disgorgement, and equitable relief to recover sums the Sudhaus Group unjustly retained.

81. The Ecuadorian General Prosecutor's Office is also investigating the Amazonas Tanker Pool but has yet to charge anyone in connection with the case.

## COUNT I: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Against all Defendants)

82. FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

83. FLOPEC had existing and prospective contractual relations with its customers, which are purchasers of Ecuadorian crude oil, mainly PetroEcuador's crude oil. Those customers pay shipping rates to FLOPEC, which generates hundreds of millions of dollars every year. During the relevant time period (approximately 2018 to 2024), FLOPEC's primary customers were the Chinese government (through PetroChina and other state-owned companies), the Thai government (through PTT), and major oil buyers and traders (such as Trafigura, Shell or Repsol). FLOPEC's business opportunities also include voyages that its vessels make after each oil delivery so that they do not remain idle until they return to Ecuador, which include transporting cargo between ports or transporting refined oil products back to Ecuador.

84. Defendants knew that they were unlawfully commandeering FLOPEC's customer relationships and business opportunities and diverting hundreds of millions of dollars in revenues. With full knowledge that FLOPEC's legal mandate is to act as Ecuador's national oil shipping company, Defendants engineered a structure that took over FLOPEC's business without providing any countervailing benefit—capturing at least $650 million in revenues while contributing neither cargo nor customers and without owning any vessels.

85. The Amazonas Tanker Pool arrangement vested the Sudhaus Group with exclusive control over vessel acceptance, termination, and fleet size, and forced FLOPEC to charter (*i.e.*, rent) exclusively through the pool for all Aframax oil shipments (which the Sudhaus Group and

their co-conspirators caused to become the most widely used vessel for Ecuadorian oil shipments). Further, the Sudhaus Group concealed from FLOPEC critical information such as detailed documentation showing voyages for the vessels after oil deliveries to generate revenues and detailed documentation showing all the costs associated with each voyage.

86.     Defendants acted intentionally and without justification to enrich themselves at FLOPEC's expense.  The Sudhaus Family has been doing business related to Ecuador since at least 2009 and thus is well acquainted with the Ecuadorian oil industry.

87.     In 2009, Core Petroleum, one of the Sudhaus Group companies, bid to broker a large PetroEcuador oil sale, further demonstrating the Sudhaus Group's familiarity with Ecuador's oil sector, its laws, and contracting procedures in the oil industry.

88.     The laws and regulations that govern FLOPEC—including its mandate, the authority of its officers, and the approval process for contracts—are public.  The Sudhaus Group is charged with knowledge of these laws. "[P]rivate citizens, defendants in criminal matters, the legislature, state officers asserting the defense of qualified immunity and corporations are charged with knowledge of the law." *Atkins v. Parker*, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law."); *Anela v. Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986) (same).

89.     The circumstances surrounding the establishment of the Amazonas Tanker Pool show Defendants' knowledge of their illegality, *inter alia*: (i) Mr. Condoy-Blacio signed lengthy English-language documents without speaking English; (ii) no legal or business analysis was undertaken; (iii) no approvals were obtained from FLOPEC's Board of Directors; (iv) Mr. Condoy-Blacio signed documents during a one-week trip to New York for which there are no

24

detailed records; and (v) the Amazonas Tanker Pool arrangement did not result from any public bidding or formal contracting processes.

90.     The Sudhaus Group also used Enrique Cadena-Marín as an intermediary despite longstanding public reporting (since at least 2016) identifying him as a corrupt oil intermediary, and despite evidence that he received over $10 million from Sudhaus via Core Petroleum.

91.     The Sudhaus Group knew it was violating Ecuadorian law and misappropriating FLOPEC's business, diverting most revenues from Ecuador's crude shipments to itself.  The Amazonas Tanker Pool arrangement resulted in forcing FLOPEC to go through the pool for any Aframax oil shipments (which became the majority of Ecuador's shipments) and in the Sudhaus Group taking over any business opportunities for vessels after each oil delivery prior to the vessels' return to Ecuador.  The consequence of this arrangement is that the Sudhaus Group, rather than FLOPEC, received the shipping rates paid by FLOPEC's customers.

