# Exhibit C

**IN THE MATTER OF AN INTERNATIONAL ARBITRATION PURSUANT TO THE 2018 ARBITRATION RULES OF THE SOCIETY OF MARITIME ARBITRATORS**

Between:

**Amazonas CA LLC
and
Core Transport LLC**

**Claimants,**

**v.**

**Empresa Publica Flota Petrolera Ecuatoriana**

**Respondent.**

---

**DEMAND FOR ARBITRATION**

---

**January 8, 2026**

**ALSTON & BIRD**

90 Park Avenue
New York, NY 10016
212-210-9400 | Fax: 212-210-9444

**TABLE OF CONTENTS**

I.    Introduction ........................................................................................................................ 1

II.   The Parties to the Dispute ................................................................................................. 4

    A.   Claimants Amazonas and Core Transport ............................................................. 4

    B.   Respondent FLOPEC ............................................................................................ 5

III.  Circumstances Giving Rise to the Dispute ....................................................................... 6

    A.   The Parties Executed A Series Of Contracts Concerning The Transport Of Crude Oil From Ecuador In Aframax Vessels ..................................................... 6

        1.   The Vessel-Specific PPAs/ACAs ............................................................. 8

        2.   The Non-Compete Obligations Under the Amazonas Contracts ............... 8

    B.   FLOPEC Wrongfully Purported To Terminate The Amazonas Contracts And Removed Its Vessels From The Fleet ........................................................... 9

    C.   FLOPEC Also Breached Its Cargo Preference and Non-Compete Obligations .................. 11

    D.   FLOPEC's Acts And Omissions In Relation To An Investigation By Ecuador's Comptroller General Caused Amazonas Economic and Reputational Harm ...................... 12

    E.   FLOPEC's Attempts To Avoid Its Obligation To Arbitrate Disputes And Abusively Disavow The Parties' Contracts .......................................................... 14

IV.   Amazonas' And Core Transport's Claims Against FLOPEC ........................................... 15

    A.   Breaches Of Contract ........................................................................................... 15

    B.   Request For Declaratory Relief ........................................................................... 16

V.    Procedural Matters .......................................................................................................... 17

    A.   Agreements to Arbitrate ....................................................................................... 17

    B.   Applicable Arbitration Rules ............................................................................... 18

    C.   Nomination of Arbitrator ..................................................................................... 18

    D.   Other Procedural Matters ..................................................................................... 18

VI.   Relief Requested ............................................................................................................. 19

1. Amazonas CA LLC (*Amazonas*) and Core Transport LLC (*Core Transport* and, collectively, *Claimants*) hereby request the initiation of arbitration proceedings against Empresa Publica Flota Petrolera Ecuatoriana (*FLOPEC* or *Respondent*), pursuant to the 2018 Arbitration Rules of the Society of Maritime Arbitrators (*2018 SMA Rules*), to obtain redress for FLOPEC's numerous breaches of its contracts with Claimants and to ensure that FLOPEC's professed claims against Claimants and their affiliates are properly resolved in the Parties' contractually agreed forum.

## I.    INTRODUCTION

2. Claimants and FLOPEC entered into a series of agreements beginning in 2020 that, over the course of a nearly four-year relationship, were mutually beneficial and extremely profitable. However, beginning in February 2024, FLOPEC breached the Parties' agreements by improperly purporting to terminate them. FLOPEC now seeks to recover for itself all of the contractual profits previously made by Claimants and, simultaneously, to inflict new damages on Claimants by either misrepresenting or failing to correct material facts concerning the applicable contracts to the Ecuadorian Comptroller General and, most recently, initiating a frivolous action in Pennsylvania state court. Because such conduct is wrongful, Claimants now bring this arbitration.

3. FLOPEC is Ecuador's State-owned maritime oil transport company. It has a statutorily mandated monopoly on the transport of Ecuadorian hydrocarbons and sets the rate for such charters. Because FLOPEC owns few oceangoing oil tankers, it enters into commercial arrangements with foreign tanker companies to enable it to profit from its monopoly on the transport of Ecuadorian crude oil. A typical arrangement utilized by FLOPEC involves creating a tanker pool pursuant to commercial agreements, whereby a foreign shipping company and FLOPEC contribute tankers to the pool, whose vessels are used under FLOPEC's control to transport Ecuadorian crude oil. By creating such a pool, FLOPEC gains control of sufficient ships to meet the demand for charters from purchasers of Ecuadorian crude oil and reaps the profits for itself and the other pool participants from the charter rates FLOPEC charges the crude oil purchasers.

4. Amazonas and Core Transport are members of a corporate group that has decades of experience providing logistics and operational services to oil producers, refiners, and other industry participants. Claimants and their affiliates have transported over one billion barrels of crude oil and also have significant experience managing the global operation of oceangoing vessels,

including vessels transporting oil from Ecuador.  By 2020, Claimants' experience and expertise were well-known to FLOPEC.

5.    In 2020, FLOPEC and Claimants entered into a tanker pool arrangement focused on one type of ship: Aframax tankers, which are mid-sized vessels with the capacity to transport approximately 700,000 barrels of oil.  At that time, FLOPEC decided to replace a similar pooling arrangement it had previously concluded with a different shipping conglomerate that had not delivered on the promised results.  Pursuant to the series of contracts between Claimants and FLOPEC, Amazonas was responsible for managing a fleet of Aframax vessels (the ***Amazonas Fleet*** or ***Fleet***) so that whenever FLOPEC or a crude oil purchaser decided to use an Aframax vessel for a particular shipment of oil cargo, a suitable vessel would efficiently be deployed for FLOPEC to charter.

6.    The Parties' relevant agreements comprise the following:

a.    The "General Terms and Conditions" agreed to by the Parties on December 1, 2020[1] and January 10, 2023[2] (the ***Amazonas Contracts***) contain cargo preference and non-compete provisions designed to optimize the performance and profitability of the Fleet and its "Participants," *i.e.*, the Parties contributing vessels to the Fleet, namely FLOPEC and Core Transport.  The Amazonas Contracts denominate all Fleet Participants (FLOPEC and Core Transport) as Parties to the Amazonas Contracts and require that each Participant maintain a minimum of three vessels in the Fleet.  The Amazonas Contracts also regulate the net revenues to be distributed to FLOPEC and Core Transport, pursuant to a formula calculated on the basis of each vessel's operational efficiency and the net performance of the entire Fleet.  The Participants are also bound by a non-compete clause that forbids them from using Aframax Fleet vessels for business outside the Fleet.

b.    Each Fleet vessel is contributed to the Fleet pursuant to a contract between Amazonas and the Participant contributing the vessel, *e.g.*, either FLOPEC or Core Transport.  These contracts (***Pool Participation Agreements*** or ***PPAs***, later renamed as ***Amazonas Commercial Agreements*** or ***ACAs***) set forth the terms and conditions upon which the vessel is entered into the Fleet and thereby effectuate the Amazonas Contracts.

---

[1] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020).

[2] **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023).

7.      FLOPEC is the chartering party facing the crude oil purchasers for all Fleet vessels because, under Ecuadorian law, all oil cargoes leaving Ecuador must be transported on vessels chartered by FLOPEC.  Under the Amazonas Contracts, FLOPEC determined which cargoes were assigned to which Fleet vessel.  The more vessels FLOPEC contributed to the Fleet, the greater the allocation of Fleet profits to which FLOPEC would be entitled.

8.      Based on Claimants' acumen and expertise in the transportation of hydrocarbons, the tanker pool arrangement operated effectively and, as a result, proved mutually beneficial and extremely profitable for FLOPEC and Claimants alike.  Indeed, prior to FLOPEC's breaches, discussed below, FLOPEC and Core Transport generated over $1.4 billion in gross revenue from the charter fees paid by purchasers of the crude oil cargoes shipped from Ecuador, as regulated by the Amazonas Contracts.  FLOPEC and Ecuador also earned over $100 million from taxes and other fees imposed on every cargo from Ecuador.  Between December 2020 and July 2024, FLOPEC's and Ecuador's collective earnings from the Amazonas Contracts exceeded $550 million, and FLOPEC's total earnings exceeded $375 million.

9.      The Amazonas Fleet delivered consistent and record profitability for FLOPEC.  In 2023 alone, FLOPEC earned more than $159 million from the Amazonas Contracts, resulting in FLOPEC's highest-ever profits.  FLOPEC's earnings from the Amazonas Contracts represented the majority of its total profits in 2023.

10.     Nevertheless, after four years, FLOPEC wrongfully terminated the contracts and subsequently has engaged in abusive efforts to coerce Claimants to relinquish the benefits they received from the Parties' bargain.  In particular, FLOPEC has: (*a*) wrongfully declared the contracts null and void; (*b*) improperly declared the Amazonas Fleet terminated; (*c*) refused to assign cargoes to Fleet vessels; (*d*) chartered its Fleet vessels to carry cargoes outside the Fleet; and (*e*) failed to continuously meet its minimum vessel contribution obligations.  This conduct has caused Claimants to incur—and continue to incur—significant damages, well in excess of $200 million.

11.     FLOPEC's subsequent bad faith actions have exacerbated Claimants' damages.  During an investigation by Ecuador's Comptroller General into several of FLOPEC's commercial arrangements, FLOPEC, on the one hand, either misrepresented material facts or failed to rebut unfounded allegations that Amazonas had not properly documented certain expense deductions applied under the terms of the Parties' contracts—even though FLOPEC had the relevant

documentation and the majority of the transactions in question had involved FLOPEC itself. On the other hand, if FLOPEC believed that there was a genuine dispute regarding such expenses, it would have been obligated to submit the matter to arbitration as mandated by the Parties' contracts. FLOPEC's omissions resulted in a defective determination by the Comptroller General that Amazonas and former FLOPEC officials are jointly and severally liable for tens of millions of dollars—a finding that Amazonas will appeal under the Ecuadorian legal framework but which already has caused substantial harm.

12. FLOPEC has now resorted to lawfare in yet another effort to rid itself of its contractual obligations. In December 2025, FLOPEC filed suit in a Pennsylvania state court against Claimants, their ultimate beneficial owner and affiliates, and others. FLOPEC brazenly declares the Amazonas tanker pool arrangement to be a commercially irrational and unenforceable "sham" that was designed to deceive FLOPEC—omitting to mention that FLOPEC selected Claimants to replace a structurally similar tanker pool arrangement for Aframax vessels, in which FLOPEC had participated with another company since at least as early as 2014.

13. In its Pennsylvania lawsuit, FLOPEC also seeks to cast obviously contractual disputes—which are meritless in any event—as supposed torts, in an ill-disguised ploy to exert pressure publicly on Claimants and escape from the Parties' agreed arbitral dispute resolution forum. These tactics must not be countenanced.

14. Amazonas and Core Transport now have no choice but to pursue this arbitration to affirm the validity and enforceability of the Amazonas Contracts and related agreements, obtain redress for FLOPEC's breaches, and ensure that FLOPEC abides by the Parties' respective rights and responsibilities.

15. This Demand for Arbitration is accompanied by factual exhibits numbered **C-01** to **C-07**. In accordance with Section 6 of the 2018 SMA Rules, Claimants reserve the right to specify, supplement, or amend the factual or legal claims and arguments or the relief requested herein.

## II.    THE PARTIES TO THE DISPUTE

### A.  Claimants Amazonas and Core Transport

16. Amazonas is a limited liability company organized under the laws of the Marshall Islands, with its principal place of business in Wayne, Pennsylvania. Amazonas was formed in 2020 to serve

as the operator of the Amazonas Fleet.  Amazonas is a Party to the Amazonas Contracts and all of the ACAs/PPAs.

17.    Core Transport is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Wayne, Pennsylvania.  Core Transport is not a signatory to the Amazonas Contracts but is a "Participant" in the Amazonas Fleet as defined in the Amazonas Contracts.  The Amazonas Contracts provided for all Participants, including Core Transport, to be considered Parties to the Amazonas Contracts (and therefore to be bound by the terms and benefit from the provisions of the Amazonas Contracts).[3]  Further, Core Transport's ACAs expressly provide that the Amazonas Contracts apply to the ACAs and vessels contributed by Core Transport.

18.    Claimants' representatives for purposes of this arbitration are the following counsel:

> Alexander A. Yanos
> Joanna C. Hendon
> Apoorva J. Patel
> **Alston & Bird LLP**
> 90 Park Avenue
> New York, NY 10016
> Tel.: 212-210-9400
> Emails: alex.yanos@alston.com
>         joanna.hendon@alston.com
>         apoorva.patel@alston.com

19.    For purposes of these proceedings, all communications shall be served on Claimants through their counsel.

**B.  Respondent FLOPEC**

20.    FLOPEC is an Ecuadorian State-owned entity responsible for the transportation of crude oil exported from Ecuador.  FLOPEC's principal place of business is in Esmeraldas, Ecuador.  FLOPEC is a Party to the Amazonas Contracts and to several PPAs/ACAs with Amazonas.

---

[3] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), at Preamble ¶ 1 (defining "persons participating in the Pool" as a 'Participant' and as a 'Party'); **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), at Preamble ¶ 1 (same).

21. We understand that FLOPEC is represented in the present matter by the following counsel:

> A. Michael Pratt
> Lucy G. Sumner
> **Greenberg Traurig, LLP**
> 1717 Arch Street, Suite 400
> Philadelphia, PA 19103
> Tel.: 215-988-7800
> Emails: prattam@gtlaw.com
>     lucy.sumner@gtlaw.com
>
> Daniel Pulecio-Boek
> **Greenberg Traurig, LLP**
> 2101 L Street, N.W., Suite 1000
> Washington, DC 20037
> Tel.: 202-331-3100
> Email: pulecioboekd@gtlaw.com
>
> John C. Molluzzo, Jr.
> **Greenberg Traurig, LLP**
> One Vanderbilt Plaza
> New York, NY 10017
> Tel.: 212-801-9200
> Email: molluzzoj@gtlaw.com

## III.  CIRCUMSTANCES GIVING RISE TO THE DISPUTE

### A.  The Parties Executed A Series Of Contracts Concerning The Transport Of Crude Oil From Ecuador In Aframax Vessels

22. Amazonas and Core Transport are indirectly owned by William S. Sudhaus, a U.S. citizen residing in Pennsylvania.  For more than twenty years, Mr. Sudhaus and his affiliated companies have been engaged in the transportation of crude oil from Ecuador for major international oil companies.

23. On December 1, 2020, FLOPEC contracted with Amazonas to operate the Amazonas Fleet of Aframax size vessels.[4]  On January 10, 2023, FLOPEC and Amazonas entered into a similar set of general terms and conditions applicable to vessels contributed to the Fleet after that date.[5]

24. The structure of the Parties' tanker pool arrangement was designed to optimize the profitability of all vessels in the Fleet while respecting the requirement under Ecuadorian law that all vessels

---

[4] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020).

[5] **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023).

carrying crude oil lifted from Ecuadorian ports be chartered by FLOPEC. FLOPEC alone negotiated the shipping rates to be paid by its customers who purchased Ecuadorian oil. Amazonas advised on the efficient utilization and profit-maximization of the Fleet's vessels. The goal of the pool was to match vessel supply and cargo demand and thereby maximize the returns from each vessel during such time as it was on-hire.

25.    To this end, the Parties' contracts set out a mechanism for determining and allocating for distribution the net revenues between FLOPEC and Core Transport on a pro rata basis. Cargoes loading in Ecuador accounted for more than 90% of the Fleet's revenue. For those cargoes, FLOPEC contracted directly with all charter parties (*i.e.*, its customers), set all charter party rates, and collected the monies paid by the charter parties. FLOPEC's accounting department, chartering department, and General Manager reviewed and approved all transfers of that revenue to Amazonas (after deducting certain Ecuadorian taxes and fees owed to FLOPEC). Upon FLOPEC's remittance of the revenues, Amazonas deducted the expenses associated with each voyage and promptly distributed the net revenues to the pool Participants, FLOPEC and Core Transport. The Parties' shared goal was for FLOPEC to receive at least 50% of the proceeds distributed between FLOPEC and Core Transport, based on their relative contributions to the Fleet (measured using a points system that reflected the efficiency and performance characteristics of each vessel relative to the other ships in the Fleet). The Amazonas Contracts were structured to encourage that outcome.[6]

26.    The Parties' commercial relationship was structured to be collaborative and transparent. At all times, FLOPEC had access to detailed information and documentation about each Fleet vessel and voyage. As the Amazonas Contracts required, Amazonas established a web portal through which FLOPEC could access up-to-date materials regarding each Fleet vessel's earnings, charters, and voyages and the Fleet's cash flow.[7] In the event FLOPEC sought additional information, it could (and did) ask Amazonas for that information, which FLOPEC received on request. Amazonas submitted weekly invoices to FLOPEC to remit the charter party revenues it had collected. The

---

[6] *See* **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 8.1; **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 8.1.

[7] *See* **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 6.1; **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 6.1.

invoices underwent a rigorous verification and approval process within senior levels of FLOPEC's management before any sums were remitted to Amazonas. In addition, pursuant to the Amazonas Contracts, the Parties' senior management met regularly to discuss best practices, commercial strategy, opportunities, and financial results.[8]

### 1. The Vessel-Specific PPAs/ACAs

27.    As noted above, FLOPEC and Core Transport are "Participants" in the Amazonas Fleet governed by the Amazonas Contracts, and each contributed vessels to the Fleet pursuant to separate PPAs/ACAs that each entered into with Amazonas. The PPAs/ACAs between Core Transport and Amazonas governed the vessels contributed to the Fleet by Core Transport. The PPAs/ACAs between FLOPEC and Amazonas governed the vessels contributed to the Fleet by FLOPEC.[9] Each PPA/ACA and associated appendices set forth, *inter alia*, the duration of the particular vessel's participation in the Fleet, the mechanism for the allocation of the vessel's earnings among Fleet Participants, and the specific conditions under which the relevant Participant may withdraw the vessel from the Fleet.

### 2. The Non-Compete Obligations Under the Amazonas Contracts

28.    Section 9 of the Amazonas Contracts contains clear-cut non-compete provisions designed to optimize the performance and profitability of the Fleet for all Participants. *First*, when buyers of crude oil seek to transport Aframax cargoes of crude oil from a port in Ecuador, FLOPEC must give preference to vessels from the Amazonas Fleet—including those contributed by Core Transport.[10]

---

[8] *See* **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 5.6; *accord* **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 5.6.

[9] **Ex. C-03**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Oct. 6, 2020) (vessel "Zaruma"); **Ex. C-04**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Dec. 1, 2021) (vessel "Pichincha").

[10] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), §§ 9.3 ("If during the term of this Addendum (including any Evergreen period) EP FLOPEC is asked to provide any vessel for a cargo to which a Cargo Reserve applies, it shall give preference to the use of a Pool Vessel, paying market rates for the use of a Pool Vessel."), 12.1 ("With respect to cargoes in which the Ecuadorian Cargo Reserve Law … applies, as it relates to the commercial chain, EP FLOPEC will be the charterer from Pool Company and disponent owner to the end user, paying market rates to Pool Company."); *accord* **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), §§ 9.3, 12.1.

29. *Second*, the Amazonas Contracts preclude each Participant from employing Fleet vessels—including vessels contributed by that Participant—in any business other than that of the Fleet, and from carrying on any Aframax shipping business in Ecuador using vessels other than those in the Fleet.[11]

30. These obligations survive until the Amazonas Contracts lawfully terminate.

## B. FLOPEC Wrongfully Purported To Terminate The Amazonas Contracts And Removed Its Vessels From The Fleet

31. Section 8.1 of the Amazonas Contracts: (*a*) required each Participant to maintain a minimum of three vessels in the Pool; (*b*) provided that neither Participant may terminate its participation in the Fleet during an initial two-year period; and (*c*) allowed a Participant subsequently to terminate its participation in the Fleet only upon six months' notice, following which the Participant may withdraw its vessels under the provisions of the applicable vessel-specific PPA/ACA:

> Except as otherwise restricted by Pool Company or Pool Manager (but in any event notwithstanding the terms of any PPA), each Participant agrees to maintain a minimum of 3 Vessels in the Pool for the Initial Period, thereafter, this Addendum (and the foregoing minimum Vessel commitment) shall continue on an Evergreen basis. Any Party may terminate its participation in the Pool during the Evergreen period by providing six months notice prior to the last day of the two-year Evergreen period that the Parties are then within. Following that, the Participants may withdraw their Vessels per their individual PPAs.[12]

32. FLOPEC did not continuously maintain its three-vessel minimum. As of February 5, 2024 (the date of FLOPEC's purported termination notice, discussed below), the Amazonas Fleet included two vessels contributed by FLOPEC: the M/T Zaruma and the M/T Pichincha. The Zaruma and

---

[11] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), §§ 9.1 ("No Pool Vessel shall be employed in any business other than the Business of the Pool without the prior written consent of all the Parties."), 9.2 ("Each Participant hereby agrees that, without the prior written consent of Pool Company, during the term of this Addendum (including any Evergreen period), neither the subject Participant, nor any of its Affiliates shall, directly or indirectly (including in conjunction with or through any other person) carry on any activities or business which uses Aframax size vessels of the Pool Business."); *accord* **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), §§ 9.1, 9.2.

[12] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 8.1; **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 8.1 ("Except as otherwise restricted by Company or Fleet Manager (but in any event notwithstanding the terms of any ACA), each Participant agrees to maintain a minimum of 3 Vessels in the Fleet. Any Party may terminate its minimum Vessel participation in the Fleet as per this Amazonas GT&C by providing six months notice (hereinafter 'Fleet Termination'). After the end of the six month notice period, the Participants may withdraw their Vessels per their individual ACAs.").

the Pichincha are each subject to a PPA between Amazonas and FLOPEC and may only be withdrawn from the Fleet "per their individual PPAs" after the six-month notice period has elapsed.

33.   The Zaruma PPA, entered into on October 6, 2020, permits FLOPEC to withdraw the vessel after giving Amazonas 90 days' written notice of its intention to do so and forbids FLOPEC from withdrawing more than one vessel from the Fleet in any three-month period without Amazonas' consent.[13]  The Pichincha PPA, entered into on December 1, 2021, permits FLOPEC to withdraw the vessel after giving Amazonas 180 days' written notice and forbids FLOPEC from withdrawing more than one vessel from the Fleet in any six-month period absent Amazonas' consent.[14]

34.   On February 5, 2024, FLOPEC breached the notice and withdrawal provisions of the Parties' agreements by purporting to terminate the agreements as of August 5, 2024.  Pursuant to the Parties' agreements, including FLOPEC's two vessel-specific PPAs, the earliest date FLOPEC could have withdrawn its two vessels was May 2, 2025.  This period comprised a six-month notice under the Amazonas Contracts, followed by a 90-day notice to withdraw the Zaruma and thereafter a 180-day notice to withdraw the Pichincha.

35.   FLOPEC's February 5, 2024 email notice (the *Notice*) stated, in relevant part:

> We refer to all of the Amazonas Commercial Agreements including but not limited to the Amazonas Tanker Pool Participation Agreements … hereinafter referred to collectively as "Amazonas Tanker Agreements." Pursuant to the Amazonas Tanker Agreements we, EP FLOPEC, as Participants, expressly serve our six months' notice of termination of EP FLOPEC's participation in the Amazonas Tanker Pool and in all other Commercial Agreements related to its participation in the Pool.  As a result of this notice, the Agreement cannot be considered renewed in any Evergreen period or any other capacity.[15]

36.   On February 9, 2024, Amazonas advised FLOPEC that its Notice was defective due to FLOPEC's failure to comply with the specific vessel withdrawal requirements for the Pichincha and Zaruma, among other reasons.  FLOPEC never requested (nor has Amazonas granted) Amazonas' consent

---

[13] **Ex. C-03**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Oct. 6, 2020) (vessel "Zaruma"), § 6(a).

[14] **Ex. C-04**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Dec. 1, 2021) (vessel "Pichincha"), § 6(a).

[15] **C-05**, Email from Jorge Alberto Regalado (General Manager of FLOPEC) to Ty Shimada (Amazonas) (Feb. 5, 2024).

to withdraw either vessel earlier than the periods provided for in each vessel's respective PPA. Until FLOPEC withdraws the Zaruma and Pichincha in conformity with their respective PPAs, these vessels remain part of the Amazonas Fleet, and FLOPEC remains a Participant under the Amazonas Contracts.

37. In contravention of its contractual obligations, on August 5, 2024, FLOPEC removed both the Pichincha and Zaruma from the Fleet in order to deploy them for non-Fleet business, well before it was permitted to do so. Had FLOPEC complied with the terms of the Amazonas Contracts and the Zaruma and Pichincha PPAs, it could not have withdrawn both vessels and ended its participation in the Fleet until May 2, 2025 (*i.e.*, six months after the date of FLOPEC's February 5, 2024 Notice under the Amazonas Contracts, plus 270 days under the terms of the Zaruma and Pichincha PPAs). Because FLOPEC never provided the withdrawal notices required by the applicable PPAs, that date continues to be extended. Amazonas and Core Transport continue to suffer damages due to FLOPEC's wrongful withdrawal of its vessels and termination of the Fleet.

## C.  FLOPEC Also Breached Its Cargo Preference and Non-Compete Obligations

38. Since August 5, 2024, in breach of the Amazonas Contracts, FLOPEC has refused to assign oil cargoes to Core Transport's vessels. Instead, FLOPEC has assigned oil cargoes to Aframax vessels outside the Amazonas Fleet. FLOPEC also has used the Zaruma and Pichincha vessels, which remain in the Fleet, for non-Fleet business. The effect of these actions has been the improper, unilateral termination of the Amazonas Fleet by FLOPEC.

39. As a result of FLOPEC's wrongful conduct, Amazonas and Core Transport have suffered damages in excess of $200 million and continue to suffer additional harm.

\* \* \* \* \*

40. Claimants promptly and repeatedly objected to FLOPEC's purported unilateral cancellation of the Parties' agreements and advised that FLOPEC was in material breach of those agreements. Claimants also notified FLOPEC that, to the extent FLOPEC provided crude oil cargoes for transportation to Aframax vessels outside the Amazonas Fleet or deployed the Zaruma or

Pichincha for business other than that of the Fleet, such actions constituted additional material breaches of the Parties' agreements.[16]

### D. FLOPEC's Acts And Omissions In Relation To An Investigation By Ecuador's Comptroller General Caused Amazonas Economic and Reputational Harm

41. At the same time as FLOPEC wrongfully sought to terminate its participation in the Amazonas Fleet, an audit process was conducted by the office of the Comptroller General of Ecuador (**CGE**). The CGE audit reportedly encompassed FLOPEC's contracts and operations, from 2018-2023, related to several oil transport services, including not only FLOPEC's commercial agreements with Amazonas, but also FLOPEC's previous Aframax tanker pool arrangement with Andes Tankers and other arrangements with third parties (*e.g.*, Panamax International, Agoyán Tankers, and Galápagos Tankers).

42. With regard to the Amazonas Contracts, the CGE's audit team questioned whether current and former officials of FLOPEC had fulfilled their administrative duties to verify information relating to travel and fuel expenses that Amazonas (as the Party in charge of the operation of the Fleet's vessels) had deducted from the gross revenues attributable to FLOPEC's vessels, pursuant to the relevant contracts. However, the CGE's audit team did not cross-check the answers given by those FLOPEC officials, request supporting documentation for the expenses incurred by FLOPEC's vessels in the Fleet, or request any information or documentation from Amazonas relating to the information that had been provided (or not provided) by the FLOPEC officials.

43. As a result, the CGE's audit team carried out an incomplete and inaccurate investigation. In a "pre-determination" of liability issued in March 2024, the CGE considered—erroneously—that the Ecuadorian State had suffered an economic loss of approximately $88 million due to the supposed failure by FLOPEC officials to review the supporting documentation for the FLOPEC vessels' expenses. The CGE offered no evidence challenging the legitimacy of the expenses that FLOPEC's vessels incurred and Amazonas paid and offered no proof that FLOPEC had suffered any economic harm. Despite a complete failure of proof, the CGE stated that Amazonas was jointly and severally liable for the alleged omissions or negligence on the part of the FLOPEC officials.

---

[16] **C-06**, Letter from Amazonas to FLOPEC (Aug. 6, 2024).

44. Upon learning of the CGE's findings, Amazonas challenged the pre-determination through an administrative review procedure. As a matter of Ecuadorian law, there was no basis for the CGE to impose liability based on FLOPEC officials' alleged lack of review of the supporting documentation, nor could Amazonas be held jointly liable for the conduct of the FLOPEC officials. Amazonas also explained the contractual basis for the expense deductions in question under the Amazonas Contracts and FLOPEC's PPAs, and that the expenses were substantiated by documentation that had been available to and accessible by FLOPEC at all times through the contractually mandated online portal. Moreover, the vast majority of the expense invoices at issue corresponded to transactions carried out with FLOPEC itself.

45. Despite Amazonas' clarifications, the CGE ultimately affirmed its own determination of liability in a decision issued in November 2025. In that decision, the CGE did not even address or engage with the above grounds for challenge set forth by Amazonas. The CGE's decision presently may be submitted for judicial review before the Ecuadorian courts, which Amazonas intends to pursue.

46. Against this background, FLOPEC knew or should have known that Amazonas had abided by the Amazonas Contracts and PPAs/ACAs, and that the expenses that were the subject of the CGE's investigation had been properly incurred and documented pursuant to those agreements. FLOPEC's failure to engage satisfactorily with the CGE's auditors not only contributed to a defective determination by the CGE but also exposed Amazonas to economic and reputational harm.

47. FLOPEC's acts and omissions in relation to the CGE investigation constitute a breach of Section 9.4 of the Amazonas Contracts, which provides that each Participant "shall not, whether by itself, its employees or agents or otherwise howsoever, directly or indirectly, do or permit anything to be done which is harmful to the reputation of Pool Company [*i.e.*, Amazonas] or Pool Manager or which is likely to cause any person to reduce the amount of business transacted between that person and the Pool or seek to change the terms of such business in a manner adverse to Pool Company."[17]

---

[17] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 9.4; *accord* **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 9.4.

**E. FLOPEC's Attempts To Avoid Its Obligation To Arbitrate Disputes And Abusively Disavow The Parties' Contracts**

48.    FLOPEC's conduct in the CGE proceeding is also inconsistent with its express agreement—repeated in Section 15.1 of the Amazonas Contracts as well as Section 14 of FLOPEC's PPAs/ACAs—to arbitrate any disputes "in connection with the interpretation or fulfillment of" the relevant contracts.[18]  If FLOPEC considered there to be any legitimate dispute concerning the expense deductions Amazonas had applied under the Amazonas Contracts or PPAs/ACAs, an arbitration would be the exclusive forum in which to resolve such a dispute.  The fact that FLOPEC never pursued such an arbitration underscores that the CGE's contentions lack merit.  But FLOPEC's affirmative decision to participate in the CGE's administrative procedure instead of submitting the matter to arbitration also improperly flouted the Parties' obligation to arbitrate.

49.    Even more egregiously, FLOPEC recently has sought to avoid its obligation to arbitrate by commencing a frivolous litigation in Pennsylvania state court against the Claimants, Mr. Sudhaus and various affiliated entities and individuals, FLOPEC's former General Manager, and other named and unnamed persons (the *Pennsylvania Litigation*).  In its Complaint in the Pennsylvania Litigation, FLOPEC professes that the Amazonas Tanker Pool arrangement was "a sham" and alleges that the Parties' contracts violate Ecuadorian law.[19]

50.    Putting aside these baseless accusations, FLOPEC's litigation tactics are a transparent effort to evade the present arbitral forum.  In the Pennsylvania Litigation, FLOPEC has attempted to manufacture untenable claims of tortious and conspiratorial conduct and has abusively joined a constellation of non-signatory parties as defendants—all in hopes of circumventing its obligation to arbitrate any dispute "in connection with the interpretation and fulfilment of" the Parties' contracts.  As Claimants will demonstrate in the appropriate judicial forum, all of FLOPEC's claims—which are centered on the structure and effect of and duties created by the Parties' contracts—require the interpretation of the contracts and assessment of the Parties' fulfillment or performance of those agreements, and therefore may be resolved only through arbitration.

---

[18] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 15.1; **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 15.1; **Ex. C-03**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Oct. 6, 2020) (vessel "Zaruma"), § 14; **Ex. C-04**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Dec. 1, 2021) (vessel "Pichincha"), § 14.

[19] **C-07**, FLOPEC's Complaint in Pennsylvania Litigation (Dec. 16, 2025).

51. FLOPEC's abusive commencement of and claims in the Pennsylvania Litigation thus constitute a further breach of the Parties' arbitration agreements and expose Claimants to additional economic and reputational harm.

## IV.   AMAZONAS' AND CORE TRANSPORT'S CLAIMS AGAINST FLOPEC

52. As discussed above, FLOPEC has repeatedly and materially breached the Amazonas Contracts and its PPAs/ACAs with Amazonas.  These breaches have damaged, and continue to damage, Claimants in amount to be quantified but presently estimated as no less than $200 million.

### A.   Breaches Of Contract

53. Amazonas, Core Transport, and FLOPEC are all "Parties" to the valid Amazonas Contracts. Amazonas and FLOPEC are also parties to the valid PPAs/ACAs associated with the vessels contributed to the Fleet by FLOPEC, which arise under and effectuate the Amazonas Contracts.

54. Under Sections 8 and 9 of the Amazonas Contracts, FLOPEC is required to, among other things: (*a*) maintain its minimum contribution of vessels to the Fleet; (*b*) give preference to Fleet vessels, including vessels contributed by Core Transport, for all Aframax oil cargoes that FLOPEC is requested to ship from Ecuadorian ports; (*c*) use Fleet vessels only for Fleet business and not use any Fleet vessel in any business other than the business of the Fleet; (*d*) abide by the written notice and withdrawal provisions of the Amazonas Contracts and all applicable vessel- and voyage-specific agreements arising under and necessary to effectuate the Amazonas Contracts; and (*e*) not do or permit anything to be done which is likely to be harmful to Amazonas' reputation or cause any person to reduce the amount of business transacted between that person and the Amazonas Fleet or seek to change the terms of such business in a manner adverse to Amazonas.

55. Under Section 15.1 of the Amazonas Contracts and Section 14 of the PPAs/ACAs, FLOPEC is required to arbitrate any dispute that should arise "in connection with the interpretation and fulfillment of" the Parties' contracts.

56. Claimants each have performed all of their respective obligations toward FLOPEC under the Amazonas Contracts, including all vessel- and voyage-specific PPAs/ACAs arising under and required to effectuate and perform the Amazonas Contracts.

57. By refusing to assign cargoes to Core Transport, chartering vessels outside the Fleet and assigning them cargoes, using FLOPEC Fleet vessels for business other than Fleet business, refusing to meet

its minimum vessel participation in the Fleet, refusing to abide by its contractual obligations to arbitrate, and/or prosecuting the Pennsylvania Litigation, FLOPEC has materially breached Sections 8, 9, and 15.1 of the Amazonas Contracts and Section 14 of the PPAs/ACAs.

58.    In addition, by withdrawing the Zaruma and Pichincha vessels from the Fleet on August 5, 2024, FLOPEC materially breached Section 8.1 of the Amazonas Contracts and Section 6(a) of the PPAs applicable to each of those vessels, respectively.

59.    FLOPEC's acts and omissions described in the foregoing paragraphs also constitute breaches of the implied covenant of good faith and fair dealing inherent in every contract.  Such actions and omissions injured Amazonas' and Core Transport's right to receive the benefits of the Parties' contracts, including the rights and benefits associated with operating a fleet of vessels for the worldwide transport of cargoes of crude oil and certain petroleum products from Ecuador.

60.    As a direct and proximate cause of FLOPEC's breaches, Amazonas and Core Transport collectively have suffered damages exceeding $200 million, plus any and all applicable late fees, penalties and interest, and continue to suffer damages.

**B.    Request For Declaratory Relief**

61.    As noted above, Ecuador's Comptroller General has concluded that Amazonas is liable for considerable sums based on the allegation that FLOPEC misallocated travel and fuel expenses that Amazonas (as the Party in charge of the operation of the Fleet's vessels) had deducted from the gross revenues attributable to FLOPEC's vessels, pursuant to the relevant contracts.

62.    In fact, as will be established, Amazonas deducted and FLOPEC allocated the relevant travel and fuel expenses in accordance with the Parties' relevant contracts.

63.    At the same time, FLOPEC's Complaint filed in the Pennsylvania Litigation argues that the Parties' contracts violated Ecuadorian law and were the product of unlawful conduct.  These allegations are false and, indeed, frivolous.

64.    As a result, Claimants are entitled to a declaration that the Parties' contracts are lawful, valid, and effective and that the relevant deductions of travel and fuel expenses were in accordance with the Parties' agreement.

