# Exhibit G

**Exhibit   C-02**

AMAZONAS CA LLC

General Terms and Conditions
Relating to Amazonas Commercial Agreements

January 10, 2023

**Exhibit C-02**

This General Terms and Conditions Relating to Amazonas Commercial Agreements ("Amazonas GT&C") is effective as of January 10, 2023 (the "Effective Date").

WHEREAS:

(1)     Empressa Publica Flota Petrolera Ecuatoriana ("EP FLOPEC"), Amazonas CA LLC ("Company") and other persons participating in the Fleet as a "Participant" (each, a "Party" and collectively, the "Parties") have previously formed a Fleet of Vessels which are and will continue to be chartered to Company.

(2)     The Parties have agreed that the commercial management of the Vessels in the Fleet shall be performed by Fleet Manager under the respective vessel ACAs and the CMA.

(3)     This Amazonas GT&C establishes certain terms relating to Vessels entered into the Fleet going forward from and after the Effective Date.

(4)     This Amazonas GT&C shall be construed to supplement and, in certain instances, modify the terms of all ACAs to which any subject Party is a party, hereafter entered into relating to the Fleet.

(5)     This Amazonas GT&C shall not apply to Vessels entered into the Fleet prior to the Effective Date hereof.

NOW, THEREFORE, IT IS AGREED as follows:

1.    Definitions

1.1    Definition of Terms

The terms used in this Amazonas GT&C, with their initial letters capitalized, shall unless the context thereof otherwise requires, have the following meanings specified in this Section:

a.    "Affiliate" shall mean, with respect to any Party, any person controlling, controlled by or under common control with, that Party.

b.    "CMA" shall mean a Commercial Management Agreement between Company and Fleet Manager, as same may be amended from time to time.

c.    "Fleet" shall mean the collective group of Vessels chartered into Company under an ACA or similar agreement and managed by Fleet Manager.

d.    "Fleet Balance Plan" shall mean a plan generated by the Fleet Manager for purposes of maintaining Fleet size balance.

e.    "Fleet Imbalance" shall mean a period in time when a Participant's total Vessel contributions to the Fleet are disproportionately larger than the contributions of the other Participants.

f.    "Participant" shall mean EP FLOPEC and any other person admitted to participate in the Fleet pursuant to a ACA.



Exhibit C-02

g.  "Company" shall mean Amazonas CA LLC, registered in Marshall Islands, and/or its successors and assigns.

h.  "Fleet Manager" shall mean Amazonas Tankers LLC, registered in Delaware, United States, and/or its successors and assigns.

i.  "Web Portal" shall mean a website administered by Fleet Manager for the purpose of disseminating pertinent Fleet performance and financial information to the Participants

j.  "Fleet Vessel" shall mean a Vessel which a Participant has contributed to the Fleet.

k.  "ACA" shall mean any Amazonas Commercial Agreement relating to any Vessel in the Fleet hereafter entered into.

l.  "Vessel" shall mean an Aframax size tanker vessel meeting the standards set forth in Attachment A hereto and otherwise reasonably acceptable to Company and Fleet Manager.

2.  **Business of the Fleet**

2.1  The "Business of the Fleet" shall comprise the operation of Vessels for world-wide transportation of crude oil, fuel oil and other petroleum products and all activities ancillary thereto. Company shall not engage in any business other than the Business of the Fleet.

3.  **Headings**

3.1  Section headings are inserted for convenience of reference only and should be ignored in interpretation of this Amazonas GT&C.

4.  **References**

4.1  In this Amazonas GT&C, unless the context otherwise requires:

a.  references to Sections and Attachments are to be construed as references to Sections of and Attachments to this Amazonas GT&C and references to this Amazonas GT&C include its Attachments;

b.  words importing the plural shall include the singular and vice versa;

c.  references to a person shall be construed as references to an individual, firm, company, corporation, unincorporated body of persons or any government entity; and

d.  references to any person includes such persons' assignees and successors in title.

5.  **Obligations**

5.1  The Parties intend for at least 8 Vessels to be included in the Fleet. Due attention and consideration shall be provided to Parties recommendations as it relates to Fleet size. However, the ultimate Fleet size shall be determined by Fleet Manager in its sole discretion and promulgated to Participants by Fleet Manager in due course.

