# Exhibit I

Exhibit C-04

Private and Confidential

# POOL PARTICIPATION AGREEMENT

## BETWEEN

## AMAZONAS TANKER POOL COMPANY LLC

## AND

## EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA

### DATED DECEMBER 1, 2021

No part of this document may be used or reproduced in any form or by any means, or stored in a database or retrieval system, without prior written permission of Amazonas Tanker Pool Company LLC. Making copies of any part of this document for any purpose is a violation of copyright laws.

Exhibit C-04

Private and Confidential

## TABLE OF CONTENTS

1.    DEFINITIONS ........................................................................................... 2
      1.1    DEFINITION OF TERMS ........................................................... 2
2.    GENERAL POLICY .................................................................................. 3
      2.1    PURPOSE OF THE POOL ........................................................... 3
      2.2    POLICIES AND OPERATIONAL STANDARDS ..................... 4
      2.3    TECHNICAL STANDARDS ....................................................... 5
      2.4    CUSTOMER SATISFACTION ................................................... 5
      2.5    MISCELLANEOUS .................................................................... 6
3.    CONDITIONS FOR POOL PARTICIPATION ...................................... 6
      3.1    TERM/DELIVERY ..................................................................... 6
      3.2    POOL ......................................................................................... 6
4.    POOL COMPANY/POOL MANAGER ................................................. 8
5.    ENTERING PARTICIPANT .................................................................. 11
6.    TERMINATION OR WITHDRAWAL ................................................. 12
7.    HIRE ........................................................................................................ 13
8.    POOL REVENUE AND DISTRIBUTION ........................................... 14
9.    CHARTER PARTY .................................................................................. 16
10.   ASSIGNMENT OF EARNINGS ........................................................... 16
11.   COMMITTEES AND AUTHORITIES ................................................. 16
12.   NEW POOL PARTICIPANTS ............................................................... 18
13.   TOTAL LOSS .......................................................................................... 18
14.   HEADINGS AND MODIFICATIONS ................................................. 18
15.   GOVERNING LAW/ARBITRATION ................................................. 18
16.   NOTICES ................................................................................................. 19
17.   CONFIDENTIALITY .............................................................................. 19
18.   INDEMNITY, LIABILITY AND SECURITY ....................................... 19
19.   NO PARTNERSHIP; U.S. TAX EXCEPTION ..................................... 20
20.   RELIANCE ON COUNSEL AND OTHER ADVISORS ...................... 21
21.   RIGHTS OF THIRD PARTIES .............................................................. 21
22.   COUNTERPARTS .................................................................................. 21

Exhibit C-04

APPENDICES:

Appendix 1    SHELLTIME 4 TIME CHARTER AND TERMS

Appendix 2    COMMERCIAL MANAGEMENT AGREEMENT

Appendix 3    POOL KEY

Appendix 4    POOL RECAP

Appendix 5    GT&C

Exhibit C-04

Private and Confidential

## POOL PARTICIPATION AGREEMENT

This Pool Participation Agreement (the "Agreement") is entered into on DECEMBER 1, 2021 by and among:

AMAZONAS TANKER POOL COMPANY LLC, a Marshall Islands corporation with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH 96960 (the "Pool Company"); and, EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA, a corporation incorporated under the laws of ECUADOR with its registered office at Avenida Del Pacifico No. 001 y Puerto Rico Esmeraldas, Ecuador Apt. 080106 (the "Entering Participant" or "Pool Participant"), as the owner or operator of the vessel "M/T PICHINCHA" ("Entering Vessel").

## RECITALS:

A.      The Pool Company has been formed and established for the purpose of operating, as charterer, under a "SHELLTIME 4" time charter to be entered into with owners or disponent owners of Qualifying Vessels substantially in the form of Appendix 1 ("Charter Party"), a pool ("Pool") of Qualifying Vessels (each a "Pool Vessel");

B.      The Pool Company will employ the Pool Vessels in the worldwide carriage and/or storage of crude oil and/or dirty petroleum products ("Pool Business");

C.      In its capacity as disponent owner of the Pool Vessels, the Pool Company has appointed Amazonas Tankers LLC, in its capacity as the designated pool manager of the Pool Company (the "Pool Manager"), as the exclusive commercial manager of the Pool Vessels to perform, such commercial management services and such administrative, financial and accounting support services in connection with the Pool and the Pool Business as set forth in the Commercial Management Agreement dated 12 January 2018, a copy of which is Annexed as Appendix 2 hereto (the "Commercial Management Agreement");

D.      The Pool Manager, as agent for the Pool Company, has determined that the Entering Vessel is a Qualifying Vessel meeting all the specification and requirements for entry into the Pool and that the Entering Participant has satisfied all other conditions for entry into the Pool based on the criteria set forth herein;

E.      The Entering Participant wishes to enter the Entering Vessel into the Pool, and the Pool Company wishes to receive the Entering Vessel into the Pool, in each case in accordance with the terms of this Agreement; and

F.      This Agreement sets forth the terms and conditions upon which the Entering Participant shall enter the Entering Vessel into the Pool and the basis upon which the Entering Vessel shall share and participate in the pooled revenues of the Pool Business and the voyage and other costs thereof.