92.     For these reasons, Defendants intentionally and without privilege interfered with FLOPEC's business relations by (i) creating and operating the Pool to hijack FLOPEC's business and divert revenues and business opportunities to the Sudhaus Group; (ii) imposing restrictive arrangements that prevented FLOPEC from chartering Aframax vessels outside the Pool; and (iii) concealing the pool's structure and finances.

93.     As a direct and proximate result of Defendants' conduct, FLOPEC suffered damages in an amount to be determined at trial, but not less than $650 million.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Against Condoy-Blacio)

94.     FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

25

95.    As General Manager of FLOPEC, Defendant Jaime Condoy-Blacio owed FLOPEC fiduciary duties of loyalty, care, and good faith.

96.    Defendant Condoy-Blacio breached those duties by entering into the Amazonas Tanker Pool arrangement.  He made FLOPEC a party to the Pool without any analysis or consultation, without any written record, and without seeking Board approval.  Defendant Condoy-Blacio allowed the Sudhaus Group to take over FLOPEC's statutory mandate and control Ecuador's oil shipments in Aframax vessels (which became most of the country's shipments), which is a brazen violation of Ecuadorian law.

97.    As a direct and proximate result of Defendant Condoy-Blacio's breaches, FLOPEC suffered damages, including lost profits and other economic harms, in an amount to be determined at trial.

## COUNT III: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Sudhaus Group Defendants)

98.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

99.    The Sudhaus Group Defendants knew or were willfully blind to Defendant Condoy-Blacio's breaches of his fiduciary duties and provided substantial assistance by: (i) hosting him in New York during the suspicious one-week trip in which Defendant Condoy-Blacio signed the March 2020 document benefiting the Sudhaus Group; (ii) designing the paperwork establishing the Amazonas Tanker Pool arrangement and having Defendant Condoy-Blacio sign that paperwork; and (iii) managing the Amazonas Tanker Pool and depriving FLOPEC of hundreds of millions of dollars in revenues.

100.    As a direct and proximate result of Defendants' aiding and abetting, FLOPEC suffered damages to be proven at trial.

26

## COUNT IV: BREACH OF FIDUCIARY DUTY
### (Against the Sudhaus Group Defendants)

101.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

102.    FLOPEC and the Sudhaus Group Defendants formed a joint venture known as the Amazonas Tanker Pool.

103.    The joint venture created a special relationship between FLOPEC and the Sudhaus Group Defendants.

104.    As their joint venture partners, the Sudhaus Group Defendants owed FLOPEC fiduciary duties.

105.    The Sudhaus Group Defendants breached their fiduciary duties to FLOPEC by failing to act in the best interests of, and with transparency towards FLOPEC.

106.    For example, the joint venture required FLOPEC to contribute Aframax vessels of its own to the Pool even though FLOPEC had enough cargo to keep the vessels in permanent use. FLOPEC then had to charter those very same vessels from the Sudhaus Group to be able to ship its own oil. Thus, by locking up these vessels in the sham Amazonas Tanker Pool, the Sudhaus Group entities were able to control Ecuador's oil shipping business and profit significantly at FLOPEC's expense. In parallel, the Sudhaus Group chartered vessels to FLOPEC at a high mark up for FLOPEC to supposedly "contribute" those vessels into the Pool. These were vessels the Sudhaus Group did not own and had rented at significantly lower prices from third party vessel owners.

107.    Further, the Amazonas Tanker Pool arrangement prohibited FLOPEC from using vessels outside the Amazonas Tanker Pool, compelling it to rent vessels from the Pool for all crude shipments. Thus, FLOPEC was barred from using its own vessels (or anyone else's) to ship its

oil, while the Sudhaus Group Defendants and their co-conspirators caused the majority of Ecuadorian oil to be exported using Aframax vessels, ensuring that most of the country's oil shipment revenue was diverted to the Sudhaus Group, and away from FLOPEC.

108. The Sudhaus Group Defendants also breached their fiduciary duty by profiting from the sale of fuel to the vessels in the Pool and by failing to provide FLOPEC with detailed documentation with respect to the vessels used as part of the Pool, including cost data and allocation of revenues and profits.

109. As a direct and proximate result of the Sudhaus Group Defendants' breaches, FLOPEC suffered damages, including lost profits and other economic harm, in an amount to be determined at trial.