## V.    PROCEDURAL MATTERS

### A.  Agreements to Arbitrate

65.    The Amazonas Contracts contain substantively identical arbitration clauses, providing for any dispute that arises in connection with the interpretation and fulfillment of the Amazonas Contracts or any PPA/ACA to be decided by arbitration in New York.  These clauses also set out the Parties' agreement as to the governing law, applicability of the SMA Rules, and appointment of arbitrators as follows:

> Notwithstanding the terms of any PPA, this Addendum and all PPAs shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Addendum or any PPA, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the Parties cannot agree upon the appointment of a single arbitrator, the dispute shall be settled by three arbitrators, each Party appointing one Arbitrator, and if the dispute is between two Parties, the third arbitrator shall be appointed by the arbitrators named by each Party. If any of the appointed arbitrators refuses or is incapable of acting, the Party appointing him shall appoint a new arbitrator in his place. Any determination rendered by the arbitrator(s) shall be final and binding upon the Parties and may, if necessary, be enforced by a court of any competent authority in the same manner as a judgment in a court of law.[20]

66.    The PPAs/ACAs between FLOPEC and Amazonas, which govern the vessels contributed to the Fleet by FLOPEC, also contain substantively identical arbitration provisions.[21]

---

[20] **Ex. C-01**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Dec. 1, 2020), § 15.1; **Ex. C-02**, General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements (Jan. 10, 2023), § 15.1 ("Notwithstanding the terms of any ACA, this Amazonas GT&C and all ACA shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Amazonas GT&C or any ACA, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the Parties cannot agree upon the appointment of a single arbitrator, the dispute shall be settled by three arbitrators, each Party appointing one Arbitrator, and if the dispute is between two Parties, the third arbitrator shall be appointed by the arbitrators named by each Party. If any of the appointed arbitrators refuses or is incapable of acting, the Party appointing him shall appoint a new arbitrator in his place. Any determination rendered by the arbitrator(s) shall be final and binding upon the Parties and may, if necessary, be enforced by a court of any competent authority in the same manner as a judgment in a court or law.").

[21] **Ex. C-03**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Oct. 6, 2020) (vessel "Zaruma"), § 14 ("If any dispute should arise in connection with the interpretation and fulfillment of this Agreement, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators."); **Ex. C-04**, Pool Participation Agreement Between Amazonas Tanker Pool Company LLC and FLOPEC (Dec. 1, 2021) (vessel "Pichincha"), § 14 (same).

### B. **Applicable Arbitration Rules**

67. The arbitration clauses in the Amazonas Contracts and FLOPEC's PPAs/ACAs all provide that the applicable arbitration rules shall be the "rules of the Society of Maritime Arbitrators." The 2018 SMA Rules apply to contracts entered into on or after March 14, 2018 and therefore encompass all of the Amazonas Contracts and related PPAs/ACAs.

### C. **Nomination of Arbitrator**

68. In accordance with the arbitration clauses in the Parties' contracts and Section 10 of the 2018 SMA Rules, Claimants hereby appoint Viren Mascarenhas as an Arbitrator on the Panel, which will comprise three Arbitrators. Mr. Mascarenhas' contact information is as follows:

> Email: viren@mascarenhaslaw.com
> Tel.: 212-404-1486

69. Pursuant to Section 10 of the 2018 SMA Rules, Claimants hereby give notice that FLOPEC is required to appoint an Arbitrator within twenty days of receipt of this Demand for Arbitration, failing which Claimants "may appoint a second Arbitrator with the same force and effect as if that second Arbitrator were appointed by" FLOPEC.

### D. **Other Procedural Matters**

70. ***Arbitral Seat and Location of Proceedings.*** The arbitration clauses in the Parties' contracts provide that the place of arbitration is New York. The legal seat of this arbitration is therefore New York, NY.

71. Pursuant to Section 7 of the 2018 SMA Rules, "arbitration hearings are to be held in the City of New York at a location chosen by the Panel, in consultation with the parties." Further, in accordance with Section 23 of the 2018 SMA Rules, "[i]n those circumstances it deems appropriate, the Panel has the discretion to direct that the testimony of witnesses be taken by video conference or such other electronic means."

72. ***Confidentiality.*** This arbitration involves confidential and commercially sensitive information and documents that require protection from public disclosure. Upon constitution of the Panel, Claimants will request that the Panel make orders concerning the confidentiality of the arbitral proceedings in consultation with the Parties.

## VI.   RELIEF REQUESTED

73.   On the basis of the foregoing, without limitation and reserving Claimants' right to supplement their claims and prayers for relief, Claimants respectfully request that the Panel:

    a.   DECLARE that the Amazonas Contracts and PPAs/ACAs are valid and effective and compliant with any applicable provisions of Ecuadorian law;

    b.   DECLARE that Claimants have complied with their obligations toward FLOPEC under the Amazonas Contracts and the PPAs/ACAs between FLOPEC and Amazonas;

    c.   DECLARE that FLOPEC has breached its obligations toward Claimants under the Amazonas Contracts and the PPAs/ACAs between FLOPEC and Amazonas;

    d.   DECLARE that FLOPEC's purported termination of the Amazonas Contracts and PPAs/ACAs is invalid and ineffective;

    e.   ORDER FLOPEC to compensate Claimants for these breaches, in an amount to be determined by the Panel and presently estimated at no less than $200 million;

    f.   ORDER FLOPEC to pay all the costs and expenses of this arbitration, including Claimants' legal fees, the fees and expenses of any experts engaged by Claimants or appointed by the Panel, the fees and expenses of the Panel, and all other costs and fees;

    g.   ORDER FLOPEC to pay all the costs and expenses of the Pennsylvania Litigation, including Claimants' legal fees; and

    h.   AWARD such other relief as the Panel deems just and proper.

Respectfully submitted this 8th day of January 2026.

ALSTON & BIRD LLP

By: _____

Alexander A. Yanos
Joanna C. Hendon
Apoorva J. Patel
90 Park Avenue
New York, NY 10016
Telephone:  212-210-9400

*Counsel to Claimants Amazonas CA LLC and Core Transport LLC*

# EXHIBIT C-01

**Exhibit C-01**

11/13/2020

ADDENDUM

General Terms and Conditions
Relating to Amazonas Tanker Pool Participation Agreements

December 1, 2020

123942312



This Addendum - General Terms and Conditions Relating to Amazonas Tanker Pool Participation Agreements ("Addendum") is effective as of December 1, 2020 (the "Effective Date").

WHEREAS:

(1)      Empressa Publica Flota Petrolera Ecuatoriana ("EP FLOPEC"), Amazonas Tanker Pool Company LLC ("Pool Company") and other persons participating in the Pool as a "Participant" (each, a "Party" and collectively, the "Parties") have previously formed a pool of Vessels (the "Pool") which are and will continue to be chartered to Pool Company.

(2)      The Parties have agreed that the commercial management of the Vessels in the Pool shall be performed by Pool Manager under the respective vessel PPAs and the CMA.

(3)      This Addendum establishes certain terms of the Pool going forward from and after the Effective Date.

(4)      This Addendum shall be construed to supplement and, in certain instances, modify the terms of all PPAs to which any subject Party is a party, previously or hereafter entered into relating to the Pool.

NOW, THEREFORE, IT IS AGREED as follows:

1.      **Definitions**

1.1      Definition of Terms

The terms used in this Addendum, with their initial letters capitalized, shall unless the context thereof otherwise requires, have the following meanings specified in this Section:

a.      "Affiliate" shall mean, with respect to any Party, any person controlling, controlled by or under common control with, that Party.

b.      "CMA" shall mean a Commercial Management Agreement between Pool Company and Pool Manager, as same may be amended from time to time.

c.      "Evergreen" shall mean that, after the Initial Period, this Addendum shall remain in effect continuously for successive two-year periods until the effective date of termination after any Party provides notice to terminate this Addendum.

d.      "Fleet" shall mean the collective group of Vessels entered into the Amazonas Tanker Pool by the respective Pool Participants.

e.      "Fleet Balance Plan" shall mean a plan generated by the Pool Manager for purposes of maintaining Fleet size balance.

f.      "Fleet Imbalance" shall mean a period in time when a Participant's total Vessel contributions to the Pool are disproportionately larger than the contributions of the other Participants.

g.      "Initial Period" shall mean the compulsory two-year period from and after the Effective Date in which no Participant has the right to voluntarily terminate its participation in the Pool.

123942312

h.      "Participant" shall mean EP FLOPEC and any other person admitted to participate in the Pool pursuant to a PPA.

i.      "Pool" shall mean the Amazonas Tanker Pool created and/or continued by this Addendum and the respective PPAs.

j.      "Pool Company" shall mean Amazonas Tanker Pool Company LLC, registered in Marshall Islands, and/or its successors and assigns.

k.      "Pool Manager" shall mean Amazonas Tankers LLC, registered in Delaware, United States, and/or its successors and assigns.

l.      "Pool Portal" shall mean a website administered by Pool Manager for the purpose of disseminating pertinent Pool performance and financial information to the Participants

m.      "Pool Review" shall mean the review of a complaint notice from a Participant to Pool Manager with respect to the Pool earnings over the previous 24 months.

n.      "Pool Vessel" shall mean a Vessel which a Participant has contributed to the Pool.

o.      "PPA" shall mean any Pool Participation Agreement relating to any Vessel in the Pool previously or hereafter entered into.

p.      "Vessel" shall mean an Aframax size tanker vessel meeting the standards set forth in Attachment A hereto and otherwise reasonably acceptable to Pool Company and Pool Manager.

## 2.    Business of the Pool

2.1     The "Business of the Pool" shall comprise the operation of Vessels for world-wide transportation of crude oil, fuel oil and other petroleum products and all activities ancillary thereto. Pool Company shall not engage in any business other than the Business of the Pool.

## 3.    Headings

3.1     Section headings are inserted for convenience of reference only and should be ignored in interpretation of this Addendum.

## 4.    References

4.1     In this Addendum, unless the context otherwise requires:

a.      references to Sections and Attachments are to be construed as references to Sections of and Attachments to this Addendum and references to this Addendum include its Attachments;

b.      words importing the plural shall include the singular and vice versa;

c.      references to a person shall be construed as references to an individual, firm, company, corporation, unincorporated body of persons or any government entity; and

d.      references to any person includes such persons' assignees and successors in title.

123942312

**Exhibit C-01**

## 5.    Obligations

5.1      The Parties intend for at least 8 Vessels to be included in the Pool.  Due attention and consideration shall be provided to Parties recommendations as it relates to Fleet size.  However, the ultimate Fleet size shall be determined by Pool Manager in its sole discretion and promulgated to Participants by Pool Manager in due course.

5.2      Participants shall submit any proposed Vessel contributions to Pool Manager for review and approval to determine acceptability in the Pool. Pool Manager may reject any Vessels submitted for approval in its sole discretion.  However, if the rejection is due to a Pool vetting requirement, the Pool Manager may provide a written list of deficiencies and/or requirements for the Participant to rectify by a stated deadline in order for the submitted Vessel to be re-considered for approval; likewise, Pool Manager may in its sole discretion terminate Vessels in the Pool for reasons such as age or other Vessel operational concerns.  Such age or operational concern terminations shall be notified to the affected Participant by Pool Manager within 30 days of the effective termination date.  If the affected Participant does not attend or resolve the age or operational concerns to the satisfaction of the Pool Manager within the 30 day notice period, the affected Vessel shall be terminated and the Participant will have the option to nominate a replacement vessel for Pool Manager approval in order to keep the fleet size proportional among the Participants.  Further, notwithstanding the terms of any PPA, Pool Manager may, in its sole discretion, establish and implement reasonable increases or other modifications to the minimum standards for Vessels to meet changing trade and customer requirements which are considered to be in the interest of optimizing the returns to Participants in the Pool.  The Pool Manager shall promulgate the modifications to the minimum standards for the Pool to all Parties within 90 days of the effective date of the change.  Each Participant shall comply with such modifications or in the alternative may terminate its participation in the Pool per the termination provisions in any applicable PPA and this Addendum.

5.3      In accordance with subsection 5.4 below and the practicalities of Vessel delivery, re-delivery and operations, the Parties agree that EP FLOPEC may contribute up to its proportionate share of the total Vessels in the Pool relative to other Participants.

5.4      A Fleet Imbalance shall exist when any one Participant's total Pool Vessel contributions exceed its disproportionate share of the total Fleet size or when Pool Manager determines the size of the Fleet is not appropriate for current market conditions. Upon a Fleet Imbalance, Pool Manager and Pool Company may, but shall not be obligated to cause the following to occur:

(1)      A Participant with a higher percentage of Pool Vessel contributions shall immediately pause future Pool Vessel contributions until authorized by Pool Manager.

(2)      Pool Manager shall submit a Fleet Balance Plan to the Parties in order to bring each Participant's Vessel contributions to the Pool to a level reasonably proportionate to the total number of Participants. This Fleet Balance Plan shall be binding upon the Parties.

5.5      The Parties shall share market information, proprietary analysis and information systems with Pool Manager on a private and confidential basis.

5.6      The senior management of the Parties and Pool Manager intend to meet on a quarterly basis to discuss best practices, commercial strategy, and opportunities.

5.7      Pool Company reserves the right to terminate the participation of any Participant in the Pool in the event of the Participant's breach of this Addendum or a PPA, or in the event of the bankruptcy, insolvency or reorganization of a Participant.

123942312

5.8     In respect of any contract of affreightment ("COA"), time or voyage charter that Pool Company enters into or has an opportunity to enter into as disponent owner or any COA, time or voyage charter in which the original owner or disponent owner has assigned its rights and benefits to Pool Company, the Parties agree that Pool Company has the right to enter into time charters as charterers with third party owners or disponent owners ("Third Party Charters"), for the purpose of chartering-in vessels from such third party owners or disponent owners ("Third Party Vessels") as needed to cover time or voyage, charter trip commitments and COA's. All Third Party Charters shall be in accordance with any Classification Society rules and any requirements of the insurance coverage for the Vessel and under the **Shelltime 4 charter form** attached as Appendix 1. All net income associated with Pool Company chartering-in is to be allocated to the net Pool revenues and such transactions will be referred to as "Pool trading transactions."

## 6.     Pool Portal

6.1   Pool Company shall appoint Pool Manager to administer a web-based Pool Portal that shall provide the Parties with details of all Pool Vessels' earnings, charters, voyages, and Pool cash flow. The Pool Portal shall be updated regularly and accessible 24 hours a day. No less than one Participant Representative will have access to the Pool Portal with login information provided in due time by the Pool Manager. The Parties shall treat all information related to the Pool and Pool Portal as private and confidential and shall not share information with any third party unless expressly authorized by each of the other Parties.

## 7.     Commencement

7.1     This Addendum shall be effective from and after the Effective Date.

## 8.     Termination

8.1     Except as otherwise restricted by Pool Company or Pool Manager (but in any event notwithstanding the terms of any PPA), each Participant agrees to maintain a minimum of 3 Vessels in the Pool for the Initial Period, thereafter, this Addendum (and the foregoing minimum Vessel commitment) shall continue on an Evergreen basis. Any Party may terminate its participation in the Pool during the Evergreen period by providing six months notice prior to the last day of the two-year Evergreen period that the Parties are then within. Following that, the Participants may withdraw their Vessels per their individual PPAs.

8.2     During the Evergreen period, if the monthly Pool net result ('TCE) is less than the weighted average hire rate for any Participant's Pool Vessels for 24 consecutive months, then that Participant may request a Pool Review wherein the Participant's complaint will be reviewed over a 60-day period. If, at the sole discretion of Pool Manager, after the 60-day period, it is determined that the Participant's complaint is valid, then the Participant may thereon withdraw its Vessels from the Pool as per the Termination/Withdrawal clause of its individual Vessel PPA.

## 9.     Non-Compete

9.1     No Pool Vessel shall be employed in any business other than the Business of the Pool without the prior written consent of all the Parties.

9.2     Each Participant hereby agrees that, without the prior written consent of Pool Company, during the term of this Addendum (including any Evergreen period), neither the subject Participant, nor any of its Affiliates shall, directly or indirectly (including in conjunction with or through any other person), carry on any activities or business which uses Aframax size vessels of the Pool Business.

123942312

9.3     If during the term of this Addendum (including any Evergreen period) EP FLOPEC is asked to provide any vessel for a cargo to which a Cargo Reserve applies, it shall give preference to the use of a Pool Vessel, paying market rates for the use of a Pool Vessel.

9.4     Each Participant agrees that during the term of this Addendum (including any Evergreen period) it shall not, whether by itself, its employees or agents or otherwise howsoever, directly or indirectly, do or permit anything to be done which is harmful to the reputation of Pool Company or Pool Manager or which is likely to cause any person to reduce the amount of business transacted between that person and the Pool or seek to change the terms of such business in a manner adverse to Pool Company.

## 10.     Confidentiality

10.1     This Addendum, including all terms, details, conditions, and period shall be kept private and confidential by each of the Parties and beyond the reach of any third person. The terms and conditions of this Addendum are for the sole use of the Parties and are not to be copied or used for any other purpose without the express written consent of each other Party.

10.2     Subject to Section 10.3, each Party shall (and shall ensure that its employees, agents and advisers shall) safeguard, treat as confidential and not use for any purposes any confidential information it acquires in connection with this Addendum or which relates to the Pool or to any of the other Parties except:

a.     as may be required by law or by any relevant national or supernational regulatory authority or by the rules of any relevant recognized stock exchange;

b.     where it has come into the public domain otherwise than through breach of this Addendum;

c.     disclosure of details of the Pool's affairs, finances and accounts to a Party's professional and financial advisers who are required to know the same to carry out their duties;

d.     disclosure on a "need to know" basis to a person which is an Affiliate of any Party where such disclosure is for a purpose reasonably incidental to this Addendum; or

e.     information which is independently developed by a Party or acquired from a third party to the extent it is acquired with the right to disclose the same.

10.3     The obligations of confidentiality in this Section 10 shall survive the termination of this Addendum but shall cease to apply to any confidential information which enters the public domain through no fault of a subject Party, whether before or after termination.

10.4     Upon termination of the Pool, each Party may demand from the others the return of its confidential information by notice in writing whereupon the other Parties shall (and shall ensure that their respective officers and employees shall):

a.     return all documents containing confidential information which have been provided by or on behalf of the Party demanding return of such information; and

b.     destroy all copies of such documents and any document or other record reproducing, containing or made from or with reference to the confidential information, including without limitation any of the foregoing held electronically (save, in each case, for any submission to or filings with governmental, tax or regulatory authorities). Such return or destruction shall take place as soon as practicable after the receipt of the said notice.

## 11.     Admission of New Pool Members

11.1     Pool Manager shall have the right to propose and negotiate on behalf of the Parties the

123942312

submission of new Pool Participants, including any amendment to this Addendum. However, no person shall be entitled to become or be regarded as a Participant in the Pool without the prior written authorization of all Parties.

**12.     EP FLOPEC / Cargo Reserve**

12.1     With respect to cargoes in which the Ecuadorian Cargo Reserve Law ("Ecuadorian Cargo Reserve Law" or "Cargo Reserve Law" shall mean LEY DE FACILITACION DE LAS EXPORTACIONES Y DEL TRANSPORTE ACUATICO. Ley No. 147.RO/901 de 25 Marzo de 1992) applies, as it relates to the commercial chain, EP FLOPEC will be the charterer from Pool Company and disponent owner to the end user, paying market rates to Pool Company.

12.2     The Parties shall work cooperatively to enable EP FLOPEC to charter Pool Vessels from Pool Company to cover all shipper/charterer cargoes loading in Ecuador. The Parties shall give priority to any Pool Vessel(s) over all other vessels for transportation of any Ecuadorian hydrocarbons.

12.3     When EP FLOPEC acts as a charterer or disponent owner using any Pool Vessels to cover any third person shipper/charterer cargoes loading in Ecuador, any claims presented to EP FLOPEC by the Pool shall be presented to the subject third person without any material amendments and shall be prosecuted by EP FLOPEC using best efforts. EP FLOPEC shall act as disponent owner between the Pool and the third person, and all funds received by EP FLOPEC from the third person relating to the claim shall be immediately turned over to the Pool without deduction or offset (less any express commissions or rebates). EP FLOPEC shall provide timely correspondence and supporting documentation requested by the Pool relating to any such claims.

**13.     Insurances**

13.1     Unless the same are determined by Pool Company or Pool Manager to be in place (following consultation with the Participants), Pool Company or Pool Manager shall be entitled, but not obliged, to effect such of the following insurances and/or such other insurances as Pool Company or Pool Manager may determine to be required for the efficient and safe operation of the Pool:

    a.     Pool/Ship Managers' Legal Liability Insurance;

    b.     Loss of Hire and/or Freight Insurance;

    c.     Charterers' Liability Insurance; and

    d.     Charterers' F.D. & D. Coverage.

**14.     Assignment**

14.1     The Parties may not assign or transfer any of their rights or obligations under this Addendum without the prior written consent of the other Parties; provided that a Party may transfer all its rights and obligations hereunder to an Affiliate of that Party.

**15.     Governing Law/Arbitration**

15.1     Notwithstanding the terms of any PPA, this Addendum and all PPAs shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Addendum or any PPA, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the Parties cannot agree upon the appointment of a

123942312

single arbitrator, the dispute shall be settled by three arbitrators, each Party appointing one Arbitrator, and if the dispute is between two Parties, the third arbitrator shall be appointed by the arbitrators named by each Party. If any of the appointed arbitrators refuses or is incapable of acting, the Party appointing him shall appoint a new arbitrator in his place. Any determination rendered by the arbitrator(s) shall be final and binding upon the Parties and may, if necessary, be enforced by a court of any competent authority in the same manner as a judgment in a court of law.

### 16.    No Partnership

16.1    Notwithstanding the terms of this Addendum or any PPA, nothing in this Addendum or any PPA shall create a partnership or establish a relationship of principal and agent or any other fiduciary relationship between or among any of the Parties.

### 17.    Miscellaneous

17.1    The Sections of this Addendum shall be deemed to give rise to separate and independent rights and obligations of the Parties hereto; to the extent that any Section (or part thereof) of this Addendum is subsequently found to be invalid or unenforceable the same shall not affect any other part of this Addendum, which shall remain in full force and effect. In such event the Parties shall negotiate in good faith to agree upon altered terms of this Addendum to replace those which have been found to be invalid or unenforceable.

17.2    No term of this Addendum is enforceable by a person who is not a Party.

17.3    The Parties agree that monetary damages may not provide adequate relief and compensation in the event of a breach of this Addendum or any PPA by a Party, and that, therefore, this Addendum and any PPA may be enforced by equitable remedies including injunctive relief (without the necessity of any bond).

17.4    Except as otherwise expressly provided in this Addendum, in the event of any conflict between the terms of this Addendum and the terms of any PPA, the terms of this Addendum shall control as between Pool Company and the subject Participant as to the subject Vessel(s), and the terms of any subject PPA shall be deemed amended accordingly.

### 18.    Notices

18.1 Notices or other communications under or with respect to this Addendum or any PPA shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or email to the parties at their respective addresses set forth below or to such other address as to which notice is given:

EP FLOPEC:
EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA
Avenida Del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador
Apt. 080106
Email: jcondov@flopec.com.ec

Pool Company:
AMAZONAS TANKER POOL COMPANY LLC
1400 Liberty Ridge Drive, Suite 100
Wayne, PA  19087
Email: operaciones@amazonastankers.com

Notice shall be deemed given upon sending except for notice by mail shall be deemed given upon receipt.



123942312

IN WITNESS WHEREOF, this Addendum has been duly executed by each of the parties as of the date first set forth above.

**EMPRESSA PUBLICA FLOTA PETROLERA ECUATORIANA**

By:

Name:   JAIME CONDOY

**AMAZONAS TANKER POOL COMPANY LLC**

By:

Name:   JOHN DAMIANI

123942312

**Exhibit C-01**

**Exhibit C-01**

Attachment B

To be provided.

123942312

# EXHIBIT C-02

**Exhibit   C-02**

AMAZONAS CA LLC

General Terms and Conditions
Relating to Amazonas Commercial Agreements

January 10, 2023

**Exhibit C-02**

This General Terms and Conditions Relating to Amazonas Commercial Agreements ("Amazonas GT&C") is effective as of January 10, 2023 (the "Effective Date").

WHEREAS:

(1)    Empressa Publica Flota Petrolera Ecuatoriana ("EP FLOPEC"), Amazonas CA LLC ("Company") and other persons participating in the Fleet as a "Participant" (each, a "Party" and collectively, the "Parties") have previously formed a Fleet of Vessels which are and will continue to be chartered to Company.

(2)    The Parties have agreed that the commercial management of the Vessels in the Fleet shall be performed by Fleet Manager under the respective vessel ACAs and the CMA.

(3)    This Amazonas GT&C establishes certain terms relating to Vessels entered into the Fleet going forward from and after the Effective Date.

(4)    This Amazonas GT&C shall be construed to supplement and, in certain instances, modify the terms of all ACAs to which any subject Party is a party, hereafter entered into relating to the Fleet.

(5)    This Amazonas GT&C shall not apply to Vessels entered into the Fleet prior to the Effective Date hereof.

NOW, THEREFORE, IT IS AGREED as follows:

1.    **Definitions**

1.1    Definition of Terms

The terms used in this Amazonas GT&C, with their initial letters capitalized, shall unless the context thereof otherwise requires, have the following meanings specified in this Section:

a.    "Affiliate" shall mean, with respect to any Party, any person controlling, controlled by or under common control with, that Party.

b.    "CMA" shall mean a Commercial Management Agreement between Company and Fleet Manager, as same may be amended from time to time.

c.    "Fleet" shall mean the collective group of Vessels chartered into Company under an ACA or similar agreement and managed by Fleet Manager.

d.    "Fleet Balance Plan" shall mean a plan generated by the Fleet Manager for purposes of maintaining Fleet size balance.

e.    "Fleet Imbalance" shall mean a period in time when a Participant's total Vessel contributions to the Fleet are disproportionately larger than the contributions of the other Participants.

f.    "Participant" shall mean EP FLOPEC and any other person admitted to participate in the Fleet pursuant to a ACA.



g.   "Company" shall mean Amazonas CA LLC, registered in Marshall Islands, and/or its successors and assigns.

h.   "Fleet Manager" shall mean Amazonas Tankers LLC, registered in Delaware, United States, and/or its successors and assigns.

i.   "Web Portal" shall mean a website administered by Fleet Manager for the purpose of disseminating pertinent Fleet performance and financial information to the Participants

j.   "Fleet Vessel" shall mean a Vessel which a Participant has contributed to the Fleet.

k.   "ACA" shall mean any Amazonas Commercial Agreement relating to any Vessel in the Fleet hereafter entered into.

l.   "Vessel" shall mean an Aframax size tanker vessel meeting the standards set forth in Attachment A hereto and otherwise reasonably acceptable to Company and Fleet Manager.

## 2.   Business of the Fleet

2.1   The "Business of the Fleet" shall comprise the operation of Vessels for world-wide transportation of crude oil, fuel oil and other petroleum products and all activities ancillary thereto. Company shall not engage in any business other than the Business of the Fleet.

## 3.   Headings

3.1   Section headings are inserted for convenience of reference only and should be ignored in interpretation of this Amazonas GT&C.

## 4.   References

4.1   In this Amazonas GT&C, unless the context otherwise requires:

a.   references to Sections and Attachments are to be construed as references to Sections of and Attachments to this Amazonas GT&C and references to this Amazonas GT&C include its Attachments;

b.   words importing the plural shall include the singular and vice versa;

c.   references to a person shall be construed as references to an individual, firm, company, corporation, unincorporated body of persons or any government entity; and

d.   references to any person includes such persons' assignees and successors in title.

## 5.   Obligations

5.1   The Parties intend for at least 8 Vessels to be included in the Fleet. Due attention and consideration shall be provided to Parties recommendations as it relates to Fleet size. However, the ultimate Fleet size shall be determined by Fleet Manager in its sole discretion and promulgated to Participants by Fleet Manager in due course.

**Exhibit C-02**

5.2     Participants shall submit any proposed Vessel contributions to Fleet Manager for review and approval to determine acceptability in the Fleet. Fleet Manager may reject any Vessels submitted for approval in its sole discretion. However, if the rejection is due to a Fleet vetting requirement, the Fleet Manager may provide a written list of deficiencies and/or requirements for the Participant to rectify by a stated deadline in order for the submitted Vessel to be re-considered for approval; likewise, Fleet Manager may in its sole discretion terminate Vessels in the Fleet for reasons such as age or other Vessel operational concerns. Such age or operational concern terminations shall be notified to the affected Participant by Fleet Manager within 30 days of the effective termination date. If the affected Participant does not attend or resolve the age or operational concerns to the satisfaction of the Fleet Manager within the 30 day notice period, the affected Vessel shall be terminated and the Participant will have the option to nominate a replacement vessel for Fleet Manager approval in order to keep the fleet size proportional among the Participants. Further, notwithstanding the terms of any ACA, Fleet Manager may, in its sole discretion, establish and implement reasonable increases or other modifications to the minimum standards for Vessels to meet changing trade and customer requirements which are considered to be in the interest of optimizing the returns to Participants in the Fleet. The Fleet Manager shall promulgate the modifications to the minimum standards for the Fleet to all Parties within 90 days of the effective date of the change. Each Participant shall comply with such modifications or in the alternative may terminate its participation in the Fleet per the termination provisions in any applicable ACA and this Amazonas GT&C.

5.3     In accordance with subsection 5.4 below and the practicalities of Vessel delivery, re-delivery and operations, the Parties agree that EP FLOPEC may contribute up to its proportionate share of the total Vessels in the Fleet relative to other Participants.

5.4     A Fleet Imbalance shall exist when any one Participant's total Fleet Vessel contributions exceed its disproportionate share of the total Fleet size or when Fleet Manager determines the size of the Fleet is not appropriate for current market conditions. Upon a Fleet Imbalance, Fleet Manager and Company may, but shall not be obligated to cause the following to occur:

(1)     A Participant with a higher percentage of Fleet Vessel contributions shall immediately pause future Vessel contributions until authorized by Fleet Manager.

(2)     Fleet Manager shall submit a Fleet Balance Plan to the Parties in order to bring each Participant's Vessel contributions to the Fleet to a level reasonably proportionate to the total number of Participants. This Fleet Balance Plan shall be binding upon the Parties.

5.5     The Parties shall share market information, proprietary analysis and information systems with Fleet Manager on a private and confidential basis.

5.6     The senior management of the Parties and Fleet Manager intend to meet on a quarterly basis to discuss best practices, commercial strategy, and opportunities.

5.7     Company reserves the right to terminate the participation of any Participant in the Fleet in the event of the Participant's breach of this Amazonas GT&C or a ACA, or in the event of the bankruptcy, insolvency or reorganization of a Participant.

5.8     In respect of any contract of affreightment ("COA"), time or voyage charter that Company enters into or has an opportunity to enter into as disponent owner or any COA, time or voyage charter in which the original owner or disponent owner has assigned its rights and benefits to Company, the Parties agree that Company has the right to enter into time charters as charterers with third party owners or disponent owners ("Third Party Charters"), for the purpose of chartering-in vessels from such third party owners or disponent owners ("Third Party Vessels") as needed to cover time or voyage, charter trip commitments and COA's. All Third Party Charters shall be in

accordance with any Classification Society rules and any requirements of the insurance coverage for the Vessel and under the Shelltime 4 charter form attached as Appendix 1. All net income associated with Company chartering-in is to be allocated to the net Fleet revenues and such transactions will be referred to as "Fleet trading transactions."

6.    **Web Portal**

6.1    Fleet Company shall appoint Fleet Manager to administer a web-based Web Portal that shall provide the Parties with details of all Fleet Vessels' earnings, charters, voyages, and Fleet cash flow. The Web Portal shall be updated regularly and accessible 24 hours a day. No less than one Participant Representative will have access to the Web Portal with login information provided in due time by the Fleet Manager. The Parties shall treat all information related to the Fleet and Web Portal as private and confidential and shall not share information with any third party unless expressly authorized by each of the other Parties.

7.    **Commencement**

7.1    This Amazonas GT&C shall be effective from and after the Effective Date.

8.    **Termination**

8.1    Except as otherwise restricted by Company or Fleet Manager (but in any event notwithstanding the terms of any ACA), each Participant agrees to maintain a minimum of 3 Vessels in the Fleet. Any Party may terminate its minimum Vessel participation in the Fleet as per this Amazonas GT&C by providing six months notice (hereinafter "Fleet Termination").. After the end of the six month notice period, the Participants may withdraw their Vessels per their individual ACAs.

9.    **Non-Compete**

9.1    No Fleet Vessel shall be employed in any business other than the Business of the Fleet without the prior written consent of all the Parties.

9.2    Each Participant hereby agrees that, without the prior written consent of Company, during the term of any active ACA, neither the subject Participant, nor any of its Affiliates shall, directly or indirectly (including in conjunction with or through any other person), carry on any activities or business which uses Aframax size vessels of the Business of the Fleet.

9.3    If during the term of any active ACA, EP FLOPEC is asked to provide any vessel for a cargo to which a Cargo Reserve applies, it shall give preference to the use of a Fleet Vessel, paying market rates for the use of a Fleet Vessel.

9.4    Each Participant agrees that during the term of any active ACA it shall not, whether by itself, its employees or agents or otherwise howsoever, directly or indirectly, do or permit anything to be done which is harmful to the reputation of Company or Fleet Manager or which is likely to cause any person to reduce the amount of business transacted between that person and the Fleet or seek to change the terms of such business in a manner adverse to Company.

10.    **Confidentiality**

10.1    This Amazonas GT&C, including all terms, details, conditions, and period shall be kept private and confidential by each of the Parties and beyond the reach of any third person. The terms and

*4- N*

conditions of this Amazonas GT&C are for the sole use of the Parties and are not to be copied or used for any other purpose without the express written consent of each other Party.

10.2    Subject to Section 10.3, each Party shall (and shall ensure that its employees, agents and advisers shall) safeguard, treat as confidential and not use for any purposes any confidential information it acquires in connection with this Amazonas GT&C or which relates to the Fleet or to any of the other Parties except:

a.    as may be required by law or by any relevant national or supernational regulatory authority or by the rules of any relevant recognized stock exchange;

b.    where it has come into the public domain otherwise than through breach of this Amazonas GT&C;

c.    disclosure of details of the Fleet's affairs, finances and accounts to a Party's professional and financial advisers who are required to know the same to carry out their duties;

d.    disclosure on a "need to know" basis to a person which is an Affiliate of any Party where such disclosure is for a purpose reasonably incidental to this Amazonas GT&C; or

e.    information which is independently developed by a Party or acquired from a third party to the extent it is acquired with the right to disclose the same.

10.3    The obligations of confidentiality in this Section 10 shall survive Fleet Termination but shall cease to apply to any confidential information which enters the public domain through no fault of a subject Party, whether before or after Fleet Termination.

10.4    Upon Fleet Termination, each Party may demand from the others the return of its confidential information by notice in writing whereupon the other Parties shall (and shall ensure that their respective officers and employees shall):

a.    return all documents containing confidential information which have been provided by or on behalf of the Party demanding return of such information; and

b.    destroy all copies of such documents and any document or other record reproducing, containing or made from or with reference to the confidential information, including without limitation any of the foregoing held electronically (save, in each case, for any submission to or filings with governmental, tax or regulatory authorities).  Such return or destruction shall take place as soon as practicable after the receipt of the said notice.

**11.    Admission of New Fleet Members**

11.1    Fleet Manager shall have the right to propose and negotiate on behalf of the Parties the submission of new Fleet Participants, including any amendment to this Amazonas GT&C.  However, no person shall be entitled to become or be regarded as a Participant in the Fleet without the prior written authorization of all Parties.

**12.    EP FLOPEC / Cargo Reserve**

12.1    With respect to cargoes in which the Ecuadorian Cargo Reserve Law ("Ecuadorian Cargo Reserve Law" or "Cargo Reserve Law" shall mean LEY DE FACILITACION DE LAS EXPORTACIONES Y DEL TRANSPORTE ACUATICO.  Ley No. 147.RO/901 de 25 Marzo de 1992) applies, as it relates to the commercial chain, EP FLOPEC will be the charterer from Company and disponent owner to the end user, paying market rates to Company.

Exhibit C-02

12.2     The Parties shall work cooperatively to enable EP FLOPEC to charter Fleet Vessels from Company to cover all shipper/charterer cargoes loading in Ecuador. The Parties shall give priority to any Fleet Vessel(s) over all other vessels for transportation of any Ecuadorian hydrocarbons.

12.3     When EP FLOPEC acts as a charterer or disponent owner using any Fleet Vessels to cover any third person shipper/charterer cargoes loading in Ecuador, any claims presented to EP FLOPEC by the Fleet shall be presented to the subject third person without any material amendments and shall be prosecuted by EP FLOPEC using best efforts. EP FLOPEC shall act as disponent owner between the Fleet and the third person, and all funds received by EP FLOPEC from the third person relating to the claim shall be immediately turned over to the Fleet without deduction or offset (less any express commissions or rebates). EP FLOPEC shall provide timely correspondence and supporting documentation requested by the Fleet relating to any such claims.

## 13.     Insurances

13.1     Unless the same are determined by Company or Fleet Manager to be in place (following consultation with the Participants), Company or Fleet Manager shall be entitled, but not obliged, to effect such of the following insurances and/or such other insurances as Company or Fleet Manager may determine to be required for the efficient and safe operation of the Fleet:

a.     Fleet/Ship Managers' Legal Liability Insurance;

b.     Loss of Hire and/or Freight Insurance;

c.     Charterers' Liability Insurance; and

d.     Charterers' F.D. & D. Coverage.

## 14.     Assignment

14.1     The Parties may not assign or transfer any of their rights or obligations under this Amazonas GT&C without the prior written consent of the other Parties; provided that a Party may transfer all its rights and obligations hereunder to an Affiliate of that Party.

## 15.     Governing Law/Arbitration

15.1     Notwithstanding the terms of any ACA, this Amazonas GT&C and all ACA shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Amazonas GT&C or any ACA, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the Parties cannot agree upon the appointment of a single arbitrator, the dispute shall be settled by three arbitrators, each Party appointing one Arbitrator, and if the dispute is between two Parties, the third arbitrator shall be appointed by the arbitrators named by each Party. If any of the appointed arbitrators refuses or is incapable of acting, the Party appointing him shall appoint a new arbitrator in his place. Any determination rendered by the arbitrator(s) shall be final and binding upon the Parties and may, if necessary, be enforced by a court of any competent authority in the same manner as a judgment in a court of law.