**Exhibit C-02**

5.2    Participants shall submit any proposed Vessel contributions to Fleet Manager for review and approval to determine acceptability in the Fleet. Fleet Manager may reject any Vessels submitted for approval in its sole discretion.  However, if the rejection is due to a Fleet vetting requirement, the Fleet Manager may provide a written list of deficiencies and/or requirements for the Participant to rectify by a stated deadline in order for the submitted Vessel to be re-considered for approval; likewise, Fleet Manager may in its sole discretion terminate Vessels in the Fleet for reasons such as age or other Vessel operational concerns.  Such age or operational concern terminations shall be notified to the affected Participant by Fleet Manager within 30 days of the effective termination date.  If the affected Participant does not attend or resolve the age or operational concerns to the satisfaction of the Fleet Manager within the 30 day notice period, the affected Vessel shall be terminated and the Participant will have the option to nominate a replacement vessel for Fleet Manager approval in order to keep the fleet size proportional among the Participants.  Further, notwithstanding the terms of any ACA, Fleet Manager may, in its sole discretion, establish and implement reasonable increases or other modifications to the minimum standards for Vessels to meet changing trade and customer requirements which are considered to be in the interest of optimizing the returns to Participants in the Fleet.  The Fleet Manager shall promulgate the modifications to the minimum standards for the Fleet to all Parties within 90 days of the effective date of the change.  Each Participant shall comply with such modifications or in the alternative may terminate its participation in the Fleet per the termination provisions in any applicable ACA and this Amazonas GT&C.

5.3    In accordance with subsection 5.4 below and the practicalities of Vessel delivery, re-delivery and operations, the Parties agree that EP FLOPEC may contribute up to its proportionate share of the total Vessels in the Fleet relative to other Participants.

5.4    A Fleet Imbalance shall exist when any one Participant's total Fleet Vessel contributions exceed its disproportionate share of the total Fleet size or when Fleet Manager determines the size of the Fleet is not appropriate for current market conditions. Upon a Fleet Imbalance, Fleet Manager and Company may, but shall not be obligated to cause the following to occur:

(1)    A Participant with a higher percentage of Fleet Vessel contributions shall immediately pause future Vessel contributions until authorized by Fleet Manager.

(2)    Fleet Manager shall submit a Fleet Balance Plan to the Parties in order to bring each Participant's Vessel contributions to the Fleet to a level reasonably proportionate to the total number of Participants. This Fleet Balance Plan shall be binding upon the Parties.

5.5    The Parties shall share market information, proprietary analysis and information systems with Fleet Manager on a private and confidential basis.

5.6    The senior management of the Parties and Fleet Manager intend to meet on a quarterly basis to discuss best practices, commercial strategy, and opportunities.

5.7    Company reserves the right to terminate the participation of any Participant in the Fleet in the event of the Participant's breach of this Amazonas GT&C or a ACA, or in the event of the bankruptcy, insolvency or reorganization of a Participant.

5.8    In respect of any contract of affreightment ("COA"), time or voyage charter that Company enters into or has an opportunity to enter into as disponent owner or any COA, time or voyage charter in which the original owner or disponent owner has assigned its rights and benefits to Company, the Parties agree that Company has the right to enter into time charters as charterers with third party owners or disponent owners ("Third Party Charters"), for the purpose of chartering-in vessels from such third party owners or disponent owners ("Third Party Vessels") as needed to cover time or voyage, charter trip commitments and COA's.  All Third Party Charters shall be in

accordance with any Classification Society rules and any requirements of the insurance coverage for the Vessel and under the Shelltime 4 charter form attached as Appendix 1. All net income associated with Company chartering-in is to be allocated to the net Fleet revenues and such transactions will be referred to as "Fleet trading transactions."

## 6.   Web Portal

6.1   Fleet Company shall appoint Fleet Manager to administer a web-based Web Portal that shall provide the Parties with details of all Fleet Vessels' earnings, charters, voyages, and Fleet cash flow. The Web Portal shall be updated regularly and accessible 24 hours a day. No less than one Participant Representative will have access to the Web Portal with login information provided in due time by the Fleet Manager. The Parties shall treat all information related to the Fleet and Web Portal as private and confidential and shall not share information with any third party unless expressly authorized by each of the other Parties.

## 7.   Commencement

7.1   This Amazonas GT&C shall be effective from and after the Effective Date.

## 8.   Termination

8.1   Except as otherwise restricted by Company or Fleet Manager (but in any event notwithstanding the terms of any ACA), each Participant agrees to maintain a minimum of 3 Vessels in the Fleet. Any Party may terminate its minimum Vessel participation in the Fleet as per this Amazonas GT&C by providing six months notice (hereinafter "Fleet Termination").. After the end of the six month notice period, the Participants may withdraw their Vessels per their individual ACAs.