1

IT IS HEREBY AGREED AS FOLLOWS:

## 1.    DEFINITIONS

### 1.1    DEFINITION OF TERMS

The terms used in this Agreement, with their initial letters capitalized, shall, unless the context thereof otherwise requires, have the meanings specified in this Article 1. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    **"Affiliate"** means in relations to a person, any other person that directly or indirectly Controls, is Controlled by or is under direct or indirect common Control with the specified person;

(b)    **"Agreement"** has the meaning set forth in the Preamble and shall be deemed to include all subsequent amendments and modifications thereto;

(c)    **"Charter Party"** has the meaning set forth in Recital A;

(d)    **"Commercial Management Agreement"** has the meaning set forth in Recital C;

(e)    **"Control"** means the power of a person, directly or indirectly, to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interests, by contract or otherwise) or the right to a share of more than one-half of the assets, or of more than one-half of the income, of another person;

(f)    **"Gross Pool Revenue"** means the revenue of the Pool Vessels calculated in accordance with Clause 8;

(g)    **<u>Entering Participant</u>"** has the meaning set forth in the Preamble;

(h)    **"Entering Vessel"** has the meaning set forth in the Preamble;

(i)    **"Net Pool Revenue"** has the meaning set forth in Clause 8;

(j)    **"Participant"** and **"Pool Participant"** means an owner or disponent owner of a Qualifying Vessel who has entered such Vessel into the Pool by execution and delivery of a pool participation agreement substantially in the form of this Agreement;

(k)    **"Participant Group"** means any group of Participants who are Affiliates and each of whom has entered a Vessel into the Pool;

2

(l) "**Pool**" has the meaning set forth in Recital A;

(m) "**Pool Company Account**" means any bank account opened by the Pool Manager as the agent of the Pool Company for the receipt of Working Capital and Gross Pool Revenue and the payment of Pool Expenses;

(n) "**Pool Business**" has the meaning set forth in Recital B;

(o) "**Pool Company**" has the meaning set forth in the Preamble;

(p) "**Pool Expense**" means the expenses relating to the Pool Vessels calculated in accordance with Clause 8;

(q) "**Pool Manager**" has the meaning set forth in Recital C;

(r) "**Pool Vessel**" has the meaning set forth in Recital A;

(s) "**Qualifying Vessel**" means a vessel approved for entry by the Pool Company;

(t) "**Technical Committee**" means a panel consisting of one or more representatives as from time to time appointed by, and acting under the direction and supervision of, the Pool Company's agent, the Pool Manager, to address vetting issues and any other technical issues as deemed appropriate;

(u) "**Working Capital**" has the meaning set forth in Clause 5; and

(v) "**Vessel**" means a vessel generally, the Entering Vessel or a Pool Vessel, as the context may require.

(w) "**Voyage Expense**" means the expenses relating to the Pool Vessels calculated in accordance with Clause 8;

(x) "**Pool Recap**" means the vessel-specific deal summary as present in appendix 4.

## 2. GENERAL POLICY

### 2.1 PURPOSE OF THE POOL

The Pool has been established to provide chartering and operational services to independent tanker owners and/or operators. The goal of the Pool Business is to secure the highest earnings per day for each Pool Vessel. The Participant's contractual relationship with the Pool Company is by way of this Agreement, setting out the organizational provisions of the pooling arrangement, and the Charter Party containing the provisions relevant to the operation of the Vessel. The commercial management of the Pool is provided by the Pool Manager, as.

3

appointed by the Pool Company under the terms of the Commercial Management Agreement and as otherwise set forth herein.

### 2.2    POLICIES AND OPERATIONAL STANDARDS

(a)    Only Vessels meeting the required characteristics of the Pool will be admitted to the Pool and parties will only be admitted as Participants who are tanker owners and operators who operate crude and/or product tankers that are in compliance with national, international and industry standards and in full accord with customer safety and environmental requirements.

(b)    The Participant will use its best efforts to ensure that each Pool Vessel, owned thereby, is able to perform operationally at all times and shall have all necessary equipment in good working order to carry out these operations. Each Participant shall ensure that its Pool Vessel shall be maintained and equipped in a manner that renders it seaworthy, is in compliance with the requirements of the relevant Classification Society and remains a Qualifying Vessel.