## COUNT V: ACCOUNTING
### (Against the Sudhaus Group Defendants)

110. FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

111. As described further, *supra*, FLOPEC entered arrangements with the Sudhaus Group—in 2018, March 2020 and December 2020. The Amazonas Tanker Pool was formed as a result of these arrangements.

112. As their joint venture partners, the Sudhaus Group Defendants owed FLOPEC fiduciary duties.

113. The Sudhaus Group Defendants breached their fiduciary duties to FLOPEC by failing to act in the best interests and with transparency toward FLOPEC.

114. The Sudhaus Group failed to provide FLOPEC with detailed information with respect to the Pool arrangement including (i) detailed documentation showing business opportunities, revenues or voyages of the vessels after completing oil deliveries and prior to

28

returning to Ecuador; and (ii) detailed documentation showing the costs associated with each voyage.

115.   Accordingly, FLOPEC demands a complete and full accounting for the Amazonas Tanker Pool arrangement.

## COUNT VI: UNJUST ENRICHMENT
### (Against all Defendants)

116.   FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

117.   Defendants have been unjustly enriched, without justification, by retaining more than $650 million in pool revenues while providing little or no consideration to FLOPEC for the value retained and while contributing neither cargo nor customers, and without owning Aframax vessels.

118.   FLOPEC has thus been correspondingly impoverished, and there is a direct relation between Defendants' enrichment and FLOPEC's impoverishment.

119.   Equity and good conscience require restitution and disgorgement of Defendants' unjust enrichment.

## COUNT VII: CIVIL CONSPIRACY
### (Against all Defendants)

120.   FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

121.   Defendants combined and agreed to accomplish an unlawful purpose: to misappropriate FLOPEC's shipping revenues and take control over the majority of Ecuador's crude exports through the creation and operation of the Amazonas Tanker Pool and related agreements.

122.     Defendants committed overt acts, in part, in Chester County, Pennsylvania, in furtherance of the conspiracy by designing and implementing the Amazonas Tanker Pool arrangement, wielding exclusive control and restricting FLOPEC's ability to charter outside the pool; concealing detailed documentation regarding Pool costs; and rechartering vessels at a premium.

123.     Other overt acts include the Sudhaus Group meeting with Mr. Condoy-Blacio in New York to form the "pool," lobbying for a broad release from the Ecuadorian government to prevent litigation, and extracting revenues for the Sudhaus Group.

124.     Defendants took these actions knowing they were acting in violation of Ecuadorian law and amidst evidence of corruption, including a recorded statement by senior official Hernán Luque that FLOPEC officials were receiving "bags of cash," use of a known corrupt intermediary (Enrique Cadena-Marín), and the Inspector General's formal findings of illegality and approximately $90 million (at least) in misappropriated funds.

125.     As a direct and proximate result of the conspiracy, FLOPEC suffered damages in an amount to be determined at trial.

### COUNT VIII: VIOLATIONS OF ECUADORIAN LAW
**(Against all Defendants)**

126.     FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

127.     As in most civil law jurisdictions, Ecuador broadly prohibits intentional or negligent conduct causing injury.  Known in civil law jurisdictions as extra-contractual liability, Ecuadorian law states that parties who cause injury through unlawful acts, whether intentional or negligent conduct, are jointly and severally liable for all damages.

30

128.     Under Ecuadorian law, anyone who acts intentionally or negligently and thereby causes an injury must pay damages.  This is codified in Articles 2214 and 2216 of the Ecuadorian Civil Code.[1]

129.     Article 2214 of the Ecuadorian Civil Code provides: "Whoever commits a crime or quasi-crime that has caused an injury to another party is required to compensate that party; without prejudice to the penalties that laws impose for that crime or quasi-crime."  Article 2216 similarly provides: "The person who caused the damage and its heirs are obligated to provide compensation. Anyone who benefits from another's wrongdoing, without being an accomplice, is only obligated up to the value of the benefit."