## 16.     No Partnership

16.1     Notwithstanding the terms of this Amazonas GT&C or any ACA, nothing in this Amazonas GT&C or any ACA shall create a partnership or establish a relationship of principal and agent or any other fiduciary relationship between or among any of the Parties.

**Exhibit C-02**

**17.    Miscellaneous**

17.1    The Sections of this Amazonas GT&C shall be deemed to give rise to separate and independent rights and obligations of the Parties hereto; to the extent that any Section (or part thereof) of this Amazonas GT&C is subsequently found to be invalid or unenforceable the same shall not affect any other part of this Amazonas GT&C, which shall remain in full force and effect. In such event the Parties shall negotiate in good faith to agree upon altered terms of this Amazonas GT&C to replace those which have been found to be invalid or unenforceable.

17.2    No term of this Amazonas GT&C is enforceable by a person who is not a Party.

17.3    The Parties agree that monetary damages may not provide adequate relief and compensation in the event of a breach of this Amazonas GT&C or any ACA by a Party, and that, therefore, this Amazonas GT&C and any ACA may be enforced by equitable remedies including injunctive relief (without the necessity of any bond).

17.4    Except as otherwise expressly provided in this Amazonas GT&C, in the event of any conflict between the terms of this Amazonas GT&C and the terms of any ACA, the terms of this Amazonas GT&C shall control as between Company and the subject Participant as to the subject Vessel(s), and the terms of any subject ACA shall be deemed amended accordingly.

**18.    Notices**

18.1 Notices or other communications under or with respect to this Amazonas GT&C or any ACA shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or email to the parties at their respective addresses set forth below or to such other address as to which notice is given:

EP FLOPEC:
EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA
Avenida Del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador
Apt. 080106
Email: g.general@flopec.com.ec

Company:
AMAZONAS CA LLC
1400 Liberty Ridge Drive, Suite 100
Wayne, PA 19087
Email: operaciones@amazonastankers.com

Notice shall be deemed given upon sending except for notice by mail shall be deemed given upon receipt.

**Exhibit C-02**

Attachment A

MINIMUM FLEET ACCEPTABILITY REQUIREMENTS TO INCLUDE BUT NOT LIMITED TO:

1)  SOTE / OCP TERMINAL ACCEPTABILITY
2)  PANAMA CANAL SUITABLE
3)  MUST BE LESS THAN 15 YEARS OLD DURING THE TIME THE VESSEL IS IN THE FLEET

## Attachment B

**To be provided.**

# EXHIBIT C-03

**Exhibit C-03**

Private and Confidential

# POOL PARTICIPATION AGREEMENT

## BETWEEN

## AMAZONAS TANKER POOL COMPANY LLC

## AND

## EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA

## DATED OCTOBER 06, 2020

*No part of this document may be used or reproduced in any form or by any means, or stored in a database or retrieval system, without prior written permission of Amazonas Tanker Pool Company LLC. Making copies of any part of this document for any purpose is a violation of copyright laws.*

CO

Exhibit C-03

Private and Confidential

## TABLE OF CONTENTS

1.   DEFINITIONS .................................................................. 2
     1.1   DEFINITION OF TERMS ........................................ 2
2.   GENERAL POLICY ........................................................ 3
     2.1   PURPOSE OF THE POOL ....................................... 3
     2.2   POLICIES AND OPERATIONAL STANDARDS ............. 4
     2.3   TECHNICAL STANDARDS ...................................... 5
     2.4   CUSTOMER SATISFACTION .................................. 5
     2.5   MISCELLANEOUS .............................................. 6
3.   CONDITIONS FOR POOL PARTICIPATION ....................... 6
     3.1   TERM/DELIVERY ............................................. 6
     3.2   POOL ............................................................ 6
4.   POOL COMPANY/POOL MANAGER ................................. 8
5.   ENTERING PARTICIPANT .............................................. 11
6.   TERMINATION OR WITHDRAWAL ................................... 12
7.   HIRE ......................................................................... 13
8.   POOL REVENUE AND DISTRIBUTION ............................. 14
9.   CHARTER PARTY ........................................................ 16
10.  ASSIGNMENT OF EARNINGS ........................................ 16
11.  COMMITTEES AND AUTHORITIES ................................. 16
12.  NEW POOL PARTICIPANTS .......................................... 18
13.  TOTAL LOSS ............................................................. 18
14.  HEADINGS AND MODIFICATIONS ................................. 18
15.  GOVERNING LAW/ARBITRATION ................................. 18
16.  NOTICES .................................................................. 19
17.  CONFIDENTIALITY ..................................................... 19
18.  INDEMNITY, LIABILITY AND SECURITY ......................... 19
19.  NO PARTNERSHIP; U.S. TAX EXCEPTION ....................... 20
20.  RELIANCE ON COUNSEL AND OTHER ADVISORS ............. 21
21.  RIGHTS OF THIRD PARTIES ......................................... 21
22.  COUNTERPARTS ........................................................ 21

CD

**Exhibit C-03**

APPENDICES:

Appendix 1    SHELLTIME 4 TIME CHARTER AND TERMS

Appendix 2    COMMERCIAL MANAGEMENT AGREEMENT

Appendix 3    POOL KEY

Appendix 4    POOL RECAP

ii

Exhibit **C-03**

**Private and Confidential**

## POOL PARTICIPATION AGREEMENT

This Pool Participation Agreement (the "Agreement") is entered into on OCTOBER 06, 2020 by and among:

AMAZONAS TANKER POOL COMPANY LLC, a Marshall Islands corporation with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH 96960 (the "Pool Company"); and, EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA, a corporation incorporated under the laws of ECUADOR with its registered office at Avenida Del Pacifico No. 001 y Puerto Rico Esmeraldas, Ecuador Apt. 080106 (the "Entering Participant" or "Pool Participant"), as the owner or operator of the vessel "M/T ZARUMA" ("Entering Vessel").

## RECITALS:

A.    The Pool Company has been formed and established for the purpose of operating, as charterer, under a "SHELLTIME 4" time charter to be entered into with owners or disponent owners of Qualifying Vessels substantially in the form of Appendix 1 ("Charter Party"), a pool ("Pool") of Qualifying Vessels (each a "Pool Vessel");

B.    The Pool Company will employ the Pool Vessels in the worldwide carriage and/or storage of crude oil and/or dirty petroleum products ("Pool Business");

C.    In its capacity as disponent owner of the Pool Vessels, the Pool Company has appointed Amazonas Tankers LLC, in its capacity as the designated pool manager of the Pool Company (the "Pool Manager"), as the exclusive commercial manager of the Pool Vessels to perform, such commercial management services and such administrative, financial and accounting support services in connection with the Pool and the Pool Business as set forth in the Commercial Management Agreement dated 12 January 2018, a copy of which is Annexed as Appendix 2 hereto (the "Commercial Management Agreement");

D.    The Pool Manager, as agent for the Pool Company, has determined that the Entering Vessel is a Qualifying Vessel meeting all the specification and requirements for entry into the Pool and that the Entering Participant has satisfied all other conditions for entry into the Pool based on the criteria set forth herein;

E.    The Entering Participant wishes to enter the Entering Vessel into the Pool, and the Pool Company wishes to receive the Entering Vessel into the Pool, in each case in accordance with the terms of this Agreement; and

F.    This Agreement sets forth the terms and conditions upon which the Entering Participant shall enter the Entering Vessel into the Pool and the basis upon which the Entering Vessel shall share and participate in the pooled revenues of the Pool Business and the voyage and other costs thereof.

CD

**Exhibit C-03**

IT IS HEREBY AGREED AS FOLLOWS:

## 1.    DEFINITIONS

### 1.1    DEFINITION OF TERMS

The terms used in this Agreement, with their initial letters capitalized, shall, unless the context thereof otherwise requires, have the meanings specified in this Article 1. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    **"Affiliate"** means in relations to a person, any other person that directly or indirectly Controls, is Controlled by or is under direct or indirect common Control with the specified person;

(b)    **"Agreement"** has the meaning set forth in the Preamble and shall be deemed to include all subsequent amendments and modifications thereto;

(c)    **"Charter Party"** has the meaning set forth in Recital A;

(d)    **"Commercial Management Agreement"** has the meaning set forth in Recital C;

(e)    **"Control"** means the power of a person, directly or indirectly, to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interests, by contract or otherwise) or the right to a share of more than one-half of the assets, or of more than one-half of the income, of another person;

(f)    **"Gross Pool Revenue"** means the revenue of the Pool Vessels calculated in accordance with Clause 8;

(g)    **"Entering Participant"** has the meaning set forth in the Preamble;

(h)    **"Entering Vessel"** has the meaning set forth in the Preamble;

(i)    **"Net Pool Revenue"** has the meaning set forth in Clause 8;

(j)    **"Participant"** and **"Pool Participant"** means an owner or disponent owner of a Qualifying Vessel who has entered such Vessel into the Pool by execution and delivery of a pool participation agreement substantially in the form of this Agreement;

(k)    **"Participant Group"** means any group of Participants who are Affiliates and each of whom has entered a Vessel into the Pool;

2

CD

**Exhibit C-03**

(l)      **"Pool"** has the meaning set forth in Recital A;

(m)    **"Pool Company Account"** means any bank account opened by the Pool Manager as the agent of the Pool Company for the receipt of Working Capital and Gross Pool Revenue and the payment of Pool Expenses;

(n)    **"Pool Business"** has the meaning set forth in Recital B;

(o)    **"Pool Company"** has the meaning set forth in the Preamble;

(p)    **"Pool Expense"** means the expenses relating to the Pool Vessels calculated in accordance with Clause 8;

(q)    **"Pool Manager"** has the meaning set forth in Recital C;

(r)     **"Pool Vessel"** has the meaning set forth in Recital A;

(s)    **"Qualifying Vessel"** means a vessel approved for entry by the Pool Company;

(t)    **"Technical Committee"** means a panel consisting of one or more representatives as from time to time appointed by, and acting under the direction and supervision of, the Pool Company's agent, the Pool Manager, to address vetting issues and any other technical issues as deemed appropriate;

(u)    **"Working Capital"** has the meaning set forth in Clause 5; and

(v)    **"Vessel"** means a vessel generally, the Entering Vessel or a Pool Vessel, as the context may require.

(w)    **"Voyage Expense"** means the expenses relating to the Pool Vessels calculated in accordance with Clause 8;

(x)    **"Pool Recap"** means the vessel-specific deal summary as present in appendix 4.

## 2.    GENERAL POLICY

### 2.1    PURPOSE OF THE POOL

The Pool has been established to provide chartering and operational services to independent tanker owners and/or operators.  The goal of the Pool Business is to secure the highest earnings per day for each Pool Vessel. The Participant's contractual relationship with the Pool Company is by way of this Agreement, setting out the organizational provisions of the pooling arrangement, and the Charter Party containing the provisions relevant to the operation of the Vessel. The commercial management of the Pool is provided by the Pool Manager, as

CD

3

**Exhibit C-03**

appointed by the Pool Company under the terms of the Commercial Management Agreement and as otherwise set forth herein.

### 2.2    POLICIES AND OPERATIONAL STANDARDS

(a)    Only Vessels meeting the required characteristics of the Pool will be admitted to the Pool and parties will only be admitted as Participants who are tanker owners and operators who operate crude and/or product tankers that are in compliance with national, international and industry standards and in full accord with customer safety and environmental requirements.

(b)    The Participant will use its best efforts to ensure that each Pool Vessel, owned thereby, is able to perform operationally at all times and shall have all necessary equipment in good working order to carry out these operations. Each Participant shall ensure that its Pool Vessel shall be maintained and equipped in a manner that renders it seaworthy, is in compliance with the requirements of the relevant Classification Society and remains a Qualifying Vessel.

(c)    The goal of the Pool is that Pool Vessels will be allocated to trades in a manner to maximize Pool results. However, the Pool Company shall use commercially reasonable efforts to ensure that voyage operation practices are being uniformly applied to all Pool Vessels, and each Participant will be treated in the same equitable fashion and each will have the same access to voyage and cargo operations data and records of each Pool Vessel. The Pool Company will endeavor to position each Pool Vessel so that off-hire time and deviation caused by repairs and dry docking is minimized. However, the Pool Company shall not be under an obligation to do so to the extent it decreases the overall results of the Pool. Upcoming dry dock intentions are to be discussed with the Pool Manager in view of increasing the Vessel's commercial tradability. The Pool Manager is to be advised of any known material operational deficiencies of a Vessel as soon as practical. Notwithstanding the foregoing, neither the Pool Company nor the Pool Manager will be under any obligation to assure that any particular results are achieved for the Pool.

### 2.3    TECHNICAL STANDARDS

The Pool Manager and/or Technical Committee may suggest reasonable increases to the minimum ship standards to meet changing trade and customer requirements which are considered to be in the interest of optimizing the returns to all Participants in the Pool. The Participants shall endeavor to comply with such recommendations or in the alternative to terminate its participation in the Pool.

### 2.4    MISCELLANEOUS

(a)    Pool Participants will use commercially reasonable actions to benefit the Pool. It is further expected that the Participants will promote the Pool,

4

CO

**Exhibit C-03**

without additional material costs to Pool Participants, in the market place and Pool Manager will assist in recruiting additional qualified owner/operators to join the Pool.

(b) The Pool Company and the Participants acknowledge that differences of opinion are likely to take place, and they further acknowledge that as professional and commercial people, all reasonable efforts will be made to reconcile such differences amicably, and that arbitration should be the last resort. The Pool Manager and/or Technical Committee may be asked to mediate in such disputes.

## 3. CONDITIONS FOR POOL PARTICIPATION

The Entering Participant endorses the General Policy statements in Part 2 and desires to enter the Entering Vessel into the Pool by way of a Charter Party entered into concurrent herewith between the Entering Participant and the Pool Company and the Pool Manager, as the Pool Company's authorized agent, has agreed to accept the Vessel into the Pool;

### 3.1 TERM/DELIVERY

(a) This Agreement shall commence as of the date the Entering Vessel is delivered under the Charter Party, and shall continue unless terminated pursuant to Clause 6 of this Agreement.

(b) A Vessel is to be delivered into the Pool in delivery areas established by the Pool Manager and reasonably agreed to by the Entering Participant. Redelivery areas to be same as delivery areas when a Vessel exits the Pool. Any exceptions to be agreed by the Pool Manager.

### 3.2 POOL

(a) The Pool Company shall in its own name (as disponent owner and principal under the Charter Party) enter into contracts for the employment of the Pool Vessels. The Pool Manager, as agent for the Pool Company, shall negotiate and conclude spot charters, consecutive voyage charters, contracts of affreightment and time charters for performance by the Pool Vessels. If the time charter employment is longer than the minimum remaining period of participation of the Vessel, the Pool Manager shall ask consent of the Participant owning the relevant Pool Vessel before committing the ship to such employment.

(b) All revenues earned by the Pool Company from the operation of the Pool Vessels shall, after deduction of all costs involved in the operation of the Pool, be remitted to the Pool Participants as provided for in Clause 8 and Appendix 3 hereof. In the same manner, any liability incurred by the Pool Company as a result of the activities of the Pool shall be comparably charged to the Pool Participants. Such payment shall be made on a



5

Exhibit C-03

periodic basis, according to a settlement schedule mutually agreed upon between the Pool Company and the Pool Participant.

(c)    In respect of any contract of affreightment that the Pool Company enters into as disponent owner or any contract of affreightment in which the original owner or disponent owner has assigned its rights and benefit to the Pool Company (in either case, a "COA"), it is agreed by the parties hereto that the Pool Company has the right to enter into time charters as charterers with third party owners or disponent owners ("Third Party Charters"), for the purpose of chartering-in vessels from such third party owners or disponent owners ("Third Party Vessels") to cover time or voyage charter trip commitments, COA's which cannot be covered by any of the existing Pool Vessels. All Third Party Charters shall be in accordance with any Classification Society rules, any requirements of the insurance coverage for the Vessel and under the Shelltime 4 charter form attached as Appendix 1.

(d)    The Pool Participant shall be obliged as follows:

(1)    To indemnify and hold the Pool Company, the Pool Manager and/or its appointed agents harmless from all consequences or liabilities from any irregularities in papers supplied by the Participant and/or from any liability that arises from the Pool Participant's failure to ensure that any Bill of Lading signed by the vessel's Master complies with the Charterer's instructions or requirements of the Agreement or the amended Shelltime 4 and additional terms at Appendix 1.

(2)    To pay for and/or reimburse the Pool Company for all reasonable costs, disbursements, and expenses whatsoever incurred thereby in the performance of their responsibilities hereunder. Such disbursements and expenses shall include, but shall not be limited to, the reasonable fees and expenses of independent consultants, professional advisors and representatives, supercargo, port captains, surveyors, superintendents or other specialists, whom the Pool Company or the Pool Manager, acting as agent for the Pool Company, considers necessary to employ from time to time in connection with the operation of the Vessel. Such expenses are to be considered voyage expenses and prorated between all Vessels, if appropriate. If the Pool Manager's operational personnel and/or port captains are sent to attend the Vessel from the Pool Manager's office, only travel and out of pocket expenses are to be reimbursed by the Pool Company and charged to the applicable voyage(s).

(3)    To provide time charterers' protection and indemnity ("P&I") from a major P&I club, freight demurrage and defense ("FDD"), bunker insurance and loss of use insurance.

6

CO COPY

**Exhibit C-03**

(4)     To engage a professional consultant for the establishment of an "Incident Response Program" to mitigate any commercial exposure to the Pool Company as a result of an incident involving the Vessel.

(5)     To take action in order to get a resolution in the event that there is a cargo contamination caused by a Pool Vessel which results in demurrage or other claim(s) being unpaid with reference to such contamination. In the event no resolution has been achieved by the Participant by the time the Vessel gives notice to leave the Pool, then the Pool Company shall have the authority at that time to deduct an amount from charter hire equal to the amount being withheld by the sub-charterer under the claim so long as the Pool Company can resolve the dispute within a usual and customary timeframe to resolve disputes. If not, the charter hire shall be disbursed to the Participant, without prejudice to any right available against the Pool Participant hereunder.

## 4.    POOL COMPANY/POOL MANAGER

(a)     In consideration of its operation of the Pool on behalf of the Pool Company, as profit interest payable, the Pool Company shall retain from Gross Pool Earnings and remit to the Pool Manager as compensation for the commercial management services to the Pool and the Pool Vessels as set forth below an administrative fee agreed in a "Pool Recap" specific to the Pool Vessel for the term of this Agreement. The Pool Manager may negotiate profit interests compensation at a higher or lower rate with individual Participants at its reasonable discretion. In consideration thereof, the Pool Manager shall, as agent of the Pool Company, perform the following commercial management services pursuant to a separate commercial management agreement to be entered into with respect to the Pool Vessels:

(1)     To be responsible for the commercial employment of the Pool Vessels including but not limited to negotiating and concluding time charters (in or out), voyage charters, and market-related contracts of affreightment.

(2)     To be responsible for the commercial operation of the Pool Vessels including supervising and arranging bunkering, appointing port agents and negotiating tug boat service contracts, to include period contracts for such services.

(3)     To communicate with the Pool Vessels, the Participants, shippers, charterers, receivers, Pool Managers and others involved with the receiving and handling of the Vessel at the loading and discharging ports, including notices required under the terms of the Pool Vessels' employment.

CD

**Exhibit C-03**

(4)    To approve Letters of Indemnity ("LOIs") provided that such LOIs are in conformity with the Charter Party. The LOIs are to be in accordance with the relevant Participants' P&I club wording.

(5)    To collect all freights and accounts receivable arising from operation of the Vessel, to give receipts therefore, to make any and all claims for monies due in respect of Pool Vessels and to issue releases upon receipt of payment of such claims and in connection with the settlement of such claims. The Pool Manager shall ensure that all funds derived from the employment of the Vessel shall be deposited by the payers to the Pool Company Account. All funds received by the Pool Manager from any other sources for the account of the Pool Company shall be immediately deposited to the Pool Company Account. In the receipt and handling of any funds of the Pool, the Pool Manager shall have fiduciary responsibilities with respect to the Pool Company in accordance with normal vessel agency practices and applicable law. Any discounts or rebates that are, or become, available are to be credited to the Pool Participants.

(6)    To defend, intervene in, settle, compromise or abandon any legal proceedings by or against the Pool Company or, its freight, earnings and disbursements and for the purposes of this clause the expression "legal proceedings" shall include arbitration, civil, regulatory and criminal proceedings of all kinds.

(7)    To furnish the Master of the Vessel appropriate voyage instructions, to monitor voyage performance, speed, and use of weather routing services if deemed necessary by the Pool Manager.

(8)    To maintain such records, accounts, statements and supporting vouchers, if any, obtained in connection with the services covered by this Agreement and make them available to the Participants upon request, including, but not limited to, any of the foregoing which the Pool Company deems necessary or advisable in order to comply with any of the charters in effect with respect to any of the Vessels. Deloitte & Touche, UHY or another major accounting firm, on an annual basis, will audit the Pool Company's books, including distributions. Audited reports will be distributed to all the Participants. All Pool results are available for review by each Participant at the offices of the Pool Manager.

(9)    To prepare and distribute unaudited quarterly reports to each Participant for each Pool Vessel.

(10)    To submit such financial and business reports and other information relating to the provision of the Pool Manager's services under this Agreement as the Pool Company may reasonably require and in such form as may be agreed between the Pool Company and the Pool Manager.

8

CD

**Exhibit C-03**

(11)    To keep such records and accounts as shall be necessary and in accordance with good accounting practices for the proper operation of the Pool, including such accounts as shall be necessary for Pool Company distributions.

(12)    To monitor the contributions and distributions for the Pool Company.

(13)    The above notwithstanding, should there occur a significant change in the market due to a change in regulations, the Pool Manager is obliged to propose a change without delay.

(14)    To be under no liability whatsoever for any costs, expenses, losses, claims or damages of whatsoever nature (including loss of profit due to detention or delay to any of the Vessels) arising in course of the performance of its duties resulting from any act or omission by personnel, representatives, independent contractors or other persons employed by it, unless the same shall be proved to have resulted from the actual personal willful misconduct of any officer or director of the Pool Manager, and the Pool Company and Participant as defined in this Agreement hereby indemnify and hold the Pool Manager harmless from any and all actions, claims, demands, and liabilities to or from third parties (including subcontractors, servants and sub-Pool Managers in respect of any claim made by or on behalf of them) brought against the Pool Manager in course of its performance of its duties under this Agreement.

## 5.    ENTERING PARTICIPANT

(a)    The Entering Participant undertakes to perform the following duties:

(1)    To indemnify and hold the Pool Company, the Pool Manager and/or its appointed agents harmless from all consequences or liabilities from any material irregularities in papers supplied by the Participant and/or from any liability that arises from the Pool Participant's failure to ensure that any Bill of Lading signed by the vessel's Master complies with the Charterer's instructions or requirements of the Agreement or the amended Shelltime 4 and additional terms at Appendix 1.

(2)    To ensure that the Vessel shall be insured in accordance with normal shipping practice with underwriters acceptable to the Pool Company. Such insurance shall include hull and machinery, P&I, war risk and, to the extent reasonably required, piracy insurance and to provide evidence of same to the Pool Company upon request.

(3)    To enter into a Charter Party and terms with the Pool Company using the Shelltime 4 form attached hereto as Appendix 1. The executed Charter Party shall be an integral part of this Agreement.

CO

9

**Exhibit C-03**

(4)   To engage a professional consultant for the establishment of an 'Incident Response Program'. The Pool Company and the Pool Manager are to be included in, and be the beneficiaries of, the program.

(5)   To maintain the Vessel in a seaworthy condition subject to the rule of the insurance coverage and the relevant Classification Society rules. Furthermore, to be fully responsible for management of the Vessel, in accordance with the Charter Party. The Participant shall at all times keep the Pool Manager informed of all relevant communications relating to vetting issues, as regards any incident pertaining to the Vessel, its crews, its cargo and the environment in order, in each case, that the Pool Manager may keep customers adequately and proactively informed and to assist in any efforts necessary to mitigate or avoid loss to the customer, the Participant, or the reputation or customer relationships to the Pool.

(6)   To contribute such amount as agreed between between the Entering Participant and the Pool Manager in the "Pool Recap." Provided that should the cashflow of the Pool be insufficient to allow it to comply with its commercial commitments on the requirement of the Pool Company, then the Pool Manager shall be entitled to recommend a further contribution of Working Capital to the Pool. The Participant may contribute additional working capital recommended by the Pool Manager or in the alternative withdraw from the Pool. If the Pool Manager withholds distributions to the respective participants, less the amount withheld in Clause 3.2(e)(5) or pledged collateral that remains uncollected or becomes ineligible as collateral for financing the pools activity, will be repaid within ninety (90) days of when the final hire payment is due after the Vessel leaves the Pool.

(7)   To deliver the vessel with the bunker quantity as set forth in the governing SHELLTIME 4. The value of the bunkers on board at delivery shall be determined by the Pool Company in accordance with SHELLTIME 4 and provided as a credit from the Pool Company to the Pool Participant, to be settled at re-delivery of the Entering Vessel. The Pool Company shall not exchange cash for bunkers on board at delivery, but rather calculate the delivery / redelivery difference in value, on a FIFO basis, and make a cash settlement at redelivery.

(8)   To perform any and all obligations of the Entering Participant including paying any and all time charter hire payments or other applicable costs incurred by the Entering Participant in connection with the Entering Vessel.

## 6.   TERMINATION OR WITHDRAWAL

(a)   Unless otherwise set forth in the SHELLTIME 4 or an Addendum attached hereto, the Entering Vessel will be entered into the Pool for an initial period of six



Exhibit C-03

(6) months after which the Charter Party becomes evergreen for continuous six (6) month period, unless the Vessel is withdrawn from the Pool in accordance with the terms hereof. After the initial period however, the Vessel may be redelivered by the Pool within the permissible redelivery area(s) and after giving ninety (90) days written notice or after the Vessel is free of any commitment. The Participant may withdraw the vessel from the Pool as set forth in this Agreement or by serving written notice to the Pool at least ninety (90) days prior to the last day of the six (6) month period that the vessel is within. Once redelivery notice has been given by either party, the other party may choose to redeliver the Vessel, or request the redelivery of the Vessel, as the case may be, at any time after receipt of the redelivery notice, as long as the Vessel is free of any commitment and after serving a minimum of seven (7) days' notice, which is to include the name of the redelivery area. Participant may not terminate more than one Vessel charter party in any three months period unless the Participant, Pool Company and the Pool Manager all agree to allow differently.

Should a participant withdraw their vessel from service without regard for the withdrawal procedure set forth in this clause, the Pool Company shall be entitled to retain all Working Capital and undistributed earnings as partial compensation for damages. Retention of Working Capital and undistributed earnings shall not prejudice the Pool Company from seeking additional recourse against Participant.

(b)     The Participant is to immediately notify the Pool Company in writing of either the firm sale of a Vessel or of Participant's intention to sell the Vessel. Should the Vessel be sold, the Participant to give notice as per Clause 6(a). The Pool Company will endeavor to redeliver the Vessel early if requested by the Participant.

(c)     The Pool Company may terminate this Agreement with respect to a Pool Vessel if such Vessel is off-hire for more than thirty (30) days in a six (6) month period.

(d)     The Pool Company has the right to terminate this Agreement with respect to a Participant if such Participant dissolves or liquidates or if an order be made or effective resolution be passed winding up either party or if a receiver shall be appointed for the property of the Participant or if the Participant shall cease to carry on its business or commences a proceeding in bankruptcy or similar proceeding (or a proceeding in bankruptcy or similar proceeding is commenced against a party which proceeding remains undismissed and unstayed after thirty (30) days) or if a party makes any special arrangements or composition with its creditors.

(e)     Upon termination or removal of the Vessel from the Pool, the Participant will pay an administrative fee of USD 25,000 to the Pool Company which will be deducted from the last hire payment. This is to cover operational and accounting costs related to finalizing the Vessel's disbursements, demurrage, etc.



CD

**Exhibit C-03**

(f)    The Pool Company may terminate this Agreement for just cause as defined in any part of this Agreement or in the Charter Party.

(g)    Any termination of this Agreement and withdrawal of the Vessel from the Pool shall be without prejudice to any and all rights and obligations of the parties hereto attributable to such termination or withdrawal.

## 7.   HIRE

The Vessel will earn charter hire in accordance with Clause 8 of this agreement.

## 8.   POOL REVENUE AND DISTRIBUTION

(a)    The net pool revenue ("Net Pool Revenue") shall be equal to the Gross Pool Revenue less any Pool and Voyage Expenses as set forth below:

(1)    Gross voyage revenue (including but not limited to freight, demurrage, and dead freight) (the "Gross Pool Revenue");

(2)    Less address commission (if applicable);

(3)    Less broker commission(s) (if applicable);

(4)    Less Pool Manager's commission (if applicable);

(5)    Less any other voyage expenses (including but not limited to port expenses, canal costs, voyage related COFR, bunker expenses, additional war or piracy risk or similar costs or expenses) and any other applicable costs (including but not limited to inspections, cleaning costs, chemicals or similar costs).

(6)    Less any legal or professional fees incurred by the Pool Company or Pool Manager in connection with the management of the Pool, which amounts shall be charged to the Pool Participants as soon as administratively practicable after the end of each calendar quarter for such calendar quarter and which amounts shall be allocated among the Pool Participants on a proportionate basis based on the number of days that the Entering Vessel is in the Pool in the applicable calendar quarter;

(7)    Less any insurance payable by the Pool Company, which amounts shall be charged to the Pool Participants as soon as administratively practicable after the end of each calendar year for such calendar year and which amounts shall be allocated among the Pool Participants on a proportionate basis based on the number of days that the Entering Vessel is in the Pool in the applicable calendar quarter;

(8)    Less any interest and bank charges;

12


CD

(9)    Less any revenue sharing withholding amounts, as applicable;

(b)    The allocation of each Vessel's earnings from the Pool Company is determined as per Appendix 3, the "Pool Key"

(c)    Notwithstanding anything in this Agreement to the contrary, any amount due or payable to the Participant from the Pool Company under this Agreement or any related document may be set off against amounts due or payable to the Lender (whether arising under this Agreement or otherwise) at the election of the Lender from time to time.

## 9.    CHARTER PARTY

The Participant/the Vessel shall at any and all times during the term of this Agreement comply with the conditions, terms and warranties expressed or implied in this Agreement and in the Charter Party attached hereto as Appendix 1 and which shall be deemed to be an integral part of this Agreement. The terms of this Agreement shall prevail if a conflict should arise in the interpretation of the terms of this Agreement and the terms of the Charter Party.

## 10.    ASSIGNMENT OF EARNINGS

The earnings of the Pool Vessels may not be assigned by the Participants but may be assigned by the Pool Company in favor of its working capital lenders. The Participants may only assign the earnings distributed by the Pool Company to the Participant's Pool Vessels. Each Participant agrees to subordinate any claims the Participant has or may have against the Pool Company to any and all claims of the Pool Company's creditors that the Pool Company determines are valid and undisputed. Participant also agrees to waive any contractual lien over the charter hire earnings distributed by the Pool Company pertaining to the Vessels in favor of such creditor and to any freight, sub-freights or sub-hires pertaining to the Vessels.

## 11.    NEW POOL PARTICIPANTS

No person shall be entitled to become or be regarded as a Pool Participant unless and until (i) such person has entered into an agreement substantially in the form hereof, with such modifications as the Pool Company or Pool Manager may from time to time approve, (ii) in relation to any Qualifying Vessel which it proposes to enter as a Pool Vessel, such person has entered into a Charter Party substantially in the form of Appendix 1 with such amendments as the Pool Company or Pool Manager shall require and (iii) such person has contributed the amount of Working Capital determined by the Pool Company or Pool Manager in accordance with Clause 5.

## 12.    TOTAL LOSS

In the event of a total loss or constructive total loss of a Vessel, the Vessel's participation in the Pool shall be deemed to be terminated at noon (GMT) on the day of her loss or, should the Vessel be missing, at noon (GMT) on the day on which she was last heard of.

13



Exhibit C-03

### 13.    HEADINGS AND MODIFICATIONS

The headings of Clauses are for convenience of reference only and shall not affect the interpretation of this contract. No modification, wavier or discharge of any term of this Agreement shall be valid unless in writing and signed by the party to be charged therewith.

### 14.    GOVERNING LAW/ARBITRATION

This Agreement shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Agreement, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the parties cannot agree upon the appointment of a single Arbitrator, the dispute shall be settled by three Arbitrators, each party appointing one Arbitrator, and if the dispute is between two parties hereto, the third Arbitrator shall be appointed by the Arbitrators named by each party. If any of the appointed Arbitrators refuses or is incapable of acting, the party appointing him shall appoint a new Arbitrator in his place. Any determination rendered by the Arbitrator(s) shall be final and binding upon the parties and may, if necessary, be enforced by a court of any other competent authority in the same manner as a judgment in a court of law. For any disputes being settled by arbitration, which may require the vote of the Pool Manager, the Principal initiating the arbitration of the Participant being brought to arbitration will abstain from such voting.

### 15.    NOTICES

Notices or other communications under or with respect to this Agreement shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or email to the parties at their respective addresses set forth below or to such other address as to which notice is given:

To the Participant:
EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA
Avenida Del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador
Apt. 080106
Email: jcondov@llopec.com.ec

To the Pool Company:
AMAZONAS TANKER POOL COMPANY LLC
c/o Amazonas Tankers LLC
1400 Liberty Ridge Drive, Suite 100
Wayne, PA 19087
Email: operaciones@amazonastankers.com

Notice shall be deemed given upon sending except for notice by mail shall be deemed given upon receipt.

CD

## 16.    CONFIDENTIALITY

This Agreement, including all terms, details, conditions, and period is to be kept private and confidential and beyond the reach of any third party, with the exception of the lending banks of the Participant or the Pool Company's working capital lenders or the Participant's technical managers. The terms and conditions of this Agreement are for the sole use of the parties to this Agreement and are not to be copied or used for any other purpose without the express written consent of the Pool.

## 17.    INDEMNITY, LIABILITY AND SECURITY

If a claim is made against a Participant ("Indemnified Party") or its affiliate, or any seizure, distraint, arrest, detention, attachment or the like ("Arrest") effected in respect of property owned, controlled or possessed by the Indemnified Party or its affiliate by reason of a claim against another Participant or its affiliate or the Pool Managers ("the Indemnifying Party") or in respect of any property owned, controlled or possessed by the Indemnifying Party then the Indemnifying Party shall:

(a)    indemnify and hold harmless the Indemnified Party and its affiliate against the claim and the Arrest, and all costs, losses, liabilities and expenses (including reasonable legal expenses) arising therefrom;

(b)    without limitation to the foregoing, provide security to ensure that any Arrest is lifted or discharged as soon as possible.

Each Participant shall be liable for its own performance under this Agreement and each Participating Charter but (for the avoidance of doubt) shall not be jointly or severally liable with any other Participant or for the obligations of any other Participant.

## 18.    NO PARTNERSHIP; U.S. TAX EXCEPTION

(a)    General Rule. Nothing in this Agreement or in any other document relating to the Pool shall be construed as constituting a partnership between the Participants or between the Participants and the Pool Manager or the Pool Company or any of them. The obligations of each Participant under this Agreement shall be owed to the Pool Company alone and not to the other Participants except in case of the obligations under Clauses 15, 17 and 18.

(b)    U.S. Tax Exception. Notwithstanding the foregoing, the Entering Participant understands and consents to the fact the Pool Company has made a tax election to be treated as a partnership solely for U.S. federal income tax purposes, with the result that the Entering Participant and each other Participant in the Pool will be considered to be a partner of such partnership. In this regard:

(1)    under partnership tax principles, each Participant will be considered to earn its pro-rata share, based on its allocable share of Net Pool Revenue, of the U.S. source gross transportation income derived by the Pool Company from trading Pool Vessels to or from U.S. ports.

15

CD

(2)    within 60 days from the end of each calendar year, the Pool Manager will provide to each Participant an information schedule setting forth the U.S. source gross transportation income derived by the Pool Company for such year and each Participant's pro rata share thereof based on such Participant's allocable share of Net Pool Revenue for such year.

(3)    each Participant shall be solely responsible for preparing and timely filing IRS Form 1120F (U.S. Tax Return of a Foreign Corporation) for each calendar year in which it has been deemed to earn U.S. source transportation income and to report on such Return its allocable share of U.S. source transportation income earned and to claim exemption from tax or pay the applicable 4% tax imposed, on such income.

(4)    the Pool Company shall procure that in addition to the information schedule referred to above, the Pool Manager will provide to each Pool Participant such advice as may be reasonably required to enable such Participant to understand and comply with the applicable U.S. federal income tax laws and filing requirements to which such Participant may be subject in any year in which it has been deemed to have earned a pro rata share of U.S. source transportation income earned by the Pool Company.

In respect of the above, the Entering Participant confirms that (i) it is the beneficial owner (generally the entity that derives and is entitled to the income) of the charter hire and other payments made to it pursuant to this Agreement and the Charter Party between the Entering Participant and the Pool Company relating to the Entering Vessel, (ii) it is not acting as a nominee, trustee or agent for another individual or entity, (iii) it is a corporation or other legal entity where all of its members have limited liability, and (iv) it has not filed for treatment as a pass-through entity with the U.S. Internal Revenue Service. The Entering Participant agrees that upon any change in its circumstances as described in this paragraph, it will notify the Pool Manager immediately.