## 9.   Non-Compete

9.1   No Fleet Vessel shall be employed in any business other than the Business of the Fleet without the prior written consent of all the Parties.

9.2   Each Participant hereby agrees that, without the prior written consent of Company, during the term of any active ACA, neither the subject Participant, nor any of its Affiliates shall, directly or indirectly (including in conjunction with or through any other person), carry on any activities or business which uses Aframax size vessels of the Business of the Fleet.

9.3   If during the term of any active ACA, EP FLOPEC is asked to provide any vessel for a cargo to which a Cargo Reserve applies, it shall give preference to the use of a Fleet Vessel, paying market rates for the use of a Fleet Vessel.

9.4   Each Participant agrees that during the term of any active ACA it shall not, whether by itself, its employees or agents or otherwise howsoever, directly or indirectly, do or permit anything to be done which is harmful to the reputation of Company or Fleet Manager or which is likely to cause any person to reduce the amount of business transacted between that person and the Fleet or seek to change the terms of such business in a manner adverse to Company.

## 10.   Confidentiality

10.1   This Amazonas GT&C, including all terms, details, conditions, and period shall be kept private and confidential by each of the Parties and beyond the reach of any third person. The terms and

conditions of this Amazonas GT&C are for the sole use of the Parties and are not to be copied or used for any other purpose without the express written consent of each other Party.

10.2     Subject to Section 10.3, each Party shall (and shall ensure that its employees, agents and advisers shall) safeguard, treat as confidential and not use for any purposes any confidential information it acquires in connection with this Amazonas GT&C or which relates to the Fleet or to any of the other Parties except:

a.     as may be required by law or by any relevant national or supernational regulatory authority or by the rules of any relevant recognized stock exchange;

b.     where it has come into the public domain otherwise than through breach of this Amazonas GT&C;

c.     disclosure of details of the Fleet's affairs, finances and accounts to a Party's professional and financial advisers who are required to know the same to carry out their duties;

d.     disclosure on a "need to know" basis to a person which is an Affiliate of any Party where such disclosure is for a purpose reasonably incidental to this Amazonas GT&C; or

e.     information which is independently developed by a Party or acquired from a third party to the extent it is acquired with the right to disclose the same.

10.3     The obligations of confidentiality in this Section 10 shall survive Fleet Termination but shall cease to apply to any confidential information which enters the public domain through no fault of a subject Party, whether before or after Fleet Termination.

10.4     Upon Fleet Termination, each Party may demand from the others the return of its confidential information by notice in writing whereupon the other Parties shall (and shall ensure that their respective officers and employees shall):

a.     return all documents containing confidential information which have been provided by or on behalf of the Party demanding return of such information; and

b.     destroy all copies of such documents and any document or other record reproducing, containing or made from or with reference to the confidential information, including without limitation any of the foregoing held electronically (save, in each case, for any submission to or filings with governmental, tax or regulatory authorities).  Such return or destruction shall take place as soon as practicable after the receipt of the said notice.

**11.     Admission of New Fleet Members**

11.1     Fleet Manager shall have the right to propose and negotiate on behalf of the Parties the submission of new Fleet Participants, including any amendment to this Amazonas GT&C.  However, no person shall be entitled to become or be regarded as a Participant in the Fleet without the prior written authorization of all Parties.

**12.     EP FLOPEC / Cargo Reserve**

12.1     With respect to cargoes in which the Ecuadorian Cargo Reserve Law ("Ecuadorian Cargo Reserve Law" or "Cargo Reserve Law" shall mean LEY DE FACILITACION DE LAS EXPORTACIONES Y DEL TRANSPORTE ACUATICO.  Ley No. 147.RO/901 de 25 Marzo de 1992) applies, as it relates to the commercial chain, EP FLOPEC will be the charterer from Company and disponent owner to the end user, paying market rates to Company.

**Exhibit C-02**

12.2    The Parties shall work cooperatively to enable EP FLOPEC to charter Fleet Vessels from Company to cover all shipper/charterer cargoes loading in Ecuador. The Parties shall give priority to any Fleet Vessel(s) over all other vessels for transportation of any Ecuadorian hydrocarbons.