(c)    The goal of the Pool is that Pool Vessels will be allocated to trades in a manner to maximize Pool results. However, the Pool Company shall use commercially reasonable efforts to ensure that voyage operation practices are being uniformly applied to all Pool Vessels, and each Participant will be treated in the same equitable fashion and each will have the same access to voyage and cargo operations data and records of each Pool Vessel. The Pool Company will endeavor to position each Pool Vessel so that off-hire time and deviation caused by repairs and dry docking is minimized. However, the Pool Company shall not be under an obligation to do so to the extent it decreases the overall results of the Pool. Upcoming dry dock intentions are to be discussed with the Pool Manager in view of increasing the Vessel's commercial tradability. The Pool Manager is to be advised of any known material operational deficiencies of a Vessel as soon as practical. Notwithstanding the foregoing, neither the Pool Company nor the Pool Manager will be under any obligation to assure that any particular results are achieved for the Pool.

### 2.3    TECHNICAL STANDARDS

The Pool Manager and/or Technical Committee may suggest reasonable increases to the minimum ship standards to meet changing trade and customer requirements which are considered to be in the interest of optimizing the returns to all Participants in the Pool. The Participants shall endeavor to comply with such recommendations or in the alternative to terminate its participation in the Pool.

### 2.4    MISCELLANEOUS

(a)    Pool Participants will use commercially reasonable actions to benefit the Pool. It is further expected that the Participants will promote the Pool,

4

without additional material costs to Pool Participants, in the market place and Pool Manager will assist in recruiting additional qualified owner/operators to join the Pool.

(b)     The Pool Company and the Participants acknowledge that differences of opinion are likely to take place, and they further acknowledge that as professional and commercial people, all reasonable efforts will be made to reconcile such differences amicably, and that arbitration should be the last resort. The Pool Manager and/or Technical Committee may be asked to mediate in such disputes.

## 3.     CONDITIONS FOR POOL PARTICIPATION

The Entering Participant endorses the General Policy statements in Part 2 and desires to enter the Entering Vessel into the Pool by way of a Charter Party entered into concurrent herewith between the Entering Participant and the Pool Company and the Pool Manager, as the Pool Company's authorized agent, has agreed to accept the Vessel into the Pool;

### 3.1     TERM/DELIVERY

(a)     This Agreement shall commence as of the date the Entering Vessel is delivered under the Charter Party, and shall continue unless terminated pursuant to Clause 6 of this Agreement.

(b)     A Vessel is to be delivered into the Pool in delivery areas established by the Pool Manager and reasonably agreed to by the Entering Participant. Redelivery areas to be same as delivery areas when a Vessel exits the Pool. Any exceptions to be agreed by the Pool Manager.

### 3.2     POOL

(a)     The Pool Company shall in its own name (as disponent owner and principal under the Charter Party) enter into contracts for the employment of the Pool Vessels. The Pool Manager, as agent for the Pool Company, shall negotiate and conclude spot charters, consecutive voyage charters, contracts of affreightment and time charters for performance by the Pool Vessels. If the time charter employment is longer than the minimum remaining period of participation of the Vessel, the Pool Manager shall ask consent of the Participant owning the relevant Pool Vessel before committing the ship to such employment.

(b)     All revenues earned by the Pool Company from the operation of the Pool Vessels shall, after deduction of all costs involved in the operation of the Pool, be remitted to the Pool Participants as provided for in Clause 8 and Appendix 3 hereof. In the same manner, any liability incurred by the Pool Company as a result of the activities of the Pool shall be comparably charged to the Pool Participants. Such payment shall be made on a

periodic basis, according to a settlement schedule mutually agreed upon between the Pool Company and the Pool Participant.

(c)    In respect of any contract of affreightment that the Pool Company enters into as disponent owner or any contract of affreightment in which the original owner or disponent owner has assigned its rights and benefit to the Pool Company (in either case, a "COA"), it is agreed by the parties hereto that the Pool Company has the right to enter into time charters as charterers with third party owners or disponent owners ("Third Party Charters"), for the purpose of chartering-in vessels from such third party owners or disponent owners ("Third Party Vessels") to cover time or voyage charter trip commitments, COA's which cannot be covered by any of the existing Pool Vessels. All Third Party Charters shall be in accordance with any Classification Society rules, any requirements of the insurance coverage for the Vessel and under the Shelltime 4 charter form attached as Appendix 1.

(d)    The Pool Participant shall be obliged as follows:

(1)    To indemnify and hold the Pool Company, the Pool Manager and/or its appointed agents harmless from all consequences or liabilities from any irregularities in papers supplied by the Participant and/or from any liability that arises from the Pool Participant's failure to ensure that any Bill of Lading signed by the vessel's Master complies with the Charterer's instructions or requirements of the Agreement or the amended Shelltime 4 and additional terms at Appendix 1.