130.     Further, if unlawful conduct is committed by two or more individuals or entities, each is jointly and severally liable for the damages caused thereby.  This is codified in Article 2217 of the Ecuadorian Civil Code.[2]

131.     As alleged in detail above, the Amazonas Tanker Pool arrangement violated Ecuadorian statutes and laws in several material ways.  Indeed, Ecuador's Office of the Inspector General has already determined through the issuance of two separate reports that the Amazonas Tanker Pool arrangement violated Ecuadorian laws and that the Sudhaus Group has misappropriated at least $90 million from FLOPEC.

---

[1] Art. 2214.- El que ha cometido un delito o cuasidelito que ha inferido daño a otro, está obligado a la indemnización; sin perjuicio de la pena que le impongan las leyes por el delito o cuasidelito.

Art. 2216.- Están obligados a la indemnización el que hizo el daño y sus herederos. El que recibe provecho del dolo ajeno, sin ser cómplice en él, sólo está obligado hasta lo que valga el provecho.

[2] Art. 2217.- Si un delito o cuasidelito ha sido cometido por dos o más personas, cada una de ellas será solidariamente responsable de todo perjuicio procedente del mismo delito o cuasidelito, salvo las excepciones de los Arts. 2223 y 2228. Todo fraude o dolo cometido por dos o más personas produce la acción solidaria del precedente inciso.

31

132.     Defendant Condoy-Blacio's breaches of fiduciary duty and acceptance of Sudhaus Group hospitality during his one-week trip to New York constitute violations of Ecuadorian law and are consistent with bribery and corrupt practices condemned by Ecuadorian authorities.

133.     Further, all Defendants have intentionally and/or negligently injured FLOPEC and must pay damages.  Defendants' unlawful conduct includes, without limitation: (i) encouraging, allowing, and facilitating a Pool arrangement that provided no benefit to FLOPEC and caused FLOPEC to lose at least $650 million in revenues; (ii) designing and implementing a Pool arrangement without any proper procedures within FLOPEC, without Board approval, without written records, reports, recommendations or documentation, let alone any bidding or competitive process; (iii) designing and implementing a Pool arrangement that essentially caused FLOPEC to forfeit its legal mandate of acting as Ecuador's national oil shipping company; and (iv) misrepresenting or concealing the Pool's costs, revenues and profits.

134.     As a result of Defendants' intentional and/or negligent conduct, Defendants improperly allowed foreign entities to reap the benefits of Ecuador's hydrocarbon export industry and illegally collect revenues that belong exclusively to FLOPEC, depriving FLOPEC of hundreds of millions of dollars.

**COUNT IX: DECLARATORY JUDGMENT**
**(Against all Defendants)**

135.     FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

136.     As detailed herein, FLOPEC asserts claims against Defendants for tortious interference, breach of fiduciary duty by FLOPEC's former General Manager, aiding and abetting of the same by the Sudhaus Group, unjust enrichment, civil conspiracy, violations of Ecuadorian law, and other claims.

32

137. Defendants Amazonas CA LLC and Core Transport LLC (collectively, "Claimants") seek to end-run this litigation by initiating an arbitration against FLOPEC in a proceeding captioned *Amazonas CA LLC and Core Transport LLC v. Empresa Pública Flota Petrolera Ecuatoriana,* pursuant to the 2018 Arbitration Rules of the Society of Maritime Arbitrators (the "SMA Arbitration"). Claimants' Demand for Arbitration (including its annexes) is attached hereto as Exhibit A.

138. In the Demand for Arbitration, Claimants allege that they are seeking "redress for FLOPEC's numerous breaches of its contracts with Claimants and ***to ensure that FLOPEC's professed claims against Claimants and their affiliates are properly resolved in the Parties' contractually agreed forum***" (emphasis added).

139. Claimants' Demand for Arbitration is premised on the erroneous assertion that FLOPEC's claims arise from alleged breaches of contracts with Claimants (even though Core Transport LLC was not even a party or signatory to the alleged agreements) and that those contracts require arbitration of such claims. In particular, Claimant's Demand for Arbitration is based on the following four contracts: (i) two agreements labeled "General Terms and Conditions" dated December 1, 2020, and January 10, 2023 signed by FLOPEC and Amazonas CA LLC; and (ii) two contracts between Amazonas CA LLC and FLOPEC through which FLOPEC contributed two of its own vessels to the Amazonas Tanker Pool (dated October 6, 2020 and December 1, 2021).