## 19.    RELIANCE ON COUNSEL AND OTHER ADVISORS.

Each party has consulted such legal, financial, technical or other experts as it deems necessary or desirable before entering into this Agreement. Each party represents and warrants that it has read, knows, understands and agrees with the terms and conditions of this Agreement.

## 20.    RIGHTS OF THIRD PARTIES

Save as expressly provided in this Agreement, no terms of this Agreement shall be enforceable by a third party, being any person other than the parties hereto and their permitted successors and assignees.

## 21.    COUNTERPARTS.

This Agreement may be executed by facsimile signatures and in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument.

16



**Exhibit C-03**

*[Signature Page Follows]*

17



**Exhibit C-03**

IN WITNESS WHEREOF, this Agreement has been duly executed by each of the parties as of the date first set forth above.

EP FLOPEC

By: 

Name:   JAIME CONDOY

AMAZONAS TANKER POOL COMPANY LLC

By: 

Name:   CASEY DALCHER

REF: M/T ZARUMA
POOL PARTICIPATION AGREEMENT

**Exhibit C-03**

**Exhibit C-03**

Code word for this Charter Party
**"SHELLTIME 4"**

# Time Charter Party
WAYNE, PA USA OCTOBER 06, 2020

*Issued December 1984*

IT IS THIS DAY AGREED between EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA

of ECUADOR (hereinafter referred to as "Owners"), being owners of the

good tanker vessel called M/T ZARUMA

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and AMAZONAS TANKER POOL COMPANY LLC

of a Marshall Islands corporation having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (hereinafter referred to as "Charterers"):

| | | |
|---|---|---|
| Description and Condition of Vessel | 1 | At the date of delivery of the vessel under this charter |

(a) she shall be classed by as per Q88

(b) she shall be in every way fit to carry crude petroleum and/or its products;

(c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state;

(d) her tanks, valves and pipelines shall be oil-tight;

(e) she shall be in every way fitted for burning (See additional clause 52)

at sea - fueloil with a maximum viscosity of Centistnkes at 50 degrees Centigrade/any commercial grade of fuel oil ("ACGFO") for main propulsion, marine diesel oil/ACGFO for auxiliaries

in port - marine diesel oil/ACGFO for auxiliaries;

(f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;

(g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;

(h) she shall comply with the description in Form B Q88 and time charter description appended hereto, provided however that if there is any conflict between the provisions of Form B Q88 and time charter description and any other provision, including this Clause 1, of this charter such other provision shall govern.

Shipboard Personnel and their Duties   2  (a)  At the date of delivery of the vessel under this charter

(i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be rained to operate the vessel and her equipment competently and safely;

(ii) all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.

(b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,

(i) prosecute all voyages with the utmost despatch;

(ii) render all customary assistance; and

(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

Duty to Maintain   3  (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy

CD

**Exhibit C-03**

available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.

(iii)    If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterer's reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers rights under Clause 21 hereof).

**Period Trading Limits    4**    Owners agree to let and Charterers agree to hire the vessel for a period of as per the Pool Agreement. commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular [petroleum – please specify] in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof.

The vessel may trade worldwide as Charterers shall direct, subject to the limits of the current I.W.L. between safe ports/berths/anchorages and always afloat and always afloat and excluding countries that are at any time boycotted by or under embargoes from the United Nations and/or European Union and/or United States. For the purpose of clarity, the vessel shall not trade in areas declared as war risk areas by the underwriter's joint war committee except in accordance with clauses 33, 34, 35 and 86 of this Charter.

The Owners warrants that at the time of delivery under this charter, the vessel is not subject to any trade restrictions declared by any multi-national or International trade bloc.

Notwithstanding the foregoing, but subject to Clause 35. Charterers may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order. Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide. The vessel shall be delivered by Owners at a port in ————

The vessel will be delivered to Charterers on passing or after dropping last outward bound sea pilot at the port of: As per recap

Notices from Owners to Charterers prior to delivery:

**N/A**

at Owners' option and redelivered to Owners at a port in

The vessel will be delivered back to Owners on passing or after dropping last outbound sea pilot at any worldwide port.

Notices from Charterers to Owners prior to redelivery:

Charterers are to give Owners approximate notice of redelivery (as per pool recap).  Charterers to give Owners firm notices of date and place of redelivery of the vessel (as per pool recap) prior to redelivery.

**Laydays/ Cancelling    5**    The vessel shall not be delivered to Charterers before  SEE "POOL RECAP" and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before SEE "POOL RECAP"

**Owners to Provide    6**    Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clause 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.

**Charterers to    7**    Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and



**Exhibit C-03**

| | | |
|---|---|---|
| Provide | | Pilotage (except where such towage and pilotage are not compulsorily required by the relevant authorities) and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. |

Rate of Hire  8

Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of as per Pool Agreement per day, and pro rata for any part of a day, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners.

Payment of Hire  9

Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to:
As per "Pool Recap"
    Account
in————————————————per calendar month in advance, less: as per the Pool Agreement
(i)   any hire paid which Charterers reasonably estimate to relate to off-hire periods, and
(ii)   any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and
(iii)   any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) or 24 hereof,
any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.
In default of such proper and timely payment,
(a)   Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and
(b)   Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

Space Available to Charterers  10

The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owner's suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall Not unless specially agreed, exceed 2000 mts (excluding bunkers, fresh water and lubes) tonnes at any time during the charter period.

Overtime  11

————————Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers of their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. Hire is inclusive of overtime.

Instructions And Logs  12

Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

Bills of Lading  13  (a)

The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise
(i)   from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents orders;
(ii)   from any irregularities in papers supplied by Charterers or their agents.
(b)   Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo
(i)   at any place other than that shown on the bill of lading and/or
(ii)   without presentation of an original bill of lading
unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners.

Conduct of Vessel's Personnel  14

If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

CO

| | | |
|---|---|---|
| Bunkers at Delivery and Redelivery | 15 | ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then-current market prices at the port of delivery or redelivery, as the case may be; or if such prices are not available payment shall be at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ See additional clauses 52 and 53 |

| | | |
|---|---|---|
| Stevedores, Pilots, Tugs | 16 | Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that |

    (i)  the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and

    (ii)  Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

| | | |
|---|---|---|
| Supernumeraries | 17 | Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of US$20.00 per day for each representative while on board the vessel. |

| | | |
|---|---|---|
| Sub-letting | 18 | Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. |

| | | |
|---|---|---|
| Final Voyage | 19 | Payments for freight or hire are payable pursuant to separate pool participation agreements. ~~If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before~~ |

~~the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for~~

    ~~(i)  disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and~~

    ~~(ii)  bunkers on board at redelivery pursuant to Clause 15.~~

~~Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.~~

~~If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.~~

| | | |
|---|---|---|
| Loss of Vessel | 20 | Should the vessel be lost, this charter shall terminate and hire shall cease at noon (GMT) on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon (GMT) on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon (GMT) on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port. |

| | | |
|---|---|---|
| Off-hire | 21 (a) | On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner) |

    (i)  due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey, collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or

    (ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

    (iii)  for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or

    (iv)  due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

    (v)  due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then

CO

**Exhibit C-03**

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers ) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned on Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the Vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of charter period.

Periodical Drydocking   22   (a) Owners have the right and obligation to drydock the vessel at regular intervals of On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable. Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 21. The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account.

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions; provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. See additional clause 112

Ship Inspection   23   Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

CD

(i)  that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and

(ii)  that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

**Detailed Description and Performance**

24  (a)  Owners guarantee that the speed and consumption of the vessel shall be as follows: -

| Average speed | Maximum average bunker consumption | |
|---|---|---|
| In knots | main propulsion fuel oil/diesel oil tonnes | auxiliaries fuel oil/diesel oil tonnes |
| Laden | | |
| | | |
| Ballast | | |

SEE SPEED AND CONSUMPTION DATA
PROVIDED BY POOL PARTICIPANT

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown.

The service speed of the vessel is as per S+C knots laden and     as per S+C knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be.

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon (GMT) to noon (GMT), when winds exceed force 8 on the Beaufort Scale for more than 12 hours.

(b)  If during any year from the date on which the vessel enters service (anniversary to anniversary ) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results

(i)  from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid;

(ii)  from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period. Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.

(c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require.

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase.

CD

**Exhibit C-03**

Clause 24 to be amended by and read with additional clauses 51, 54 and 55.

| | | |
|---|---|---|
| Salvage | 25 | Subject to the provisions of <u>Clause 24</u> hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25. All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share. |

Lien    26    ~~Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.~~

Exceptions    27    (a)    The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however that Clauses 1,2,3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b)    The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c)    Clause 27 (a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of

(i)    loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or

(ii)    ~~any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated ) or, if no such bill of lading is issued, to the Hague-Visby Rules.~~

any claim (whether brought by Charterers or any other person) arising out of any loss of, or damage to, or in connection with, the cargo shall be subject to the Hague Visby Rules, or the Hague Rules, or the Hamburg Rules as the case may be.  Such rules which ought, pursuant to clause 38 (as replaced by additional clause 88) hereof, to have been incorporated in the relevant Bill of Lading (whether or not such rules were so incorporated) shall apply, or if no such bill of lading is issued, the Hague Visby Rules are to apply, unless the Hamburg Rules are compulsorily in which case the Hamburg Rules are to apply instead.

Also see additional clause 88

(d)    In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

| | | |
|---|---|---|
| Injurious Cargoes | 28 | No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. |

Grade of    29    ~~Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of——————Centistokes at 50~~
Bunkers    ~~degrees Centigrade /ACGFO for main propulsion and diesel oil/ACGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.~~
~~—————Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time.~~ See additional clauses 51 and 52.

| | | |
|---|---|---|
| Disbursements | 30 | Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire. |
| Laying-up | 31 | Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up, Charterers may exercise the said option any number of times during the charter period. |
| Requisition | 32 | Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of |


CD

the charter period.

| | | |
|---|---|---|
| **Outbreak of War** | 33 | If war or hostilities break out between any two or more of the following countries: U.S.A., ~~U.S.S.R.~~ Russian Federation, P.R.C., U.K., Netherlands- and the vessel's flag state both Owners and Charterers shall have the right to cancel this charter. |

**Additional War Expenses** 34    If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war as determined by the Joint War Committee Listed Areas,

Charterers shall reimburse Owners for any additional insurance premia, crew bonuses for areas designated by the International Bargaining Forum (IBF) framework agreement and other expenses which

are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

**War Risks** 35 (a)    The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b)    If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35 (a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c)    The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

**Both to Blame Collision Clause** 36    If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

**New Jason Clause** 37    General average contributions shall be payable according to the York/ Antwerp Rules, ~~1974~~ 1994 (as subsequently amended from time to time), and shall

be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover

CO

**Exhibit C-03**

prohibition, and such discharge shall constitute due performance of the contract contained in this bill of lading, so far as the cargo so discharged is concerned."

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being deemed to be references to this charter.

**Law and Litigation** 41 (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

(b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree.

(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

(i) A party shall lose its right to make such an election only if:

(a) it receives from the other party a written notice of dispute which -

(1) states expressly that a dispute has arisen out of this charter;

(2) specifies the nature of the dispute; and

(3) refers expressly to this clause 41(c)

and

(b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.

(ii) The parties hereby agree that either party may -

(a) appeal to the High Court on any question of law arising out of an award;

(b) apply to the High Court for an order that the arbitrator state the reasons for his award;

(c) give notice to the arbitrator that a reasoned award is required; and

(d) apply to the High Court to determine any question of law arising in the course of the reference.

(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay. See additional clause 89

**Construction** 42 The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

IN WITNESS WHEREOF The parties have caused this charter to be executed in duplicate the day and year herein first above written.

Owners                                                            Charterers        CD

the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

**Clause Paramount  38**

Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause:

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if applicable, such term shall be void to that extent but no further."

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law." See additional clause 88

**TOVALOP  39**

Owners warrant that the vessel is
(i)   a tanker in TOVALOP and
(ii)  properly entered in —————————————— P & I Club
and will so remain during the currency of this charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, undertake such measures as are reasonably necessary to prevent or minimize such Pollution Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:
(1)   any such escape or discharge or Threat was caused or contributed to by Charterers, or
(2)   by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or
(3)   the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.

Th herein "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed to them in TOVALOP. See additional clause 80(k)

**Export Restrictions  40**

The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the

CD

**Exhibit C-03**

| Parties |
|---|
| **SEE POOL RECAP** |

| Owners | |
|---|---|
| **Owners' parent company / organisation:** | |
| **Address:** | |
| **Contact Details:** | |

| **Head Owners** | |
|---|---|
| **Full style:** | |
| **Address:** | |
| **Contact:** | |

| **Current Owners' full style:** | |
|---|---|
| **Owners' address:** | |
| **Contact details:**<br>**24 hour contact name and number:** | |

| **Owners' chartering management company:** | |
|---|---|
| **Address:** | |
| **Contact details for Chartering and operations** | |

| **Owners Broker:** | |
|---|---|
| **Contact details for chartering and operations:** | |

| Chartering | |
|---|---|
| **Charterers' full Style:** | |
| **Charterers' address:** | |
| **Contact:** | |

| | |
|---|---|
| **Charterers' Broker:** | |
| **Contact details for chartering and operations:** | |

In addition to clauses 1 through 42 of the SHELLTIME4 (issued December 1984) charter party the following additional clauses 43-115 are to apply. In any instance of a conflict the additional clauses are to overrule those of SHELLTIME4 (issued December 1984) and are to be binding

The existence and details of this fixture to be kept strictly private and confidential between these parties and the same is not to be reported.



**Exhibit C-03**

## Additional Clauses 43-115

### The Vessel

**43. Additional description.**

In addition to the vessel's Questionnaire 88, the vessel is further described as follows:

| Detailed description of *MT* | | | |
|---|---|---|---|
| **SEE Q88 FOR DETAILS** | | | |
| **Vessel's actual class:** | | | |
| **Ice class (if any):** | | | |
| **Vessel's flag:** | | **Vessel built / age:** | |
| **Deadweight:** | | **Draft:** | |
| **Hull type:** | **Single skin** | **Double sided** | **Double bottom** |
| | Yes / No | Yes / No | Yes / No |
| **Fitted equipment:** | **I.G.S.** | **S.B.T.** | **C.O.W.** |
| | Yes / No | Yes / No | Yes / No |
| **Heating ability and heating equipment:** | **Coiled** | **Coil composition** | **Max capacity (Deg)** |
| | Yes / No | | |
| **SWL of derricks (mt):** | | | |
| **Vessel's approvals:** | | | |
| **Hull and machinery insured value** | | | |

| Tank groupings, segregations and tank capacity. | | | |
|---|---|---|---|
| **Group** | **Tanks used** | **Capacity of each tank (m³)** | **Total capacity (m³)** |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

| Capacity for bunkers and stores | | | |
|---|---|---|---|
| **Fuel oil (mt)** | | **Diesel/gas oil (mt)** | |
| **Fresh water (mt)** | | **Stores (mt)** | |

| Cargo transfer rates.  Loading capacity and discharging capacity. | | | |
|---|---|---|---|
| **Loading rate (m³ph)** | | **Discharging rate (m³ph)** | |

| Ballast transfer rates | | | |
|---|---|---|---|
| **Taking on ballast (m³ph)** | | **Discharging ballast (m³ph)** | |
| **Maximum percentage of the deadweight in fully ballasted condition:** | | | |

| Nationality of ships complement and communications | |
|---|---|
| **Nationality of Master and name** | |
| **Nationality of officers** | |
| **Nationality of crew** | |
| **Vessel's call sign** | |
| **Vessel's email** | |
| **Vessel's phone number** | |
| **Vessel's fax number** | |
| **Vessel's telex number** | |



CD

Exhibit C-03

## 44. Documentation.

For all time charters in excess of 30 days in period, the Owners shall arrange to deliver the following documents within three working days of all subjects being lifted and the time charter confirmed::

- a)    Questionnaire 88 (latest edition).
- b)    General arrangement and capacity plans.
- c)    Deadweight scale.
- d)    Detailed cargo manifold arrangement drawing, loading scale and mooring plan.
- e)    Cargo/ballast pumping and pipeline arrangement plans (types of valves fitted to be clearly show).
- g)    Plan of cargo tank ventilating and inert gas systems.
- h)    Mooring arrangement plan.
- i)    O.C.I.M.F. Ship Information Questionnaire (latest edition).

In the event that the above documents are not received with in time, the Charterers shall, in its option, be entitled to cancel the time charter or postpone delivery of the vessel until such documents have been received in full.

Owners shall provide Charterers with read only access for the vessel if she is registered with Q88.com. If the Owners has not registered the vessel with Q88.com, then they are to provide a copy of the OCIMF VPQ in .vpz format. The Q88.com is to be kept updated with all the required information, including but not limited to class certificates and approvals.

## 45. Fixed equipment.

a) Inert gas system.

The Owners warrants that the vessel has a working inert gas system and that the officers and crew are experienced in the operation of the system.  The Owners further warrants that the vessel will arrive at load port with cargo tanks inerted when required by Charterers and that tanks will remain inerted throughout the voyage and during discharge.

The vessel's inert gas system shall fully comply with regulation 62, chapter 11-2 of the SOLAS Convention 1974 as modified by its protocol of 1978 and Owners' undertake that such system shall be operated by the officers and crew in accordance with the operational procedures set out in the IMO publication entitled "Inert Gas System 1983" as may, from time to time, be amended.

The Master may be requested by terminal personnel or independent inspector to breach the IGS for purpose of gauging, sampling, temperature determination and or determining the quantity of cargo remaining on board after discharge.  The Master shall comply with these requests consistent with the safe operation of the vessel.

If the Charterers so requires, the Owners shall arrange for the vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling, and re-inerting thereafter shall count as on-hire.

b) Crude oil washing.

The Owners warrant that the vessel is equipped with a fully functional crude oil washing system complying with the latest edition of MARPOL, and have officers and crew skilled and competent in the operation of such a system.  The Charterers shall have the right to require the vessel to crude oil wash the tanks in which the cargo is carried.  The Owners agrees to conduct crude oil washing of all cargo tanks at discharge port(s) simultaneously with cargo discharge operations and the same is to be to the Charterers' satisfaction.



Exhibit C-03

**[Insert if vessel is fitted with heating coils]** [c) Heating.

The Owners warrants that the vessel is fully fitted with tight and functioning heating coils in all cargo tanks, or with heat exchangers, and is capable of applying heat to the cargo as agreed in this charter. The vessel is to be able to receive cargo up to a maximum temperature of 165 degrees Fahrenheit. The vessel's heating system is to be able to maintain a cargo temperature, if required to do so, up to a maximum of 135 degrees Fahrenheit. The vessel is to be able to maintain the temperature of the whole cargo on board.]

Any delays and or expenses resulting from non-compliance with this clause shall be for the Owners' account.  Any lost time owing to deficient or improper operation of the inert gas system or otherwise resulting from non-compliance with this clause to be considered as off hire.

## 46. Cast iron.

The Owners warrant that all piping, valves, spools, reducers and other fittings comprising that portion of the vessel's manifold system outboard of the last fixed rigid support to the vessel's deck and used in the transfer of cargo, bunkers or ballast will be made of steel or nodular iron and that only steel reducer or spacer will be used between the ship's valve and the loading arm.

The fixed rigid support for the manifold system must be designed to prevent both lateral and vertical movement of the manifold.  Owners further warrants that no more than one reducer or spacer will be used between the vessel's manifold valve and the terminal hose or loading arm connection.  Owners warrants that all piping, valves, fittings and reducers on the manifold system or area used in the transfer of cargo and ballast will be made of steel or nodular iron.

## 47. Re-measurement.

The Charterers are to have the option to re-measure the vessel for the purpose of satisfying certain port or terminal regulations at any time during c/p period as often as required. All costs and time used for re-measuring to be for Charterers' account. Owners are to advise if vessel has multiple load lines and if so, the corresponding deadweights.

## 48. Management and flag.

The Owners shall not change the Ownership or management of the vessel, or change the vessel's flag or registry during the period of this charter without prior and written approval of the Charterers.  Such a change is always not to compromise the approvals that the vessel has.

Any delay to the vessel caused by her flag or the nationality of her crew shall count as off hire.  All extra expenses and consequences, whatsoever, incurred by the Charterers attributable to the vessel's flag or the nationality of her crew, will be for the Owners' account.

## 49. Major oil company approvals.

    (a)  The Owners will have the vessel regularly vetted by major or other oil companies always at the Charterers' time to ensure as many as possible vetting approvals are maintained or obtained and to keep the Charterers regularly informed of the vetting status of the vessel.

    (b)  Unless the vessel is a newbuilding and has not traded prior to its delivery under this charter then the vessel shall at all times comply with the following:

        (i)  have approval / acceptance from a minimum of 4 of the following majors: Shell, BP, Exxonmobil, Chevtex, TotalFinaElf and Statoil (each an "**Oil Major**" and together, the "**Oil Majors**"); and



**Exhibit C-03**

(ii) have at least one (1) positive hydrocarbon discharge SIRE report from an Oil Major always less than six months old and its latest hydrocarbon discharge SIRE report from an Oil Major shall always be positive.

Immediately after a positive hydrocarbon discharge SIRE report from an Oil Major, it is assumed for the purpose of this clause that the vessel shall have approval / acceptance from all the Oil Majors except where an Oil Major has put in place a technical hold in relation to the Vessel and in all other other cases, until proven otherwise as per the definition in clause 49 (d)(i).

(c) If the vessel has been trading in areas where SIRE inspectors are unwilling to visit, the Owners are obliged to arrange a SIRE hydrocarbon discharge inspection at the first opportunity that the Vessel is in a discharge port where SIRE inspectors are willing to visit. If the Owners complies with this obligation, there shall be a grace period of three (3) weeks after the date of such inspection before the Charterers can exercise its rights as a result of a breach of clause 49(b)(ii).

(d) For the purpose of this clause 49:

i) the Vessel shall cease to have "**approval/ acceptance**" from an Oil Major if (x) the Vessel has a technical hold put over the Vessel by such Oil Major or (y) the Vessel is, for whatever reason, rejected or not accepted, approved or preferred by such Oil Major for a prospective voyage charter when nominated by the Charterers who shall, if possible, disclose to Owners material facts for such nomination and shall, if possible, provide the Owners with the opportunity to refer to such Oil Major for the reasons of non acceptance; and

ii) a SIRE report is "**positive**" if (x) it contains no recommendations / deficiencies, or any deficiencies noted have been rectified by the Owners and (y) the vessel's technical manager listed in the SIRE report has not changed.

(e) The Owners represents and warrants that the Oil Majors approving of the vessel at the time of delivery are:

| Major oil company name | Approval expires |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

If there is any misrepresentation of the Oil Major approvals of the vessel at the time of the delivery by the Owners, the Charterers shall have the right to cancel the Charter and redeliver the vessel back to the Owners forthwith.

(f) If the Vessel is a newbuilding and has obtained a BP Newbuilding Questionnaire and a Shell Idle Inspection, the Owners shall have a grace period of 3 months from the date of delivery under this charter before the Charterers can exercise their rights as a result of a breach by Owners of the provisions of clause 49(b).

CO

Exhibit C-03

(g)  If the Charterers so requests, the Owners shall also arrange for further inspections by other oil company(ies) as required, as per Charterers' trading program. The cost for such further inspection shall (provided the Owners first informs the cost to the Charterers) be for the Charterers' account save where the SIRE report for such inspection is not positive, in which case all inspection costs incurred for such inspection shall be for Owners' account.

(h)  If the vessel fails to comply with the Oil Major and/or SIRE requirements in clause 49(b), Charterers have the option either: (i) to redeliver the vessel under this Charter to Owners by giving minimum 30 days notice without penalty to either party and such redelivery to take place within the agreed redelivery range as provided in the charter party or (ii) put the vessel off-hire under this charter until such failure to comply has been rectified. In the event that the vessel has been placed off-hire for a period of more than thirty (30) consecutive days within the terms of this clause, then Charterers shall have the right to cancel this Charter and redeliver the vessel to Owners in accordance with the terms of the this Charter without any further liability to either party.

(i)  The Owners agrees that they shall participate in OCIMF's TMSA (Tanker Management Self Assessment) and the Owners will keep the Charterers informed of the levels reached or obtained in such programme. The Owners failing to achieve TMSA acceptance with OCIMF will give Charterers the right either (i) to redeliver the vessel to Owners by giving minimum 30 days notice without penalty to either party and such redelivery to take place within the agreed redelivery range as provided in the charter or (ii) put the vessel off-hire under this charter until such failure to comply has been rectified. In the event that the vessel has been placed off-hire for a period of more than thirty (30) consecutive days within the terms of this clause, then Charterers shall have the right to cancel this Charter and redeliver the vessel to Owners in accordance with the terms of the this Charter without any further liability to either party.

## 50. English Language and effective communication.

The vessel will be manned/crewed with a Master and Officers able to communicate both verbally and in written English, so as to ensure smooth communication with the Charterers, its agents and the shore personnel of any suppliers and receivers.

The Owners guarantees that the vessel is equipped with the technical and human means capable to send and receive via satellite or radio, all messages necessary to the commercial operation of the Charterers.

The communication costs paid by the Charterers to the Owners cover access to the vessel's email, telex, fax and phone facilities, without restrictions. This access is to be extended to the Charterers' agents, brokers, bunker suppliers and all such parties involved in the vessel's voyage.

## Bunkers, Speed and Consumptions, Performance.

## 51. Speed and consumption warranty.

The Owners warrants that the vessel will perform as follows. The following speeds and consumptions to be applicable up to and including force 5 on the Beaufort Scale.

*SEE SPEED AND CONSUMPTION DATA AS PROVIDED BY THE POOL PARTICIPANT*

CO

Exhibit C-03

### Speeds and consumptions for main engine steaming in open waters - IFO:

| Type of steaming | Speed (Knots) | | Consumption (MT per day) | |
|---|---|---|---|---|
| | Laden | Ballast | Laden | Ballast |
| Full speed | | | | |
| Performing speed | | | | |
| Economic speed | | | | |

### Speeds and consumptions for main engine steaming in open waters – MGO (SECA Areas only):

| Type of steaming | Speed (Knots) | | Consumption (MT per day) | |
|---|---|---|---|---|
| | Laden | Ballast | Laden | Ballast |
| Full speed | | | | |
| Performing speed | | | | |
| Economic speed | | | | |

### Extra consumptions for auxiliary engines:

| Additional IFO | | Additional MGO | | Additional MDO | |
|---|---|---|---|---|---|
| | | | | | |

### Bunker consumptions in port and discharging

| Activity | Amount of IFO | Amount of MDO | Time allocated (hrs) |
|---|---|---|---|
| Idle | | | |
| Manoeuvring in shallow water | | | |
| Loading full cargo | | | |
| Discharge full cargo | | | |

### Bunker consumptions for other activities:

| Activity | Amount of IFO | Amount of MDO | Time allocated (hrs) |
|---|---|---|---|
| To clean from clean to clean | | | |
| To clean from dirty to clean | | | |
| To inert vessel | | | |
| To gas free vessel | | | |
| To maintain 135Deg F | | | |
| To raise cargo temp | | | |
| To ballast | | | |
| To de-ballast | | | |
| Crude Oil Wash | | | |

To the extent that there is any conflict between SHELLTIME4 clause 24 and this clause 51, this clause 51 shall take precedence.

### 52. Bunker quality and supply.

The Owners confirms that the bunker specification and quantity on board at delivery, which is to be confirmed with supporting documents, to be as follows:

| Fuel Type | Specific Grade | Quantity R.O.B. (mt) |
|---|---|---|
| IFO | | |
| MDO | | |
| MGO | | |
| Other | | |
| Other | | |

The Charterers are to make best endeavours to provide bunkers

CD

**Exhibit C-03**

Owners shall advise the charterer, acting as agents only, of the quality and type suitable for burning in the vessel's main engine, auxiliary engines and boilers with a maximum viscosity of 380 CST and which conforms to the specifications of RMG 380 in ISO 8217 as last amended and to supply marine diesel oil of grade DMA conforming to the specifications of ISO 8217 as last amended. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

In areas of the world where such bunkers are not available, ISO standards are exceeded or ISO standards cannot be guaranteed (for example in countries where local state oil company specifications apply), the Charterers must supply bunkers as available locally. In such circumstances the local bunker specifications are to meet with the Owners', or the Master's, approval that is not to be unreasonably withheld.

Owners are solely responsible for checking the quality and quantity of the bunkers supplied and Charterers' responsibility is limited to an obligation of due diligence to order the correct grade and quantity. Any discrepancy in the quantity of bunkers supplied and received, where the received quantity is less than the supplied quantity, is to be protested by master immediately upon receipt of bunkers. Owners are responsible for any discrepancy that is not immediately protested as above, or is only subsequently identified, and the value of the shortfall in bunkers received can at Charterers' option be deducted from hire. Charterers shall have the right to ullage, inspect and sample vessel's bunker tanks as well as inspect vessel's void spaces and other tanks whatsoever.

The gauging of bunker barge soundings (of all tanks, whether or not nominated for discharge) and the sealing of the bunker sample must be witnessed by the vessel's master or chief engineer in accordance with Charterers' standard general instructions to masters provided to the Master from time to time and in the event Owners fail to comply, Owners shall be barred from bringing any claims against Charterers as to the quality of bunkers supplied under this Charter.

Should any dispute arise as to the quality of the bunkers supplied under this Charter (such to be time-barred unless notified by Owners to Charterers within 15 days of supply) then the Owners and the Charterers are to agree to a joint re-analysis of a representative sample, which has been witnessed and signed by the bunkering ship or barge representative, at a laboratory acceptable to Owners and Charterers. The sample for testing shall be the sample which has its seal number endorsed on the Bunker Delivery Receipt. The result of this analysis will be final and binding on all parties. Owners will arrange to have the delivered fuel tested by an internationally recognized fuel testing laboratory such as DNV or similar.

### 53. Bunker settlement.

The Charterer will accept the bunkers onboard the vessel at time and place of delivery. An independent inspector will verify the actual quantity of bunkers remaining on board at time of delivery. The cost of such a bunker survey to be split 50/50 between the Owner and the Charterer.

The Charterer shall re-deliver the vessel to the Owner with a similar quantity of bunkers on board at re-delivery to those at the time of delivery, but sufficient to safely reach next main bunkering port. An independent inspector will verify the actual quantity remaining on board at the time of re-delivery. The cost of such bunker survey to be split 50/50 between the Owner and the Charterer.

In the event of any disparity in quantity the following method of compensation to apply:

CD

**Exhibit C-03**

The Charterer is to reimburse Owner for any shortfall in quantity below delivered quantity at the price that the Charterer last bunkered the vessel for prior to re-delivery against the relevant supporting documentation.

In the event that quantity is in excess of the quantity at delivery then the Owner will reimburse the Charterer at the price that the Charterer last bunkered the vessel prior to re-delivery against relevant supporting documentation. Alternately the charterer is at liberty to deduct such amount from the final hire payment due to the owner.

## 54. Performance warranty.

The speed and consumptions of the vessel provided by the Owners in accordance with Clause 51 will be binding to this charter. Where the vessel is a newbuild upon delivery under this Charter, the speed, consumptions at sea and consumptions in ports will be reviewed and actualised on the basis of performance data over the first 3 months. Such actualisation will be calculated separately for laden, ballast and in port consumptions.

The data will be used for the purposes of reviewing and determining the vessel's total costs under the pool agreement for the vessel. Save for adjustments to the vessel total costs, no claims for over performance or under performance to be allowed. SHELLTIME4 clause 24 shall be read together with this clause 54 and to the extent that there is conflict between the two provisions, this clause 54 shall take precedence.

## 55. Monitoring vessel's performance.

The parties agree that the vessel's performance shall be monitored by a third party independent weather routing service nominated by the Charterers. Charterers shall pay all cost and expenses of such service provider. Owners agree that the Master's daily noon (GMT) and other required reports for the vessel shall be sent to the weather routing service provider and such data regarding distance sailed and bunkers consumed shall be used to evaluate the vessel's performance for the purposes of the semi-annual Periodic Performance Review of the vessel under the Pool Agreement for the vessel. The weather routing service provider's data regarding weather conditions during the vessel's voyages shall be used for the purposes of such evaluation.

## 56. Vessel tracking.

It is agreed that the Charterers may from the time of fixing until completion of the charter period employ an Inmarsat C tracking system on the vessel. Such tracking system works using data provided automatically from the vessel's on-board Inmarsat C system and can be installed simply, either remotely, or on some older systems, with minimal set up. The system will automatically provide information on the vessel's position at set intervals. Such information is displayed through password controlled internet access. (Charterers will, if required, supply the Owners with read-only access to this information through a website).

All registration and direct communication costs relating to this tracking system will be for the Charterers' account. The Charterers will advise the Owners when the system is operative and confirm termination on completion of this charter.

The OWNERS are required to supply the following information to the Charterers to enable installation, such information to form part of this charter.

| VESSEL'S NAME | |
|---|---|
| INMARSAT NUMBER 9 DIGITS (1ST IS 4) | |
| MAKE AND MODEL OF TERMINAL | |
| MODEL NUMBER | |
| TERMINAL S/W VERSION | |
| SERIAL NUMBER | |

## 57. Sailing plan and notice of any delay.

Exhibit C-03

The Master is to notify the Charterers, before commencing next ocean passage and prior to sailing from port, his intended sailing plan, routing, estimated duration of the voyage and estimated arrival date and time at the next destination. If during the course of any voyage the vessel experiences a delay, of any nature, which will affect the Master's estimated arrival time at the next port in excess of six hours the Master is to immediately contact the Charterers by phone then follow up in writing. The Master is to provide a detailed explanation of the reason for the delay, any problems that have been caused to the vessel and provide the Charterers with a revised estimated time of arrival.

### 58. Weather routing service.
Owners hereby acknowledge that Fleetweather is currently Charterers' nominated weather routing service provider.

Charterers may provide suggestions concerning navigation based on advice from the weather routing service provider and such suggestions shall be followed by Master. The Master, at his reasonable discretion, may not follow suggested route if such route will cause a threat to the vessel and or cargo or the performance will not be improved. In such case the Master is to describe in detail the reasons for departing from the suggested route.

### 59. Traffic separation.
In the interests of safety Owners will recommend that the Master is to observe the recommendations as to traffic separation and routing as issued from time to time by the I.M.O. or as promulgated by the state of the flag of the vessel, or the state in which the effective management of the vessel is exercised.

## Financial

### 60. Commission.
[_0.00_] percent address commission is payable to the charter only on hire paid. Such commission is to be deducted at source. Any and all other commissions are to be agreed between the Owners and the Charterers and are to be billed to the Owners directly for settlement.

### 61. Taxes on the vessel or the hire.
Any and all taxes and or dues on the vessel and or the hire payments to the Owners are to be for the Owners' account and settled directly by them.

### 62. Extension of period.
Any loss of time during which the vessel is off hire shall count as part of the charter period.  The Charterers, however, in its option shall be able to add any or all of the off hire time to the period of the charter as an extension of the charter period.

## Cargo Operations

### 63. Pumping performance.
Owners warrant that Vessel shall always load/discharge cargo from/to receiving facilities, including a vessel used in ship-to-ship transfers, at the maximum possible rate consistent with the safe operation of Vessel.

Where more than one grade is to be loaded/discharged such grades shall, if required, be loaded /discharged concurrently, whilst maintaining two-valve segregation between grades, provided Vessel is physically capable of doing so.

Any additional time used owing to the inability of Vessel to load/discharge in accordance with the above shall be deductible from distribution.

Owners warrant that:

CD

**Exhibit C-03**

1)   Vessel shall discharge a full cargo, either homogeneous or multi-grade, within 24 hours (or pro-rata for part cargo) including stripping, but excluding time for COW, for which a maximum of an additional 8 hours pumping time will be allowed for a full COW, or pro-rata for a partial COW.

or

2.)   Will maintain an average minimum pressure at Vessel's manifold throughout discharge of 100 psi at the ship's rail, provided receiving facilities are capable of accepting cargo within such time or at such pressure.

If Vessel does not comply with above warranty then any unreasonable stoppage or suspension of cargo operations for internal stripping and draining that cannot be recovered as demurrage, then the cost of the loss to the Charterers will be deductible from distribution, as will the cost of any additional bunker consumption.

Should it become necessary to withdraw the ship from berth because of her failure to maintain the discharge rate, all time and expenses incurred are to be for Owners' account until vessel re-berth and is securely moored and her gangway, if to be used, is in place.

The Owners will receive no credit or compensation if the vessel is able to discharge at a rate greater than specified above.

## 64. Tank cleaning.
On delivery, the vessel is to be suitably clean to carry Charterers nominated cargo, within the terms of this charter party, in all tanks (inclusive slop tanks).

Owners warrant that the Master, Officers and crew are familiar with and trained in tank cleaning procedures including wall washing techniques to enable Charterers to maximize the vessel's carrying capacity within the limits of the permitted cargoes and tank coating manufacturer's restrictions. A copy of any such restrictions is to be faxed to Charterers latest 7 days after the day of this charter party.

The Owners shall be responsible for cleaning tanks, lines and pumps between voyages in such manner as to enable vessel to pass inspection for the Charterers' next nominated cargo upon arrival at the port of loading providing sailing / delivery time between voyages permit. The master is to advise his intended cleaning procedure to the Charterers.

Charterers to supply cleaning detergents and chemicals at their cost as required. Charterers have the right to put on board their supercargo as an advisor to the crew to carry out the cleaning process.

Should the vessel fail a tank inspection, all time, bunker and costs incurred from the time when notice of readiness was originally tendered prior to the failed tank inspection will be for Owners account. Vessel will be off-hired from the time the Vessel originally tendered notice of readiness prior to the failed tank inspection until the Vessel passes the tank inspection and retenders her NOR.