12.3    When EP FLOPEC acts as a charterer or disponent owner using any Fleet Vessels to cover any third person shipper/charterer cargoes loading in Ecuador, any claims presented to EP FLOPEC by the Fleet shall be presented to the subject third person without any material amendments and shall be prosecuted by EP FLOPEC using best efforts. EP FLOPEC shall act as disponent owner between the Fleet and the third person, and all funds received by EP FLOPEC from the third person relating to the claim shall be immediately turned over to the Fleet without deduction or offset (less any express commissions or rebates). EP FLOPEC shall provide timely correspondence and supporting documentation requested by the Fleet relating to any such claims.

13.    **Insurances**

13.1    Unless the same are determined by Company or Fleet Manager to be in place (following consultation with the Participants), Company or Fleet Manager shall be entitled, but not obliged, to effect such of the following insurances and/or such other insurances as Company or Fleet Manager may determine to be required for the efficient and safe operation of the Fleet:

a.    Fleet/Ship Managers' Legal Liability Insurance;

b.    Loss of Hire and/or Freight Insurance;

c.    Charterers' Liability Insurance; and

d.    Charterers' F.D. & D. Coverage.

14.    **Assignment**

14.1    The Parties may not assign or transfer any of their rights or obligations under this Amazonas GT&C without the prior written consent of the other Parties; provided that a Party may transfer all its rights and obligations hereunder to an Affiliate of that Party.

15.    **Governing Law/Arbitration**

15.1    Notwithstanding the terms of any ACA, this Amazonas GT&C and all ACA shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Amazonas GT&C or any ACA, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the Parties cannot agree upon the appointment of a single arbitrator, the dispute shall be settled by three arbitrators, each Party appointing one Arbitrator, and if the dispute is between two Parties, the third arbitrator shall be appointed by the arbitrators named by each Party. If any of the appointed arbitrators refuses or is incapable of acting, the Party appointing him shall appoint a new arbitrator in his place. Any determination rendered by the arbitrator(s) shall be final and binding upon the Parties and may, if necessary, be enforced by a court of any competent authority in the same manner as a judgment in a court of law.

16.    **No Partnership**

16.1    Notwithstanding the terms of this Amazonas GT&C or any ACA, nothing in this Amazonas GT&C or any ACA shall create a partnership or establish a relationship of principal and agent or any other fiduciary relationship between or among any of the Parties.

17.    Miscellaneous

17.1    The Sections of this Amazonas GT&C shall be deemed to give rise to separate and independent rights and obligations of the Parties hereto; to the extent that any Section (or part thereof) of this Amazonas GT&C is subsequently found to be invalid or unenforceable the same shall not affect any other part of this Amazonas GT&C, which shall remain in full force and effect. In such event the Parties shall negotiate in good faith to agree upon altered terms of this Amazonas GT&C to replace those which have been found to be invalid or unenforceable.

17.2    No term of this Amazonas GT&C is enforceable by a person who is not a Party.

17.3    The Parties agree that monetary damages may not provide adequate relief and compensation in the event of a breach of this Amazonas GT&C or any ACA by a Party, and that, therefore, this Amazonas GT&C and any ACA may be enforced by equitable remedies including injunctive relief (without the necessity of any bond).

17.4    Except as otherwise expressly provided in this Amazonas GT&C, in the event of any conflict between the terms of this Amazonas GT&C and the terms of any ACA, the terms of this Amazonas GT&C shall control as between Company and the subject Participant as to the subject Vessel(s), and the terms of any subject ACA shall be deemed amended accordingly.

18.    Notices

18.1 Notices or other communications under or with respect to this Amazonas GT&C or any ACA shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or email to the parties at their respective addresses set forth below or to such other address as to which notice is given:

EP FLOPEC:
EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA
Avenida Del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador
Apt. 080106
Email: g.general@flopec.com.ec

Company:
AMAZONAS CA LLC
1400 Liberty Ridge Drive, Suite 100
Wayne, PA   19087
Email: operaciones@amazonastankers.com

Notice shall be deemed given upon sending except for notice by mail shall be deemed given upon receipt.

**Exhibit C-02**

Attachment A

MINIMUM FLEET ACCEPTABILITY REQUIREMENTS TO INCLUDE BUT NOT LIMITED TO:

1) SOTE / OCP TERMINAL ACCEPTABILITY
2) PANAMA CANAL SUITABLE
3) MUST BE LESS THAN 15 YEARS OLD DURING THE TIME THE VESSEL IS IN THE FLEET

Exhibit C-02

## Attachment B

To be provided.