(2)    To pay for and/or reimburse the Pool Company for all reasonable costs, disbursements, and expenses whatsoever incurred thereby in the performance of their responsibilities hereunder. Such disbursements and expenses shall include, but shall not be limited to, the reasonable fees and expenses of independent consultants, professional advisors and representatives, supercargo, port captains, surveyors, superintendents or other specialists, whom the Pool Company or the Pool Manager, acting as agent for the Pool Company, considers necessary to employ from time to time in connection with the operation of the Vessel. Such expenses are to be considered voyage expenses and prorated between all Vessels, if appropriate. If the Pool Manager's operational personnel and/or port captains are sent to attend the Vessel from the Pool Manager's office, only travel and out of pocket expenses are to be reimbursed by the Pool Company and charged to the applicable voyage(s).

(3)    To provide time charterers' protection and indemnity ("P&I") from a major P&I club, freight demurrage and defense ("FDD"), bunker insurance and loss of use insurance.

6

Exhibit C-04

(4)     To engage a professional consultant for the establishment of an "Incident Response Program" to mitigate any commercial exposure to the Pool Company as a result of an incident involving the Vessel.

(5)     To take action in order to get a resolution in the event that there is a cargo contamination caused by a Pool Vessel which results in demurrage or other claim(s) being unpaid with reference to such contamination. In the event no resolution has been achieved by the Participant by the time the Vessel gives notice to leave the Pool, then the Pool Company shall have the authority at that time to deduct an amount from charter hire equal to the amount being withheld by the sub-charterer under the claim so long as the Pool Company can resolve the dispute within a usual and customary timeframe to resolve disputes. If not, the charter hire shall be disbursed to the Participant, without prejudice to any right available against the Pool Participant hereunder.

## 4.    POOL COMPANY/POOL MANAGER

(a)     In consideration of its operation of the Pool on behalf of the Pool Company, as profit interest payable, the Pool Company shall retain from Gross Pool Earnings and remit to the Pool Manager as compensation for the commercial management services to the Pool and the Pool Vessels as set forth below an administrative fee agreed in a "Pool Recap" specific to the Pool Vessel for the term of this Agreement. The Pool Manager may negotiate profit interests compensation at a higher or lower rate with individual Participants at its reasonable discretion. In consideration thereof, the Pool Manager shall, as agent of the Pool Company, perform the following commercial management services pursuant to a separate commercial management agreement to be entered into with respect to the Pool Vessels:

(1)     To be responsible for the commercial employment of the Pool Vessels including but not limited to negotiating and concluding time charters (in or out), voyage charters, and market-related contracts of affreightment.

(2)     To be responsible for the commercial operation of the Pool Vessels including supervising and arranging bunkering, appointing port agents and negotiating tug boat service contracts, to include period contracts for such services.

(3)     To communicate with the Pool Vessels, the Participants, shippers, charterers, receivers, Pool Managers and others involved with the receiving and handling of the Vessel at the loading and discharging ports, including notices required under the terms of the Pool Vessels' employment.

7

Exhibit C-04

(4)     To approve Letters of Indemnity ("LOIs") provided that such LOIs are in conformity with the Charter Party. The LOIs are to be in accordance with the relevant Participants' P&I club wording.

(5)     To collect all freights and accounts receivable arising from operation of the Vessel, to give receipts therefore, to make any and all claims for monies due in respect of Pool Vessels and to issue releases upon receipt of payment of such claims and in connection with the settlement of such claims. The Pool Manager shall ensure that all funds derived from the employment of the Vessel shall be deposited by the payers to the Pool Company Account. All funds received by the Pool Manager from any other sources for the account of the Pool Company shall be immediately deposited to the Pool Company Account. In the receipt and handling of any funds of the Pool, the Pool Manager shall have fiduciary responsibilities with respect to the Pool Company in accordance with normal vessel agency practices and applicable law. Any discounts or rebates that are, or become, available are to be credited to the Pool Participants.

(6)     To defend, intervene in, settle, compromise or abandon any legal proceedings by or against the Pool Company or, its freight, earnings and disbursements and for the purposes of this clause the expression "legal proceedings" shall include arbitration, civil, regulatory and criminal proceedings of all kinds.

(7)     To furnish the Master of the Vessel appropriate voyage instructions, to monitor voyage performance, speed, and use of weather routing services if deemed necessary by the Pool Manager.