140. FLOPEC's claims, however, are not based on breach of contract, nor are they subject to the arbitration clauses in the four contracts identified by Claimants. Amazonas CA LLC is the only Defendant that is a party and signatory to these four contracts. The arbitration clauses in these four agreements state that claims relating to their "interpretation and fulfillment" are subject to arbitration. Additionally, the agreements state that no third party can enforce their terms.

33

141. Importantly, according to the Ecuadorian Constitution and several other blackletter Ecuadorian statutes, Ecuadorian government entities (such as FLOPEC) may only enter into international arbitration agreements subject to the prior, written approval of the Ecuadorian Attorney General. Neither Mr. Condoy-Blacio (who signed the October 2020 agreement and the December 2020 agreement), nor the General Managers who signed the December 2021 agreement and the January 2023 agreement, nor the Sudhaus Group ever sought, let alone obtained, any such written approval. Therefore, the FLOPEC General Managers who signed those agreements lacked authority to enter into any such arbitration clauses and the arbitration clauses contained therein are illegal, invalid and unenforceable.

142. Conspicuously, Claimants do not discuss in their Demand for Arbitration that the two other agreements discussed *supra*, dated December 2018 and March 2020, which are the agreements that created the Amazonas Tanker Pool arrangement—do ***not*** contain arbitration provisions.

143. The four contracts that Claimants have put at issue in their Demand for Arbitration do not provide a basis for arbitrating FLOPEC's claims against Defendants because: (i) the arbitration clauses in the four contracts violate Ecuador's Constitution and several other blackletter Ecuadorian statutes, including because the officials who signed them lack authority to do so; (ii) Core Transport LLC and the other Defendants did not sign and are not parties to the contracts and thus cannot enforce them, let alone compel that FLOPEC's claims against them be arbitrated; and (iii) FLOPEC's claims do not relate to the "interpretation and fulfillment" of the contracts and therefore do not fall within those arbitration provisions.

144. Accordingly, an actual and justiciable controversy exists between FLOPEC and Defendants, who have weaponized the SMA Arbitration in an attempt to deprive FLOPEC of the

ability to assert its non-arbitrable claims against Defendants (most of whom are not—and cannot—be parties to the SMA Arbitration). Thus, this dispute is ripe for adjudication.

145. FLOPEC seeks a declaration that the claims asserted herein are not subject to arbitration, and an order permanently enjoining the SMA Arbitration.

146. In the absence of such a declaration, FLOPEC will be forced to participate in the SMA Arbitration, which will irreparably prejudice and harm FLOPEC including by depriving it of its right to a judicial determination of arbitrability and jurisdiction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FLOPEC respectfully requests that the Court enter judgment in its favor and against all Defendants, jointly and severally, and grant the following relief:

1. Awarding compensatory damages in an amount to be proven at trial, but not less than $650,000,000;

2. Ordering disgorgement and restitution of all revenues and profits obtained by Defendants through the Amazonas Tanker Pool;

3. Imposing constructive trusts on Defendants' assets traceable to the unlawful proceeds;

4. Awarding pre- and post-judgment interest under 28 U.S.C. § 1961;

5. Awarding costs of suit and attorneys' fees to the extent permitted by law;

6. A declaration stating that the claims brought by FLOPEC in this action are not arbitrable and thus permanently enjoining the SMA Arbitration (or any other arbitration).

7. Granting such other and further relief as the Court deems just and proper.

Dated:    January 28, 2026                    Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By:  /s/ A. Michael Pratt
A. Michael Pratt (PA Bar #44973)
Sophia Lee (PA Bar #86239)
Lucy G. Sumner (PA Bar #337829)
1717 Arch Street, Suite 400
Philadelphia, PA 19103
T: (215) 988-7800
prattam@gtlaw.com
sophia.lee@gtlaw.com
lucy.sumner@gtlaw.com

Daniel Pulecio-Boek
(*pro hac vice forthcoming*)
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
T: (202) 331-3100
pulecioboekd@gtlaw.com

John C. Molluzzo Jr.
(*pro hac vice forthcoming*)
One Vanderbilt Avenue
New York, NY 10017
T: (212) 801-9200
molluzzoj@gtlaw.com

*Attorneys for Plaintiff Flota Petrolera
Ecuatoriana*

36