## 65. Ballasting and deballasting operations.
The Owners warrants that the vessel is able to ballast and de-ballast concurrently with cargo operation. Any time lost by vessel being unable to ballast or de-ballast concurrently with cargo operation to be for the Owners' account and may be deducted from hire unless such ballasting or de-ballasting concurrently with cargo operation is prohibited by local regulations.

## 66. Tank washings and prevention of pollution.
The vessel is to be delivered to the Charterers and re-delivered back to the Owners free

CO

of slops, however, if this is not operationally possible then the following clause to apply.

In relation to tank washings the Master shall:

At the start of the ballast passage before presenting for loading at the commencement of this charter, retain on board all oil residues remaining in the vessel from one previous cargo in one slop tank, which the Charterers are to accept and arrange disposal of at Owners' cost and time.

During tank washing collect the washing into one cargo compartment and, after maximum separation of free water, discharge such water overboard always, however, in accordance with international pollution legislation.

Notify the Charterers by email or telephone of the amounts of oil and water in segregated tank washings.

On being so notified the Charterers shall, before the vessel's arrival at the loading port, give instructions for the disposal of such segregated tank washing. The Owners shall ensure that the Master, on the vessel's arrival at the loading port, is to arrange in conjunction with the cargo suppliers for the measurement of the quantity of such segregated tank washings and make a note of such quantity in the vessel's Oil record book.  Owners shall ensure that the Master shall keep the water in such segregated tank washing to a minimum.

On re-delivery the Owners will accept the vessel back into their control with the washings from one previous cargo on board in one slop tank.  The Charterers are to make best endeavours to keep such washings and or slops to a minimum. Owners shall arrange for such disposal at the vessel's next port of call after re-delivery at Charterers' cost and time.

### 67. Cargo retention.
In the event that any cargo remains on board upon completion of discharge, the Charterers shall have the right to deduct from hire an amount equal to the FOB port loading value of such cargo plus voyage freight due with respect thereto provided that the volume of cargo remaining on board is pumpable and reachable by the vessel's fixed pumps, or would have been pumpable and reachable but for the fault or negligence of the Owners, the Master, the vessel or her crew, as determined by an independent surveyor appointed by the Charterers and acceptable to both the Owners and the Charterers, whose findings shall be final and binding. Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the Charterers. For the purposes of this clause, any surveyor from an internationally reputable surveyor company shall be considered acceptable to both the Owners and the Charterers.

### 68. In transit loss.
The Owners are to be responsible for any cargo in-transit loss exceeding 0.3 % as determined by an independent surveyor appointed by the Charterers and acceptable to both the Owners and the Charterers, whose findings shall be final and binding. In-transit loss is defined as, the difference between net vessel's volume after loading at the load port and before unloading at the discharge port, based on the independent surveyor's figures. Calculation is always to be based on same cargo temperature. Such cargo in-transit losses are to be deducted from hire at an amount equal to the FOB load port value of such cargo, plus hire and bunkers with respect thereto. For the purposes of this clause, any surveyor from an internationally reputable surveyor company shall be considered acceptable to both the Owners and the Charterers.

### 69. Cargo transfer inspection.
The Charterers may, in its option, at their time and at its risk and expense place a representative on board to observe preparations for loading or discharging of the cargo



CD

**Exhibit C-03**

during the period that the vessel is proceeding to or is in a port. Such representative to be suitably insured for all personal risk and liability by the Charterers. Such visits shall include, without limitation, access to the pump room, the engine room, the cargo control room, the navigation bridge and the deck area. The Charterers' representative may render advice to the Master.  He will not, however, under any circumstances order or direct the taking of any particular action by vessel or crew or interfere in any way with the Master's exercise of his authority.

### 70. Ship to ship transfer.
The Charterers shall have the option to load and discharge and/or lighten the vessel via ship-to-ship transfer at sea, at anchor or underway off any port or berth to berth, or double banking in any port within the trading limits of this Charter. The Charterers will provide all fenders, hoses and equipment necessary to perform the lightering operation. The Owners are to agree to allow supervisory personnel on board, including but not limited to a qualified/experienced Mooring Master, to assist in the performance of the lightering operation.

Owners and Charterers warrant that any ship-to-ship operation and equipment shall be carried out in accordance with the procedures set out in the last revised edition of the International Chamber of Shipping Oil Companies International Marine Forum, Ship-to-Ship Transfer Guide for Petroleum. Owners warrant that the vessel, master, officers and crew are, and shall remain during this Charter, capable of safely carrying out all the procedures in the current edition of the ICS/ OCIMF Ship to Ship Transfer Guide (Petroleum).

Operations shall be made under the exclusive direction, supervision and control of the vessel's master and to the satisfaction of the mooring master and/or cargo STS advisor. Vessel's master shall continue to be fully responsible for the operation, management and navigation of the Vessel during the entire STS operation. It is understood and agreed that the crew of the vessel will be required to assist handling fenders and cargo hoses as well as mooring and unmooring as designated by the Mooring Master at the transfer site at no additional cost to the Charterers.

Charterers shall notify Owners in advance when, where and how much cargo shall be carried out under such ship to ship transfer operations as well as any other relevant information required prior to the arrival of the Vessel at the intended ship to ship transfer site.

The vessel may be required to accept dirty ballast from one or more of Charterers lightering vessels in performance of the lightering operation if technically and operationally feasible and the Owners warrants that the Master will co-operate with the Mooring Master concerning dirty ballast to the extent possible in the Master's discretion. The Charterers are to pay all costs related to removal of such ballast water ashore on a regular basis, and vessel shall be redelivered with no such waters/ROB.

### 71. Sea terminal.
The Owners warrants that the vessel, when calling at a sea terminal, will maintain her engines in readiness.  The vessel will be loaded and discharged in such manner that she, at any stage of loading or discharging operation, is able if necessary, for any reason, to immediately shut down cargo operations and promptly disconnect hoses and mooring lines to proceed to another anchorage at sea.

### 72. Agents and watchmen.
The Owners are to appoint their own agents when and if there is major Owners' business such as extensive repairs, docking, and other extended off-hire periods. However, the Charterers' choice of agents are to attend, at cost, to minor matters such as postage, cash advance to Master, crew transportations, medical, telexes, etc., on the Owners' behalf.

CD

Gangway watchmen and fire watchmen to be for the Owners' account unless compulsory in which case the cost to be for the Charterers' account, unless watchmen from vessel's crew are sufficient and may be used.

### 73. Adherence to voyage orders.
Owner undertakes that, unless Charterers require otherwise, the Master will follow voyage instructions issued by Charterers which instructions shall include Charterers' standard general instructions contained in the Masters Manual and/or Charterers' Vessels Circular provided by Charterers to the Master from time to time. Owner shall be responsible for any time, cost, delay or loss associated with vessel deviating from Charterers' voyage instructions including, without limitation, loading any cargo quantity in excess of, or short of, that instructed within the voyage orders.  If a discrepancy arises at loading terminal, Master is to contact Charterers at once concerning said discrepancy, before loading, to clarify the situation. If a conflict arises between terminal order and Charterers' voyage instructions, the Master is to stop cargo operations and to contact Charterers at once. Terminal orders shall never supersede Charterers' voyage instructions  and any conflict shall be resolved prior to resumption of cargo operations. The vessel is not to resume cargo operations until Charterers have directed the vessel to do so.

### 74. International transport workers federation.
The Owners guarantees that the employment of the vessel's officers and crew is covered by a bona-fide trade union agreement acceptable to the International Transport Workers Federation worldwide and will remain so during the currency of this charter party.  The vessel is to carry such agreement on board during the service.  In the event that the vessel is delayed by strikes, labour disputes or any other discrimination or difficulties against the vessel because of: previous trade prior to commencement of this Charter; the Ownership; the flag; the officers, crew and the officer's and crew's employment conditions, all such time lost is to be considered as off hire and expenses directly incurred thereby including bunker fuel consumed during such periods to be for the Owners' account.

## Eligibility Insurance and Certification

### 75. Classification and eligibility.
The Owners warrants that the vessel is in all respect eligible under applicable conventions, laws and regulations for trading to and from the port and places specified in **clause** 4 of this time charter party.  Furthermore, the vessel is not in any way listed as unacceptable by any Major Oil Company, Government or other organization whatsoever, nor is she debarred by any activity of any port within the agreed trading areas.  The vessel shall have on board for inspection by the authorities all certificates, records, compliance letters and other documents required for such services, including, but not limited to, a U.S. Coast Guard Certificate of Financial Responsibility (Oil Pollution) and the certificate required by Article VII of International Convention on Civil Liability for Oil Pollution Damage of 1969, as amended.

The Owners warrants that the vessel does and will throughout the duration of this charter fully comply with all applicable conventions, laws, regulations and ordinances of any international, national, state or local governmental entity having jurisdiction including, but not limited to:

(a) the US Port and Tanker Safety Act, as amended,
(b) the US Federal Water Pollution Control Act (Clean Water Act), as amended,
(c) MARPOL 1973/78 as amended and extended,
(d) SOLAS 1974/1978/1983 as amended and extended,
(e) OPA 1990, as amended,
(f) The EU Directive 2005/33/EC, as amended.

CD

**Exhibit C-03**

The Owners further warrants that any alterations (including time for alterations) to the ship to comply with any of these conventions, laws, regulations, ordinances and/or their amendments will be entirely at Owners' expense.

The Owners further warrants to keep the vessel with unexpired classification in force at all time during the charter period.

Any delays, losses, expenses or damages arising as a result of failure to comply with any part of this clause shall be for the Owners' account and the Charterers shall not be liable for any delay caused by failure to comply with these warranties.  Any resultant loss of time will be considered as off hire.

**76. USCG compliance.**
The Owners certifies that the vessel complies with the provisions of current U.S. Coast Guard regulations and any subsequent amendment thereto and all other applicable state pollution and safety laws, rules and regulations as may be promulgated and subsequent amendments thereto. The Owners further certifies that the vessel is not presently under an outstanding letter of discrepancy issued by the U.S. Coast Guard as a result of Coast Guard inspection of the vessel at a prior call at a U.S.A. port.

Owners warrant that they are aware of the requirements of the U.S Bureau of Customs and Border Protection ruling issued on December 5th 2003 under Federal Register Part II Department of Homeland Security 19 CFR Parts 4, 103, et al. and will comply fully with these requirements for entering U.S ports.

The vessel must possess a valid U.S.C.G Certificate of Compliance (COC) Certificate. Owners appreciate that without a COC in force, the Vessel may not be able to tender a valid NOR under Charterer's sub-charter party, with loss of demurrage as a result. The Vessel will be off-hire for the period of time for which Charterers are unable to collect voyage charter laytime/demurrage due to the Vessel arriving in the U.S. without a valid U.S.C.G COC. Should the vessel be overdue for an annual interim COC exam and the U.S.C.G deems the vessel to be cargo restricted, the Vessel shall be considered as not being in possession of a valid COC. Should the vessel have to deviate, proceed to a layberth and / or incur additional costs to complete the COC exam, all deviation time, bunkers and port costs incurred will be for Owner's account. The Vessel will return on hire at a position not less favourable to Charterers.

Should the Vessel fail the U.S.C.G COC inspection or Owners fail to arrange COC inspection prior to arrival, then the entire period of time in which Charterers are unable to collect Voyage laytime/demurrage shall be off-hire.

Should it be feasible to carry out the COC inspection at a port outside the USA (such as for example Singapore or Rotterdam), Charterers may request that Owners have the vessel inspected at such a location at Owners's time and expense. Should Owners refuse to carry out the inspection as requested, the Vessel shall be off-hire from arrival at the US port of inspection and until the COC certificate has been issued.

In respect of US/Canadian Asian Gyspy Moth (AGM) regulations, Owners shall ensure that pre-departure certifications are obtained prior to departing AGM-affected ports and:

(a) all costs and associated costs of AGM certification;
(b) any time lost waiting for and undertaking the certification inspections; and
(c) any fines, delays, claims or other losses that are incurred in connection with non-compliance with AGM regulations,

shall be for Owners' account.

CD

**Exhibit C-03**

## 77. AMS and CBSA requirements.

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall submit a cargo declaration by AMS (Automated Manifest System) to the US Customs using the Charterers' service provider and Charterers' SCAC (Standard Carrier Alpha Code) and ICB (International Carrier Bond). Similarly, if the Vessel loads or carries cargo destined for Canada or passing through Canadian ports in transit, the Owners shall comply with the current Canadian customs regulations and any Canada Border Services Agency (CBSA) requirements, including those related to the Bonded Carrier Code.

(b) The Charterers shall provide all necessary information to the Owners and/or their agents to enable the Owners to submit a timely and accurate cargo declaration.

The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of this sub-clause.

(c) The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners failure to comply with any of the provisions of sub-clause (a).

(d)  Any implied assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) or for the purposes of the Canadian Customs Regulations shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

The Owners will submit the cargo declaration via the Charterers service provider to the US or Canadian (as applicable) customs authorities, however the Charterers are obliged to provide all the necessary cargo information enabling Owners to submit the cargo declaration in a timely fashion. In this regard, Charterers indemnify and hold the Owners harmless against any loss or damage whatsoever arising out of the non-compliance by the Charterers with the obligations under this clause.

Furthermore Owners to indemnify the Charterers for loss and/or damage arising from the Owners' failure to comply with the regulation as it has been outlined.
In the event the vessel is delayed, detained as a result of Charterers failure to comply with its obligations under this clause; in these instances vessel will remain On hire unless delays has been caused by the Owners breach of its obligations hereunder.

## 78. ISPS.

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or the

CD

Exhibit C-03

Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

(b) (i) The Charterers shall provide the CSO and or the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and or the SSO/Master.

The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers account.

(c)  Security guards posted on the vessel due to crew issues by the USCG will be for Owners' account.

### 79. Drug and alcohol abuse.
The *Exxon Drug and Alcohol Policy*, blanket declaration is to be deemed a part of this charter party. The Owners warrants such blanket declaration is registered with Exxon. The Owners further warrants that it has an active policy on drug and alcohol abuse, applicable to the vessel, in full force at all times which meets or exceeds the standards set down in the Oil Companies International Marine Forum Guidelines for the control of drugs and alcohol onboard ship. The policy will remain in effect during the term of this charter and will be fully complied with at all times.  The Charterers are not to be held responsible for any and all consequences of the Owners failing to comply with this clause.

### 80. Insurance and financial responsibility.
a) Owners warrant that, throughout Vessel's service under this Charter, Owners shall have full and valid Protection and Indemnity Insurance ("P&I Insurance") for the Vessel, as described in this clause, with the P&I Insurance placed with a P&I Club which is a member of the International Group of P&I Clubs.  This P&I Insurance and any Excess Insurance shall be at no cost to Charterers.

(b) The P&I Insurance must include coverage against liability for cargo loss and or damage and coverage against liability for pollution for an amount not less than US$1 Bliiion per incident.  Owners will also obtain any additional oil pollution insurance cover which becomes available, either through their P&I Club(s) or through underwriters providing first class security.

(c) Owners hereby warrant and represent that the insured value of the Vessel is [***]. Owners warrant that it has in full force and effect Hull and Machinery insurance placed through reputable Brokers on International Hull clauses, or equivalent, for the value of the Vessel with first class underwriters. Such insurance to be maintained for the duration of this Charter.

(d) Owners warrant that the Vessel carries on board a certificate (which will be maintained in effect throughout the duration of the charter) issued by Owners' P&I Club in compliance with Article VII of the International Convention on Civil Liability for Oil Pollution Damage 1992 (and any amendments thereto). Any delay or consequences due to failure to have on board or to maintain in effect such certificate to be for Owners' account.

(e) DELETED

CD

**Exhibit C-03**

(f) Nothing in this Charter shall prejudice Charterers' rights to take such preventive measures in relation to pollution or threatened pollution as may be permissible under applicable laws and the rights and duties of Owners and Charterers herein shall be and remain subject to and in accordance with any such applicable law.

(g) If requested by Charterers, Owners shall promptly furnish to Charterers proper evidence of such P&I Insurance and Hull & Machinery Insurance (including but not limited to certificates of Entry / Endorsement Slip) immediately upon entering into this Charter or at any time during the Charter term.

(h) The Owners further guarantees to keep the vessel with un-expired classification in force at all time during the charter period and are to provide evidence of the same in accordance with this clause.

(i) Water Quality and FMC Clause
The Owners warrants to have, and to carry, on board the vessel the U.S. Federal Maritime Commission Certificate of Financial Responsibility and to comply with the U.S. Federal Water Pollution Control Act as amended by the Clean Water Act 1977(water pollution and any subsequent amendment thereto). The Owners are to provide evidence of Financial Responsibility in respect not only of oil but also of hazardous substance.

(j) State of California.
The Owners warrants that the vessel carries on board documentation of proof of financial responsibility satisfying requirements of the California Oil Spill Prevention and Response Act of 1990.

(k) I.T.O.P.F (revised Tovalop 1987)
The Owners warrants that it is a member of the International Tanker Owners Pollution Federation (I.T.O.P.F.) and that it will retain such membership during the entire period of the services of its vessel under this charter.

(l) I.S.M.
The Owners warrants that this vessel complies fully with the I.S.M. code and is in possession of a valid Safety Management Certificate and this will remain so for the entirety of her employment under this charter.

Without prejudice to any rights or remedies available under the terms of this charter or under English law, in the event of a breach of the above undertaking, any loss, damage, expense or delay following there from shall be for the Owners' account and the Charterers shall have the absolute right to cancel this Charter if such breach is not rectified within three (3) days.

**81. Oil pollution.**
(a)    Subject to the terms of this Charter, as between Owners and Charterers, in the event of an oil pollution incident involving any discharge or threat of discharge of oil, oily mixture, or oily residue from the Vessel (the "Pollution Incident"), Owners shall have sole responsibility for responding to the Pollution Incident as may be required of the vessel interests by applicable law or regulation.

(b)    Without prejudice to the above, as between the parties it is hereby agreed that:

   (i) Owners shall indemnify, defend and hold Charterers harmless in respect of any liability for criminal fine or civil penalty arising out of or in connection with a Pollution Incident, to the extent that such Pollution Incident results from a negligent act or omission, or breach of this Charter by Owners, their servants or agents;

CD

(ii)  Charterers shall indemnify, defend and hold Owners harmless in respect of any liability for criminal fine or civil penalty arising out of or in connection with a Pollution Incident, to the extent that such Pollution Incident results from a negligent act or omission, or breach of this Charter by Charterers, their servants or agents;

provided always that if such fine or penalty has been imposed by reason wholly or partly of any fault of the party seeking the indemnity, the amount of the indemnity shall be limited accordingly and further provided that the law governing the Charter does not prohibit recovery of such fines.

(c)    The rights of Owners and Charterers under this clause shall extend to and include an indemnity in respect of any reasonable legal costs and/or other expenses incurred by or awarded against them in respect of any proceedings instituted against them for the imposition of any fine or other penalty in circumstances set out in paragraph (b), irrespective of whether any fine or other penalty is actually imposed.

(d)    Nothing in this Clause shall prejudice any right of recourse of either party, or any defences or right to limit liability under any applicable law.

(e)    Owners warrants that the vessel will be able to trade to and from Canadian ports.

### 82. Extra insurance.
Owners warrants that any extra insurance, if any, due to the Vessel's age shall be for the Owners' account.

### 83. Hull and machinery value.
The value of hull and machinery insurance may be changed every year, however, such change to be understood as the adjustment of this type of vessel's market value or as required by holders of the mortgage at that time only and Owners will inform Charterers of new value, if changed accordingly.

### 84. Air pollution.
The Owners will comply with all applicable laws, regulations and ordinances by any national, state, regional or local, government having jurisdiction regarding air pollution.

### 85. Return insurance.
Charterers to have the benefit of any return insurance premium received by Owners from underwriters (as and when received from underwriters) by reason of the vessel being in port for a minimum period of 30 days, provided the vessel is on hire.

### 86. War risk and Piracy.
a)    Charterers shall not be liable for late redelivery under this charter resulting from seizure of the vessel by pirates.

b)    Owners shall not be allowed to claim blocking and trapping insurance.

c)    No contraband of war shall be shipped, but petroleum and/or its products shall not be deemed contraband of war for the purposes of this clause. Vessel shall not, however, be required, without the consent of Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations or hostilities, civil strike, insurrection or piracy whether there be a declaration of war or not, where it might reasonably be expected to be subjected to capture, seizure or arrest, or to be a hostile act by a belligerent power (the term "power meaning any de jure or de facto authority or any other purported governmental organization maintaining naval, military or air forces).

d)    For the purpose of this clause it shall be unreasonable for Owners to withhold consent to any voyage, route or port of loading or discharge if (i) insurance against all



CD

**Exhibit C-03**

risks defined in paragraph c) is then available commercially or under a government program in respect of such voyage, route or port of loading or discharge and (ii) it continues to be customary tanker shipping industry practice for vessels to undertake such voyage, route or port of loading or discharge. If such consent is given by Owners, Charterers will pay the provable additional war risk premium of insuring the vessel against hull war risk in an amount equal to the value under her ordinary hull policy net of all discounts, rebates and no claims bonuses. The benefit of discounts, rebates and no claims bonuses on additional premiums received by Owners from their War Risks insurers, underwriters or brokers shall be credited to Charterers in full. Charterers shall reimburse Owners any amounts due under this clause upon receipt of Owners' invoice, together with full supporting documentation including all associated debit and credit notes.

e)      If additional insurance for hull war risk is not obtainable commercially or through a government program, vessel shall not be required to enter or remain at any such port or zone.

f)      In addition, Owners may purchase at their own cost war risk insurance on ancillary risks such as loss of hire, freight, disbursements, etc. if they carry such insurance for ordinary marine hazards.

g)      Owners must submit all reimbursement claims together with all required supporting documents under this Charter to Charterers within 3 months of Owners being invoiced the relevant costs otherwise Owners' claim shall be time-barred under this Charter.

h)      Where there is a conflict between the provisions of this clause 86 and clause 105, the provisions of clause 105 shall take precedence.

### Bills of Lading   Documentation   Arbitration

### 87A. Letter of Indemnity and Bill of Lading.
If Charterers by facsimile, email or other form of written communication that specifically refers to this clause request Owners to discharge a quantity of cargo either:

a)      Without Bills of Lading and/or;

b)      at a discharge place other than that named in a Bill of lading and/or;

c)      that is different from the Bill of Lading quantity;

In consideration of Owners complying with Charterers' specific instructions, as above, Charterers shall, upon giving formal notification to Owners, invoke Owners' P and I Club Letter of Indemnity Wording for such activity. Owners' P and I Club Letter of Indemnity Wording are always to be issued without a bank guarantee.

Owners' blanket Letter of Indemnity wordings are to have been provided by Owners prior to delivery under this Charter and are incorporated into this Charter. Charterers always have the option to invoke the same as and when necessary either verbally or by facsimile or email to the Owners and when invoked, the Letter of Indemnity is deemed to have been issued by Charterers with the relevant cargo quantity, description of cargo, vessel's name and receiver's name (as given in the relevant voyage/discharge instructions to the vessel) incorporated into such Letter of Indemnity and, therefore, to be in full force and effect on each and every occasion when discharge as aforesaid takes place.



**Exhibit C-03**

Such indemnity shall automatically be null and void upon presentation of the relevant Bill of Lading, or 12 (twelve) months after completion of discharge of cargo to which such indemnity is relevant.

### 87B. Electronic Bills of Lading.
Notwithstanding anything contained in this Charter, Charterers may require Owners to sign up to an electronic document trading platform system that is approved by Owners P&I Club so that Owners can, upon instructions from Charterers, issue and sign in electronic form and transmit electronically any bill of lading, waybill, delivery order, certificate or other document (each, an "**eDoc**") issued pursuant to, or in connection with, this Charter (whether or not signed on behalf of Owners or Charterers or any sub-charterers). It is expressly agreed that any applicable requirement of law, contract, custom or practice that any bill of lading, waybill, delivery order, certificate or other document or communication issued pursuant to this Charter shall be made or evidenced in writing, signed or sealed shall be satisfied by such eDoc and the parties agree not to contend in any dispute arising out of or in connection with any eDoc or any eDoc which has been converted to paper that such eDoc is invalid on the grounds that it is not in writing or that it is not equivalent to an original paper document signed by hand, or, as the case may be, sealed.

Charterers agree to hold Owners harmless in respect of any liability, cost or expense arising from the use of any electronic trading system, to the extent that such liability, cost or expense would not have arisen under a paper trading system.

### 88. New paramount.
Charterers shall endeavor to ensure that all Bills of Lading issued pursuant to this charter shall contain the following clauses:

1. Subject to sub-clauses (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague Visby Rules").
Nothing contained herein shall be deemed to be either surrender by the carrier of any of his rights or immunities, or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules.

2. If there is governing legislation that applies the Hague Rules compulsorily to this Bill of Lading to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either surrender by the carrier of any of his rights or immunities, or an increase of any of his responsibilities or liabilities under the Hague Rules.

3. If there is governing legislation that applies the Hamburg Rules compulsorily to this Bill of Lading to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing herein contained shall be deemed to be either surrender by the carrier of any of his rights or immunities, or an increase of any of his responsibilities or liabilities under the Hamburg Rules.

If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg Rules, if applicable, such term shall be void to that extent, but no further. Nothing in the Bill of Lading shall be constructed as in any way to restrict, exclude or waive the right of any of the relevant parties or person to limit liability under any available legislation and or law.

### 89. Arbitration (Society of Maritime Arbitrators).
This Charter is governed by New York law and the provisions of clause 15 of the Pool Agreement for the vessel shall apply to this Charter as if the same was set out in full, mutatis mutandis, herein.

CD

**Exhibit C-03**

### 90. Onboard blending / Commingling.

Charterers shall have the right to perform onboard blending and/or commingling of cargo whilst loading or during sea passage, being two or more grades, over the designated cargo tanks to be loaded. Vessel's staff shall ensure that proper stability maintained during the entire operation. Charterers' nominated cargo inspector to supervise such onboard blending and vessel's staff is to follow the inspector's recommendations. In the absence of Charterers' cargo inspector, Owners to follow Charterers' instructions subject to ship's safety. Charterers will issue L.O.I. in Owners P&I Club wording.

### 91. Additive.

In case Charterers request additive to be added to a cargo while in the vessel's cargo tanks Owners will accept to do the operation provided it is proper/permissible and within the industry practice and Charterers to provide a LOI to that effect agreeable to Owners.

### Miscellaneous

### 92. Smuggling.

Any delays, expenses and/or fines incurred on the account of smuggling to be for Owners' account if caused by the Master, Officers, Crew or Owners' servants.

### 93. Third Party Arrest Clause.

In the event of arrest (by a party other than authorities at home or abroad) or other sanction levied against the vessel or the Charterers arising out of the Owners' breach or any fault of the Owners or out of any incident in which Charterers are not at fault, the Owners shall immediately and, forthwith upon receiving notice of the arrest of the vessel or of its detention in exercise or purported exercise of any lien or claim, procure its release by providing bail or otherwise as the circumstances may require and agree to assume full responsibility for all penalties, claims from cargo receivers, sub charterers and other third parties arising due to such event of arrest or other sanction and for putting up security and the vessel shall be considered off-hire during any delay or detention arising therefrom. Owners shall further be liable for all consequential losses caused by an arrest, seizure, detention or other claims against the vessel arising out of any matters in which Charterers are not at fault.

### 94. Detention Clause.

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against the vessel or having or purporting to have any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at the Charterers' use and all extra expenses shall be for the Owners' account and Owners shall immediately and, forthwith upon receiving notice of the arrest of the vessel or of its detention in exercise or purported exercise of any lien or claim, procure its release by providing bail or otherwise as the circumstances may require and will also be responsible for claims from cargo receivers, sub charterers and other third parties arising due to such event of seizure, detention or arrest and, unless such seizure, detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of cargo carried. Owners shall further be liable for all consequential losses caused by an arrest, seizure, detention or other claims against the vessel arising out of any matters in which Charterers are not at fault.

### 95. Vaccination Clause.

Owners are to arrange at its expense for the Master, Officer and Crew of the vessel, to hold valid vaccination certificates against yellow fever, cholera, as per International Health Regulations 1969 or any other future legislation and subsequent amendments, upon delivery of the vessel and throughout the time charter period. Any other vaccination requirement, which may come up from time to time throughout the world and are relevant to the vessel's trading, shall be carried out at Owners' expense.

CD

**Exhibit C-03**

### 96. Clean Ballast Clause.
Throughout the duration of this time charter, the vessel is always to arrive at all load port(s) with clean ballast only.

### 97. Notice Of Readiness (NOR) Clause.
At every load port and discharge port, throughout the duration of this time charter, the vessel shall tender her NOR immediately on arrival in the customary way. Until such time as the vessel is all fast at the berth/jetty, the Master shall re-tender vessel's NOR, daily, at 09:00 hours local time, to all parties if so instructed in the Charterers' load/discharge orders.

The text of subsequent daily NOR, as above, to be:

"Without prejudice to original NOR tendered ................ Hrs on..............20.... (to be completed as appropriate), on vessel's arrival, please be advised that my vessel is/remains ready in all respects to commence loading/discharging (delete as appropriate) of the cargo of .............. (complete as appropriate)".

### 98. Slop Clause.
The vessel shall have efficient and safe means of transferring engine room / pump room bilge liquids to designated holding tanks on board for disposal in accordance with international regulations.

### 99. Gauges Clause.
The vessel to be equipped with closed venting, gauging and sampling systems and cargo tanks to be equipped with high level alarms. Sufficient portable pressure gauges to be on board all times for the manifolds.

### 100. Slow Steam.
Owners agree to allow Charterers to issue orders to slow down the vessel consistent with safe operation of the vessel and its machinery on ballast and / or laden passage.

### 101. Oil Pollution Prevention.
Owners shall instruct the Master to retain on board all oily residues of oil of a persistent nature remaining in the vessel from the previous cargo. The Master shall, during tank washing, collect the washing into one cargo compartment and after maximum separation of the free water, discharge the water so separated overboard as permitted by MARPOL regulations so as not to conflict with any applicable local laws. The Master shall keep the Charterers notified of estimated tonnage of all segregated tank washings from previous cargoes.

### 102. U.S. Compliance Clause.
Owners warrants and guarantees that it and the vessel are not in any way directly or indirectly owned, controlled by or related to any Cuban, North Korean, Iranian, Serbian or Montenegro interests.

### 103. Baltic Navigation Clause.
Before entering Baltic waters vessel to have all navigation aids in perfect condition and while in the Baltic and / or Finnish Gulf strictly observe all regulations and recommendations. No oil or oily residues or wastes to be let overboard into the sea whilst in the Baltic or in the Gulf of Finland.

### 104. Low Sulphur Fuel Clause.
(a) Owners warrant that the vessel will be fitted with the required piping, tanks and equipment to comply with Marpol Annex VI requirements and have on board procedures to carry out and comply with the change to and from Low Sulphur Fuel (LSF) (or MDO as the area may require) in the Sulphur Emission Controlled Areas (SECAs) as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as,

CO

**Exhibit C-03**

but not limited to, the EU and the US Environmental Protection Agency. Owners undertake that they will comply with any worldwide regional and international regulations in regards to bunker quality, bunker specifications, supply and any technical, mechanical issue throughout the duration of the time charter.

(b) Charterers will ensure and arrange for the supply of sufficient LSFO or MDO, at all times necessary to trade in SECA. Any time lost or deviation as a result of supplying or waiting for supply of such fuels shall be for the Charterers account and shall not be considered off-hire and any and all expenses shall be for Charterers account.

(c) Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from Owners' breach of its obligations under this clause 104 and/or non-compliance with bunker regional and international regulations or the vessel's failure to comply with Regulations 14 and 18 of Marpol Annex VI, which shall be for Owners account.

### 105. Gulf Of Aden and Indian Ocean Clause.

In the event that the vessel is required by Charterers to transit through areas within the Gulf of Aden or the Indian Ocean which are covered by the current Joint War Committee listings (together, the "**Risk Areas**"), the Owners shall follow such orders however the following provisions shall apply:

(a)  subject to clause 105(h), the vessel if transiting the Gulf of Aden will transit under the first available naval convoy. Vessel will remain on hire during waiting time;

(b)  subject to clause 105(h), in case Owners requires the vessel to transit under a specific naval-led convoy, the vessel will remain on-hire for a maximum of 24 hours waiting time. Thereafter all waiting time to be off-hire and bunkers consumed during such time to be for Owners' account;

(c)  Charterers will arrange for insurance cover for KnR (kidnap and ransom) on behalf of the Owners with a cap of USD 8 million for each transit undertaken by the vessel through the Risk Areas. Any additional KnR cover required by Owners shall be arranged by Owners, at its cost;

(d)  crew bonuses are reimbursable and will be paid by Charterers up to 100% of the crew's basic wages, per transit for the full crew (including officers), in line with the IBF MOA/ ITF Agreements, for a period limited to the number of days of transit through the IBF High Risk Area and if applicable, the IBF Extended Risk Zone. Any additional crew bonus paid ex-gratia by Owners shall be for Owners' account;

(e)  Owners shall take out the Additional war risk cover for the vessel, and provide necessary invoices and proof of payment to Charterers for reimbursement by Charterers to Owners. Owners shall procure discounts from their war risk underwriters for the fact that kidnap and ransom and loss of hire insurance have been taken out separately and if applicable, to take into account the presence of armed or unarmed guards on board the vessel and other vessel hardening measures undertaken for the Risk Area transit;

(f)  Charterers shall reimburse Owners towards all or part of the cost of razor wire to be acquired by Owners and utilised on the vessel during the Risk Area transit, up to a limit of US$2,500 in case of Handy and MR vessels and US$3,500 in the case of Aframax and VLCC vessels, subject to Owners providing necessary invoices and proof of payment;

(g)  Owners shall have the option of taking armed guards on the vessel for Risk Area transits, subject to the conditions set out in clauses 105(h) and 105(i). If Owners so wishes to take armed guards, Charterers will arrange for the appointment of and pay for the cost of the armed guards on behalf of Owners. In the case that Owners insists

CO

on using a different armed guards service from that of Charterers' preferred provider, then Charterers agrees to reimburse the cost of the armed guards but such reimbursement shall be limited to the price that could have been obtained from using Charterers' preferred armed guards service provider. The reimbursement of the cost of Owners' own armed guards is subject to Owners providing the necessary invoices and proof of payment;

(h)    all waiting time and deviation for picking up and dropping off armed guards shall be for the account of Charterers provided that Charterers receive approval from Owners for the use of Charterers' preferred armed guards service provider or confirmation of appointment of Owners' own choice of other armed guards service provider promptly and in a timely manner so as not to cause delay to the vessel's itinerary;

(i)    the conditions for armed guards being taken on the vessel for a Risk Area transit, are that:

(i)    if transiting the Gulf of Aden, the vessel shall not wait for any naval convoy and shall proceed directly or transit with the first available MSCHOA grouped transit or naval convoy, whichever is first;

(ii)    the vessel shall adopt a direct route through the Risk Areas, but always keeping a minimum distance of 300 nautical miles away from the Somalian coast; and

(iii)    it is agreed that no armed guards are required to be taken on board the vessel for any transits going from the southern tip of India to the Arabian Gulf (or vice versa) which hug the Western Indian, Pakistani and Gulf of Oman coastlines.

Any waiting time or deviation in contravention of the conditions for the taking of armed guards set out in this clause 105(i) shall be off-hire and for Owners' account;

(j)    it is further agreed that the Owners / vessel will follow and implement the latest edition of BMP when in or transiting the Risk Areas;

(k)    other than as set out in the above paragraphs of this clause 105 Charterers will not cover for any other security or additional insurance measures adopted by Owners; and

(l)    the above provisions of this clause 105 are based on the current situation in the Gulf of Aden and the Indian Ocean, and this will be subject to review as and when the situation changes.

The Owners agree that this additional clause 105 may be amended from time to time by way of the Charterers notifying the Owners of changes to the Navig8 GoA and Indian Ocean policy.

### 106. Breach of Warranty Clause.
Should Owners be in breach of any of their warranties or representations under this charter, Charterers may put Owners on notice. In the absence of any express provision relating to such specific breach in this charter, Owners have 30 days thereafter to rectify the breach, failing which the vessel will be considered as off-hired. If such an offhire continues for another 10 days, Charterers shall have the option to terminate the CP without penalty to any party.

### 107. Switching of bills of lading.
Charterers shall have the option of switching bills of lading. The procedure will be as below:

CD

(a)   Charterers to confirm that full set of first original bills of lading which are to be re-issued are in Charterers' custody;

(b)   The full set of the first original bills of lading (full set 3/3) are to be marked 'null and void' and sent by fax/email to Owners;

(c)   The original cancelled bills of lading are to be couriered to Owners;

(d)   Specimens of the new bills of lading are to be faxed to Owners for their comments/approval;

(e)   upon receipt by Owners' representative at the Charterers' requested port of the full and complete set of relevant original cancelled bills of lading, Owners will then revert with their written authorisation for Charterers to be issued a new set of original bills of lading, in accordance with the specimen faxed copy.

**108. Storage Clause.**
Charterers' option to employ vessel up to a maximum of 180 days during the currency of this Charter as storage vessel and Owners/Master to co-operate to keep vessel's bunker consumption to a minimum always subject to vessel's safety. However, if vessel is employed on storage or is idle for a period of 60 days or more, Owners to have the right to conduct underwater hull cleaning at Charterers' expense. Furthermore if this option is exercised, Charterers shall reimburse Owners for hull cleaning but only if the anti-fouling paint cycle is current and not overdue.