(8)     To maintain such records, accounts, statements and supporting vouchers, if any, obtained in connection with the services covered by this Agreement and make them available to the Participants upon request, including, but not limited to, any of the foregoing which the Pool Company deems necessary or advisable in order to comply with any of the charters in effect with respect to any of the Vessels. Deloitte & Touche, UHY or another major accounting firm, on an annual basis, will audit the Pool Company's books, including distributions. Audited reports will be distributed to all the Participants. All Pool results are available for review by each Participant at the offices of the Pool Manager.

(9)     To prepare and distribute unaudited quarterly reports to each Participant for each Pool Vessel.

(10)    To submit such financial and business reports and other information relating to the provision of the Pool Manager's services under this Agreement as the Pool Company may reasonably require and in such form as may be agreed between the Pool Company and the Pool Manager.

8

Exhibit C-04

(11)    To keep such records and accounts as shall be necessary and in accordance with good accounting practices for the proper operation of the Pool, including such accounts as shall be necessary for Pool Company distributions.

(12)    To monitor the contributions and distributions for the Pool Company.

(13)    The above notwithstanding, should there occur a significant change in the market due to a change in regulations, the Pool Manager is obliged to propose a change without delay.

(14)    To be under no liability whatsoever for any costs, expenses, losses, claims or damages of whatsoever nature (including loss of profit due to detention or delay to any of the Vessels) arising in course of the performance of its duties resulting from any act or omission by personnel, representatives, independent contractors or other persons employed by it, unless the same shall be proved to have resulted from the actual personal willful misconduct of any officer or director of the Pool Manager, and the Pool Company and Participant as defined in this Agreement hereby indemnify and hold the Pool Manager harmless from any and all actions, claims, demands, and liabilities to or from third parties (including subcontractors, servants and sub-Pool Managers in respect of any claim made by or on behalf of them) brought against the Pool Manager in course of its performance of its duties under this Agreement.

## 5.    ENTERING PARTICIPANT

(a)    The Entering Participant undertakes to perform the following duties:

(1)    To indemnify and hold the Pool Company, the Pool Manager and/or its appointed agents harmless from all consequences or liabilities from any material irregularities in papers supplied by the Participant and/or from any liability that arises from the Pool Participant's failure to ensure that any Bill of Lading signed by the vessel's Master complies with the Charterer's instructions or requirements of the Agreement or the amended Shelltime 4 and additional terms at Appendix 1.

(2)    To ensure that the Vessel shall be insured in accordance with normal shipping practice with underwriters acceptable to the Pool Company. Such insurance shall include hull and machinery, P&I, war risk and, to the extent reasonably required, piracy insurance and to provide evidence of same to the Pool Company upon request.

(3)    To enter into a Charter Party and terms with the Pool Company using the Shelltime 4 form attached hereto as Appendix 1. The executed Charter Party shall be an integral part of this Agreement.

9

|

(4)    To engage a professional consultant for the establishment of an 'Incident Response Program'. The Pool Company and the Pool Manager are to be included in, and be the beneficiaries of, the program.

(5)    To maintain the Vessel in a seaworthy condition subject to the rule of the insurance coverage and the relevant Classification Society rules. Furthermore, to be fully responsible for management of the Vessel, in accordance with the Charter Party. The Participant shall at all times keep the Pool Manager informed of all relevant communications relating to vetting issues, as regards any incident pertaining to the Vessel, its crews, its cargo and the environment in order, in each case, that the Pool Manager may keep customers adequately and proactively informed and to assist in any efforts necessary to mitigate or avoid loss to the customer, the Participant, or the reputation or customer relationships to the Pool.

(6)    To contribute such amount as agreed between between the Entering Participant and the Pool Manager in the "Pool Recap." Provided that should the cashflow of the Pool be insufficient to allow it to comply with its commercial commitments on the requirement of the Pool Company, then the Pool Manager shall be entitled to recommend a further contribution of Working Capital to the Pool. The Participant may contribute additional working capital recommended by the Pool Manager or in the alternative withdraw from the Pool. If the Pool Manager withholds distributions to the respective participants, less the amount withheld in Clause 3.2(e)(5) or pledged collateral that remains uncollected or becomes ineligible as collateral for financing the pools activity, will be repaid within ninety (90) days of when the final hire payment is due after the Vessel leaves the Pool.

(7)    To deliver the vessel with the bunker quantity as set forth in the governing SHELLTIME 4. The value of the bunkers on board at delivery shall be determined by the Pool Company in accordance with SHELLTIME 4 and provided as a credit from the Pool Company to the Pool Participant, to be settled at re-delivery of the Entering Vessel. The Pool Company shall not exchange cash for bunkers on board at delivery, but rather calculate the delivery / redelivery difference in value, on a FIFO basis, and make a cash settlement at redelivery.