**109. Vessel Inspection Clause.**
(a) The on-hire survey shall be held at the last port of call prior to delivery to Charterers. The off-hire survey shall be held at the last port of call prior to redelivery to Owners. The costs of both surveys shall be split fifty/fifty (50/50) between Owners and Charterers and shall be conducted by an independent surveyor acceptable to both parties.

(b) In addition to the joint on-hire/off-hire surveys and further to their rights of inspection as set out elsewhere in this Charter, Charterers' right to make such inspection of the vessel as they may consider necessary includes but is not limited to the right to place on board the vessel an inspector, surveyor and/or representative to inspect and/or test:

(i) the vessel's hull, machinery and equipment and living spaces;

(ii) the vessel's operational procedures both in port and at sea; and

(iii) the vessel's certificates, records and documents,

to determine whether Owners are complying in all respects with their obligations and that the vessel is in full compliance with international, national, state or local conventions, laws, regulations and ordinances currently in force or which may come into force in respect of the waters and trading areas to which the vessel may be ordered during the Charter period. Any delay caused by such inspection or test will be for Charterers' account but any repair or delay by reason of Owners' non-compliance will be for Owners' account.

(c) Charterers shall also have the right to require inspection of the vessel's tanks at loading and/or discharging ports to ascertain the condition of the tanks, the quality of the cargo, water and residues on board. In that respect Charterers' inspector, surveyor and/or representative has the right to ullage, inspect and take samples from the vessel's cargo tanks, bunker tanks, void spaces and other non-cargo tanks. Depressurisation of the tanks to permit such inspection and/or ullaging shall be carried out under the supervision of the vessel's Master in accordance with the recommendations in the latest edition of the International Safety Guide for Oil Tankers and Terminals.

(d) Charterers are further entitled from time to time during the Charter period on reasonable notice to arrange for their representative(s) to attend Owners' offices or the offices of Owners' managers or managing agents as the case may be in order to audit, assess and/or investigate Owners' safety management system, policies, management, crewing and operations in relation to the services to be provided by the vessel under this Charter.



CD

**Exhibit C-03**

(e) Whether or not Charterers exercise their rights under this clause no action or inaction on their part (including any action or inaction taken following an exercise of a right under this Clause) shall be deemed to be a waiver of their rights and shall be without prejudice to Charterers' rights and remedies including under clause 3.

**110. Turkish Customs.**
If the vessel is discharging cargo in a Turkish port and there is any short or overlanded cargo issue with the Turkish customs, Charterers are to take up the matter with the loadport agents and arrange for the issue of a quantity correcting document or other similar document required by the Turkish customs. All costs, delays etc associated with the above to be for Charterers account, provided the vessel has discharged her full cargo and obtained a dry tank certificate.

**111. EU Advance Cargo Declaration Clause.**
(a) If the vessel loads cargo in any EU port or place destined for a port or place outside the EU or loads cargo outside the EU destined for an EU port or place, Charterers shall comply with the current EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and in their own name, time and expense shall:

(i) Have in place an EORI number (Economic Operator Registration and Identification);

(ii) Provide Owners with a timely confirmation of (i) above as appropriate; and

(iii) Submit an ENS (Entry Summary Declaration) cargo declaration electronically to the EU Member States' Customs and provide the Owners at the same time with a copy thereof.

(b) Charterers assume liability for and shall indemnify, defend and hold harmless Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) The assumption of the role of carrier by Charterers pursuant to this Clause and for the purpose of the EU Advance Cargo Declaration Regulations shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**112. Dry Docking Clause.**
(a) No drydocking shall be undertaken by the Owners during the period of this Charter Party unless mutually agreed, unless the drydocking is necessary to maintain vessel's seaworthiness, in which case the vessel shall be off-hire from the time vessel received free pratique on arrival, if in ballast, or upon completion of discharge of cargo, if loaded, until the Vessel is again ready for service and presented at the Charterers' discharging and/or loading place.

In case of drydocking at a port other than where the vessel is to load, discharge or bunker under the Charterers' orders the following time and bunkers shall be deducted from hire:

Total time and bunkers including repair, port call for the actual voyage from last port of call under the Charterers' orders to the next port of call under the Charterers' orders less theoretical voyage time and bunkers for the direct voyage from said first port of call to said next port of call. Theoretical voyage will be calculated on the basis of the sea buoy distance at the warranted speed and consumption.

CD

**Exhibit C-03**

(b) In the event that gas freeing of certain tanks is required in connection with drydocking, the Charterers' will reimburse Owners for a maximum of 48 hours towards the additional time of gas freeing to the standard required for entry into drydock for cleaning and painting the hull. Any time spent for such gas freeing in excess of 48 hours to be for Owners account. Such gas freeing time commences when the vessel is released to the Owners for the purposes mentioned in this clause and terminates when the tanks are gas-freed to the above required standard. For the avoidance of doubt, all fuel consumed and related gas-freeing expenses shall be for Owners account.

(c) Charterers and Owners to mutually cooperate for economic dry docking of the vessel. Owners to provide minimum 90 days advance notice of any drydocking while Charterers to make best endeavours to bring the vessel to a trading range where drydocking can be undertaken in a shipyard suitable for Owners' requirements.

**113. Insolvency of Owners.**
In the event of the potential application of both, or a conflict between, admiralty and insolvency/ bankruptcy jurisdiction, the parties expressly agree that admiralty jurisdiction shall pre-empt insolvency/ bankruptcy jurisdiction with respect to the rights and obligations of the parties under this Charter, and with respect to enforcing maritime lien or attachment rights. In the event that Owners, its parent or affiliated companies file for insolvency / bankruptcy protection, the parties expressly agree that this Charter and any and all liens that Owners otherwise possess with respect to bunkers and cargo terminate, and ownership interest reverts to Charterers at 0001 hours on the date of such filing. In that event, Owners remain a bailee of the bunkers and cargo, and as such are obligated to safely discharge same into Charterers custody. Owners also stipulate that Charterers are entitled to recover possession of the bunkers and cargo for purposes of Admiralty Supplemental Rule D or other equivalent legislation or regulation in any other jurisdiction.

**114.  Sanctions Clause.**
Owners represent, warrant, guarantee and undertake that:

(a)    Owners are not a target of Sanction or a Sanctioned Entity;
(b)    the vessel is not a target of Sanction or a Sanctioned Entity; and
(c)    to the best of their knowledge, after having made due enquiries, none of the operational manager, the technical manager nor any owners above the Owners in the chartering chain of the vessel (if applicable), nor the registered owner nor the ultimate beneficial owners of the vessel are Sanctioned Entities or a target of Sanction.

For the purposes of this clause 114:

"Sanction" means any sanction, regulation, statute, official embargo measures or any 'specially designated nationals' or 'blocked persons' lists, or any equivalent lists maintained and imposed by the United Nations, the European Union, the United States Department of Treasury's Office of Foreign Assets Control. the United States Department of State or any replacement or other regulatory body enforcing economic and trade sanctions legislation in such countries or by any supranational or international governmental organization; and

"Sanctioned Entity" means any entity, being an individual, corporation, company, vessel, association or government, who or which:

(x) is target of a Sanction; or

(y) is subject to a sanction or is directly or indirectly owned by any entity who is subject to a Sanction.

CD

**Exhibit C-03**

Notwithstanding anything to the contrary herein, nothing in this Charter is intended, and nothing herein should be interpreted or construed, to induce or require Charterers to act in any manner (including failing to take any actions in connection with a transaction) which is inconsistent with or prohibited under any Sanction.

In the event it is or becomes unlawful under the laws of any jurisdiction for Charterers in their respective judgment to perform any of their obligations under this Charter by reason of the provisions of this clause 114 or in the event that the Owners and/or the vessel become the target of Sanction or become a Sanctioned Entity, Charterers may immediately terminate the Charter and redeliver the vessel forthwith, without incurring any liability.

(d) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (d) anything is done or not done, such shall not be deemed a deviation.

(e) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (d).

(f) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

**115. Ebola Clause.**
(a) If the Vessel proceeds to or through any port, place, area or zone, or any waterway or canal (hereinafter called an "**Area**") exposed to the risk of Ebola the Owners shall have the liberty, but not the obligation:

(i) to take reasonable preventative measures to protect the Vessel, her crew and cargo including but not limited to furnishing the crew with necessary personal protective gear at charterers time and cost, (PPG) as follows:

1.   Sufficient disposable Tyvek coveralls
2.   Antibacterial face masks
3.   Disposable shoe covers
4.   Nitrile or latex gloves
5.   Antibacterial wash
6.   Remote-sensing infrared thermometer
7.   Disposable dining utensils
8.   Additional food for stevedores

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice (including all updates to such orders, directions, recommendations or advice) given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military and/or health authorities, whatsoever acting with the power to compel compliance with their orders or directions. Where such orders, directions, and

CO

**Exhibit C-03**

recommendations vary, Owners shall, if they chose to comply with them, be at liberty, acting reasonably, to decide which orders, directions, and recommendations, if any, they comply with; and

(iv) to comply with the terms of any recommendation of the World Health Organization and/or the United States National Institute of Health Center for Disease Control, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the recommendations, orders or directions of those who are charged with their enforcement. Where such orders, directions, and recommendations vary, Owners shall, if they chose to comply with them, be at liberty, acting reasonably, to decide which orders, directions, and recommendations, if any, they comply with.

(b) Costs and hire

(i) If the Vessel proceeds to or through an Area where, due to risk of Ebola, additional costs will be incurred including but not limited to preventative measures to avoid Ebola, such directly related, documented and reasonable costs which are approved in advance by the Charterers shall be for the Charterers' account. Any time and expenses incurred waiting for quarantine or at the load/discharge port(s) and or used in taking measures to minimise risk in both cases up to 21 days after the vessel's arrival, shall be for the Charterers' account;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then any bonus or additional wages paid in accordance with the International Transport Workers' Federation and the International Bargaining Forum framework agreement shall be reimbursed to the Owners by the Charterers;

(iii) If the underwriters of the Owners' insurances require additional premiums, or additional insurance cover is necessary, because the Vessel proceeds to or through an Area exposed to risk of Ebola, then such additional insurance costs shall be reimbursed by the Charterers to the Owners;

(iv) Owners must submit all reimbursement and expense claims together with all required supporting documents under this clause to Charterers within one (1) month after the completion of final discharge of the relevant voyage otherwise Owners' claim shall be time-barred under this clause. All payments arising under sub-clause (b) shall be settled within fifteen (15) days of receipt of Owners' supported invoices.

(c) Notwithstanding the terms of clause 21, hire shall be paid for time lost from Ebola including any time lost owing to loss of or sickness to the Master, Officers, crew or passengers from Ebola PROVIDED that no hire shall be payable in respect of any time lost due to the action of the Crew in refusing to proceed to a place where there has been any actual, threatened or reported cases of Ebola. Such delay shall be limited to seven (7) running days for Charterer's account. If any crew is found to have contracted Ebola any and all expenses, including death benefits due under the collective bargaining agreement (CBA) shall be for the account of the Charterers.

(d) If the Vessel is affected or detained by reason of suspected or actual Ebola in the load/discharge port Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released.

EP FLOPEC

AMAZONAS TANKER POOL COMPANY LLC

**Exhibit C-03**

REF: M/T ZARUMA

ANNEX TO POOL PARTICIPATION AGREEMENT

DATED OCTOBER 06, 2020

END OF CHARTER PARTY TERMS AND CONDITIONS

CD

# EXHIBIT C-04

**Exhibit C-04**

**Private and Confidential**

# POOL PARTICIPATION AGREEMENT

## BETWEEN

## AMAZONAS TANKER POOL COMPANY LLC

## AND

## EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA

## DATED DECEMBER 1, 2021

No part of this document may be used or reproduced in any form or by any means, or stored in a database or retrieval system, without prior written permission of Amazonas Tanker Pool Company LLC. Making copies of any part of this document for any purpose is a violation of copyright laws.

**Exhibit C-04**

Private and Confidential

## TABLE OF CONTENTS

1.   DEFINITIONS ........................................................................................... 2
     1.1   DEFINITION OF TERMS ............................................................. 2
2.   GENERAL POLICY ................................................................................ 3
     2.1   PURPOSE OF THE POOL ............................................................ 3
     2.2   POLICIES AND OPERATIONAL STANDARDS ........................ 4
     2.3   TECHNICAL STANDARDS ......................................................... 5
     2.4   CUSTOMER SATISFACTION ..................................................... 5
     2.5   MISCELLANEOUS ....................................................................... 6
3.   CONDITIONS FOR POOL PARTICIPATION ...................................... 6
     3.1   TERM/DELIVERY ....................................................................... 6
     3.2   POOL ............................................................................................ 6
4.   POOL COMPANY/POOL MANAGER ................................................. 8
5.   ENTERING PARTICIPANT .................................................................. 11
6.   TERMINATION OR WITHDRAWAL .................................................. 12
7.   HIRE ...................................................................................................... 13
8.   POOL REVENUE AND DISTRIBUTION ............................................. 14
9.   CHARTER PARTY ............................................................................... 16
10.  ASSIGNMENT OF EARNINGS ........................................................... 16
11.  COMMITTEES AND AUTHORITIES ................................................. 16
12.  NEW POOL PARTICIPANTS .............................................................. 18
13.  TOTAL LOSS ....................................................................................... 18
14.  HEADINGS AND MODIFICATIONS .................................................. 18
15.  GOVERNING LAW/ARBITRATION ................................................... 18
16.  NOTICES .............................................................................................. 19
17.  CONFIDENTIALITY ............................................................................ 19
18.  INDEMNITY, LIABILITY AND SECURITY ...................................... 19
19.  NO PARTNERSHIP; U.S. TAX EXCEPTION ..................................... 20
20.  RELIANCE ON COUNSEL AND OTHER ADVISORS ....................... 21
21.  RIGHTS OF THIRD PARTIES ............................................................. 21
22.  COUNTERPARTS ................................................................................ 21

1

Exhibit C-04

APPENDICES:

Appendix 1    SHELLTIME 4 TIME CHARTER AND TERMS

Appendix 2    COMMERCIAL MANAGEMENT AGREEMENT

Appendix 3    POOL KEY

Appendix 4    POOL RECAP

Appendix 5    GT&C

Exhibit C-04

Private and Confidential

## POOL PARTICIPATION AGREEMENT

This Pool Participation Agreement (the "Agreement") is entered into on DECEMBER 1, 2021 by and among:

AMAZONAS TANKER POOL COMPANY LLC, a Marshall Islands corporation with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH 96960 (the "Pool Company"); and, EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA, a corporation incorporated under the laws of ECUADOR with its registered office at Avenida Del Pacifico No. 001 y Puerto Rico Esmeraldas, Ecuador Apt. 080106 (the "Entering Participant" or "Pool Participant"), as the owner or operator of the vessel "M/T PICHINCHA" ("Entering Vessel").

### RECITALS:

A.    The Pool Company has been formed and established for the purpose of operating, as charterer, under a "SHELLTIME 4" time charter to be entered into with owners or disponent owners of Qualifying Vessels substantially in the form of Appendix 1 ("Charter Party"), a pool ("Pool") of Qualifying Vessels (each a "Pool Vessel");

B.    The Pool Company will employ the Pool Vessels in the worldwide carriage and/or storage of crude oil and/or dirty petroleum products ("Pool Business");

C.    In its capacity as disponent owner of the Pool Vessels, the Pool Company has appointed Amazonas Tankers LLC, in its capacity as the designated pool manager of the Pool Company (the "Pool Manager"), as the exclusive commercial manager of the Pool Vessels to perform, such commercial management services and such administrative, financial and accounting support services in connection with the Pool and the Pool Business as set forth in the Commercial Management Agreement dated 12 January 2018, a copy of which is Annexed as Appendix 2 hereto (the "Commercial Management Agreement");

D.    The Pool Manager, as agent for the Pool Company, has determined that the Entering Vessel is a Qualifying Vessel meeting all the specification and requirements for entry into the Pool and that the Entering Participant has satisfied all other conditions for entry into the Pool based on the criteria set forth herein;

E.    The Entering Participant wishes to enter the Entering Vessel into the Pool, and the Pool Company wishes to receive the Entering Vessel into the Pool, in each case in accordance with the terms of this Agreement; and

F.    This Agreement sets forth the terms and conditions upon which the Entering Participant shall enter the Entering Vessel into the Pool and the basis upon which the Entering Vessel shall share and participate in the pooled revenues of the Pool Business and the voyage and other costs thereof.

1

Exhibit C-04

IT IS HEREBY AGREED AS FOLLOWS:

## 1.    DEFINITIONS

### 1.1    DEFINITION OF TERMS

The terms used in this Agreement, with their initial letters capitalized, shall, unless the context thereof otherwise requires, have the meanings specified in this Article 1. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    **"Affiliate"** means in relations to a person, any other person that directly or indirectly Controls, is Controlled by or is under direct or indirect common Control with the specified person;

(b)    **"Agreement"** has the meaning set forth in the Preamble and shall be deemed to include all subsequent amendments and modifications thereto;

(c)    **"Charter Party"** has the meaning set forth in Recital A;

(d)    **"Commercial Management Agreement"** has the meaning set forth in Recital C;

(e)    **"Control"** means the power of a person, directly or indirectly, to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interests, by contract or otherwise) or the right to a share of more than one-half of the assets, or of more than one-half of the income, of another person;

(f)    **"Gross Pool Revenue"** means the revenue of the Pool Vessels calculated in accordance with Clause 8;

(g)    **"Entering Participant"** has the meaning set forth in the Preamble;

(h)    **"Entering Vessel"** has the meaning set forth in the Preamble;

(i)    **"Net Pool Revenue"** has the meaning set forth in Clause 8;

(j)    **"Participant"** and **"Pool Participant"** means an owner or disponent owner of a Qualifying Vessel who has entered such Vessel into the Pool by execution and delivery of a pool participation agreement substantially in the form of this Agreement;

(k)    **"Participant Group"** means any group of Participants who are Affiliates and each of whom has entered a Vessel into the Pool;

2

Exhibit C-04

(l)    "**Pool**" has the meaning set forth in Recital A;

(m)    "**Pool Company Account**" means any bank account opened by the Pool Manager as the agent of the Pool Company for the receipt of Working Capital and Gross Pool Revenue and the payment of Pool Expenses;

(n)    "**Pool Business**" has the meaning set forth in Recital B;

(o)    "**Pool Company**" has the meaning set forth in the Preamble;

(p)    "**Pool Expense**" means the expenses relating to the Pool Vessels calculated in accordance with Clause 8;

(q)    "**Pool Manager**" has the meaning set forth in Recital C;

(r)    "**Pool Vessel**" has the meaning set forth in Recital A;

(s)    "**Qualifying Vessel**" means a vessel approved for entry by the Pool Company;

(t)    "**Technical Committee**" means a panel consisting of one or more representatives as from time to time appointed by, and acting under the direction and supervision of, the Pool Company's agent, the Pool Manager, to address vetting issues and any other technical issues as deemed appropriate;

(u)    "**Working Capital**" has the meaning set forth in Clause 5; and

(v)    "**Vessel**" means a vessel generally, the Entering Vessel or a Pool Vessel, as the context may require.

(w)    "**Voyage Expense**" means the expenses relating to the Pool Vessels calculated in accordance with Clause 8;

(x)    "**Pool Recap**" means the vessel-specific deal summary as present in appendix 4.

## 2.    GENERAL POLICY

### 2.1    PURPOSE OF THE POOL

The Pool has been established to provide chartering and operational services to independent tanker owners and/or operators.  The goal of the Pool Business is to secure the highest earnings per day for each Pool Vessel. The Participant's contractual relationship with the Pool Company is by way of this Agreement, setting out the organizational provisions of the pooling arrangement, and the Charter Party containing the provisions relevant to the operation of the Vessel. The commercial management of the Pool is provided by the Pool Manager, as.

appointed by the Pool Company under the terms of the Commercial Management Agreement and as otherwise set forth herein.

### 2.2   POLICIES AND OPERATIONAL STANDARDS

(a)   Only Vessels meeting the required characteristics of the Pool will be admitted to the Pool and parties will only be admitted as Participants who are tanker owners and operators who operate crude and/or product tankers that are in compliance with national, international and industry standards and in full accord with customer safety and environmental requirements.

(b)   The Participant will use its best efforts to ensure that each Pool Vessel, owned thereby, is able to perform operationally at all times and shall have all necessary equipment in good working order to carry out these operations. Each Participant shall ensure that its Pool Vessel shall be maintained and equipped in a manner that renders it seaworthy, is in compliance with the requirements of the relevant Classification Society and remains a Qualifying Vessel.

(c)   The goal of the Pool is that Pool Vessels will be allocated to trades in a manner to maximize Pool results. However, the Pool Company shall use commercially reasonable efforts to ensure that voyage operation practices are being uniformly applied to all Pool Vessels, and each Participant will be treated in the same equitable fashion and each will have the same access to voyage and cargo operations data and records of each Pool Vessel. The Pool Company will endeavor to position each Pool Vessel so that off-hire time and deviation caused by repairs and dry docking is minimized. However, the Pool Company shall not be under an obligation to do so to the extent it decreases the overall results of the Pool. Upcoming dry dock intentions are to be discussed with the Pool Manager in view of increasing the Vessel's commercial tradability. The Pool Manager is to be advised of any known material operational deficiencies of a Vessel as soon as practical. Notwithstanding the foregoing, neither the Pool Company nor the Pool Manager will be under any obligation to assure that any particular results are achieved for the Pool.

### 2.3   TECHNICAL STANDARDS

The Pool Manager and/or Technical Committee may suggest reasonable increases to the minimum ship standards to meet changing trade and customer requirements which are considered to be in the interest of optimizing the returns to all Participants in the Pool. The Participants shall endeavor to comply with such recommendations or in the alternative to terminate its participation in the Pool.

### 2.4   MISCELLANEOUS

(a)   Pool Participants will use commercially reasonable actions to benefit the Pool. It is further expected that the Participants will promote the Pool,

·4

**Exhibit C-04**

without additional material costs to Pool Participants, in the market place and Pool Manager will assist in recruiting additional qualified owner/operators to join the Pool.

(b)  The Pool Company and the Participants acknowledge that differences of opinion are likely to take place, and they further acknowledge that as professional and commercial people, all reasonable efforts will be made to reconcile such differences amicably, and that arbitration should be the last resort. The Pool Manager and/or Technical Committee may be asked to mediate in such disputes.

## 3.  CONDITIONS FOR POOL PARTICIPATION

The Entering Participant endorses the General Policy statements in Part 2 and desires to enter the Entering Vessel into the Pool by way of a Charter Party entered into concurrent herewith between the Entering Participant and the Pool Company and the Pool Manager, as the Pool Company's authorized agent, has agreed to accept the Vessel into the Pool;

### 3.1  TERM/DELIVERY

(a)  This Agreement shall commence as of the date the Entering Vessel is delivered under the Charter Party, and shall continue unless terminated pursuant to Clause 6 of this Agreement.

(b)  A Vessel is to be delivered into the Pool in delivery areas established by the Pool Manager and reasonably agreed to by the Entering Participant. Redelivery areas to be same as delivery areas when a Vessel exits the Pool. Any exceptions to be agreed by the Pool Manager.

### 3.2  POOL

(a)  The Pool Company shall in its own name (as disponent owner and principal under the Charter Party) enter into contracts for the employment of the Pool Vessels. The Pool Manager, as agent for the Pool Company, shall negotiate and conclude spot charters, consecutive voyage charters, contracts of affreightment and time charters for performance by the Pool Vessels. If the time charter employment is longer than the minimum remaining period of participation of the Vessel, the Pool Manager shall ask consent of the Participant owning the relevant Pool Vessel before committing the ship to such employment.

(b)  All revenues earned by the Pool Company from the operation of the Pool Vessels shall, after deduction of all costs involved in the operation of the Pool, be remitted to the Pool Participants as provided for in Clause 8 and Appendix 3 hereof. In the same manner, any liability incurred by the Pool Company as a result of the activities of the Pool shall be comparably charged to the Pool Participants. Such payment shall be made on a

Exhibit C-04

periodic basis, according to a settlement schedule mutually agreed upon between the Pool Company and the Pool Participant.

(c)     In respect of any contract of affreightment that the Pool Company enters into as disponent owner or any contract of affreightment in which the original owner or disponent owner has assigned its rights and benefit to the Pool Company (in either case, a "COA"), it is agreed by the parties hereto that the Pool Company has the right to enter into time charters as charterers with third party owners or disponent owners ("Third Party Charters"), for the purpose of chartering-in vessels from such third party owners or disponent owners ("Third Party Vessels") to cover time or voyage charter trip commitments, COA's which cannot be covered by any of the existing Pool Vessels. All Third Party Charters shall be in accordance with any Classification Society rules, any requirements of the insurance coverage for the Vessel and under the Shelltime 4 charter form attached as Appendix 1.

(d)     The Pool Participant shall be obliged as follows:

(1)     To indemnify and hold the Pool Company, the Pool Manager and/or its appointed agents harmless from all consequences or liabilities from any irregularities in papers supplied by the Participant and/or from any liability that arises from the Pool Participant's failure to ensure that any Bill of Lading signed by the vessel's Master complies with the Charterer's instructions or requirements of the Agreement or the amended Shelltime 4 and additional terms at Appendix 1.

(2)     To pay for and/or reimburse the Pool Company for all reasonable costs, disbursements, and expenses whatsoever incurred thereby in the performance of their responsibilities hereunder. Such disbursements and expenses shall include, but shall not be limited to, the reasonable fees and expenses of independent consultants, professional advisors and representatives, supercargo, port captains, surveyors, superintendents or other specialists, whom the Pool Company or the Pool Manager, acting as agent for the Pool Company, considers necessary to employ from time to time in connection with the operation of the Vessel. Such expenses are to be considered voyage expenses and prorated between all Vessels, if appropriate. If the Pool Manager's operational personnel and/or port captains are sent to attend the Vessel from the Pool Manager's office, only travel and out of pocket expenses are to be reimbursed by the Pool Company and charged to the applicable voyage(s).

(3)     To provide time charterers' protection and indemnity ("P&I") from a major P&I club, freight demurrage and defense ("FDD"), bunker insurance and loss of use insurance.

6

Exhibit C-04

(4)    To engage a professional consultant for the establishment of an "Incident Response Program" to mitigate any commercial exposure to the Pool Company as a result of an incident involving the Vessel.

(5)    To take action in order to get a resolution in the event that there is a cargo contamination caused by a Pool Vessel which results in demurrage or other claim(s) being unpaid with reference to such contamination. In the event no resolution has been achieved by the Participant by the time the Vessel gives notice to leave the Pool, then the Pool Company shall have the authority at that time to deduct an amount from charter hire equal to the amount being withheld by the sub-charterer under the claim so long as the Pool Company can resolve the dispute within a usual and customary timeframe to resolve disputes. If not, the charter hire shall be disbursed to the Participant, without prejudice to any right available against the Pool Participant hereunder.

## 4.    POOL COMPANY/POOL MANAGER

(a)    In consideration of its operation of the Pool on behalf of the Pool Company, as profit interest payable, the Pool Company shall retain from Gross Pool Earnings and remit to the Pool Manager as compensation for the commercial management services to the Pool and the Pool Vessels as set forth below an administrative fee agreed in a "Pool Recap" specific to the Pool Vessel for the term of this Agreement. The Pool Manager may negotiate profit interests compensation at a higher or lower rate with individual Participants at its reasonable discretion. In consideration thereof, the Pool Manager shall, as agent of the Pool Company, perform the following commercial management services pursuant to a separate commercial management agreement to be entered into with respect to the Pool Vessels:

(1)    To be responsible for the commercial employment of the Pool Vessels including but not limited to negotiating and concluding time charters (in or out), voyage charters, and market-related contracts of affreightment.

(2)    To be responsible for the commercial operation of the Pool Vessels including supervising and arranging bunkering, appointing port agents and negotiating tug boat service contracts, to include period contracts for such services.

(3)    To communicate with the Pool Vessels, the Participants, shippers, charterers, receivers, Pool Managers and others involved with the receiving and handling of the Vessel at the loading and discharging ports, including notices required under the terms of the Pool Vessels' employment.

7

(4)    To approve Letters of Indemnity ("LOIs") provided that such LOIs are in conformity with the Charter Party. The LOIs are to be in accordance with the relevant Participants' P&I club wording.

(5)    To collect all freights and accounts receivable arising from operation of the Vessel, to give receipts therefore, to make any and all claims for monies due in respect of Pool Vessels and to issue releases upon receipt of payment of such claims and in connection with the settlement of such claims. The Pool Manager shall ensure that all funds derived from the employment of the Vessel shall be deposited by the payers to the Pool Company Account. All funds received by the Pool Manager from any other sources for the account of the Pool Company shall be immediately deposited to the Pool Company Account. In the receipt and handling of any funds of the Pool, the Pool Manager shall have fiduciary responsibilities with respect to the Pool Company in accordance with normal vessel agency practices and applicable law. Any discounts or rebates that are, or become, available are to be credited to the Pool Participants.

(6)    To defend, intervene in, settle, compromise or abandon any legal proceedings by or against the Pool Company or, its freight, earnings and disbursements and for the purposes of this clause the expression "legal proceedings" shall include arbitration, civil, regulatory and criminal proceedings of all kinds.

(7)    To furnish the Master of the Vessel appropriate voyage instructions, to monitor voyage performance, speed, and use of weather routing services if deemed necessary by the Pool Manager.

(8)    To maintain such records, accounts, statements and supporting vouchers, if any, obtained in connection with the services covered by this Agreement and make them available to the Participants upon request, including, but not limited to, any of the foregoing which the Pool Company deems necessary or advisable in order to comply with any of the charters in effect with respect to any of the Vessels. Deloitte & Touche, UHY or another major accounting firm, on an annual basis, will audit the Pool Company's books, including distributions. Audited reports will be distributed to all the Participants. All Pool results are available for review by each Participant at the offices of the Pool Manager.

(9)    To prepare and distribute unaudited quarterly reports to each Participant for each Pool Vessel.

(10)    To submit such financial and business reports and other information relating to the provision of the Pool Manager's services under this Agreement as the Pool Company may reasonably require and in such form as may be agreed between the Pool Company and the Pool Manager.

(11)    To keep such records and accounts as shall be necessary and in accordance with good accounting practices for the proper operation of the Pool, including such accounts as shall be necessary for Pool Company distributions.

(12)    To monitor the contributions and distributions for the Pool Company.

(13)    The above notwithstanding, should there occur a significant change in the market due to a change in regulations, the Pool Manager is obliged to propose a change without delay.

(14)    To be under no liability whatsoever for any costs, expenses, losses, claims or damages of whatsoever nature (including loss of profit due to detention or delay to any of the Vessels) arising in course of the performance of its duties resulting from any act or omission by personnel, representatives, independent contractors or other persons employed by it, unless the same shall be proved to have resulted from the actual personal willful misconduct of any officer or director of the Pool Manager, and the Pool Company and Participant as defined in this Agreement hereby indemnify and hold the Pool Manager harmless from any and all actions, claims, demands, and liabilities to or from third parties (including subcontractors, servants and sub-Pool Managers in respect of any claim made by or on behalf of them) brought against the Pool Manager in course of its performance of its duties under this Agreement.

## 5.    ENTERING PARTICIPANT

(a)    The Entering Participant undertakes to perform the following duties:

(1)    To indemnify and hold the Pool Company, the Pool Manager and/or its appointed agents harmless from all consequences or liabilities from any material irregularities in papers supplied by the Participant and/or from any liability that arises from the Pool Participant's failure to ensure that any Bill of Lading signed by the vessel's Master complies with the Charterer's instructions or requirements of the Agreement or the amended Shelltime 4 and additional terms at Appendix 1.

(2)    To ensure that the Vessel shall be insured in accordance with normal shipping practice with underwriters acceptable to the Pool Company. Such insurance shall include hull and machinery, P&I, war risk and, to the extent reasonably required, piracy insurance and to provide evidence of same to the Pool Company upon request.

(3)    To enter into a Charter Party and terms with the Pool Company using the Shelltime 4 form attached hereto as Appendix 1. The executed Charter Party shall be an integral part of this Agreement.

9

Exhibit C-04

(4)    To engage a professional consultant for the establishment of an 'Incident Response Program'. The Pool Company and the Pool Manager are to be included in, and be the beneficiaries of, the program.

(5)    To maintain the Vessel in a seaworthy condition subject to the rule of the insurance coverage and the relevant Classification Society rules. Furthermore, to be fully responsible for management of the Vessel, in accordance with the Charter Party. The Participant shall at all times keep the Pool Manager informed of all relevant communications relating to vetting issues, as regards any incident pertaining to the Vessel, its crews, its cargo and the environment in order, in each case, that the Pool Manager may keep customers adequately and proactively informed and to assist in any efforts necessary to mitigate or avoid loss to the customer, the Participant, or the reputation or customer relationships to the Pool.

(6)    To contribute such amount as agreed between between the Entering Participant and the Pool Manager in the "Pool Recap." Provided that should the cashflow of the Pool be insufficient to allow it to comply with its commercial commitments on the requirement of the Pool Company, then the Pool Manager shall be entitled to recommend a further contribution of Working Capital to the Pool. The Participant may contribute additional working capital recommended by the Pool Manager or in the alternative withdraw from the Pool. If the Pool Manager withholds distributions to the respective participants, less the amount withheld in Clause 3.2(e)(5) or pledged collateral that remains uncollected or becomes ineligible as collateral for financing the pools activity, will be repaid within ninety (90) days of when the final hire payment is due after the Vessel leaves the Pool.

(7)    To deliver the vessel with the bunker quantity as set forth in the governing SHELLTIME 4. The value of the bunkers on board at delivery shall be determined by the Pool Company in accordance with SHELLTIME 4 and provided as a credit from the Pool Company to the Pool Participant, to be settled at re-delivery of the Entering Vessel. The Pool Company shall not exchange cash for bunkers on board at delivery, but rather calculate the delivery / redelivery difference in value, on a FIFO basis, and make a cash settlement at redelivery.

(8)    To perform any and all obligations of the Entering Participant including paying any and all time charter hire payments or other applicable costs incurred by the Entering Participant in connection with the Entering Vessel.

## 6.    TERMINATION OR WITHDRAWAL

(a)    Unless otherwise set forth in the SHELLTIME 4 or an Addendum attached hereto, the Entering Vessel will be entered into the Pool for an initial period of

one (1) year after which the Charter Party becomes evergreen for continuous one (1) year periods, unless the Vessel is withdrawn from the Pool in accordance with the terms hereof. After the initial period however, the Vessel may be redelivered by the Pool within the permissible redelivery area(s) and after giving one hundred eighty (180) days written notice or after the Vessel is free of any commitment. The Participant may withdraw the vessel from the Pool as set forth in this Agreement or by serving one hundred eight (180) days written notice to the Pool provided the initial period is met and the Pool has determined that the vessel is not required to perform any Pool contracts existing at the time the notice was received by the Pool. Once redelivery notice has been given by either party, the other party may choose to redeliver the Vessel, or request the redelivery of the Vessel, as the case may be, at any time after receipt of the redelivery notice, as long as the Vessel is free of any commitment and after serving a minimum of seven (7) days' notice, which is to include the name of the redelivery area. Participant may not terminate more than one Vessel charter party in any six (6) months period unless the Participant, Pool Company and the Pool Manager all agree to allow differently.

Should a participant withdraw their vessel from service without regard for the withdrawal procedure set forth in this clause, the Pool Company shall be entitled to retain all Working Capital and undistributed earnings as partial compensation for damages. Retention of Working Capital and undistributed earnings shall not prejudice the Pool Company from seeking additional recourse against Participant.

(b)   The Participant is to immediately notify the Pool Company in writing of either the firm sale of a Vessel or of Participant's intention to sell the Vessel. Should the Vessel be sold, the Participant to give notice as per Clause 6(a). The Pool Company will endeavor to redeliver the Vessel early if requested by the Participant.

(c)   The Pool Company may terminate this Agreement with respect to a Pool Vessel if such Vessel is off-hire for more than thirty (30) days in a six (6) month period.

(d)   The Pool Company has the right to terminate this Agreement with respect to a Participant if such Participant dissolves or liquidates or if an order be made or effective resolution be passed winding up either party or if a receiver shall be appointed for the property of the Participant or if the Participant shall cease to carry on its business or commences a proceeding in bankruptcy or similar proceeding (or a proceeding in bankruptcy or similar proceeding is commenced against a party which proceeding remains undismissed and unstayed after thirty (30) days) or if a party makes any special arrangements or composition with its creditors.

(e)   Upon termination or removal of the Vessel from the Pool, the Participant will pay an administrative fee of USD 25,000 to the Pool Company which will be deducted from the last hire payment. This is to cover operational and accounting costs related to finalizing the Vessel's disbursements, demurrage, etc.

11

(f)     The Pool Company may terminate this Agreement for just cause as defined in any part of this Agreement or in the Charter Party.

(g)     Any termination of this Agreement and withdrawal of the Vessel from the Pool shall be without prejudice to any and all rights and obligations of the parties hereto attributable to such termination or withdrawal.

## 7.    HIRE

The Vessel will earn charter hire in accordance with Clause 8 of this agreement.

## 8.    POOL REVENUE AND DISTRIBUTION

(a)     The net pool revenue ("Net Pool Revenue") shall be equal to the Gross Pool Revenue less any Pool and Voyage Expenses as set forth below:

(1)     Gross voyage revenue (including but not limited to freight, demurrage, and dead freight) (the "Gross Pool Revenue");

(2)     Less address commission (if applicable);

(3)     Less broker commission(s) (if applicable);

(4)     Less Pool Manager's commission (if applicable);

(5)     Less any other voyage expenses (including but not limited to port expenses, canal costs, voyage related COFR, bunker expenses, additional war or piracy risk or similar costs or expenses) and any other applicable costs (including but not limited to inspections, cleaning costs, chemicals or similar costs).