(8)    To perform any and all obligations of the Entering Participant including paying any and all time charter hire payments or other applicable costs incurred by the Entering Participant in connection with the Entering Vessel.

## 6. TERMINATION OR WITHDRAWAL

(a)    Unless otherwise set forth in the SHELLTIME 4 or an Addendum attached hereto, the Entering Vessel will be entered into the Pool for an initial period of

one (1) year after which the Charter Party becomes ever green for continuous one (1) year periods, unless the Vessel is withdrawn from the Pool in accordance with the terms hereof. After the initial period however, the Vessel may be redelivered by the Pool within the permissible redelivery area(s) and after giving one hundred eighty (180) days written notice or after the Vessel is free of any commitment. The Participant may withdraw the vessel from the Pool as set forth in this Agreement or by serving one hundred eight (180) days written notice to the Pool provided the initial period is met and the Pool has determined that the vessel is not required to perform any Pool contracts existing at the time the notice was received by the Pool. Once redelivery notice has been given by either party, the other party may choose to redeliver the Vessel, or request the redelivery of the Vessel, as the case may be, at any time after receipt of the redelivery notice, as long as the Vessel is free of any commitment and after serving a minimum of seven (7) days' notice, which is to include the name of the redelivery area. Participant may not terminate more than one Vessel charter party in any six (6) months period unless the Participant, Pool Company and the Pool Manager all agree to allow differently.

Should a participant withdraw their vessel from service without regard for the withdrawal procedure set forth in this clause, the Pool Company shall be entitled to retain all Working Capital and undistributed earnings as partial compensation for damages. Retention of Working Capital and undistributed earnings shall not prejudice the Pool Company from seeking additional recourse against Participant.

(b)  The Participant is to immediately notify the Pool Company in writing of either the firm sale of a Vessel or of Participant's intention to sell the Vessel. Should the Vessel be sold, the Participant to give notice as per Clause 6(a). The Pool Company will endeavor to redeliver the Vessel early if requested by the Participant.

(c)  The Pool Company may terminate this Agreement with respect to a Pool Vessel if such Vessel is off-hire for more than thirty (30) days in a six (6) month period.

(d)  The Pool Company has the right to terminate this Agreement with respect to a Participant if such Participant dissolves or liquidates or if an order be made or effective resolution be passed winding up either party or if a receiver shall be appointed for the property of the Participant or if the Participant shall cease to carry on its business or commences a proceeding in bankruptcy or similar proceeding (or a proceeding in bankruptcy or similar proceeding is commenced against a party which proceeding remains undismissed and unstayed after thirty (30) days) or if a party makes any special arrangements or composition with its creditors.

(e)  Upon termination or removal of the Vessel from the Pool, the Participant will pay an administrative fee of USD 25,000 to the Pool Company which will be deducted from the last hire payment. This is to cover operational and accounting costs related to finalizing the Vessel's disbursements, demurrage, etc.

11

Exhibit C-04

(f)     The Pool Company may terminate this Agreement for just cause as defined in any part of this Agreement or in the Charter Party.

(g)     Any termination of this Agreement and withdrawal of the Vessel from the Pool shall be without prejudice to any and all rights and obligations of the parties hereto attributable to such termination or withdrawal.

## 7.     <u>HIRE</u>

The Vessel will earn charter hire in accordance with Clause 8 of this agreement.

## 8.     POOL REVENUE AND DISTRIBUTION

(a)     The net pool revenue ("Net Pool Revenue") shall be equal to the Gross Pool Revenue less any Pool and Voyage Expenses as set forth below:

    (1)     Gross voyage revenue (including but not limited to freight, demurrage, and dead freight) (the "Gross Pool Revenue");

    (2)     Less address commission (if applicable);

    (3)     Less broker commission(s) (if applicable);

    (4)     Less Pool Manager's commission (if applicable);

    (5)     Less any other voyage expenses (including but not limited to port expenses, canal costs, voyage related COFR, bunker expenses, additional war or piracy risk or similar costs or expenses) and any other applicable costs (including but not limited to inspections, cleaning costs, chemicals or similar costs).

    (6)     Less any legal or professional fees incurred by the Pool Company or Pool Manager in connection with the management of the Pool, which amounts shall be charged to the Pool Participants as soon as administratively practicable after the end of each calendar quarter for such calendar quarter and which amounts shall be allocated among the Pool Participants on a proportionate basis based on the number of days that the Entering Vessel is in the Pool in the applicable calendar quarter;

    (7)     Less any insurance payable by the Pool Company, which amounts shall be charged to the Pool Participants as soon as administratively practicable after the end of each calendar year for such calendar year and which amounts shall be allocated among the Pool Participants on a proportionate basis based on the number of days that the Entering Vessel is in the Pool in the applicable calendar quarter;

    (8)     Less any interest and bank charges;

Exhibit C-04

(9)     Less any revenue sharing withholding amounts, as applicable;

(b)    The allocation of each Vessel's earnings from the Pool Company is determined as per Appendix 3, the "Pool Key"

(c)    Notwithstanding anything in this Agreement to the contrary, any amount due or payable to the Participant from the Pool Company under this Agreement or any related document may be set off against amounts due or payable to the Lender (whether arising under this Agreement or otherwise) at the election of the Lender from time to time.