(6)     Less any legal or professional fees incurred by the Pool Company or Pool Manager in connection with the management of the Pool, which amounts shall be charged to the Pool Participants as soon as administratively practicable after the end of each calendar quarter for such calendar quarter and which amounts shall be allocated among the Pool Participants on a proportionate basis based on the number of days that the Entering Vessel is in the Pool in the applicable calendar quarter;

(7)     Less any insurance payable by the Pool Company, which amounts shall be charged to the Pool Participants as soon as administratively practicable after the end of each calendar year for such calendar year and which amounts shall be allocated among the Pool Participants on a proportionate basis based on the number of days that the Entering Vessel is in the Pool in the applicable calendar quarter;

(8)     Less any interest and bank charges;

12

(9)     Less any revenue sharing withholding amounts, as applicable;

(b)     The allocation of each Vessel's earnings from the Pool Company is determined as per Appendix 3, the "Pool Key"

(c)     Notwithstanding anything in this Agreement to the contrary, any amount due or payable to the Participant from the Pool Company under this Agreement or any related document may be set off against amounts due or payable to the Lender (whether arising under this Agreement or otherwise) at the election of the Lender from time to time.

## 9.  CHARTER PARTY

The Participant/the Vessel shall at any and all times during the term of this Agreement comply with the conditions, terms and warranties expressed or implied in this Agreement and in the Charter Party attached hereto as Appendix 1 and which shall be deemed to be an integral part of this Agreement. The terms of this Agreement shall prevail if a conflict should arise in the interpretation of the terms of this Agreement and the terms of the Charter Party.

## 10.  ASSIGNMENT OF EARNINGS

The earnings of the Pool Vessels may not be assigned by the Participants but may be assigned by the Pool Company in favor of its working capital lenders. The Participants may only assign the earnings distributed by the Pool Company to the Participant's Pool Vessels. Each Participant agrees to subordinate any claims the Participant has or may have against the Pool Company to any and all claims of the Pool Company's creditors that the Pool Company determines are valid and undisputed. Participant also agrees to waive any contractual lien over the charter hire earnings distributed by the Pool Company pertaining to the Vessels in favor of such creditor and to any freight, sub-freights or sub-hires pertaining to the Vessels.

## 11.  NEW POOL PARTICIPANTS

No person shall be entitled to become or be regarded as a Pool Participant unless and until (i) such person has entered into an agreement substantially in the form hereof, with such modifications as the Pool Company or Pool Manager may from time to time approve, (ii) in relation to any Qualifying Vessel which it proposes to enter as a Pool Vessel, such person has entered into a Charter Party substantially in the form of Appendix 1 with such amendments as the Pool Company or Pool Manager shall require and (iii) such person has contributed the amount of Working Capital determined by the Pool Company or Pool Manager in accordance with Clause 5.

## 12.  TOTAL LOSS

In the event of a total loss or constructive total loss of a Vessel, the Vessel's participation in the Pool shall be deemed to be terminated at noon (GMT) on the day of her loss or, should the Vessel be missing, at noon (GMT) on the day on which she was last heard of.

## 13.  HEADINGS AND MODIFICATIONS

The headings of Clauses are for convenience of reference only and shall not affect the interpretation of this contract. No modification, wavier or discharge of any term of this Agreement shall be valid unless in writing and signed by the party to be charged therewith.

## 14.  GOVERNING LAW/ARBITRATION

This Agreement shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Agreement, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the parties cannot agree upon the appointment of a single Arbitrator, the dispute shall be settled by three Arbitrators, each party appointing one Arbitrator, and if the dispute is between two parties hereto, the third Arbitrator shall be appointed by the Arbitrators named by each party. If any of the appointed Arbitrators refuses or is incapable of acting, the party appointing him shall appoint a new Arbitrator in his place. Any determination rendered by the Arbitrator(s) shall be final and binding upon the parties and may, if necessary, be enforced by a court of any other competent authority in the same manner as a judgment in a court of law. For any disputes being settled by arbitration, which may require the vote of the Pool Manager, the Principal initiating the arbitration of the Participant being brought to arbitration will abstain from such voting.

## 15.  NOTICES

Notices or other communications under or with respect to this Agreement shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or email to the parties at their respective addresses set forth below or to such other address as to which notice is given:

To the Participant:
EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA
Avenida Del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador
Apt. 080106
Email: g.general@flopec.com.ec

To the Pool Company:
AMAZONAS TANKER POOL COMPANY LLC
c/o Amazonas Tankers LLC
1400 Liberty Ridge Drive, Suite 100
Wayne, PA 19087
Email: operaciones@amazonastankers.com


Notice shall be deemed given upon sending except for notice by mail shall be deemed given upon receipt.

14

## 16.  CONFIDENTIALITY

This Agreement, including all terms, details, conditions, and period is to be kept private and confidential and beyond the reach of any third party, with the exception of the lending banks of the Participant or the Pool Company's working capital lenders or the Participant's technical managers. The terms and conditions of this Agreement are for the sole use of the parties to this Agreement and are not to be copied or used for any other purpose without the express written consent of the Pool.

## 17.  INDEMNITY, LIABILITY AND SECURITY

If a claim is made against a Participant ("Indemnified Party") or its affiliate, or any seizure, distraint, arrest, detention, attachment or the like ("Arrest") effected in respect of property owned, controlled or possessed by the Indemnified Party or its affiliate by reason of a claim against another Participant or its affiliate or the Pool Managers ("the Indemnifying Party") or in respect of any property owned, controlled or possessed by the Indemnifying Party then the Indemnifying Party shall:

(a)  indemnify and hold harmless the Indemnified Party and its affiliate against the claim and the Arrest, and all costs, losses, liabilities and expenses (including reasonable legal expenses) arising therefrom;

(b)  without limitation to the foregoing, provide security to ensure that any Arrest is lifted or discharged as soon as possible.

Each Participant shall be liable for its own performance under this Agreement and each Participating Charter but (for the avoidance of doubt) shall not be jointly or severally liable with any other Participant or for the obligations of any other Participant.

## 18.  NO PARTNERSHIP; U.S. TAX EXCEPTION

(a)  General Rule. Nothing in this Agreement or in any other document relating to the Pool shall be construed as constituting a partnership between the Participants or between the Participants and the Pool Manager or the Pool Company or any of them. The obligations of each Participant under this Agreement shall be owed to the Pool Company alone and not to the other Participants except in case of the obligations under Clauses 15, 17 and 18.

(b)  U.S. Tax Exception. Notwithstanding the foregoing, the Entering Participant understands and consents to the fact the Pool Company has made a tax election to be treated as a partnership solely for U.S. federal income tax purposes, with the result that the Entering Participant and each other Participant in the Pool will be considered to be a partner of such partnership. In this regard:

(1)  under partnership tax principles, each Participant will be considered to earn its pro-rata share, based on its allocable share of Net Pool Revenue, of the U.S. source gross transportation income derived by the Pool Company from trading Pool Vessels to or from U.S. ports.

15.

|

Exhibit C-04

(2)    within 60 days from the end of each calendar year, the Pool Manager will provide to each Participant an information schedule setting forth the U.S. source gross transportation income derived by the Pool Company for such year and each Participant's pro rata share thereof based on such Participant's allocable share of Net Pool Revenue for such year.

(3)    each Participant shall be solely responsible for preparing and timely filing IRS Form 1120F (U.S. Tax Return of a Foreign Corporation) for each calendar year in which it has been deemed to earn U.S. source transportation income and to report on such Return its allocable share of U.S. source transportation income earned and to claim exemption from tax or pay the applicable 4% tax imposed, on such income.

(4)    the Pool Company shall procure that in addition to the information schedule referred to above, the Pool Manager will provide to each Pool Participant such advice as may be reasonably required to enable such Participant to understand and comply with the applicable U.S. federal income tax laws and filing requirements to which such Participant may be subject in any year in which it has been deemed to have earned a pro rata share of U.S. source transportation income earned by the Pool Company.

In respect of the above, the Entering Participant confirms that (i) it is the beneficial owner (generally the entity that derives and is entitled to the income) of the charter hire and other payments made to it pursuant to this Agreement and the Charter Party between the Entering Participant and the Pool Company relating to the Entering Vessel, (ii) it is not acting as a nominee, trustee or agent for another individual or entity, (iii) it is a corporation or other legal entity where all of its members have limited liability, and (iv) it has not filed for treatment as a pass-through entity with the U.S. Internal Revenue Service. The Entering Participant agrees that upon any change in its circumstances as described in this paragraph, it will notify the Pool Manager immediately.

## 19.    RELIANCE ON COUNSEL AND OTHER ADVISORS.

Each party has consulted such legal, financial, technical or other experts as it deems necessary or desirable before entering into this Agreement. Each party represents and warrants that it has read, knows, understands and agrees with the terms and conditions of this Agreement.

## 20.    RIGHTS OF THIRD PARTIES

Save as expressly provided in this Agreement, no terms of this Agreement shall be enforceable by a third party, being any person other than the parties hereto and their permitted successors and assignees.

## 21.    COUNTERPARTS.

This Agreement may be executed by facsimile signatures and in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument.

16

**Exhibit C-04**

*[Signature Page Follows]*

17

**Exhibit C-04**

IN WITNESS WHEREOF, this Agreement has been duly executed by each of the parties as of the date first set forth above.

**EPPETROEC**

By: _____

Name: _____

**AMAZONAS TANKER POOL COMPANY LLC**

By: _____

Name:    TY SHIMADA

REF: M/T PICHINCHA
POOL PARTICIPATION AGREEMENT

Case 2:26-cv-00124-GAW    Document 35-4    Filed 03/11/26    Page 133 of 177

# EXHIBIT C-05

**Exhibit C-05**

| | |
|---|---|
| **From:** | GGR-Gerencia General |
| **To:** | Ty Shimada; Roberto Dongo; Axel Maurer |
| **Cc:** | andrea.arrobo@energiayminas.gob.ec; smoya@planificacion.gob.ec; rluque@mtop.gob.ec; jvega@finanzas.gob.ec; Andres Velasquez Viscarra; Cristian Panchi Zambrano; Verónica Jahaira Simisterra; Jorge Alberto Regalado Tejada |
| **Subject:** | Notice of termination of EP FLOPEC´s participation in the Amazonas Tanker Pool |
| **Date:** | Monday, February 5, 2024 7:17:48 PM |

Dear Ty,

We refer to all of the Amazonas Commercial Agreements including but not limited to the Amazonas Tanker Pool Participation Agreements and the Temporary Extraordinary Measures Implementation Structure relating to Amazonas Commercial Agreements, hereinafter referred to collectively as "Amazonas Tanker Agreements".

Pursuant to the Amazonas Tanker Agreements we, EP FLOPEC, as Participants, expressly serve our six months' notice of termination of EP FLOPEC´s participation in the Amazonas Tanker Pool and in all other Commercial Agreements related to its participation in the Pool.

As a result of this notice, the Agreement cannot be considered renewed in an Evergreen period or any other capacity.

As a result of this notice, the Participants will need to review all further business of the Pool but any and all vessels that may participate on behalf of EP FLOPEC in the Amazonas Tanker Pool, be it as virtual ships or through charterparties shall be entered up to the termination date, this is, six months from this notice and for the only purpose of optimizing the Pool business during the six month period until termination.

Best Regards,

Jorge Alberto Regalado T, MBA
**General Manager**
**Empresa Pública Flota Petrolera Ecuatoriana**

Av. del Pacífico 001 y calle Puerto Rico, Edif. EP FLOPEC
(593) 62999900 / (593) 23947800 ext. 2097
Código postal: 080108 / Esmeraldas-Ecuador
**https://www.flopec.com.ec**



En EP FLOPEC PROHIBIMOS EXPRESAMENTE EL SOBORNO en cualquier forma, ya sea de forma directa o indirecta, a través de un agente u otro

tercero y con relación a un servidor/funcionario público o una persona privada. *NO se permite entregar o recibir, directa o indirectamente regalos, viajes, donaciones, patrocinios, artículos de entretenimiento u otro tipo de beneficios.*

Nuestros canales de denuncias son:

1)Página Web: https://www.flopec.com.ec/wp-antisoborno/public/
2)Correo electrónico: denuncias@flopec.com.ec

# EXHIBIT C-06

**Exhibit C-06**

**From:** William Sudhaus <wsudhaus@coresynergy.com>
**Date:** August 6, 2024 at 3:34:25 PM EDT
**To:** "Petrilli (Giovanni Von Buchwald) Frederick" <fpetrilli@flopec.com.ec>
**Cc:** Barriga Roberto <roberto.barriga@lcb.ec>, Pino Daniel <dpino@pinoelizalde.com>, Elizalde Valentin <Elizalde@pinoelizalde.com>, Craig Culbertson <cculbertson@coresynergy.com>, Shapiro S <shapiro@formanshapiro.com>
**Subject: AMAZONAS TANKERS Notice of Breach & Reservation of Rights Letter Attached**

1

   

**Exhibit C-06**

1400 LIBERTY RIDGE DRIVE, STE 100

WAYNE, PA 19088

+1.610.296.6400

OPERATIONS@AMAZONASTANKERS.COM

August 6, 2024

Dear Mr. Petrilli:

By e-mail dated February 5, 2024 and on other occasions since, EP Flopec advised us that, on August 5, 2024, it intends unilaterally to cancel "all of the Amazonas Commercial Agreements" and to terminate EP Flopec's participation in the Amazonas Tanker fleet.

We write to advise you, again, that EP Flopec's purported unilateral cancellation of the parties' agreements constitutes a material breach of those agreements.

Further, to the extent that EP Flopec provides cargos of crude oil for transportation to Aframax vessels outside the Amazonas Tanker fleet or deploys the M/T Zaruma or the M/T Pichincha for business other than that of the Amazonas Tankers fleet, those actions will constitute additional material breaches of the parties' agreements.

These breaches, and others, have caused and will continue to cause substantial damages to Amazonas, as well as Core Transport as a fleet participant.  In an effort to mitigate these damages, Amazonas and its affiliates will begin repositioning their fleet vessels.

Amazonas and its affiliates reserve all of their rights under the Amazonas Commercial Agreements and related contracts and under applicable law.

Sincerely,

Craig Culbertson
Senior Vice President and General Counsel
Amazonas Tankers LLC

# EXHIBIT C-07

Exhibit C-07

**Supreme Court of Pennsylvania**
**Court of Common Pleas**
**Civil Cover Sheet**
**CHESTER** County

*For Prothonotary Use Only:*

Docket No:

**2025-11952-TT**

*Filed and Accepted by PROTHONOTARY 17 Dec 2025 03:09 PM M. SCHIAVONI*

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

### SECTION A

**Commencement of Action**

✓ Complaint    __ Writ of Summons    __ Petition

__ Transfer from Another Jurisdiction    __ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| **FLOTA PETROLERA ECUATORIANA EP** | **WILLIAM S SUDHAUS** |

Are money damages requested? ✓ Yes __ No

Dollar Amount Requested: __ Within arbitration limits
(check one) ✓ outside arbitration limits

Is this a Class Action Suit? __ Yes ✓ No

Is this an MDJ Appeal? __ Yes ✓ No

Name of Plaintiff/Appellant's Attorney: A. Michael Pratt

__ Check here if you have no attorney(are a Self-Represented [Pro Se] Litigant)

### SECTION B

**Nature of the Case:** Place "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE.*

If you are making more than one type of claim, check the one that you consider most important.

| **TORT** *(do not include Mass Tort)* | **CONTRACT** *(do not include Judgments)* | **CIVIL APPEALS** |
|---|---|---|
| __ Intentional | __ Buyer Plaintiff | Administrative Agencies |
| __ Malicious Prosecution | __ Debt Collection: Credit Card | __ Board of Assessment |
| __ Motor Vehicle | __ Debt Collection: Other | __ Board of Elections |
| __ Nuisance | __ Employment Dispute: | __ Dept. of Transportation |
| __ Premises Liability | Discrimination | __ Statutory Appeal: Other |
| __ Product Liability *(does not include mass tort)* | __ Employment Dispute: Other | __ Zoning Board |
| __ Slander/Libel/Defamation | __ Other | __ Other: |
| ✓ Other: | | |

| **MASS TORT** | **REAL PROPERTY** | **MISCELLANEOUS** |
|---|---|---|
| __ Asbestos | __ Ejectment | __ Common Law/Statutory Arbitration |
| __ Tobacco | __ Eminent Domain/Condemnation | __ Declaratory Judgement |
| __ Toxic Tort - DES | __ Ground Rent | __ Mandamus |
| __ Toxic Tort - Implant | __ Landlord/Tenant Dispute | __ Non-Domestic Relations |
| __ Toxic Waste | __ Mortgage Foreclosure: Residential | __ Restraining Order |
| __ Other: | __ Mortgage Foreclosure: Commercial | __ Quo Warranto |
| | __ Partition | __ Replevin |
| **PROFESSIONAL LIABILITY** | __ Quiet Title | __ Other: |
| __ Dental | __ Other: | |
| __ Legal | | |
| __ Medical | | |
| __ Other Professional | | |

2025-11952-TT

Exhibit C-07



**GREENBERG TRAURIG, LLP**
A. Michael Pratt, Esq. (#44973)
Lucy G. Sumner, Esq. (#337829)
Daniel Pulecio-Boek, Esq. (*pro hac vice forthcoming*)
John C. Molluzzo Jr., Esq. (*pro hac vice forthcoming*)
prattam@gtlaw.com
lucy.sumner@gtlaw.com
pulecioboekd@gtlaw.com
molluzzoj@gtlaw.com
1717 Arch Street, Suite 400
Philadelphia, PA 19103

---

**FLOTA PETROLERA ECUATORIANA EP**
Avenida del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador, Código Postal 080108,

                    Plaintiff,

        v.

**WILLIAM S. SUDHAUS**
967 Delchester Road
Newtown Square, PA 19073,

**DAVID W. SUDHAUS**
578 Pugh Road
Wayne, PA 19087,

**ENRIQUE CADENA-MARIN**
Unknown,

**JAIME CONDOY-BLACIO**
Unknown,

~~**DRAGUN USA LLP**~~  c/o  CT CORP
15 Exchange Place
Jersey City, NJ 07302-3912,

**MJØLNER AFRAMAX POOL CO LLC**
15 Exchange Place
Jersey City, NJ 07302-3912,

**MJØLNER SOLUTIONS CHARTERING LLC**
15 Exchange Place
Jersey City, NJ 07302-3912,

**IN THE COURT OF COMMON**

**PLEAS OF CHESTER COUNTY**

_____, Term 2025

No. _____

**JURY TRIAL DEMANDED**

2025-11952-TT

Exhibit C-07

**MJØLNER SHIP MANAGEMENT LLC**
15 Exchange Place
Jersey City, NJ 07302-3912,

**AMAZONAS CA, LLC**
1400 Liberty Ridge Drive
Chesterbrook, PA 19087-5525,

**AMAZONAS TANKERS, LLC**
1400 Liberty Ridge Drive
Chesterbrook, PA 19087-5525,

**CORE TRANSPORT, LLC**
1400 Liberty Ridge Drive
Chesterbrook, PA 19087-5525,

and

**JOHN AND JANE DOES 1-10**
being a fictitious designation pursuant to
Pa. R. Civ. P. 2005 for individual(s) and/or
entity(ies) that are members of or assisted the
Sudhaus Group in its fraudulent scheme as
described in detail below on the date as outlined
below, and whose identity/identities is/are
presently unknown to plaintiff.

Defendants.

## NOTICE TO DEFEND

You have been sued in Court If you wish to defend against the claims set forth in the following
pages, you must take action within twenty (20) days after this Complaint and Notice are served,
by entering a written appearance personally or by attorney and filing in writing with the Court
your defenses or objections to the claims set forth against you. You are warned that if you fail to
do so the case may proceed without you and a judgment may be entered against you by the Court
without further notice for any money claimed in the Complaint or for any other
claim or relief requested by the plaintiff. You may lose money or property or other rights
important to you.

2

*2025-11952-TT*

YOU SHOULD TAKE THESE PAPERS TO YOUR LAWYER AT ONCE. IF YOU DO NOT
HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE
SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. THIS
OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO
PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL
SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERRAL SERVICE
Chester County Bar Association
15 West Gay Street
West Chester, PA. 19380
(610) 429-1500

3

*2025-11952-TT*

Exhibit C-07

**GREENBERG TRAURIG, LLP**
A. Michael Pratt, Esq. (#44973)
Lucy G. Sumner, Esq. (#337829)
Daniel Pulecio-Boek, Esq. (*pro hac vice forthcoming*)
John C. Molluzzo Jr., Esq. (*pro hac vice forthcoming*)
prattam@gtlaw.com
lucy.sumner@gtlaw.com
pulecioboekd@gtlaw.com
molluzzoj@gtlaw.com
1717 Arch Street, Suite 400
Philadelphia, PA 19103

| | |
|---|---|
| FLOTA PETROLERA ECUATORIANA EP, <br><br> Plaintiff, <br><br><br> v. <br><br> WILLIAM S. SUDHAUS, DAVID W. SUDHAUS, ENRIQUE CADENA-MARIN, JAIME CONDOY-BLACIO, DRAGUN USA LLP, MJØLNER AFRAMAX POOL CO LLC, MJØLNER SOLUTIONS CHARTERING LLC, MJØLNER SHIP MANAGEMENT LLC, AMAZONAS CA, LLC, AMAZONAS TANKERS, LLC, CORE TRANSPORT, LLC, AND JOHN AND JANE DOES 1-10. <br><br> Defendants. | **IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY** <br><br> _____, Term 2025 <br><br> No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Flota Petrolera Ecuatoriana EP ("FLOPEC"), by and through the undersigned counsel, brings this action for damages against Defendants William S. Sudhaus, David W. Sudhaus, Enrique Cadena-Marín, Jaime Condoy-Blacio, Dragun USA LLP, Mjølner Aframax

4

*2025-11952-TT*

Exhibit C-07

Pool Co LLC, Mjølner Solutions Chartering LLC, Mjølner Ship Management LLC, Amazonas CA LLC (previously known as Amazonas Tanker Pool Company, LLC), Amazonas Tankers, LLC, and Core Transport, LLC.

## INTRODUCTION

1. This action arises from a calculated, audacious scheme by Pennsylvania residents William S. Sudhaus and David W. Sudhaus, their web of affiliated entities (together, with William and David Sudhaus, the "Sudhaus Group"), and other defendants, to hijack Ecuador's state-owned oil-shipping business and thereby deprive Ecuador of at least $650 million in revenues.

2. Defendants systematically defrauded FLOPEC, Ecuador's state-owned enterprise established by Ecuadorian law to act as the country's exclusive oil shipping company. Defendants did so including by divesting FLOPEC of its exclusive rights over Ecuadorian oil shipments, diverting the majority of revenues to Sudhaus-controlled entities, and concealing their theft behind deliberately opaque structures.

3. Through the Sudhaus Group's interconnected entities including Dragun USA, Mjølner-branded companies, Core-branded companies, and Amazonas-branded companies, Defendants engineered a commercially senseless maritime "pool" arrangement (the "Amazonas Tanker Pool" or "Pool"), stripped FLOPEC of control over its statutory oil shipping mandate, deprived FLOPEC of financial transparency, and diverted the majority of revenues to Sudhaus-controlled entities rather than to FLOPEC.

4. In the maritime industry, pool arrangements of this type are relatively common. Companies will pool together assets or capabilities (generally, cargo such as oil, customers, vessels), creating a joint venture to buy, ship and sell a product. In the oil industry, one example of a reasonable pool arrangement is a joint venture between an oil producer, a shipping company

5

*2025-11952-TT*

Exhibit C-07

and an oil broker to produce, ship and sell oil to customers. However, the Amazonas Tanker Pool—the pool arrangement at issue here—was a sham designed exclusively by Defendants to misappropriate hundreds of millions of dollars from the Ecuadorian government.

5.    Under the Amazonas Tanker Pool arrangement, Defendants precluded FLOPEC from chartering (*i.e.*, renting) vessels other than those vessels offered by the pool and Defendants kept the majority of revenues generated by each shipment of Ecuadorian oil. .Defendants did not own the vessels chartered to FLOPEC at high cost, did not generate any customers for FLOPEC, and certainly did not produce any oil. PetroEcuador (Ecuador's national oil company) produced the oil, PetroEcuador produced the customers, and the vessels were available in the open market. In short, Defendants did virtually nothing other than sit back, and profit handsomely at Ecuador's expense.

6.    As a result of this arrangement, most of the oil Ecuador exported from 2020 to 2024 (when FLOPEC terminated the "Pool") was shipped through Defendants, yielding Defendants over $650 million in revenues.

7.    The Sudhaus Group deceptively engineered a series of documents to create the Amazonas Tanker Pool. Starting with a December 7, 2018 email memorializing an initial arrangement between FLOPEC and the Sudhaus Group vehicle, Dragun USA, the Sudhaus Group appeared to create a relatively standard pool structure. In March 2020, however, the Sudhaus Group designed a document that formally created the Amazonas Tanker Pool arrangement. The Sudhaus Group perfected its fraudulent scheme with a December 2020 document that entirely deprived FLOPEC of its statutory mandate to act as Ecuador's oil shipping company.

8.    The Amazonas Tanker Pool arrangement resulted from complicity with corrupt government officials. Without the statutorily required approval (or knowledge of FLOPEC's

6

Exhibit C-07

board, former FLOPEC General Manager, Jaime Condoy-Blacio signed the 2020 documents creating the arrangement. The documents are in English, but Mr. Condoy-Blacio does not speak English. No record exists that he ever retained counsel, let alone U.S. counsel, in connection with these documents, and no FLOPEC records exist that Mr. Condoy-Blacio discussed these documents with anyone or sought the statutorily required approval of FLOPEC's Board of Directors. Moreover, Mr. Condoy-Blacio apparently signed at least one of these documents during a one-week trip to New York for which there are no detailed records or information. Finally, Mr. Condoy-Blacio was appointed to that role by a former Minister of Energy who took bribes from an oil company associated with the Sudhaus Group and committed suicide while in custody pending trial.

9.    This fact pattern is consistent with a repeated pattern of corruption by the Sudhaus Group with former FLOPEC officials which has been reported to include lavish travel and meals, arranging for rent-free condominiums, and cash payments. More importantly, the pool arrangement is a brazen violation of Ecuadorian law. The Sudhaus Group is well-versed in Ecuadorian law—they have been conducting business in or relating to the Ecuadorian oil industry for over a decade and knows (or should know) that Ecuadorian law does not allow the creation of a pool that entirely supplants FLOPEC's governmental business role and deprives it of hundreds of millions of dollars in revenues and profits. The Sudhaus Group has also historically relied on local power brokers and intermediaries that have been suspected of corruption or are under investigation for corruption.

10.    In October 2023 when Daniel Noboa was elected President, Ecuador underwent a seismic political shift. President Noboa's election ended over a decade of corrupt governments.

2025-11952-TT

The Noboa administration began to clean house and, in 2024, FLOPEC terminated the Amazonas Tanker Pool.

11.    FLOPEC brings claims for tortious interference with business relations, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, civil conspiracy, and violations of Ecuadorian civil law, and seeks, among other relief, disgorgement and restitution of ill-gotten revenues, constructive trusts, actual losses, lost profits and other consequential damages.  Notably, the Ecuadorian government's Office of the Inspector General (which has oversight over the country's national spending) has already concluded that the Sudhaus Group misappropriated at least approximately $90 million from FLOPEC by charging, withholding or collecting supposed and undocumented costs relating to the Amazonas Tanker Pool arrangement.

12.    As alleged herein, the evidence will show Defendants used a deliberately opaque structure to expropriate FLOPEC's business and revenue stream, asserted control over Ecuador's oil shipments, and concealed the costs by which they retained hundreds of millions of dollars that should have flowed to FLOPEC.

## PARTIES

13.    Plaintiff FLOPEC is a state-owned company created by and incorporated under the laws of Ecuador and domiciled in Esmeraldas, Ecuador.  FLOPEC's headquarters are located at Avenida del Pacifico No. 001 y Puerto Rico Esmeraldas, Ecuador, Código Postal 080108.

14.    FLOPEC was established on March 26, 2012, under Executive Decree No. 1117, published in the official registry on April 12, 2012, No. 681.  Under Ecuadorian law, FLOPEC is responsible for Ecuadorian oil shipments and therefore holds a near-monopoly in Ecuador for (i) shipping crude oil produced in Ecuador mainly by PetroEcuador, the national oil company; and (ii) shipping into Ecuador refined petroleum products such as gasoline and diesel.  *See* Ley de

*2025-11952-TT*

Facilitación de las Exportaciones y del Transporte Acuático, 147/1992; and Decreto Ejecutivo 1117/2012.

15.    Defendant William S. Sudhaus is an individual and citizen of the United States who resides in Wayne, Delaware County, Pennsylvania at 967 Delchester Road, Newtown Square, PA 19073.  He has been and remains the current owner of numerous companies involved in the oil industry, as well as shipping or maritime services.  William S. Sudhaus operates these companies from offices located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525.  William S. Sudhaus has long been associated with Gunvor, an international oil trading company, who pleaded guilty in March 2024 to violating the U.S. Foreign Corrupt Practices Act by engaging in a scheme to provide over $70 million in bribes to Ecuadorian government officials.

16.    Defendant David W. Sudhaus (with William S. Sudhaus, the "Sudhaus Family") is an individual and citizen of the United States who is domiciled in Wayne, Chester County, Pennsylvania at 578 Pugh Road, Wayne, PA 19087.  Along with his father, William S. Sudhaus, Defendant David W. Sudhaus has been and remains the current owner of numerous companies involved in the oil industry, as well as shipping or maritime services.  David W. Sudhaus operates these companies from offices located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525.

17.    Defendant Enrique Cadena-Marín is an individual and Ecuadorian national.  He has been publicly identified in media reports as working with the Sudhaus Family in Ecuador.  Media reports also indicate that he is under investigation for corruption involving Ecuador's oil sector.  Upon information and belief, Cadena-Marín has received millions of dollars in payments from entities associated with the Sudhaus Group.

18.    Defendant Jaime Condoy-Blacio is an individual and Ecuadorian national who was a former General Manager of FLOPEC.  Defendant Condoy-Blació has worked closely with the

9

*2025-11952-TT*

Sudhaus Family and has taken trips to the United States to meet with the Sudhaus Group. As General Manager of FLOPEC, he signed several documents purportedly on FLOPEC's behalf. He lacked authority from FLOPEC's Board of Directors to enter into any such agreements and failed to obtain requisite approvals under FLOPEC's bylaws.

19. Defendant Dragun USA LLP ("Dragun USA") is a limited liability limited partnership organized and existing under the laws of Delaware, with its registered headquarters in New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Dragun is owned by the Sudhaus Family and operates as part of the Sudhaus Group.

20. Defendant Mjølner Aframax Pool Co LLC is a Marshall Islands company with offices in New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Upon information and belief, Mjølner Aframax Pool Co LLC is another vehicle of the Sudhaus Group.

21. Defendant Mjølner Solutions Chartering LLC is a Marshall Islands company with offices in or around New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Mjølner Solutions Chartering LLC is one of the Sudhaus Group entities that participated in the Amazonas Tanker Pool arrangement.

22. Defendant Mjølner Ship Management LLC is a Marshall Islands company with offices in or around New Jersey at 15 Exchange Place, Jersey City, NJ 07302-3912. Mjølner Ship Management LLC is one of the Sudhaus Group entities that participated in the Amazonas Tanker Pool arrangement.

23. Defendant Core Transport, LLC is a Marshall Islands company with its office in Chester County located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525. Core Transport, LLC is one of the Sudhaus Group entities that participated in the Amazonas Tanker Pool arrangement.

10

*2025-11952-TT*

Exhibit C-07

24.    Defendant Amazonas CA LLC (previously known as Amazonas Tanker Pool Company, LLC) is a Marshall Islands company with its office in Chester County, Pennsylvania located at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525.  Amazonas Tanker Pool Company, LLC is one of the Sudhaus Group companies involved in the Amazonas Tanker Pool.

25.    Defendant Amazonas Tankers LLC is a Delaware company with its office in Chester County, Pennsylvania at 1400 Liberty Ridge Drive, Chesterbrook, PA 19087-5525. Amazonas Tankers LLC is one of the Sudhaus Family companies involved in the Amazonas Tanker Pool.

26.    The Dragun, Core, Mjølner and Amazonas branded companies are all mere sham vehicles or shells of the Sudhaus Family. These use the same U.S. bank accounts or have accounts at the same U.S. banks, use the same addresses and/or offices and have the same directors, officers and agents.

27.    The true extent and scope of this fraud against the Ecuadorian government is not yet known.  There are likely several additional entities and individuals that are members of or assisted the Sudhaus Group, including via bribe payments or kickback schemes.  FLOPEC therefore includes John and Jane Does 1-10 as named defendants and will amend the complaint as discovery reveals the identities of all wrongdoers.

28.    The Sudhaus Family, Cadena-Marín, Dragun USA, Mjølner Aframax Pool Co LLC, Mjølner Solutions Chartering LLC, Mjølner Ship Management LLC, Core Transport LLC, Amazonas CA, LLC, and Amazonas Tankers LLC shall be known as the "Sudhaus Group Defendants."

## JURISDICTION AND VENUE

11

29.     Jurisdiction is proper in this Court pursuant to 42 Pa.C.S. § 5301, et seq. because Defendants carry on continuous and systematic business within Pennsylvania, have caused harm or injury by act or omission in Pennsylvania, or otherwise have purposefully directed activities at Pennsylvania residents and purposely availed themselves of the privilege of conducting activities within Pennsylvania.

30.     Venue is proper pursuant to 246 Pa.C.S. 302 and 231 Pa.C.S. 2179(a) because Defendants regularly conduct business in Chester County, Pennsylvania or the causes of action arose out of transactions or occurrences which took place in whole or part in Chester County, Pennsylvania.

<strong><u>FACTS</u></strong>

**A. FLOPEC's Role, Business Model, and Vessels**

31.     FLOPEC is an Ecuadorian state-owned company responsible for maritime transportation of hydrocarbons. Established under Ecuadorian law, FLOPEC is responsible for (i) exporting crude oil produced in Ecuador—principally crude oil produced by PetroEcuador, the state-owned oil enterprise and the country's primary oil company; and (ii) importing into Ecuador refined products such as gasoline and diesel.

32.     FLOPEC does not own a large fleet of vessels, and therefore charters (*i.e.*, rents) most vessels from third parties to transport its oil.

33.     FLOPEC's business model is designed to be transparent and efficient. FLOPEC assumes minimal commercial or financial risks because it neither purchases the oil from PetroEcuador nor bears responsibility for identifying customers. Rather, FLOPEC's role is to transport crude oil to PetroEcuador's customers, who pay FLOPEC for delivering the crude oil. These payments are known as the "shipping rate."

12

*2025-11952-TT*

34.     As such, FLOPEC's profits derive from the spread between the shipping rate customers pay and what FLOPEC pays to vessel owners for charters as well as other operational costs. Typically, shipping rates exceed the charter prices, yielding profits—sometimes significant profits.

35.     Additionally, FLOPEC generates revenues by transporting cargo after completing each oil shipment. When the oil is delivered, the vessel becomes available for use. Because FLOPEC usually maintains control of the vessel after each delivery of oil (either because it owns the vessel or because it chartered the vessel and there are still days left in the charter period), FLOPEC "finds work" for the vessel. For example, FLOPEC can find refined oil products to transport back to Ecuador (Ecuador has almost no independent refining capabilities), or other cargo to be transported between other ports before the vessel makes its way back to Ecuador or to the vessel's owner.

36.     FLOPEC uses three different types of vessels to transport its crude oil, depending on the destination:

   a.   Panamax vessels: These vessels are specifically designed to pass through the Panama Canal.

   b.   Aframax vessels: These are larger vessels used for short- to medium-length trips. The Sudhaus Group and their co-conspirators caused the majority of oil shipments out of Ecuador from 2018 to 2024 to rely on Aframax vessels, which are the types of vessels at issue in the Amazonas Tanker Pool arrangement.

   c.   Suezmax vessels: The largest types of vessels for transporting crude oil and the largest size that can pass through the Suez Canal. These are used for long voyages.

13

*2025-11952-TT*

Exhibit C-07

## B. Pool Arrangements and Structure

37.     The maritime industry often employs "pools," which are joint ventures in which participants contribute assets or capabilities—such as vessels, cargo, or customer relationships—and share profits pursuant to agreed allocation formulas (e.g., by contribution or vessel type/efficiency).

38.     Pool arrangements are necessary because single parties often lack the assets or capabilities to operate an entire maritime business on their own.  For example, a party may have cargo (e.g., oil or another commodity) but no customers or vessels to ship the cargo, while another party may have relationships with customers, and another party may own vessels.

39.     Given its need to ship crude oil to various customers around the globe, FLOPEC has entered into several pool arrangements over the years.

40.     The pool at the center of this dispute, the Amazonas Tanker Pool, was formed to increase and monopolize Ecuador's oil shipments through Aframax vessels.  Indeed, from 2018 to 2024, the Sudhaus Group and their co-conspirators caused the majority of crude oil produced in Ecuador to be exported through Aframax vessels.  Therefore, through the Amazonas Tanker Pool arrangement, the Sudhaus Group essentially attempted to take over the entirety of Ecuador's oil-shipping business.