## 9.    CHARTER PARTY

The Participant/the Vessel shall at any and all times during the term of this Agreement comply with the conditions, terms and warranties expressed or implied in this Agreement and in the Charter Party attached hereto as Appendix 1 and which shall be deemed to be an integral part of this Agreement. The terms of this Agreement shall prevail if a conflict should arise in the interpretation of the terms of this Agreement and the terms of the Charter Party.

## 10.    ASSIGNMENT OF EARNINGS

The earnings of the Pool Vessels may not be assigned by the Participants but may be assigned by the Pool Company in favor of its working capital lenders. The Participants may only assign the earnings distributed by the Pool Company to the Participant's Pool Vessels. Each Participant agrees to subordinate any claims the Participant has or may have against the Pool Company to any and all claims of the Pool Company's creditors that the Pool Company determines are valid and undisputed. Participant also agrees to waive any contractual lien over the charter hire earnings distributed by the Pool Company pertaining to the Vessels in favor of such creditor and to any freight, sub-freights or sub-hires pertaining to the Vessels.

## 11.    NEW POOL PARTICIPANTS

No person shall be entitled to become or be regarded as a Pool Participant unless and until (i) such person has entered into an agreement substantially in the form hereof, with such modifications as the Pool Company or Pool Manager may from time to time approve, (ii) in relation to any Qualifying Vessel which it proposes to enter as a Pool Vessel, such person has entered into a Charter Party substantially in the form of Appendix 1 with such amendments as the Pool Company or Pool Manager shall require and (iii) such person has contributed the amount of Working Capital determined by the Pool Company or Pool Manager in accordance with Clause 5.

## 12.    TOTAL LOSS

In the event of a total loss or constructive total loss of a Vessel, the Vessel's participation in the Pool shall be deemed to be terminated at noon (GMT) on the day of her loss or, should the Vessel be missing, at noon (GMT) on the day on which she was last heard of.

13

### 13.    HEADINGS AND MODIFICATIONS

The headings of Clauses are for convenience of reference only and shall not affect the interpretation of this contract. No modification, wavier or discharge of any term of this Agreement shall be valid unless in writing and signed by the party to be charged therewith.

### 14.    GOVERNING LAW/ARBITRATION

This Agreement shall be governed by the laws of the State of New York. If any dispute should arise in connection with the interpretation and fulfillment of this Agreement, such dispute shall be decided by arbitration in New York subject to the rules of the Society of Maritime Arbitrators. If the parties cannot agree upon the appointment of a single Arbitrator, the dispute shall be settled by three Arbitrators, each party appointing one Arbitrator, and if the dispute is between two parties hereto, the third Arbitrator shall be appointed by the Arbitrators named by each party. If any of the appointed Arbitrators refuses or is incapable of acting, the party appointing him shall appoint a new Arbitrator in his place. Any determination rendered by the Arbitrator(s) shall be final and binding upon the parties and may, if necessary, be enforced by a court of any other competent authority in the same manner as a judgment in a court of law. For any disputes being settled by arbitration, which may require the vote of the Pool Manager, the Principal initiating the arbitration of the Participant being brought to arbitration will abstain from such voting.

### 15.    NOTICES

Notices or other communications under or with respect to this Agreement shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or email to the parties at their respective addresses set forth below or to such other address as to which notice is given:

To the Participant:
EMPRESA PUBLICA FLOTA PETROLERA ECUATORIANA
Avenida Del Pacifico No. 001 y Puerto Rico
Esmeraldas, Ecuador
Apt. 080106
Email: g.general@flopec.com.ec

To the Pool Company:
AMAZONAS TANKER POOL COMPANY LLC
c/o Amazonas Tankers LLC
1400 Liberty Ridge Drive, Suite 100
Wayne, PA 19087
Email: operaciones@amazonastankers.com

Notice shall be deemed given upon sending except for notice by mail shall be deemed given upon receipt.

14

## 16.    CONFIDENTIALITY

This Agreement, including all terms, details, conditions, and period is to be kept private and confidential and beyond the reach of any third party, with the exception of the lending banks of the Participant or the Pool Company's working capital lenders or the Participant's technical managers. The terms and conditions of this Agreement are for the sole use of the parties to this Agreement and are not to be copied or used for any other purpose without the express written consent of the Pool.