41.     The pool lacked any legitimate commercial purpose.  FLOPEC brought the cargo (i.e., Ecuadorian oil) and customers (i.e., PetroEcuador's buying customers) to the pool.  During the relevant time period (approximately 2018 to 2024), FLOPEC's primary customers were the Chinese government (through PetroChina and other state-owned companies), the Thai government (through PTT), and major oil buyers and traders (such as Trafigura, Shell or Repsol).  The vessels needed to ship Ecuadorian oil to PetroEcuador's customers are and have always been widely

14

Exhibit C-07

available in the maritime market. However, the Sudhaus Group controlled the Amazonas Tanker Pool. It contributed no meaningful assets or capabilities to the pool but kept a majority of the revenues and profits. Notably, the Sudhaus Group did not own any of the Aframax vessels that participated in the Amazonas Tanker Pool arrangement.

### C. Amazonas Tanker Pool

#### 1. The Initial Pool Arrangement

42.    On December 7, 2018, FLOPEC and the Sudhaus Group (through its vehicle, Dragun USA) entered into a pool arrangement. This arrangement was never memorialized in a contract but rather was reflected in email communications.

43.    Upon information and belief, PetroChina, a Chinese state-owned oil company and, at the time, one of the principal purchasers of PetroEcuador's crude, demanded that FLOPEC work through the Sudhaus Group to ship crude from Ecuador to PetroChina. But for PetroChina's demand, the arrangement made no commercial sense: FLOPEC could have used its own vessels or, as needed, chartered (i.e., rented) vessels in the open market to ship PetroEcuador's oil to PetroChina.

44.    Under the initial arrangement, FLOPEC would charter to the Sudhaus Group (through the Sudhaus vehicle, Dragun USA) two Aframax vessels that FLOPEC owned and the Sudhaus Group would "contribute" those two vessels to a joint venture styled as the "Mjølner Aframax Pool." The Sudhaus Group (though Mjølner-branded companies), in turn, would "contribute" two additional Aframax vessels into the pool. The pool would seek to employ the four Aframax vessels, including chartering them to FLOPEC, though FLOPEC did not obtain any preference.

15

45.    This initial pool arrangement was merely a vehicle for the Sudhaus Group to charter vessels to FLOPEC for FLOPEC to ship oil to PetroChina.

### 2. March 2020 Arrangement

46.    On March 10, 2020, the Sudhaus Group created a new pool arrangement styled as the "Amazonas Tanker Pool."

47.    This new arrangement permitted FLOPEC to charter up to four Aframax vessels to the Sudhaus Group (via Sudhaus vehicles, Dragun USA or Mjølner-branded companies) which would then "contribute" FLOPEC's own vessels to the Amazonas Tanker Pool. The Sudhaus Group (through Mjølner-branded companies) would also contribute vessels into the Pool. The pool would seek employment for participating vessels, including charters to FLOPEC, and provided FLOPEC a preference to charter the vessels that FLOPEC had contributed.

48.    The document describing this new pool arrangement was signed by Jaime Condoy-Blacio, then-General Manager of FLOPEC, and the Sudhaus Group (through the Sudhaus vehicle, Dragun USA). Mr. Condoy-Blacio signed this document during a suspicious one-week trip to New York for which there are no detailed records.

49.    Like the original arrangement, the March 2020 pool arrangement lacked any legitimate commercial rationale for FLOPEC. It made no sense for FLOPEC to contribute additional Aframax vessels of its own to the pool when FLOPEC had enough cargo (*i.e.*, Ecuadorian oil) to keep its vessels permanently in use. As such, this amendment simply sought to lock up more of FLOPEC's Aframax vessels in a sham pool arrangement intended solely for the Sudhaus Family to take control of Ecuador's oil shipping business and profit handsomely at FLOPEC's expense. As such, this absurd arrangement essentially forced FLOPEC to render its

16

*2025-11952-TT*

Exhibit C-07

own Aframax vessels to the Sudhaus Group, only to later pay charter hire (*i.e.*, rent) to the Sudhaus Group to be able to use them and ship its own oil.

### 3. The December 2020 Arrangement

50.     On December 1, 2020, the Sudhaus Group devised a new pool arrangement. Under the terms of the December 2020 pool arrangement, two new Sudhaus Group vehicles, Amazonas Tanker Pool Company, LLC (now known as Amazonas CA, LLC) and Amazonas Tankers, LLC would manage the pool of vessels in their sole discretion. As such, the Sudhaus Group had full discretion to accept or terminate vessels and to determine the size of the pool fleet.

51.     More importantly, the December 2020 agreement prohibited FLOPEC from using Aframax vessels outside the Amazonas Tanker Pool, compelling FLOPEC to charter (*i.e.*, rent) exclusively from the Pool for all crude shipments. This prohibited FLOPEC from using its own Aframax vessels or anyone else's to ship its own oil. At the same time, the Sudhaus Group and their co-conspirators caused the majority of Ecuadorian oil to be exported using Aframax vessels thereby ensuring that the overwhelming majority of the country's revenues for oil shipments were diverted to the Sudhaus Group. As such, this arrangement subordinated FLOPEC to the Sudhaus Group and effectively forced most of Ecuador's crude exports to go through the pool.

52.     The December 2020 structure had no legitimate business purpose. FLOPEC was required to route the majority of its cargo through the pool without any corresponding benefit, while the Sudhaus Group pocketed the majority of the pool's profits. Further, this was an absurd arrangement that yielded circular benefits to the Sudhaus Group. The Sudhaus Group chartered (*i.e.*, rented) Aframax vessels to FLOPEC that the Sudhaus Group did not even own (forcing FLOPEC to pay substantially higher rates than the Sudhaus Group was paying third parties for those vessels); FLOPEC then had to "contribute" those vessels into the Amazonas Tanker Pool

17

Exhibit C-07

because it was prohibited from using Aframax vessels outside the Pool; and FLOPEC then had to charter those very same Aframax vessels from the Sudhaus Group to ship its own oil.

53.    The document describing this new pool arrangement was signed by Jaime Condoy-Blacio, then-General Manager of FLOPEC, and Casey Dalcher from the Sudhaus Group.

### D. Revenue and Concealment

54.    From 2020 to 2024, the Sudhaus Group received at least $650 million in revenues flowing from the Amazonas Tanker Pool arrangement. This is revenue that the Sudhaus Group took from the Ecuadorian government and that should have been received by FLOPEC.

55.    The Sudhaus Group extracted revenues all around from the Pool arrangement, engaging in a circular structure that allowed it to deprive FLOPEC and, ultimately, the Ecuadorian government, of a significant source of revenue.

- The Sudhaus Group received most of the shipping rates paid by FLOPEC's customers for each oil delivery. Every oil delivery requires FLOPEC's customers (which are mainly purchasers of PetroEcuador's oil) to pay a shipping rate. FLOPEC had to direct most of each shipping rate to the Sudhaus Group as "charter hire" *i.e.*, rent payments, for using the Pool's Aframax vessels. Since FLOPEC could not use Aframax vessels outside the Pool and since the Sudhaus Group caused the majority of Ecuador's oil to be shipped via Aframax vessels, this resulted in hundreds of millions of dollars in revenues for the Sudhaus Group.

- The Sudhaus Group received payments from FLOPEC for chartering (*i.e.*, renting) Aframax vessels to FLOPEC that FLOPEC then had to "contribute" back to the Pool. As described immediately above, FLOPEC would then have to charter again those very same vessels from the Sudhaus Group for each shipment. Importantly, the vessels that

18

*2025-11952-TT*

the Sudhaus Group chartered to FLOPEC were not owned by the Sudhaus Group—they were vessels that the Sudhaus Group had chartered in the open market from third party vessel owners at significantly lower rates.

- As described above (*supra* 35), after each oil delivery, the vessel remains available to find other work and thus generate additional revenues. The vessel, for example, can transport refined oil products back to Ecuador or can transport cargo between other ports prior to returning to Ecuador. The Sudhaus Group deprived FLOPEC of revenues resulting from using the vessels after completion of each oil delivery. Further, the Sudhaus Group concealed from FLOPEC the supporting documentation showing revenues generated by the vessels for this secondary workflow. As such, FLOPEC lacks documentation showing exactly how much the Sudhaus Group profited from using the vessels after each delivery to FLOPEC's customers.

- The Sudhaus Group also profited by selling the fuel to the vessels in the "Pool." Defendant Core Transport LLC, which is a Sudhaus Group vehicle, sold most of the fuel needed to power the vessels for each voyage.

- FLOPEC does not know for certain whether the Sudhaus Group profited in additional ways, for example, by fabricating costs associated with each voyage. The Sudhaus Group concealed from FLOPEC detailed supporting documentation for every source of income and cost associated with each voyage of the vessels in the Pool. As such, it is possible that the Sudhaus Group's revenues and profits exceed the categories described in this complaint. FLOPEC will amend the complaint as it receives information from Defendants during discovery.

E. **Ecuadorian Law Violations**

19

*2025-11952-TT*

56.     The pool arrangement created by the Sudhaus Group violated Ecuadorian law in two significant ways.

57.     First, then-General Manager of FLOPEC, Mr. Condoy-Blacio, entered into the pool arrangement without consulting, much less obtaining approval from, FLOPEC's Board of Directors, in direct violation of FLOPEC's bylaws.  Further, there are no records within FLOPEC of Mr. Condoy-Blacio conducting any market or business analysis or seeking advice or opinions from shipping advisors or legal counsel in connection with entering into the pool arrangement.  As is obvious, Ecuadorian laws require state-owned companies to carefully deliberate about any business or joint venture arrangements, including leaving a detailed record of their decision-making process.

58.     Second, Ecuadorian law prohibits state-owned business enterprises from forfeiting their businesses or transferring them to privately-owned third parties.  In hijacking the Ecuadorian oil shipping industry, which is under the exclusive mandate of FLOPEC, the Amazonas Tanker Pool arrangement violated Ecuadorian law and public policy.

59.     The Sudhaus Group knew fully well that the pool arrangement that it designed and implemented brazenly violated Ecuadorian law.  The Sudhaus Family and their web of companies have been conducting business in and related to Ecuador, including in the Ecuadorian oil industry, for over a decade.  For example, in 2009, Core Petroleum, one of the Sudhaus Group companies, bid to broker a large PetroEcuador oil sale, demonstrating the Sudhaus Group's familiarity with Ecuador's oil sector, its laws, and contracting procedures in the oil industry.  Further, the Sudhaus Group has extensively relied on and availed itself of Ecuadorian intermediaries and powerbrokers, including corrupt agents.  The local intermediaries of the Sudhaus Group include Defendant Cadena-Marín, Roberto Dorigo (a local operator) and local attorney Daniel Piño-Arroba.

20

*2025-11952-TT*

### F. The Amazonas Tanker Pool Resulted from Corruption

60.     Substantial evidence shows the Amazonas Tanker Pool arrangement was the product of corruption.

61.     First, the pool arrangement lacked any legitimate commercial rationale and provided no benefit to FLOPEC while delivering hundreds of millions of dollars in upside to the Sudhaus Group.

62.     Second, FLOPEC had no management or control over the pool and only limited, curated visibility into its finances.  The Sudhaus Group controlled which vessels participated, fleet size, and pool management, and provided to FLOPEC only limited information and documentation.

63.     Third, Mr. Condoy-Blacio signed the document reflecting the March 2020 arrangement during a one-week trip to New York.  Unsurprisingly, he left no detailed records of that trip or his discussions with the Sudhaus Group.

64.     Fourth, Mr. Condoy-Blacio prepared no internal analyses or reports justifying the entrance into the Amazonas Tanker Pool, and he did not retain business advisors or legal counsel in connection with same.  The documents reflecting the pool arrangement were in English.  Mr. Condoy-Blacio signed them, even though he did not speak English.

65.     Fifth, as detailed above, the pool arrangement violated Ecuadorian law in key respects, to the full knowledge of the Sudhaus Group.

66.     Sixth, Hernán Luque—a senior government official responsible for government contracting when the Amazonas Tanker Pool arrangement was implemented—was recorded stating that FLOPEC officials were receiving "bags of cash."  Mr. Luque has been charged with crimes in Ecuador and is a fugitive.

2025-11952-TT

Exhibit C-07

67.     Seventh, media reports indicated that the Sudhaus Group engaged in a repeated pattern of corruption with former FLOPEC officials including paying for lavish travel and meals, arranging for rent-free condominiums, and cash deliveries.   Further, William S. Sudhaus the patriarch of the Sudhaus Group, has long been associated with Gunvor, an international oil trading company, which pleaded guilty in March 2024 to violating the U.S. Foreign Corrupt Practices Act by paying in excess of $70 million in bribes to Ecuadorian government officials.   Importantly, part of these admitted bribes were to pay José Agusto Briones, the Minister of Energy who appointed Mr. Condoy-Blacio as FLOPEC's General Manager.   Mr. Briones committed suicide while in custody in Ecuador pending trial for corruption.

68.     Lastly, one of the Sudhaus Group's operators in Ecuador appears to be Enrique Cadena-Marín, a target of an ongoing U.S. investigation into corruption in Ecuador's oil sector. Public reporting shows Mr. Cadena-Marín received over $10 million from the Sudhaus Group via Core Petroleum (one of the Sudhaus Family's vehicles) and has been publicly identified as a corrupt intermediary in Ecuador's oil industry since at least 2016.

### G.  The Ecuadorian Government Terminates Corrupt Amazonas Tanker Pool

69.     The Amazonas Tanker Pool arrangement has been at the center of Ecuadorian legal and political scrutiny since 2021.  Indeed, in 2021, the Ecuadorian Inspector General's Office opened an investigation into the pool and in November 2021 issued a report concluding that the pool arrangement violated Ecuadorian law, including for the reasons described above.  The report also found that FLOPEC was losing money through the pool.  For example, the report concluded that FLOPEC was paying substantially more for chartering the pool's vessels than what the Sudhaus Group was paying third party vessel owners to charter those vessels from them and "contribute" them to the pool.

22

*2025-11952-TT*

Exhibit C-07

70. Further, in May 2024, the Inspector General's Office issued a second reporting expressly finding, *inter alia*, that the Sudhaus Group had misappropriated approximately $90 million from FLOPEC by charging, withholding, or collecting supposed and undocumented costs relating to the Amazonas Tanker Pool arrangement.

71. Moreover, the Pool has become a matter of national scrutiny in Ecuador. In 2023, the Ecuadorian Congress initiated impeachment proceedings against then-President Guillermo Lasso, in part, based on allegations concerning the pool and the government's handling of it. Amid the resulting turmoil, President Lasso dissolved Congress and called for a snap presidential election.

72. Daniel Noboa won that presidential election and assumed office in November 2023. His administration prioritized anti-corruption measures. Early in 2024, FLOPEC, under the Noboa administration, terminated the Pool. FLOPEC gave notice terminating its participation in February 2024 and the termination became effective in August 2024.

73. FLOPEC's termination encountered substantial resistance from legacy—and likely corrupt—FLOPEC officials. In August 2024, then-General Manager Frederic Petrilli (since replaced) nevertheless chartered three vessels from the Sudhaus Group that had previously been in the Pool. Continuing to do business with entities FLOPEC was preparing to sue—after deciding to end the relationship—lacked any legitimate justification. Mr. Petrilli was dismissed in October 2024.

74. The only logical explanation for Mr. Petrilli's decision is corruption. Indeed, Mr. Petrilli had a close relationship with the Sudhaus Group. On information and belief, in May 2024, the Sudhaus Group invited Mr. Petrilli and one of FLOPEC's legacy Ecuadorian advisors to a

23

*2025-11952-TT*

Exhibit C-07

Formula 1 race held in Miami. Shortly thereafter, Mr. Petrilli chartered vessels from the Sudhaus Group.

75.    Further, in the summer of 2024, Mr. Petrilli (or someone acting at his direction) appears to have leaked FLOPEC's contemplated litigation to the Sudhaus Group. This triggered a period of intense lobbying. In particular, the Sudhaus Group—through their Ecuadorian intermediaries and powerbrokers—attempted to lobby senior officials in the Noboa administration to get a broad release of any legal claims. The Sudhaus Group's team of local intermediaries included Defendant Cadena-Marín and local operator Roberto Dongo, as well as local attorney Daniel Pino-Arroba. The administration refused.

76.    On October 1, 2024, Defendant David W. Sudhaus, signing as "owner" of the Sudhaus family vehicle, Amazonas Tankers, LLC, wrote to FLOPEC and Ecuador's Ministry of Energy stating he regretted Ecuador's refusal to sign a release and threatening counterclaims if FLOPEC sued. Mr. Sudhaus' threat was an attempt to bully FLOPEC into foregoing litigation, as he has never identified the basis for any such counterclaims nor did he ever file any claims against FLOPEC.

77.    The Pool's end immediately revealed transparent market rates, enabling FLOPEC—through direct chartering—to capture the revenues that the Sudhaus Group had been misappropriating for years.

78.    FLOPEC continues to incur damages, including lost profits, investigation costs, and reputational harm, and seeks damages, restitution, disgorgement, and equitable relief to recover sums the Sudhaus Group unjustly retained.

79.    The Ecuadorian General Prosecutor's Office is also investigating the Amazonas Tanker Pool but has yet to charge anyone in connection with the case.

24

## COUNT I: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Against all Defendants)

80.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

81.    FLOPEC had existing and prospective contractual relations with its customers, which are purchasers of Ecuadorian crude oil, mainly PetroEcuador's crude oil. Those customers pay shipping rates to FLOPEC, which generates hundreds of millions of dollars every year. During the relevant time period (approximately 2018 to 2024), FLOPEC's primary customers were the Chinese government (through PetroChina and other state-owned companies), the Thai government (through PTT), and major oil buyers and traders (such as Trafigura, Shell or Repsol). FLOPEC's business opportunities also includes voyages that its vessels make after each oil delivery so that they do not remain idle until they return to Ecuador, which include transporting cargo between ports or transporting refined oil products back to Ecuador.

82.    Defendants knew that they were unlawfully commandeering FLOPEC's customer relationships and business opportunities and diverting hundreds of millions of dollars in revenues. With full knowledge that FLOPEC's legal mandate is to act as Ecuador's national oil shipping company, Defendants engineered a structure that took over FLOPEC's business without providing any countervailing benefit—capturing at least $650 million revenues while contributing neither cargo nor customers and without owning any vessels.

83.    The Amazonas Tanker Pool arrangement vested the Sudhaus Group with exclusive control over vessel acceptance, termination, and fleet size, and forced FLOPEC to charter (*i.e.*, rent) exclusively through the pool for all Aframax oil shipments (which the Sudhaus Group and their co-conspirators caused to become the most widely used vessel for Ecuadorian oil shipments). Further, the Sudhaus Group concealed from FLOPEC critical information such as detailed

25

*2025-11952-TT*

Exhibit C-07

documentation showing voyages for the vessels after oil deliveries to generate revenues and detailed documentation showing all the costs associated with each voyage.

84.     Defendants acted intentionally and without justification to enrich themselves at FLOPEC's expense.  The Sudhaus Family has been doing business related to Ecuador since at least 2009 and thus is well acquainted with the Ecuadorian oil industry.

85.     In 2009, Core Petroleum, one of the Sudhaus Group companies, bid to broker a large PetroEcuador oil sale, further demonstrating the Sudhaus Group's familiarity with Ecuador's oil sector, its laws, and contracting procedures in the oil industry.

86.     The laws and regulations that govern FLOPEC—including its mandate, the authority of its officers, and the approval process for contracts—are public.  The Sudhaus Group is charged with knowledge of these laws. "[P]rivate citizens, defendants in criminal matters, the legislature, state officers asserting the defense of qualified immunity and corporations are charged with knowledge of the law." *Atkins v. Parker*, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law."); *Anela v. Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986) (same).

87.     The circumstances surrounding the establishment of the Amazonas Tanker Pool show Defendants' knowledge of their illegality, *inter alia*: (i) Mr. Condoy-Blacio signed lengthy English-language documents without speaking English; (ii) no legal or business analysis was undertaken; (iii) no approvals were obtained from FLOPEC's Board of Directors; (iv) Mr. Condoy-Blacio signed documents during a one-week trip to New York for which there are no detailed records; and (v) the Amazonas Tanker Pool arrangement did not result from any public bidding or formal contracting processes.

*2025-11952-TT*

Exhibit C-07

88.    The Sudhaus Group also used Enrique Cadena-Marín as an intermediary despite longstanding public reporting (since at least 2016) identifying him as a corrupt oil intermediary, and despite evidence that he received over $10 million from Sudhaus via Core Petroleum.

89.    The Sudhaus Group knew it was violating Ecuadorian law and misappropriating FLOPEC's business, diverting most revenues from Ecuador's crude shipments to itself. The Amazonas Tanker Pool arrangement resulted in forcing FLOPEC to go through the pool for any Aframax oil shipments (which became the majority of Ecuador's shipments) and in the Sudhaus Group taking over any business opportunities for vessels after each oil delivery prior to the vessels' return to Ecuador. The consequence of this arrangement is that the Sudhaus Group, rather than FLOPEC, received the shipping rates paid by FLOPEC's customers.

90.    For these reasons, Defendants intentionally and without privilege interfered with FLOPEC's business relations by (i) creating and operating the Pool to hijack FLOPEC's business and divert revenues and business opportunities to the Sudhaus Group; (ii) imposing restrictive arrangements that prevented FLOPEC from chartering Aframax vessels outside the Pool; and (iii) concealing the pool's structure and finances.

91.    As a direct and proximate result of Defendants' conduct, FLOPEC suffered damages in an amount to be determined at trial, but not less than $650 million.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Against Condoy-Blacio)

92.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

93.    As General Manager of FLOPEC, Defendant Jaime Condoy-Blacio owed FLOPEC fiduciary duties of loyalty, care, and good faith.

27

*2025-11952-TT*

Exhibit C-07

94.    Defendant Condoy-Blacio breached those duties by entering into the Amazonas Tanker Pool arrangement.   He made FLOPEC a party to the Pool without any analysis or consultation, without any written record, and without seeking Board approval.  Defendant Condoy-Blacio allowed the Sudhaus Group to take over FLOPEC's statutory mandate and control Ecuador's oil shipments in Aframax vessels (which became most of the country's shipments), which is a brazen violation of Ecuadorian law.

95.    As a direct and proximate result of Defendant Condoy-Blacio's breaches, FLOPEC damage damages, including lost profits and other economic harms, in an amount to be determined at trial.

## COUNT III: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Sudhaus Group Defendants)

96.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

97.    The Sudhaus Group Defendants knew or were willfully blind to Defendant Condoy-Blacio's breaches of his fiduciary duties and provided substantial assistance by: (i) hosting him in New York during the suspicious one-week trip in which Defendant  Condoy-Blacio signed the March 2020 document benefiting the Sudhaus Group; (ii) designing the paperwork establishing the ·Amazonas Tanker Pool arrangement· and having Defendant Condoy-Blacio sign that paperwork; and (iii) managing the Amazonas Tanker Pool and depriving FLOPEC of hundreds of millions of dollars in revenues.

98.    As a direct and proximate result of Defendants' aiding and abetting, FLOPEC suffered damages to be proven at trial.

28

*2025-11952-TT*

Exhibit C-07

## COUNT IV: BREACH OF FIDUCIARY DUTY
### (Against the Sudhaus Group Defendants)

99.     FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

100.    FLOPEC and the Sudhaus Group Defendants formed a joint venture known as the Amazonas Tanker Pool.

101.    The joint venture created a special relationship between FLOPEC and the Sudhaus Group Defendants.

102.    As their joint venture partners, the Sudhaus Group Defendants owed FLOPEC fiduciary duties.

103.    The Sudhaus Group Defendants breached their fiduciary duties to FLOPEC by failing to act in the best interests of, and with transparency towards FLOPEC.

104.    For example, the joint venture required FLOPEC to contribute Aframax vessels of its own to the Pool even though FLOPEC had enough cargo to keep the vessels in permanent use. FLOPEC then had to charter those very same vessels from the Sudhaus Group to be able to ship its own oil.  Thus, by locking up these vessels in the sham Amazonas Tanker Pool, the Sudhaus Group entities were able to control Ecuador's oil shipping business and profit significantly at FLOPEC's expense.  In parallel, the Sudhaus Group chartered vessels to FLOPEC at a high mark up for FLOPEC to supposedly "contribute" those vessels into the Pool.  These were vessels the Sudhaus Group did not own and had rented at significantly lower prices from third party vessel owners.

105.    Further, the Amazonas Tanker Pool arrangement prohibited FLOPEC from using vessels outside the Amazonas Tanker Pool, compelling it to rent vessels from the Pool for all crude shipments.  Thus, FLOPEC was barred from using its own vessels (or anyone else's) to ship its

29

*2025-11952-TT*

oil, while the Sudhaus Group Defendants and their co-conspirators caused the majority of Ecuadorian oil to be exported using Aframax vessels, ensuring that most of the country's oil shipment revenue was diverted to the Sudhaus Group, and away from FLOPEC.

106. The Sudhaus Group Defendants also breached their fiduciary duty by profiting from the sale of fuel to the vessels in the Pool and by failing to provide FLOPEC with detailed documentation with respect to the vessels used as part of the Pool, including cost data and allocation of revenues and profits.

107. As a direct and proximate result of the Sudhaus Group Defendants breaches, FLOPEC suffered damages, including lost profits and other economic harm, in an amount to be determined at trial.

## COUNT V: ACCOUNTING
### (Against the Sudhaus Group Defendants)

108. FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

109. As described further, *supra*, FLOPEC entered arrangements with the Sudhaus Group—in 2018, March 2020 and December 2020. These Amazonas Tanker Pool was formed because of these arrangements.

110. As their joint venture partners, the Sudhaus Group Defendants owed FLOPEC fiduciary duties.

111. The Sudhaus Group Defendants breached their fiduciary duties to FLOPEC by failing to act in the best interests and with transparency with FLOPEC.

112. The Sudhaus Group failed to provide FLOPEC with detailed information with respect to the Pool arrangement including (i) detailed documentation showing business opportunities, revenues or voyages of the vessels after completing oil deliveries and prior to

30

*2025-11952-TT*

returning to Ecuador; and (ii) detailed documentation showing the costs associated with each voyage.

113.    Accordingly, FLOPEC demands a complete and full accounting for the Amazonas Tanker Pool arrangement.

## COUNT VI: UNJUST ENRICHMENT
### (Against all Defendants)

114.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

115.    Defendants have been unjustly enriched, without justification, by retaining more than $650 million in pool revenues while providing little or no consideration to FLOPEC for the value retained and while contributing neither cargo nor customers, and without owning Aframax vessels.

116.    FLOPEC has thus been correspondingly impoverished, and there is a direct relation between Defendants' enrichment and FLOPEC's impoverishment.

117.    Equity and good conscience require restitution and disgorgement of Defendants' unjust enrichment.

## COUNT VII: CIVIL CONSPIRACY
### (Against all Defendants)

118.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

119.    Defendants combined and agreed to accomplish an unlawful purpose: to misappropriate FLOPEC's shipping revenues and take control over the majority of Ecuador's crude exports through the creation and operation of the Amazonas Tanker Pool and related agreements.

31

Exhibit C-07

120.    Defendants committed overt acts, in part, in Chester County, Pennsylvania in furtherance of the conspiracy by designing and implementing the Amazonas Tanker Pool arrangement, wielding exclusive control and restricting FLOPEC's ability to charter outside the pool; concealing detailed documentation regarding Pool costs; and rechartering vessels at a premium.

121.    Other overt acts include the Sudhaus Group meeting with Mr. Condoy-Blacio in New York to form the "pool", lobbying for a broad release from the Ecuadorian government to prevent litigation, and extracting revenues for the Sudhaus Group.

122.    Defendants took these actions knowing they were acting in violation of Ecuadorian law and amidst evidence of corruption, including a recorded statement by senior official Hernán Luque that FLOPEC officials were receiving "bags of cash," use of a known corrupt intermediary (Enrique Cadena-Marín), and the Inspector General's formal findings of illegality and approximately $90 million (at least) in misappropriated funds.

123.    As a direct and proximate result of the conspiracy, FLOPEC suffered damages in an amount to be determined at trial.

## COUNT VIII: VIOLATIONS OF ECUADORIAN LAW
### (Against all Defendants)

124.    FLOPEC realleges and incorporates the preceding paragraphs as if fully set forth herein.

125.    As in most civil law jurisdictions, Ecuador broadly prohibits intentional or negligent conduct causing injury.  Known in civil law jurisdictions as extra-contractual liability, Ecuadorian law states that parties who cause injury through unlawful acts, whether intentional or negligent conduct, are jointly and severally liable for all damages.

32

Exhibit C-07

126.    Under Ecuadorian law, anyone who acts intentionally or negligently and thereby causes an injury must pay damages. This is codified in Articles 2214 and 2216 of the Ecuadorian Civil Code.[1]

127.    Article 2214 of the Ecuadorian Civil Code provides: "Whoever commits a crime or quasi-crime that has caused an injury to another party is required to compensate that party; without prejudice to the penalties that laws impose for that crime or quasi-crime." Article 2216 similarly provides: "The person who caused the damage and its heirs are obligated to provide compensation. Anyone who benefits from another's wrongdoing, without being an accomplice, is only obligated up to the value of the benefit."

128.    Further, if unlawful conduct is committed by two or more individuals or entities, each is jointly and severally liable for the damages caused thereby. This is codified in Article 2217 of the Ecuadorian Civil Code.[2]

129.    As alleged in detail above, the Amazonas Tanker Pool arrangement violated Ecuadorian statutes and laws in several material ways. Indeed, Ecuador's Office of the Inspector General has already determined through the issuance of two separate reports that the Amazonas Tanker Pool arrangement violated Ecuadorian laws and that the Sudhaus Group has misappropriated at least $90 million from FLOPEC.

---

[1] Art. 2214.- El que ha cometido un delito o cuasidelito que ha inferido daño a otro, está obligado a la indemnización; sin perjuicio de la pena que le impongan las leyes por el delito o cuasidelito.

Art. 2216.- Están obligados a la indemnización el que hizo el daño y sus herederos. El que recibe provecho del dolo ajeno, sin ser cómplice en él, sólo está obligado hasta lo que valga el provecho.

[2] Art. 2217.- Si un delito o cuasidelito ha sido cometido por dos o más personas, cada una de ellas será solidariamente responsable de todo perjuicio procedente del mismo delito o cuasidelito, salvo las excepciones de los Arts. 2223 y 2228. Todo fraude o dolo cometido por dos o más personas produce la acción solidaria del precedente inciso.

*2025-11952-TT*

Exhibit C-07

130.    · Defendant. Condoy-Blacio's breaches of fiduciary duty and acceptance of Sudhaus Group hospitality during his one-week trip to New York constitute violations of Ecuadorian law and are consistent with bribery and corrupt practices condemned by Ecuadorian authorities.

131.    Further, all Defendants have intentionally and/or negligently injured FLOPEC and must-pay damages. Defendants' unlawful conduct includes, without limitation: (i) encouraging, allowing, and facilitating a Pool arrangement that provided no benefit to FLOPEC and caused FLOPEC to lose at least $650 million in revenues; (ii) designing and implementing a Pool arrangement without any proper procedures within FLOPEC, without Board approval, without written records, reports, recommendations or documentation, let·alone·any bidding or competitive process; (iii) designing and implementing a Pool arrangement that essentially caused FLOPEC to forfeit its legal mandate of acting as Ecuador's national oil shipping company; and (iv) misrepresenting or concealing the Pool's costs, revenues and profits.

132.    As a result of Defendants' intentional and/or negligent conduct, Defendants improperly allowed foreign entities to reap the benefits of Ecuador's hydrocarbon export industry and illegally collect revenues that belong exclusively to FLOPEC, depriving FLOPEC of hundreds of millions of dollars.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff FLOPEC respectfully requests that the Court enter judgment in its favor and against all Defendants, jointly and severally, and grant the following relief:

1. Awarding compensatory damages in an amount to be proven at trial, but not less than $650,000,000;

2. Ordering disgorgement and restitution of all revenues and profits obtained by Defendants through the Amazonas Tanker Pool;

3. Imposing constructive trusts on Defendants' assets traceable to the unlawful proceeds;

34

2025-11952-TT

Exhibit C-07

4.  Awarding pre- and post-judgment interest under 28 U.S.C. § 1961;

5.  Awarding costs of suit and attorneys'.fees to the extent permitted by law;

6.  Granting such other and further relief as the Court deems just and proper.


Dated:    December 16, 2025                    Respectfully submitted,

                                               **GREENBERG TRAURIG, LLP**


                                               By: */s/  A. Michael Pratt*
                                               A. Michael Pratt (PA Bar #44973)
                                               1717 Arch Street, Suite 400
                                               Philadelphia, PA 19103
                                               T: (215) 988-7800
                                               prattam@gtlaw.com

                                               Lucy G. Sumner (PA Bar #337829)
                                               1717 Arch Street, Suite 400
                                               Philadelphia, PA 19103
                                               T: (215) 988-7800
                                               Lucy.sumner@gtlaw.com

                                               Daniel Pulecio-Boek
                                               (*pro hac vice forthcoming*)
                                               2101 L Street, N.W., Suite 1000
                                               Washington, D.C. 20037
                                               T: (202) 331-3100
                                               pulecioboekd@gtlaw.com

                                               John C. Molluzzo Jr.
                                               (*pro hac vice forthcoming*)
                                               One Vanderbilt Plaza
                                               New York, NY 10017
                                               T: (212) 801-9200
                                               molluzzoj@gtlaw.com

                                               *Attorneys for Plaintiff Flota Petrolera*
                                               *Ecuatoriana*


35

*2025-11952-TT*

Exhibit C-07

## **VERIFICATION**

I, Diego Villavicencio, General Manager of EP FLOPEC, affirm that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I make this verification subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.



Name: Diego Villavicencio

Dated: December 15, 2025

*2025-11952-TT*

Exhibit C-07

## Chester County
## Court of Common Pleas
## Cover Sheet

| Docket No: |
|---|
| **2025-11952-TT** |

| Plaintiff(s): (Name, Address) | Plaintiff's/Appellant's Attorney(circle one) |
|---|---|
| **FLOTA PETROLERA ECUATORIANA EP** | (Name, firm, address, telephone and attorney ID#) |
| | **A. Michael Pratt** |
| | null Greenberg Traurig attorney ID#: 044973 |
| | 1717 Arch Street, Suite 400, Philadelphia, PA 19103, US |

| Defendant(s): (Name, Address) | Are there any related cases? Please provide case nos. |
|---|---|
| **DRAGUN USA LLP** | |
| **DAVID W SUDHAUS** | |
| **WILLIAM S SUDHAUS** | |
| **JAIME CONDOY-BLACIO** | |
| **MJOLNER AFRAMAX POOL CO LLC** | |
| **ENRIQUE CADENA-MARIN** | |
| **MJOLNER SOLUTIONS CHARTERING LLC** | |
| **MJOLNER SHIP MANAGEMENT LLC** | |
| **AMAZONAS CA LLC** | |
| **AMAZONAS TANKERS LLC** | |
| **CORE TRANSPORT LLC** | |
| **JOHN AND JANE DOES 1-10** | |

**Defendants who are proceeding without counsel are strongly urged to file with the Prothonotary a written statement of an address AND a telephone number at which they can be reached**

Commencement of Action (if applicable): __ Agreement for an Amicable Action __ Motion to Confirm Arbitration Award
Notice of Appeal

If this is an appeal from a Magisterial District Judgement, was appellant __ Plaintiff or __ Defendant in the original action?

Jury Trial Demanded ✓ Yes __ No

Nature of case if not on previous cover sheet - Please choose the most applicable

| | |
|---|---|
| __ Annulment | __ Writ of Certiorari |
| __ Custody - Conciliation Required | __ Injunctive Relief |

*2025-11952-TT*

Exhibit C-07

| | |
|---|---|
| __ ·Custody - Foreign Order | __ Mechanics Lien Claim |
| __ Custody - No Conciliation Required | __ Issuance of Foreign Subpoena |
| __ Divorce - Ancillary Relief Request | __ Name Change |
| __ Divorce - No Ancillary Relief Requested | __ Petition for Structured Settlement |
| __ Foreign Divorce | |
| __ Foreign Protection from Abuse | |
| __ Paternity | |
| __ Protection from Abuse | |
| __ Standby Guardianship | |

**Arbitration Cases Only**

Arbitration Date [mm/dd/yyyy]

Arbitration Time [hh:mm:ss]

Defendants are cautioned that the scheduling of an arbitration date does not alter the duty of the defendant to respond to the complaint and does not prevent summary disposition form occurring prior to the arbitration date.

This matter will be heard by a Board of Arbitrators at the time and date specified but, if one or more of the parties is not present at the hearing, the matter may be heard at the same time and date before a judge of the court without the absent party or parties. There is no right to a trial *de novo* on appeal from a decision entered by a judge.

**Notice of Trial Listing Date**

Pursuant to C.C.R.C.P. 249.3, if this case is not subject to compulsory arbitration it will be presumed ready for trial twelve (12) months from the date of the initiation of the suit and will be placed on the trial list one (1) year from the date the suit was filled unless otherwise ordered by the Court.

To obtain relief from automatic trial listing a party must proceed pursuant to C.C.R.C.P. 249.3(b), request an administrative conference and obtain a court order deferring the placement of the case on the trial list until a later date.

**File with:** Chester County Justice Center, Prothonotary Office, 201 W. Market St., Ste. 1425, PO Box 2746, West Chester, PA 19380-0989

These cover sheets must be served upon all other parties to the action immediately after filing.

Submit enough copies for service.

*2025-11952-TT*