## 17.    INDEMNITY, LIABILITY AND SECURITY

If a claim is made against a Participant ("Indemnified Party") or its affiliate, or any seizure, distraint, arrest, detention, attachment or the like ("Arrest") effected in respect of property owned, controlled or possessed by the Indemnified Party or its affiliate by reason of a claim against another Participant or its affiliate or the Pool Managers ("the Indemnifying Party") or in respect of any property owned, controlled or possessed by the Indemnifying Party then the Indemnifying Party shall:

(a)    indemnify and hold harmless the Indemnified Party and its affiliate against the claim and the Arrest, and all costs, losses, liabilities and expenses (including reasonable legal expenses) arising therefrom;

(b)    without limitation to the foregoing, provide security to ensure that any Arrest is lifted or discharged as soon as possible.

Each Participant shall be liable for its own performance under this Agreement and each Participating Charter but (for the avoidance of doubt) shall not be jointly or severally liable with any other Participant or for the obligations of any other Participant.

## 18.    NO PARTNERSHIP; U.S. TAX EXCEPTION

(a)    General Rule.  Nothing in this Agreement or in any other document relating to the Pool shall be construed as constituting a partnership between the Participants or between the Participants and the Pool Manager or the Pool Company or any of them.  The obligations of each Participant under this Agreement shall be owed to the Pool Company alone and not to the other Participants except in case of the obligations under Clauses 15, 17 and 18.

(b)    U.S. Tax Exception.  Notwithstanding the foregoing, the Entering Participant understands and consents to the fact the Pool Company has made a tax election to be treated as a partnership solely for U.S. federal income tax purposes,  with the result that the Entering Participant and each other Participant in the Pool will be considered to be a partner of such partnership.  In this regard:

(1)    under partnership tax principles, each Participant will be considered to earn its pro-rata share, based on its allocable share of Net Pool Revenue, of the U.S. source gross transportation income derived by the Pool Company from trading Pool Vessels to or from U.S. ports.

15.

I

(2)    within 60 days from the end of each calendar year, the Pool Manager will provide to each Participant an information schedule setting forth the U.S. source gross transportation income derived by the Pool Company for such year and each Participant's pro rata share thereof based on such Participant's allocable share of Net Pool Revenue for such year.

(3)    each Participant shall be solely responsible for preparing and timely filing IRS Form 1120F (U.S. Tax Return of a Foreign Corporation) for each calendar year in which it has been deemed to earn U.S. source transportation income and to report on such Return its allocable share of U.S. source transportation income earned and to claim exemption from tax or pay the applicable 4% tax imposed, on such income.

(4)    the Pool Company shall procure that in addition to the information schedule referred to above, the Pool Manager will provide to each Pool Participant such advice as may be reasonably required to enable such Participant to understand and comply with the applicable U.S. federal income tax laws and filing requirements to which such Participant may be subject in any year in which it has been deemed to have earned a pro rata share of U.S. source transportation income earned by the Pool Company.

In respect of the above, the Entering Participant confirms that (i) it is the beneficial owner (generally the entity that derives and is entitled to the income) of the charter hire and other payments made to it pursuant to this Agreement and the Charter Party between the Entering Participant and the Pool Company relating to the Entering Vessel, (ii) it is not acting as a nominee, trustee or agent for another individual or entity, (iii) it is a corporation or other legal entity where all of its members have limited liability, and (iv) it has not filed for treatment as a pass-through entity with the U.S. Internal Revenue Service. The Entering Participant agrees that upon any change in its circumstances as described in this paragraph, it will notify the Pool Manager immediately.

## 19.    RELIANCE ON COUNSEL AND OTHER ADVISORS.

Each party has consulted such legal, financial, technical or other experts as it deems necessary or desirable before entering into this Agreement. Each party represents and warrants that it has read, knows, understands and agrees with the terms and conditions of this Agreement.

## 20.    RIGHTS OF THIRD PARTIES

Save as expressly provided in this Agreement, no terms of this Agreement shall be enforceable by a third party, being any person other than the parties hereto and their permitted successors and assignees.

## 21.    COUNTERPARTS.

This Agreement may be executed by facsimile signatures and in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument.

16

Exhibit C-04

[Signature Page Follows]

17

**Exhibit C-04**

IN WITNESS WHEREOF, this Agreement has been duly executed by each of the parties as of the date first set forth above.

EPF LOPEC

By: _____

Name: JOHNNY BESHOWIKAN.

AMAZONAS TANKER POOL COMPANY LLC

By: _____

Name:   TY SHIMADA

REF: M/T PICHINCHA
POOL PARTICIPATION AGREEMENT